MAYER BROWN LLP
Matthew H. Marmolejo (CA Bar No. 242964)
*mmarmolejo@mayerbrown.com*
333 S. Grand Avenue
47th Floor
Los Angeles, CA 90071-1503
Telephone: +1.213.229.9500
Ori Lev (DC Bar No. 452565)
*(pro hac vice forthcoming)*
*olev@mayerbrown.com*
1999 K Street, N.W.
Washington, DC  20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

VINSON & ELKINS LLP
Stephen M. Medlock (VA Bar No. 78819)
*(pro hac vice forthcoming)*
*smedlock@velaw.com*
2200 Pennsylvania Ave., N.W., Ste. 500 W
Washington, DC  20036
Telephone:  +1.202.639.6500
Facsimile:   +1.202.879.8939

CENTER FOR GENDER AND REFUGEE STUDIES
Melissa Crow (DC Bar No. 453487)
*(pro hac vice forthcoming)*
*crowmelissa@uclawsf.edu*
1121 14th Street, N.W., Suite 200
Washington, DC  20005
Telephone: +1.202.355.4471
Facsimile: +1.415.581.8824

*Additional Attorneys for Plaintiffs Listed in Signature Block*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., a California Corporation;<br><br>HAITIAN BRIDGE ALLIANCE, a California Corporation;<br><br>DIEGO DOE, ELENA DOE, GUADALUPE DOE, ALEXANDER DOE, LAURA DOE, LUISA DOE, MICHELLE DOE, NATASHA DOE, PABLO DOE, AND SOMAR DOE, | Case No.: **'23CV1367 AGS BLM**<br><br>**CLASS ACTION COMPLAINT FOR VACATUR, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF FOR:**<br><br>**(1) VIOLATION OF THE *ACCARDI* DOCTRINE**<br><br>**(2) VIOLATION OF THE ADMINISTRATIVE** |

individually and on behalf of all others
similarly situated;

Plaintiffs,

v.

ALEJANDRO N. MAYORKAS,
Secretary, U.S. Department of Homeland
Security, in his official capacity;

TROY A. MILLER, Senior Official
Performing the Duties of Commissioner,
U.S. Customs and Border Protection, in
his official capacity;

DIANE J. SABATINO, Acting Executive
Assistant Commissioner, Office of Field
Operations, U.S. Customs and Border
Protection, in her official capacity;

Defendants.

**PROCEDURE ACT, 5 U.S.C. §
706(2)(A), (C);**

**(3) VIOLATION OF THE
ADMINISTRATIVE
PROCEDURE ACT, 5 U.S.C. §
706(2)(A);**

**(4) VIOLATION OF THE
ADMINISTRATIVE
PROCEDURE ACT, 5 U.S.C. §
706(1)**

**(5) VIOLATION OF DUE
PROCESS UNDER THE
FIFTH AMENDMENT;**

**(6) VIOLATION OF NON-
REFOULEMENT DOCTRINE**

MAYER BROWN LLP
Michelle Webster (DC Bar No. 985265)
(*pro hac vice forthcoming*)
Mwebster@mayerbrown.com
1999 K Street, N.W.
Washington, DC  20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300
Matthew Fenn
(*pro hac vice forthcoming*)
Mfenn@mayerbrown.com
71 S. Wacker Dr.
Chicago, IL  60606
Telephone: +1.312.782.0600

VINSON & ELKINS LLP
Evan Miller (DC Bar No. 219310)
(*pro hac vice forthcoming*)
emiller@velaw.com
Nataly Farag (DC Bar No. 90006516)
(*pro hac vice forthcoming*)
nfarag@velaw.com
Rami Abdallah E. Rashmawi (DC Bar No. 1780184)
(*pro hac vice forthcoming*)
rrashmawi@velaw.com
Alex Rant (DC Bar No. 1780786)
(*pro hac vice forthcoming*)
arant@velaw.com
2200 Pennsylvania Ave., N.W., Ste. 500 W
Washington, DC  20036
Telephone:  +1.202.639.6500
Facsimile:   +1.202.879.8939

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740)
(*pro hac vice forthcoming*)
*bazmy@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688)
(*pro hac vice forthcoming*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY  10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

AMERICAN IMMIGRATION COUNCIL
Gianna Borroto (IL Bar No. 6305516)
(*pro hac vice forthcoming*)
gborroto@immcouncil.org
Katherine Melloy Goettel (IA Bar No. 53821)
(*pro hac vice forthcoming*)
kgoettel@immcouncil.org
Suchita Mathur (NY Bar No. 5373162)
(*pro hac vice forthcoming*)

smathur@immcouncil.org
1331 G St. NW, Suite 200
Washington, DC  20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

CENTER FOR GENDER & REFUGEE STUDIES
Neela Chakravartula (CA Bar No. 254746)
neela@uclawsf.edu
UC College of the Law, San Francisco
200 McAllister Street
San Francisco, CA  94102
Telephone: +1.415.565.4877
Facsimile: +1.415.581.8824

CENTER FOR GENDER & REFUGEE STUDIES
Robert Pauw (WA Bar. No. 13613)
rpauw@ghp-law.net
c/o GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA  98104
Telephone: +1.206.682.1080
Facsimile: +1.206.689.2270

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................... 1

II.  PARTIES ........................................................................................... 4

     A. Plaintiffs .................................................................................... 4

     B. Defendants ................................................................................ 11

III. JURISDICTION AND VENUE ....................................................... 12

IV.  LEGAL BACKGROUND ................................................................ 13

     A. Statutory Protections for Asylum Seekers ............................... 13

     B. Constitutional Protections for Asylum Seekers ....................... 15

     C. International Legal Protections for Asylum Seekers ................ 15

     D. The Government's Obligation to Follow Its Own Policies ...... 17

V.   FACTS .............................................................................................. 17

     A. Ports of Entry ............................................................................ 17

     B. Defendants' Long History of Turning Back Arriving Asylum
        Seekers ...................................................................................... 19

     C. Defendants Have Adopted Guidance Prohibiting Turnbacks ... 20

     D. Promulgation of the Final Asylum Ban Rule ........................... 21

     E. The CBP One App and Its Limitations .................................... 24

        1.   How CBP One Functions ................................................. 24

        2.   Migrants forced to use CBP One face insurmountable hurdles
             to getting appointments .................................................. 26

     F. Despite the end of Title 42, the Guidance and the Rule, Defendants
        are continuing to turn back arriving noncitizens ..................... 33

        1.   Use of CBP One Post-Title 42 ......................................... 33

        2.   Processing of Noncitizens with a CBP One Appointment ............. 33

        3.   Defendants Have a Policy and Widespread Practice of
             Turning Back Asylum Seekers Who Present at POEs Without
             CBP One Appointments .................................................. 34

     G. The CBP One Turnback Policy Places Arriving Asylum Seekers in
        Grave Danger ............................................................................ 41

i

VI. CLASS ACTION ALLEGATIONS...............................................................53

VII..............................................................................................CAUSES OF
    ACTION ...................................................................................55

    FIRST CLAIM FOR RELIEF Violation of the *Accardi*
        Doctrine........................................................................55

    SECOND CLAIM FOR RELIEF Violation of Administrative
        Procedure Act, § 706(2)(A), (C), Agency Action Not in
        Accordance with Law and in Excess of Statutory
        Authority ..................................................................57

    THIRD CLAIM FOR RELIEF Violation of Administrative
        Procedure Act, § 706(2)(A),  Arbitrary & Capricious.............59

    FOURTH CLAIM FOR RELIEF Violation of Administrative
        Procedure Act, § 706(1), Agency Action Unlawfully
        Withheld or Unreasonably Delayed.........................................60

    FIFTH CLAIM FOR RELIEF Violation of Due Process.................62

    SIXTH CLAIM FOR RELIEF  Violation of the Non-
        Refoulement Doctrine Actionable Via the Alien Tort
        Statute, 28 U.S.C. § 1350 ........................................64

VIII.  PRAYER FOR RELIEF ........................................................65

## I.      INTRODUCTION

Plaintiffs Al Otro Lado, Inc. and Haitian Bridge Alliance, both non-profit immigrant rights organizations working on the southern border, and Plaintiffs Diego Doe, Elena Doe, Guadalupe Doe, Alexander Doe, Laura Doe, Luisa Doe, Michelle Doe, Natasha Doe, Pablo Doe, and Somar Doe ("Individual Plaintiffs"), acting on their own behalf and on behalf of all similarly situated individuals, allege as follows:

1.      Individual Plaintiffs are noncitizens who, after fleeing grave harm in their home countries, have tried to seek access to the U.S. asylum process by presenting themselves at Class A ports of entry along the U.S.-Mexico border ("POEs"), but have been denied that fundamental right due to their inability to obtain an appointment via Defendants' CBP One smartphone application. Plaintiffs challenge Defendants' border-wide policy and widespread practice of turning back arriving noncitizens without CBP One appointments at or near Class A POEs and thereby denying them access to the asylum process. This policy and widespread practice, referred to as the "CBP One Turnback Policy," contravenes statutory, constitutional, and international law, as well as Defendants' binding agency guidance.

2.      For many noncitizens, making an appointment to present at a POE is impossible. Some lack access to up-to-date smartphones, Wi-Fi, a cellular data plan, or reliable electricity, all of which are necessary to use CBP One. Others do not understand the few languages used in the app, are illiterate, lack technological know-how, or have disabilities that prevent them from successfully navigating the app. And the U.S. government has artificially capped the number of appointment slots far below the number of noncitizens who need them, meaning that even those who are able to use the app are repeatedly denied appointments. As a result,

countless asylum seekers have been forced to wait indefinitely under precarious conditions in Mexico in the hope of obtaining scarce appointments.

3.    The CBP One Turnback Policy is just the latest manifestation of the government's multi-year effort to block asylum access for asylum seekers in the process of arriving at the southern border. Indeed, this Court has already examined the 2017 iteration of a turnback policy, under which the government coordinated with Mexican officials to implement a "metering" or waitlist system, requiring asylum seekers to wait indefinitely in Mexico based on a demonstrably false pretext that CBP "lacked capacity" to inspect and process them. After extensive discovery and briefing, this Court issued a declaratory judgment finding that this version of the turnback policy violated the government's mandatory duties to inspect and process asylum seekers under the Immigration and Nationality Act ("INA") and the Due Process Clause, "regardless of the purported justification for doing so." *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1049-50 (S.D. Cal. 2022) ("*AOL I*").

4.    The new CBP One Turnback Policy similarly violates Defendants' mandatory duties under the INA and the Due Process Clause, as well as their own binding internal guidance, which dictates that a CBP One appointment is not a prerequisite for inspection and processing at a POE.

5.    Under the CBP One Turnback Policy, when asylum seekers approach a POE, they are typically met at or near the "limit line," the physical demarcation point between U.S. and Mexican territory, by CBP officers or Mexican authorities who, upon information and belief, are acting at the behest of CBP. If the asylum seekers do not have a CBP One appointment confirmation or present at a date or time different from the designated appointment slot, they are turned back to Mexico.

6. CBP One essentially creates an electronic waitlist that restricts access to the U.S. asylum process to a limited number of privileged migrants. Defendants' implementation of the CBP One Turnback Policy means that at the southwest border, the only asylum seekers who can access the asylum process are those who (a) have access to an up-to-date, well-functioning smartphone; (b) fluently read one of the few languages currently supported by CBP One; (c) have access to a sufficiently strong and reliable mobile internet connection and electricity to submit the necessary information and photographs required by the app; (d) have the technological literacy to navigate the complicated multi-step process to create an account and request an appointment via CBP One; (e) are able to survive in a restricted area of Mexico for an indeterminate period of time while trying to obtain an appointment; and (f) are lucky enough to obtain one of the limited number of appointments at certain POEs.

7. This Court held in *AOL I* that noncitizens arriving in the United States must be permitted to seek asylum whenever they present themselves at a POE. *See Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *18, *20 (S.D. Cal. 2021). There is nothing in U.S. statutes or regulations that allows Defendants to set an artificial cap on the number of noncitizens who can present at a POE to seek asylum. Nor does U.S. law permit Defendants to create a technological barrier that deprives individuals of their statutory right to seek asylum or produces unreasonable and dangerous delays in accessing the U.S. asylum process. Congress "mandated equity in its treatment of all refugees, however they arrived." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021).

8. Through the CBP One Turnback Policy, Defendants have injured both organizational and Individual Plaintiffs. This Policy has wreaked havoc on the lives of Individual Plaintiffs by denying them access to the U.S. asylum process and forcing them to live in dangerous Mexican border towns where they are

1    subject to assault, rape, kidnapping, extortion, and even murder. The CBP One
2    Turnback Policy has harmed Al Otro Lado and Haitian Bridge Alliance by
3    frustrating their missions and forcing them to divert a substantial portion of their
4    limited time and resources away from their core programs to counteract the effects
5    of the Policy.

6            9.     Despite persistent advocacy by Al Otro Lado and Haitian Bridge
7    Alliance, among other organizations, and despite the Individual Plaintiffs' urgent
8    need and right to seek asylum in the United States, Defendants show no signs of
9    ending their illegal CBP One Turnback Policy. Accordingly, Plaintiffs require the
10   intervention of this Court to declare that Defendants' conduct violates U.S. and
11   international law, enjoin Defendants from violating the *Accardi* doctrine, vacate
12   the CBP One Turnback Policy, and order Defendants to implement procedures to
13   ensure effective compliance with the law and Defendants' own written guidance.
14   Absent this Court's intervention, Defendants' unlawful conduct will continue to
15   imperil the lives and safety of countless vulnerable individuals seeking asylum.

16   **II.    PARTIES**

17           **A.    Plaintiffs**

18           10.    Plaintiff Al Otro Lado, Inc. ("AOL") is a non-profit advocacy and
19   legal services organization incorporated in California and based in Los Angeles,
20   with offices in San Diego, California, and Tijuana, Mexico. AOL's mission is to
21   uplift immigrant communities by defending the rights of migrants against
22   systemic injustices and fighting for all families that have been torn apart by unjust
23   immigration laws. AOL prioritizes providing holistic legal and humanitarian
24   support to refugees, and other migrants through a multidisciplinary, client-
25   centered, harm reduction-based practice. AOL is the lead organizational plaintiff
26   in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC. AOL provides
27   free direct legal services on both sides of the U.S.-Mexico border and beyond.
28

AOL's Border Rights Project provides legal education, representation, accompaniment, and human rights monitoring for thousands of asylum seekers in Tijuana every year. AOL also documents human rights violations committed by U.S. and Mexican government officials against refugees at the U.S.-Mexico border, which provide a basis for advocacy with U.S. policy makers and international human rights bodies. Defendants have frustrated AOL's mission and forced AOL to divert significant resources away from its core programs to serve individuals and families denied access to the U.S. asylum process based on the CBP One Turnback Policy.

11.    Plaintiff Haitian Bridge Alliance ("HBA") is a grassroots, non-profit, community-based organization incorporated in California. HBA's main office is located in San Diego, California, and they also have offices in Tijuana, Reynosa, and Tapachula, Mexico. HBA's mission is to assist Haitian and other immigrants to acclimate to the United States and ensure their success in navigating their new lives. HBA focuses on Black people, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA regularly brings delegations to the border to provide legal orientations and Know Your Rights trainings to migrants from Haiti, the Caribbean, and Africa; interview individuals and family units to identify systemic issues uniquely affecting Black migrants; and support HBA's advocacy for fair U.S. immigration policies. Members of these delegations also assist HBA staff in assessing individuals' eligibility for relief and identifying those with vulnerabilities that may require immediate assistance. Defendants have frustrated HBA's mission and forced HBA to divert significant resources away from its core programs to serve noncitizens denied access to the U.S. asylum process based on the CBP One Turnback Policy.

12. Michelle Doe is a citizen of Nicaragua attempting to apply for asylum with her one-month-old baby after fleeing an abusive partner, a Mexican citizen, who threatened to kill her. She presented herself at the San Ysidro POE with her newborn child in mid-July 2023. At the San Ysidro POE, she told a CBP officer that she wanted to seek asylum. When asked if she had an appointment, Michelle explained she did not have a working phone. The officer called his supervisor, who said that people cannot cross without using the CBP One app. After being turned back at the POE, Michelle and her baby went to AOL's office to help find shelter. To date, Michelle has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

13. Diego Doe is a citizen of Mexico attempting to apply for asylum because he fears persecution and retribution on the basis of his work for the Mexican government. After fleeing his home state and traveling to Nogales, Mexico, Diego went to the Nogales, Arizona POE to seek asylum. He was told he needed to put his name on a list and wait outside the POE for two to three weeks. Diego then traveled to Tijuana, Mexico, and attempted to seek asylum at the bridge that crosses from the Tijuana airport, but the CBP officer on duty ignored him and turned his back. On July 26, 2023, Diego and his wife attempted to present at the San Ysidro East POE. Diego explained to CBP that his life is in danger in Mexico and he cannot use CBP One because he does not have a sponsor in the United States and the app will not allow him to request an appointment without that information. The CBP officer told Diego to speak to Mexican immigration officials about his issues with the app. To date, Diego has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

14. Natasha Doe is a citizen of Haiti attempting to apply for asylum with her five-year-old child after fleeing violence in Haiti. She arrived at the border in

Matamoros in mid-March 2023 without a cell phone. In April, a friend loaned her a phone and helped her register on the CBP One App. Over the next few months, Natasha participated in two group registrations and a second individual registration on another friend's phone in an effort to get a CBP One appointment. Out of desperation, Natasha set out for a POE in early-July 2023 to seek asylum. She and her child traveled to Piedras Negras, Mexico. There, she met other Haitians who told her that she would be turned back at the border without a CBP One appointment. Acting on this advice, she did not present herself at the POE and returned to Matamoros, where she lives outside under a gas station awning. To date, Natasha has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

15.    Pablo Doe is a citizen of Honduras attempting to apply for asylum after fleeing gang violence and extortion in April 2023. During his journey, he was assaulted and his telephone, life savings, and personal items were stolen. Pablo arrived in Ciudad Juarez, Mexico, in May 2023. He registered on CBP One; however, the application routinely stalls, freezes, and has an update that he has been unable to download. The error messages appear in English, a language that he does not understand, and sometimes the screen displays nothing but indecipherable computer code. In early-July 2023, Pablo went to the Paso Del Norte Bridge in El Paso, Texas, to seek asylum. At the midpoint of the bridge, two CBP officers told him he could not apply for asylum without a CBP One appointment. Pablo told them he could not get the application to work, did not understand the error messages in English, and did not feel safe in Mexico. The officers told him that was not their problem. A few days later, Pablo again tried to present at the POE in El Paso. Before he arrived at the bridge, a group of armed men in a civilian car stopped him and told him he was not going to cross without paying them $600 to enter the bridge. He instead returned to Ciudad Juarez to

wait. To date, Pablo has been unable to obtain a CBP One appointment or access the U.S. asylum process at a POE.

16.     Laura Doe is a Mexican citizen who fled her home after a criminal organization disappeared her husband and father-in-law. She learned about CBP One while she was still in her home state, but her phone was too old to download the app. With assistance from a relative abroad, Laura bought a new phone, and since June 1, 2023, has tried every day to get a CBP One appointment. At the end of the process when she is about to request an appointment, she almost always gets error messages that require her to close the application and reopen it, which does not resolve the issue. Laura arrived in Tijuana in mid-June 2023. In mid-July 2023, Laura approached the Otay Mesa, California POE. CBP officers turned her back because she did not have a CBP One appointment. To date, Laura has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

17.     Plaintiff Elena Doe is a Mexican citizen and the mother of two young children, including an infant. She fled her home at the end of April 2023 due to the threat of familial and cartel violence and has been in hiding in Tijuana. Elena traveled to the Ped West entrance at the San Ysidro POE in Tijuana to seek asylum. While she was waiting in line, a Mexican immigration official informed Elena that she could not get through without a CBP One appointment and directed her to a Mexican government building for assistance. Elena registered on the CBP One app, but has not been able to get an appointment for three months. In mid-July, Elena again tried to seek asylum at the San Ysidro POE, this time accompanied by an AOL staff member. At the POE, CBP officers laughed at Elena's attempts to present without a CBP One appointment and refused to allow her to proceed. Elena left because the CBP officers would not allow her to

proceed. To date, Elena has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

18. Plaintiff Alexander Doe is a Russian citizen from Chechnya with a wife and three children. He fled Chechnya because of threats stemming from his political views not aligning with those of the Russian Federation, and is attempting to apply for asylum. After arriving in Tijuana in May 2023, Alexander downloaded and registered on the CBP One app upon the advice of other migrants. In mid-June 2023, after nearly a month of trying to obtain a CBP One appointment, he twice attempted to present at the San Ysidro POE to seek asylum, but was turned back both times by a CBP officer. The first time, Alexander asked the CBP officer for assistance in English because the app was displaying an error message he did not understand; he was told to go back to Mexico and to keep trying to use the app. The second time, Alexander explained to a CBP officer at the limit line between the U.S. and Mexico that he was seeking political asylum and refuge in the United States; the CBP officer told him to "get the fuck out of here" and pushed him backwards onto the cement, causing bruising. Alexander has continued to try to obtain a CBP One appointment every day from Tijuana. To date, he has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

19. Luisa Doe is a citizen of Mexico attempting to apply for asylum with her two young children. She arrived in Tijuana, Mexico, in early-June 2023 after fleeing a criminal organization that targeted her based on her cooperation with local police and her family connections. Since arriving in Tijuana, Luisa has been trying daily to get a CBP One appointment for herself and her children, but has instead confronted repeated error messages and glitches. These include instructions to delete and reinstall the app and messages incorrectly stating that she is not in the correct geographic region to request an appointment. At the end

of June 2023, Luisa went to the San Ysidro POE to seek asylum. CBP officials blocked her from entering and told her she needed a CBP One appointment. In mid-July 2023, Luisa went back to the San Ysidro POE. Mexican officials stopped her, but she insisted on speaking to a U.S. official. When Luisa informed two CBP officers at the POE that she needed to seek asylum, they responded that the only way to do so was through a CBP One appointment. Despite knowing that Luisa was Mexican and therefore did not need a CBP One appointment, the CBP officers threatened to call Mexican officials to take her away if she did not leave. Luisa continues to attempt to secure a CBP One appointment daily, without success. To date, Luisa has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

20. Plaintiff Guadalupe Doe is a citizen of Mexico attempting to apply for asylum after fleeing her hometown on account of extreme domestic violence that threatened her life. Guadalupe traveled to Tijuana with her mother, Plaintiff Somar Doe, and her three children, who are also seeking asylum. They arrived in Tijuana in early-June 2023, and immediately went to the San Ysidro POE to present themselves. However, the CBP officer at the border told them they needed a CBP One appointment or they could wait in a line that had not moved in days. Fearful of waiting on the street with her children, Guadalupe and her family found a shelter to stay in. They registered on the CBP One app and began trying to get appointments. In late-July 2023, Guadalupe and her family attempted to present at the Ped West San Ysidro POE, accompanied by a staff member from AOL. When Guadalupe explained that she and her family were trying to seek asylum but had been unable to get a CBP One appointment, a CBP officer suggested that they apply separately from Plaintiff Somar Doe. When the AOL staff member inquired about placing them on an emergency list given Guadalupe's ex-husband's connections to organized crime, the CBP officer directed them to speak

to Mexican immigration officials at the Ped East POE. To date, Guadalupe and her family have been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

21.    Plaintiff Somar Doe is a citizen of Mexico and the mother of Plaintiff Guadalupe Doe. Somar fled her hometown in Mexico with Guadalupe and her three grandchildren after her son-in-law threatened violence against Guadalupe, the children, and Somar. She now hopes to seek asylum in the United States. Upon arriving in Tijuana in June 2023, Somar, Guadalupe, and Somar's grandchildren attempted to seek asylum at the San Ysidro POE. They were turned away, as described in Paragraph 20. In late-July 2023, Somar and her family attempted to present at the Ped West San Ysidro POE, and they were again turned away, as described in Paragraph 20. The family is currently living at a migrant shelter in Tijuana and has been trying to obtain CBP One appointments for nearly two months. To date, Somar and her family have been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**B.    Defendants**

22.    All Defendants are sued in their official capacities.

23.    Defendant Alejandro N. Mayorkas is the Secretary of the U.S. Department of Homeland Security ("DHS"), a cabinet-level department of the federal government. Defendant Mayorkas is responsible for the administration of U.S. immigration laws pursuant to 8 U.S.C. § 1103. He oversees each of the component agencies within DHS, including Customs and Border Protection ("CBP"), and has ultimate authority over all DHS policies, procedures, and practices, including the CBP One Turnback Policy. Defendant Mayorkas is a defendant in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.).

24.     Defendant Troy A. Miller is the Senior Official Performing the Duties of the Commissioner of CBP, the DHS component responsible for implementing the CBP One Turnback Policy. Defendant Miller, who reports to Defendant Mayorkas, is a supervisory official with direct authority over all CBP policies, procedures, and practices, and responsibility for overseeing the implementation of the CBP One Turnback Policy at POEs. Defendant Miller oversees a staff of more than 60,000 employees, manages a budget of more than $14 billion, and exercises authority over all CBP operations. Defendant Miller's predecessor, Chris Magnus, was a defendant in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.).

25.     Defendant Diane J. Sabatino is the Acting Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including the operations of POEs. Defendant Sabatino, who reports to Defendant Miller, is a supervisory official responsible for implementing the CBP One Turnback Policy at POEs. She exercises authority over 20 major field offices and 328 POEs, oversees a staff of more than 31,000 employees, and manages a budget of more than $6.5 billion. Defendant Sabatino's predecessor, Pete R. Flores, was a defendant in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.).

## III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1350.

27.     The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

28.     Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred at or in the vicinity of the San Ysidro POE, the busiest Class A POE on the U.S.-Mexico

border. A number of the Individual Plaintiffs attempted to present themselves for inspection and processing at either the San Ysidro POE or the Otay Mesa POE, both of which are located in this district. Witnesses who observed turnbacks pursuant to the CBP One Turnback Policy at the San Ysidro POE or the Otay Mesa POE are likely to be within this judicial district. Moreover, both Plaintiff Al Otro Lado and Plaintiff Haitian Bridge Alliance maintain offices within this judicial district. Defendants' implementation of the CBP One Turnback Policy happens largely on U.S. soil. CBP officers implementing the Policy are standing on U.S. soil when they turn back arriving noncitizens. Even in instances where Mexican immigration officers conduct the actual turnbacks, they—at the behest of their CBP counterparts—direct arriving noncitizens to utilize CBP One, which sends the information it collects to servers in the United States and funnels information to Defendants in the United States.[1] Defendants use information generated by CBP One to make decisions about their use of resources in the United States.

## IV.  LEGAL BACKGROUND

### A.  Statutory Protections for Asylum Seekers

29.   This Court previously addressed the government's statutory obligations with respect to noncitizens arriving at POEs, finding that Congress "intended [8 U.S.C. § 1158(a)(1)] to apply to asylum seekers in the process of arriving" in the United States, even if they have not quite reached the U.S. border. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1202 (S.D. Cal. 2019); *Al Otro Lado, Inc.*, 2021 WL 3931890, at *7-8. A motions panel of the U.S. Court of

---

[1] *See, e.g.*, U.S. Dep't of Homeland Sec., No. DHS/CBP/PIA-068, *Privacy Impact Statement for CBP One* 4 (Feb. 19, 2021), https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf ("Regardless of the function, CBP One does not store any information locally on the device. CBP pushes all information collected through CBP One to back-end systems associated with functions the user is using.").

Appeals for the Ninth Circuit found that this court's "linguistic and contextual analysis" of the relevant statutory provisions "has considerable force" and "is likely correct." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020).

30.     The INA provides that: "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or . . . section 1225(b)." 8 U.S.C. § 1158(a)(1).

31.     An implementing regulation more broadly defines "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of means of transport." 8 C.F.R. § 1.2 (2023).

32.     By using the phrase "arrives in" in 8 U.S.C. § 1158(a)(1), the statute "plainly covers a[] [noncitizen] who may not yet be in the United States, but who is in the process of arriving in the United States through a POE." *Al Otro Lado, Inc*, 394 F. Supp. 3d at1200; *see also Al Otro Lado, Inc.*, 952 F.3d at 1013. The text of 8 U.S.C. § 1158(a)(1) encompasses "two classes of [noncitizens] who may apply for asylum: (1) a[] [noncitizen] 'who is physically present in the United States' and (2) any [noncitizen] 'who arrives in the United States.'" *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1199. Applying the rule against surplusage, "the Court must presume that these phrases 'mean different things.'" *Id.* (citation omitted). Thus, the statute cannot be read to allow only noncitizens who are physically present in the United States to apply for asylum, and the phrase "arrives in" must connote something different than physical presence in the United States. *See id.*

14

Moreover, Congress' use of verb tense, the statutory context, and relevant legislative history further confirm that § 1158(a)(1) applies to noncitizens in the process of arriving. *See id.* at 1200-01; *Implementation of Title III of the Illegal Immigration Reform & Immigration Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17-18 (1997) (letter from Lamar Smith, Chairman, Subcomm. on Immigr. & Claims, to Dir., Pol'y Directives & Instructions Branch, INS).

### B.   Constitutional Protections for Asylum Seekers

33.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. In addition, where Congress has granted statutory rights and has directed an agency to establish a procedure for providing such rights, the Constitution requires the government to establish a fair procedure and to abide by that procedure. In the asylum context, U.S. law mandates that asylum seekers be provided with such process. "In the enforcement of [congressional] policies, the Executive Branch of the Government must respect the procedural safeguards of due process[.]" *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972) (citation omitted).

34.   The INA and its implementing regulations provide Individual Plaintiffs with the right to be inspected and processed at a POE and granted access to the asylum process. *See, e.g.*, 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2). These rights form the basis of Individual Plaintiffs' due process claims.

### C.   International Legal Protections for Asylum Seekers

35.   The Office of the United Nations High Commissioner for Refugees ("UNHCR") has described non-refoulement as "the cornerstone of international refugee protection," and notes that it is "of particular relevance to asylum-

seekers." U.N. Refugee Agency, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol, ¶¶ 5-6 (Jan. 26, 2007), https://www.unhcr.org/media/advisory-opinion-extraterritorial-application-non-refoulement-obligations-under-1951-0. A primary treaty source for the duty of non-refoulement is the 1951 Convention on the Rights of Refugees. Article 33 of the Convention prohibits a state from returning

> "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

1951 Convention and Protocol relating to the Status of Refugees, 189 U.N.T.S. 137, 176, Art. 33(1), entered into force 22 Apr. 1954 (emphasis added). As UNHCR has explained, the Treaty's emphasis on "any manner" of refoulement reflects a state duty to avoid using direct or indirect ways of subjecting a person to a risk of return to persecution. U.N. Refugee Agency, Advisory Opinion at 7.

36.    The duty of non-refoulement extends not only to a person's country of origin, "but also to any other place where a person has reason to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 Convention, or from where he or she risks being sent to such a risk." *Id.* at 3 (citing UNHCR, Note on Non-Refoulement ¶ 4 (EC/SCP/2), 1977). Accordingly, a state must not only prevent return to danger, but also take affirmative measures to prevent a risk of harm by "adopt[ing] a course that does not result in [asylum seekers'] removal, directly or indirectly, to a place where their lives or freedom would be in danger." *Id.* ¶ 8. In order to effectuate an asylum seeker's right to non-refoulement, the United States is obligated to implement and follow procedures to ensure that the request for asylum is duly and efficiently considered.

37.     The norm of non-refoulement at the border is specific, universal, and obligatory. It is so widely accepted that it has reached the status of *jus cogens*—a norm not subject to derogation.

### D.     The Government's Obligation to Follow Its Own Policies

38.     "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974). This principle is known as the *Accardi* doctrine. *See United States Ex Rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954); *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004).

39.     The "procedures" that agencies are required to follow include both formal agency regulations and informal operating procedures and guidance. *Alcaraz*, 384 F.3d at 1162; *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990).

40.     The *Accardi* doctrine applies "even where the internal procedures are possibly more rigorous than otherwise would be required." *Alcaraz*, 384 F.3d at 1162 (quoting *Morton*, 415 U.S. at 235).

## V.     FACTS

### A.     Ports of Entry

41.     The United States has three classes of ports of entry. Class A ports of entry are "designated port[s] of entry for all travelers," including noncitizens seeking asylum in the United States.[2]

42.     Class A ports of entry on the U.S-Mexico border that are capable of processing and inspecting pedestrians include San Ysidro, CA; Otay Mesa, CA;

---

[2] CBP, *Class A, B, or C Port of Entry* (May 27, 2022), https://www.cbp.gov/travel/international-visitors/visa-waiver-program/port-classes#:~:text=Class%20A%20means%20that%20the,of%20entry%20for%20al l%20travelers; 8 C.F.R. § 100.4 (a).

Calexico, CA; Tecate, CA; Andrade, CA; Douglas, AZ; Lukeville, AZ; Naco, AZ; Nogales, AZ; San Luis, AZ; Columbus, NM; Santa Teresa, NM; Roma, TX; Progreso, TX; Laredo, TX; Hidalgo, TX; Eagle Pass, TX; Del Rio, TX; El Paso, TX; and Brownsville, TX. In this Complaint, the terms "port of entry" and "POE" refer to Class A ports of entry on the U.S.-Mexico border.

43.    Each port of entry reports to a specific Field Operation Office. The four Field Operations Offices that oversee the operation of POEs on the U.S.-Mexico border are the San Diego, Tucson, El Paso, and Laredo Field Offices. The head of each Field Office is the Director of Field Operations ("DFO"). The four DFOs overseeing the Field Offices on the U.S.-Mexico border report to the Executive Director for Operations at OFO, who reports to Defendant Sabatino.

44.    A Class A POE has multiple missions, including processing and inspecting commercial freight, vehicle traffic, pedestrians, and noncitizens who express a desire to apply for asylum or a fear of persecution or torture in their country of origin. CBP officers at POEs are also responsible for interdicting illicit cargo, such as narcotics, and for anti-terrorism operations.

45.    Each of these duties is co-equal. As this Court previously found, "[n]one of the enumerated lists of various responsibilities and missions" delegated to DHS by Congress "include any indication that Congress intended to supersede the dut[y]" to inspect and process asylum seekers who arrive at POEs. *Al Otro Lado, Inc.*, 2021 WL 3931890, at *11. Indeed, Congress intended for one of DHS' "primary mission[s]" to be to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland"—including inspecting and processing arriving noncitizens at POEs— "are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b). This case focuses on that primary mission—inspecting and processing asylum seekers.

**B.** **Defendants' Long History of Turning Back Arriving Asylum Seekers**

46. Multiple witnesses in *Al Otro Lado, Inc. v. Mayorkas* confirmed that Defendants had a long-standing policy of turning back arriving noncitizens, and a long history of attempting to justify turnbacks at POEs by citing pretextual excuses such as "lack of capacity." For example, although Defendants had told the public that they were turning back arriving noncitizens only when POEs were at capacity, a CBP officer who worked at the Tecate, California POE testified that Defendants' "capacity excuse" was a lie.

47. In an October 27, 2020 report DHS's Office of Inspector General ("DHS OIG") concluded that "CBP took several actions to limit the number of undocumented [noncitizens] . . . processed each day at the Southwest Border land ports of entry." U.S. Dep't of Homeland Sec., Office of Inspector Gen., No. OIG-21-02, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry* 6 (2020). For example, "without prior public notice, seven ports of entry stopped processing virtually all undocumented [noncitizens], including asylum seekers." *Id.* at ii. At two other POEs, DHS OIG investigators observed that "CBP had stopped using blocks of available holding cells, allowing those cells to sit empty while asylum seekers and other undocumented [noncitizens] waited in . . . lines in Mexico." *Id.* at 7.

48. Indeed, CBP's internal records of capacity at POEs on the Mexican border, known as Queue Management Reports or MCAT Reports, showed that most POEs routinely operated well below 100% capacity. Even in the instances where POEs come close to utilizing 100% of their capacity, each POE has operational contingency plans that it can implement to temporarily increase its capacity, such as utilizing space at nearby U.S. Border Patrol stations and

substations, using temporary spaces in tents, and relying on video conference technology to conduct virtual interviews of arriving noncitizens.

49.    Defendants also have a history of refusing to commit the turnback policy to writing. Shortly after the November 2016 presidential election, then-DHS Secretary Jeh Johnson held a meeting of senior officials from OFO and CBP. During this meeting, Kevin McAleenan, who was the Assistant Commissioner of CBP at that time, pushed for OFO to begin turning back arriving noncitizens at all Class A POEs on the U.S.-Mexico border. Then-Commissioner Johnson agreed to McAleenan's proposal. Then-Executive Assistant Commissioner of OFO, Todd Owen, agreed to implement that proposal, but stated that he did not want to put the policy in writing. Instead, OFO's Executive Director of Operations communicated the Turnback Policy to the four Directors of Field Operations for the four OFO field offices responsible for POEs on the U.S.-Mexico border. The four Directors of Field Operations then communicated the policy to the port directors of the POEs on the U.S.-Mexico border.

50.    More generally, CBP and OFO frequently communicate directives to port directors, assistant port directors, watch commanders, and CBP line officers using a similar procedure, which is known as a "verbal muster."  For example, a CBP officer at the Tecate, California POE testified that he was told to turn back arriving noncitizens via a verbal muster.

**C.    Defendants Have Adopted Guidance Prohibiting Turnbacks**

51.    On November 1, 2021, Acting CBP Commissioner Troy Miller issued a memorandum titled *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (the "Guidance"). The memorandum "provides updated guidance for the management and processing" of undocumented noncitizens who present at POEs along the southern border. Guidance at 1. Miller instructed Defendant OFO to "take

appropriate measures, as operationally feasible" to increase processing capacity at POEs along the southern border, including by leveraging technology such as the CBP One mobile application. *Id.* at 2. But the memorandum was clear that "asylum seekers or others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a Southwest Border land POE," and that an individual's failure to use CBP One "should not influence the outcome of any inspection." *Id.* This guidance remains effective and has not been rescinded or superseded by CBP.

### D. Promulgation of the Final Asylum Ban Rule

52. On May 11, 2023, the Biden administration promulgated a new Rule, dubiously titled "Circumvention of Lawful Pathways" (the "Rule"), which purports to incentivize the use of new "legal" pathways to seek protection, such as nationality-specific parole programs, to reduce the number of people seeking to cross the southern border.[3] The Rule, while erecting barriers to asylum eligibility, contemplates that all noncitizens will be able to access the process for seeking protection by coming to a POE, whether they have a CBP One appointment or not.[4] The Rule's preamble further clarifies that CBP is required to inspect and process all asylum seekers who present at POEs.

---

[3] Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023). On July 25, 2023, a California district court vacated the Rule on the basis that it is contrary to law, arbitrary and capricious, and procedurally invalid, in violation of the Administrative Procedure Act. *See East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. 2023). The order has been stayed for 14 days and thus remains in effect as of the date of this filing.

[4] While individuals subject to the Rule may be ineligible for asylum, they remain eligible for statutory withholding of removal and protection under Article 3 of the Convention Against Torture ("CAT"). 8 C.F.R. § 208.33(b)(2); *see also* 88 Fed. Reg. at 31,318. Under the Rule, anyone barred from establishing eligibility for asylum—e.g., because they presented at a POE without a CBP appointment—should still have the opportunity to show that they face a reasonable possibility of persecution or torture in their designated country or countries of removal, and thus potentially win relief from removal that would enable them to remain in the United States. 88 Fed. Reg. at 31,318. As such, the "asylum process" referenced

53.   The Rule makes ineligible for asylum all individuals who transited through a third country en route to the United States (i.e., all non-Mexicans). 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1); *see also* 88 Fed. Reg. 31314 (May 16, 2023). Under the rule, this bar to asylum will not apply if a person seeking asylum in the United States (i) applied for and received a denial of protection in a transit country; (ii) obtained advance permission to travel to the United States through an approved parole program; or (iii) obtained an appointment to present through CBP One. 8 C.F.R. §§ 208.33(a)(2)(ii), 1208.33(a)(2)(ii).[5] Despite the other exceptions, as a practical matter for most people at the southern border, CBP One is the exclusive means through which they can seek asylum at a POE.

54.   The Rule also provides an exception to its bar on asylum if the noncitizen "presented at a port of entry without a pre-scheduled time and place [i.e., without a CBP One appointment], if the [noncitizen] demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

55.   The Rule provides further that its bar on asylum will not apply if a noncitizen "demonstrate[ing] by a preponderance of the evidence that exceptionally compelling circumstances" exist, such as facing "an acute medical emergency" or "imminent and extreme threat to life or safety," or having been a "victim of a severe form of trafficking." 8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i).

in this Complaint encompasses the processes for establishing eligibility for asylum, withholding of removal, and CAT protection.

[5]  In addition, the Rule exempts unaccompanied children. 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i).

56.     Nonetheless, in practice, the CBP Turnback Policy precludes most individuals without CBP One appointments (including many Mexicans, who are not even subject to the Rule) from presenting at POEs or even asserting that they fall into any of the exception categories.

57.     To establish an exception to the asylum bar for either the inability to use CBP One or exceptionally compelling circumstances, a noncitizen must have access to the POE. The regulatory language recognizes as much with respect to the inability to use CBP One, as it applies to a noncitizen who "presented at a port of entry without a pre-scheduled time and place."

58.     The preamble to the Rule repeatedly articulates Defendants' official position of allowing individuals who present at a POE without a CBP One appointment to be inspected and processed for the purpose of seeking access to the asylum process.

59.     For example, the preamble states that "CBP's policy is to inspect and process all arriving noncitizens at POEs, *regardless of whether they have used the CBP One app*," that "[i]ndividuals without appointments *will not be turned away*," and that an advance appointment is "not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed." 88 Fed. Reg. at 31,358 (emphasis added) (citing the Guidance).

60.     The preamble makes this assertion—that CBP will process all individuals who present at a POE without regard to whether the individual has a CBP One appointment—over and over. *See* 88 Fed. Reg. at 31,358, 31,365, 31,392, 31,396, 31,399, 31,401 n.240. But as described below, instead of complying with this internal guidance, CBP has instead adopted a policy of turning back asylum seekers who do not have a CBP One appointment, regardless of the reasons for their inability to access the CBP One app.

### E.      The CBP One App and Its Limitations

*61.*    Despite explicitly and officially disavowing turnbacks, upon the termination of Title 42 on May 12, 2023, Defendants continued their practice of turning back arriving noncitizens at POEs—this time under the guise of CBP One. Instead of providing the Individual Plaintiffs and proposed class members access to POEs, Defendants effectively forced them to use the CBP One app. This means that access to the U.S. asylum process at POEs is now entirely dependent on factors that Congress never considered and that appear nowhere in the INA. For example, arriving noncitizens must now have the right type of smartphone, be able to read the correct languages, and have access to the internet in order to seek asylum at a POE. And even if an asylum seeker is lucky enough to meet all of these arbitrary and unwritten rules for seeking asylum at a POE, they must wait indefinitely, often in unsafe Mexican border towns in the hope that the app will one day allow them to reserve a time to come to a POE. But there is no guarantee that will happen because the app also imposes arbitrary caps on the number of asylum seekers that can present themselves at a POE for inspection and processing. This is not, and never has been, the law. The INA does not permit Defendants to impose *de facto* language and income tests before a refugee can seek asylum in the United States. But that is exactly what Defendants have done.

### 1.      How CBP One Functions

62.    In August 2018, CBP began developing CBP One to have a single portal for a variety of services provided by different CBP mobile apps. When CBP announced the official launch of CBP One in October 2020, the app had limited capabilities that did not include processing of asylum seekers.

63.      Nonetheless, CBP began using CBP One to process arriving noncitizens at POEs in spring 2021 during the wind-down of MPP. MPP had already forced tens of thousands of asylum seekers to wait in Mexico, some for

years. Since then, while the agency has released various updates to the app, certain aspects have remained static: users must have an up-to-date smartphone, an account with an app store that carries CBP One, a strong and reliable internet or data connection, access to a stable electricity source, and be able to read and type in one of a limited number of languages to successfully navigate CBP One.

64.    Using CBP One to seek an appointment at a POE involves a multi-step process, the specifics of which have shifted over time but the general features of which have remained constant. An individual must sign in to an authorized mobile app store, such as the Apple App Store or Google Play Store. The individual must then establish a stable, sustained internet connection through which to download CBP One. After downloading the app from an online mobile application store, accepting the terms and conditions, and installing the app on their smartphone, an individual must create an account at Login.gov—a website that provides account management and user authentication services for participating federal government agencies. To do so, the user must provide personally identifiable information (including an email address and a phone number), create a password, and set up multi-factor authentication. Only then can the individual enter their information into the CBP One app and take the required steps to attempt to schedule an appointment at a POE.

65.    Once an individual has successfully logged into the app, they must enter extensive biographic and biometric information—including date and place of birth; country of citizenship and residence; height; weight; hair and eye color; marital status; parentage; travel document number, issue, and expiration date; employment history; any countries traveled through in the previous year with the relevant dates; and destination address and emergency contact in the United States (for each member of their traveling group)—before being prompted to request an appointment. After indicating they are a traveler at a land border seeking an

advance appointment, they are able to fill out their profile, including activating geolocation capability to confirm their location and taking a live video selfie to validate that a live person is present at the time of submitting the registration.

66.    The principal applicant can include family members by adding their personal biographic and biometric information, including a photograph of each person. If an individual erroneously submits their registration with a mistake, there is no option for correcting it; rather, the CBP guide advises deleting the registration and beginning again.

67.    The CBP guide for using the app is 47 pages long.

68.    CBP One's facial recognition technology, use of GPS tracking, and data storage methods raise significant privacy and surveillance concerns for asylum seekers. CBP initially sought to address privacy concerns raised by CBP One by insisting that its use was voluntary. A CBP Information Collection Notice issued in September 2021 states that providing advance information to CBP "is not a prerequisite for processing under Title 8."[6] But as discussed above, use of CBP One is no longer voluntary, as it has become the only way for most noncitizens to access the U.S. asylum process.

## 2.    Migrants forced to use CBP One face insurmountable hurdles to getting appointments

69.    DHS has touted CBP One as a way to increase "efficiency" at the border.[7] CBP states that by allowing undocumented noncitizens to submit their biographic and biometric information in advance of their arrival at a POE, the

---

[6] 86 Fed. Reg. 53,667, 53,667 (Sept. 28, 2021).

[7] Alejandro Mayorkas, Sec'y, U.S. Homeland Sec., Remarks at a Media Availability Outlining Planning and Operations Ahead of the Lifting of the Title 42 Public Health Order (May 10, 2023), https://www.dhs.gov/news/2023/05/10/secretary-mayorkas-remarks-media-availability-outlining-planning-and-operations.

agency can streamline in-person processing. However, by making successful navigation of CBP One a prerequisite to inspection at POEs, Defendants have created new technological hurdles for seeking protection and prevented significant segments of the migrant population from accessing the asylum process.

70. **Tech Access and Costs.** Requiring use of the app puts poorer migrants at a distinct disadvantage, preventing some asylum seekers from ever being able to access the asylum process at a POE. Similarly, asylum seekers who cannot read or write, or lack technological know-how, have no way around the app's requirements. To complete the registration process, take the necessary photos, and request and schedule an appointment, users must have a functioning, charged, and compatible smartphone; an account with a certified app store, which requires a functioning email address; and an internet or data connection with significant bandwidth. While many migrants have smartphones, some do not and cannot afford to purchase them or the data plans required to use them. Asylum seekers have reported being robbed of all their belongings, including their mobile phones, either during their journeys or upon arrival at the border.

71. Further, simply having access to any smartphone is not sufficient to successfully operate CBP One. Many smartphones commonly obtained by migrants run on older or nonstandard hardware and operating systems. Individuals must know how to download the application from a certified app store and ensure that the download is successful. CBP One is over 220 MB in size, which is exceptionally large for an application of this kind. For context, the Mobile Passport Control app, another app created by CBP, is only 22 MB in size. As such, downloading CBP One takes significant time, data, and electricity. If a migrant is able to begin downloading CBP One, the download may terminate mid-way if their internet connection is not stable, and the migrant will need to try again.

72.    Even if an individual is able to properly download CBP One, using the app requires more data and electricity. Migrants with older or cheaper smartphones and those without access to strong and reliable Wi-Fi or a cell signal have reported a range of technological problems with CBP One that prevent them from successfully obtaining appointments at POEs, including the app crashing, freezing, timing out, and generating error messages. The Wi-Fi connections in shelters and migrant camps—if they exist at all—are often weak and slow, particularly when hundreds of people are attempting to connect. Some migrants have been forced to climb onto the roof of a shelter to try to pick up a good signal, while others have had to travel within dangerous areas of Mexico to find a shelter with a stable internet connection.

73.    Purchasing cellular data or wireless internet access can cost up to $6 a day—a cost that is prohibitive for many displaced migrants in Mexico. For individuals who cannot afford smartphones or access cellular networks, Wi-Fi, or electricity, the consequences are unimaginably high. Some asylum-seeking families have had to make the choice between buying food or buying data for their phones to access CBP One on a daily basis.

74.    The app's "geofencing" technology requires users to be physically located in central or northern Mexico to request an appointment. However, migrants have reported that the app frequently misidentifies them as being in the incorrect location and prevents them from requesting an appointment even when they are present in border towns.

75.    Plaintiff Al Otro Lado regularly conducts surveys of asylum seekers at the border to understand the challenges migrants are facing. In January 2023, AOL added questions to ascertain the issues that migrants were having with the CBP One app. According to 937 survey responses as of June 2023, of those who wished to make an appointment with CBP One:

- Almost 30% reported not having access to an internet connection or data plan that would enable them to utilize the CBP One app;
- About 25% reported living in a shelter, many of which are overcrowded and lack a strong Wi-Fi connection. Another 30% reported being homeless or living in an encampment;
- About 6% of survey respondents did not have a smartphone with a camera, even though the CBP One app requires the applicant to take two photographs of themselves; and
- Almost 40% of survey respondents could not register on the CBP One app because of error messages, many of which were in English, a language that they do not read or understand.

76.    **Language Barriers.** CBP One also presents language access issues for asylum seekers who do not speak, read, or write English, Spanish, or Haitian Creole—the only languages currently supported by the app. It is nearly impossible for asylum seekers who cannot fluently read or write in one of these languages to navigate the app on their own and successfully obtain a CBP One appointment.

77.    Asylum seekers arriving at the southern border speak many languages apart from English, Spanish, and Haitian Creole. AOL's migrant survey demonstrated that individuals were unable to make appointments because they spoke one of 20 languages not supported by the app, including French, Portuguese, Russian, Farsi, Ukrainian, Arabic, Uzbek, Azeri, Belarusian, Turkish, Amharic, Tigrinya, Dari, Tajik, Hindi, and Mandarin, as well as a variety of Indigenous languages, including Garifuna, Mixteco, Triqui, Miskito, Nahautl, Q'eqchi, Tzotzil, and Pech. The CBP One app is not accessible to speakers of any of these languages.

78.    Even if a person speaks one of the languages included on the CBP One app, certain error messages are only in English. This prevents individuals who do not read or understand English from successfully making a CBP One appointment on their own after receiving an error message. Although CBP provides an email address where people can send questions, most migrants and border organizations report not receiving any response to their inquiries.

79.    In addition to error messages, Haitian Creole speakers have reported numerous other issues with the Haitian Creole version of CBP One. Haitian Creole speakers can only access the Haitian Creole version of the app after a full user registration process in English or Spanish. The Haitian Creole version of CBP One also includes mistranslations of important words. For example, the word "customs" in "Customs and Border Protection" is mistranslated as the Haitian Creole word for "cultural traditions." Some of the Haitian Creole words in the app have spacing issues, resulting in nonsensical words. These language access issues make successful navigation of CBP One even more challenging for Haitian asylum seekers and often prevent them from obtaining appointments.

80.    **Challenges for Individuals with Disabilities.** CBP One lacks accommodations for individuals with physical disabilities that prevent them from reading or inputting information into the app. The app does not even provide a place to indicate if an applicant has a disability or other medical condition that should make them a priority for humanitarian reasons. The Sidewalk School, a service provider in Matamoros, has assisted several clients with disabilities that would otherwise have precluded them from using CBP One. These included a man who uses a wheelchair and has a severe medical condition that causes his hands to seize up, along with stage 3 pressure ulcers, which prevented him from holding a phone; a woman with a brain tumor who had difficulty getting CBP One to

accept her photograph because of the partial paralysis in her face; and a client with impaired vision who could not see the phone screen.

81.    **Discriminatory Facial Recognition**. Problems with CBP One's facial recognition technology have created additional barriers for asylum seekers. Asylum seekers have struggled with CBP One's requirement that they submit a photograph taken with their mobile phone at various stages of the data entry process. The app has prevented many individuals with darker complexions from making appointments because it failed to register their features and rejected their photos.

82.    AOL, HBA, and other organizations assisting asylum seekers have previously had to resort to flashing a bright light on individuals with darker complexions when taking CBP One photos, which sometimes helps the app register their facial features. A migrant shelter in Reynosa had to install bright construction lights for Haitian and other asylum seekers to use when taking CBP One photos. Migrants forced to live in encampments or on the street often do not have access to such assistance. In any case, such lights do not always help, so individuals with darker complexions are always disadvantaged by CBP One.

83.    **Exploitation.** While CBP initially advertised CBP One as "providing immediate benefits in reducing exploitation of vulnerable persons seeking to present at POEs," the reality has been the reverse.[8] The Ciudad Juarez Office Chief of the U.N. International Organization for Migration described as a common phenomenon people posing as "lawyers and other professionals offering to help" migrants with CBP One for a fee, even though the app should be accessible for free. Because navigating the app is complicated, asylum seekers are vulnerable to

---

[8] Press Release, CBP, CBP Releases January 2023 Monthly Operational Update (Feb. 10, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.

organized criminal groups and smugglers selling them fake appointments, pretending to be service providers, or claiming to have special access to the app. This has led to "countless cases of fraud and extortion related to the use of this app." Reports indicate that individuals have been charged up to $2,000 for "help" with CBP One. Non-profit organizations such as AOL and HBA have faced security issues due to criminal groups seeking to protect this revenue source brought about by Defendants' illegal implementation of CBP One.

84. **Discriminatory Access.** CBP's requirement that asylum seekers utilize the app has led to unequal access to POEs based on an individual's socioeconomic status and ultimately, their nationality and race. People with newer or more advanced smartphones and those staying in hotels with strong internet connections have generally had better luck securing appointments through the app. Data from Tijuana's Migrant Affairs Office demonstrates that as of May 2023, over 40% of CBP One appointments secured by migrants in Tijuana have gone to Russian nationals, despite Russians making up less than 10% of Tijuana's overall migrant population. As the head of the office in Mexico explained, Russian nationals are generally better equipped to access CBP One, as they have the money to stay in hotels with strong Wi-Fi signals and have better smartphones. In contrast, the average Central American migrant stays in a crowded shelter where hundreds of people compete to use the same internet connection, and has a less updated phone.

85. These challenges to CBP One's accessibility and functionality also put enormous stress on humanitarian providers like Plaintiffs Al Otro Lado and Haitian Bridge Alliance, which have been forced to divert significant resources to provide technical assistance to migrants trying to navigate the app.

**F.     Despite the end of Title 42, the Guidance and the Rule, Defendants are continuing to turn back arriving noncitizens**

**1.     Use of CBP One Post-Title 42**

86.     As of May 12, 2023, CBP One has allowed users a 23-hour period, between 11:00 a.m. and 10:00 a.m. CST the following morning, to request an appointment. Users are notified the next day if they received an appointment and have a further 23-hour period to accept or decline. To accept the appointment, users must upload a live photo to the app.

87.     On June 30, 2023, CBP announced an increase in the number of available appointments to a total of 1,450 appointments per day at eight POEs[9]— still far short of the number of migrants the administration anticipated would be seeking access to asylum after the Title 42 policy ended. CBP also announced that a percentage of daily appointments would be reserved for the earliest-registered CBP One profiles in order to prioritize asylum seekers who had been waiting the longest—sometimes for months—but had been unable to obtain appointments. However, individuals who have to delete their old registrations due to an error, or because they were previously registered with a larger group with whom they are no longer traveling, must create a new registration and thus lose the benefit to which they should have been entitled based on their older profile.

**2.     Processing of Noncitizens with a CBP One Appointment**

88.     The administration insists that the use of CBP One is critical to a safe, orderly, and humane migration process.[10] But even for those lucky enough to win

[9] These POEs are at Brownsville, TX; Paso del Norte in El Paso, TX; Eagle Pass, TX; Hidalgo, TX; Laredo, TX; Calexico, CA; San Ysidro, CA; and Nogales, AZ.

[10] Press Release, CBP, CBP Makes Changes to CBP One App (May 5, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app.

the CBP One appointment lottery, the realities of the process remain dangerous and uncertain.

89.   Migrants who secure a CBP One appointment must still wait in Mexico for the date of their appointment before they can present at their assigned POE. Appointments are generally scheduled 13 days in advance. Border organizations and independent reporting confirm that migrants have experienced violence, kidnapping, extortion, and even been murdered in Mexico while waiting for scheduled appointments.

90.   Further, Defendants continue to offer appointments for inspections scheduled through CBP One at only eight POEs along the U.S.-Mexico border, despite maintaining many more Class A POEs that have the capacity and mandate to inspect and process arriving noncitizens. Several of the eight POEs are hundreds of miles apart, requiring many asylum seekers who are in different border cities to travel significant distances to reach their appointments. As detailed below, these journeys expose asylum seekers to a wide range of dangers in northern Mexico.

**3.    Defendants Have a Policy and Widespread Practice of Turning Back Asylum Seekers Who Present at POEs Without CBP One Appointments**

91.   Significant evidence confirms Defendants' policy and widespread practice of turning back most asylum seekers without CBP One appointments. Although Defendants' Rule provides for exceptions to the use of CBP One, CBP does not permit most asylum seekers to avail themselves of those exceptions. CBP is almost uniformly requiring asylum seekers to have a CBP One appointment in order to be inspected and processed, regardless of whether they may be eligible for an exception.

92.    Border-wide data shows that, as of May 2023, the eight Class A POEs that are processing asylum seekers are turning back almost all those who do not have a CBP One appointment. At four of these POEs—Matamoros, Reynosa, Nuevo Laredo, and Nogales—there is a tightly controlled process through which local intermediary organizations are able to facilitate the presentation of a limited number of individuals without appointments. The processes for effecting such intervention are opaque, not publicly disclosed, and inaccessible to the vast majority of migrants. The other four POEs are processing almost exclusively asylum seekers with CBP One appointments. And at many Class A POEs, CBP is processing no asylum seekers at all, despite their obligation to do so. Individual migrants, border organizations, and public reporting confirm that turnbacks continued to occur at POEs through June and July 2023 as well.

93.    Since the end of Title 42 on May 12, 2023, CBP has been coordinating with Mexican authorities to prevent asylum seekers without CBP One appointments from physically reaching POEs. Mexican officers are generally stationed a few hundred feet from the U.S.-Mexico limit line to identify and turn back individuals without a CBP One appointment.

94.    Upon information and belief, CBP communicates directly with Mexican authorities pursuant to this arrangement and, in furtherance of the CBP One Turnback Policy, regularly requests their assistance in clearing lines of waiting asylum seekers who do not have CBP One appointments from the bridges and entryways leading to POEs.

95.    The tactics used to implement the CBP One Turnback Policy vary slightly at different POEs, but the result is the same. Noncitizens are turned back by or in coordination with CBP officers and must use CBP One to access the asylum process.

*San Ysidro POE - Tijuana, Mexico/San Diego, CA*

96.    Since the Title 42 policy ended, AOL staff and volunteers have regularly monitored the San Ysidro POE and observed regular turnbacks by CBP of individuals and families without CBP One appointments. AOL staff have observed CBP officers telling asylum seekers they could not be processed without an appointment, and asylum seekers have reported experiencing the same. As described earlier, several Individual Plaintiffs have attempted to present at the San Ysidro POE to seek asylum, only to be turned back when CBP officers determined they did not have CBP One appointments.

97.    These turnbacks reflect close coordination between Mexican authorities and CBP, which gives the Mexican National Migration Institute ("INM"), the Mexican immigration agency, the number of appointments per time slot throughout the day. CBP communicates directly with Mexican immigration and law enforcement officers and regularly requests their assistance in clearing the backlog of people at the San Ysidro POE who do not have CBP One appointments.

98.       For example, around May 31, 2023, a line began forming outside the San Ysidro Ped East POE because CBP was not processing asylum seekers without CBP appointments. After about a day, approximately 350 individuals were lined up. Many slept there for days, without food, water, or shelter, other than donations from volunteers and non-profits. A Tijuana police officer directed a port monitor to communicate the message that "the only legal way to enter the U.S. is through the [CBP One] application."

99.    Since early June 2023, Mexican officials, at the behest of CBP, have prevented asylum seekers without CBP One appointments from even waiting on the Mexican side of the bridge leading to the San Ysidro POE. Those who circumvent Mexican officers and make it to the limit line are generally turned

back by CBP officers, who direct them to make CBP One appointments. If any migrant remains at the POE after being turned away, Mexican officers approach them and order them to leave. Those who refuse may be detained.

*Paso del Norte POE - Ciudad Juarez, Mexico/El Paso, TX*

100.    Since the end of Title 42, Las Americas staff has regularly monitored the Paso Del Norte Bridge that connects Ciudad Juarez, Mexico to El Paso, Texas. Staff members report that CBP officers routinely turn back asylum seekers who cannot access CBP One, even in the case of exigent circumstances.

101.    In mid-May 2023, CBP officers at Paso del Norte POE in El Paso, TX, directly turned back asylum seekers without CBP One appointments, telling them they would not be processed. A reporter witnessed nine instances of CBP officers telling asylum seekers arriving at POEs in El Paso that they "needed" appointments via CBP One in order to present. A CBP officer on the Paso del Norte bridge told a group of asylum seekers without CBP One appointments that asylum without a prearranged appointment "doesn't exist anymore." At the same POE in June 2023, CBP officers did not process anyone without a CBP One appointment for 14 days, despite the fact that several families with children under three had been waiting over 15 days to enter the port to seek asylum.

102.  In July 2023, an attorney with Las Americas Immigrant Advocacy Group in El Paso, Texas accompanied a family of Venezuelan asylum seekers who could not obtain a CBP One appointment to the midpoint of the Paso Del Norte Bridge. The mother was disabled, ill, and pregnant, and the attorney explained that she needed immediate medical attention. A CBP officer refused to let the family pass but directed them to wait while he contacted his supervisor. After the family had endured approximately 45 minutes in extreme heat, the CBP officer relayed that the port was at capacity and that no asylum seekers, including the family, could cross. While the Venezuelan family waited, CBP turned back

six additional asylum seekers, all of whom had crossed the midpoint of the bridge into U.S. territory.

103. Las Americas staff have also observed that CBP officers regularly dismiss asylum seekers' pleas for consideration when they cannot access CBP One or have missed their appointments due to kidnapping. In June 2023, for example, Las Americas interviewed a man from Honduras who, shortly after obtaining a CBP One appointment, was kidnapped by gangs in Mexico and held in captivity for 11 days. While in captivity, he was beaten severely, and gang members sent dogs to kill him when he first attempted to escape. He eventually succeeded in escaping, but had to leave behind all his possessions, including his cell phone, without which he could not register for CBP One. When he presented for asylum at the midpoint of the Paso Del Norte Bridge, CBP emphasized that he needed to sign up through the app and denied him any opportunity to explain the exigencies of his situation.

104. Later in June 2023, Las Americas interviewed a woman who was kidnapped along with her husband and two minor children. The family was released from captivity on June 17, missing their CBP One appointment on June 14 by three days. The family explained to CBP officers on the Paso Del Norte Bridge that they had missed their appointment because they had been kidnapped and did not feel safe staying in Ciudad Juarez. While one CBP officer told them that they could not be processed without a CBP One appointment, the family overheard another officer say, "Well everyone is saying they're kidnapped these days." After being turned back, the family tried without success to re-register for another appointment every day for three weeks.

105. Human Rights First reported that a Honduran teenage minor, adult sibling, and one-year-old child sought protection at the Paso del Norte bridge in Ciudad Juarez in June 2023, but were told by CBP officers that it was at capacity.

*Matamoros and Reynosa POEs - Matamoros, Mexico/Brownsville, Texas and Reynosa-McAllen/Hidalgo POE*

106. Local advocates have indicated that CBP and INM have been coordinating closely on the management and processing of asylum seekers in Matamoros and Reynosa since Title 42 ended. Some advocates have reported hearing INM officers call the local CBP Port Director to ask if particular asylum seekers were allowed to present. Advocates have also reported that Mexican officials have stated that they are "carrying out orders" when preventing asylum seekers from approaching the U.S. POEs and have specifically referenced "CBP orders."

107. On May 12, 2023, an HBA delegation in Matamoros witnessed Mexican officers turning away roughly 100 asylum seekers, including children, and preventing two African asylum seekers from approaching the CBP limit line on the bridge.

108. The following day, an advocate from the Sidewalk School accompanied two families without CBP One appointments to the Gateway International Bridge in Matamoros. Although both families were in desperate need of medical care, INM officers informed them that they could not walk on the bridge or even wait in the plaza at the foot of the bridge.

109. In late May 2023, Mexican officers blocked a pregnant Mexican woman and her husband from approaching the Matamoros POE to seek asylum. The officers instructed the couple to get a CBP One appointment, which they had been attempting to do for two months without success.

110. Human Rights First has reported several turnbacks of asylum seekers by CBP officers at the Matamoros POE. A Nicaraguan woman, who had been waiting months for a CBP One appointment, tried to seek asylum four times, but CBP officers repeatedly told her that the only way to do so was with a CBP One

appointment. CBP also reportedly turned away a Mexican Indigenous woman who had been repeatedly raped and impregnated in Matamoros, and whose rapist was looking for her. In addition, CBP reportedly turned away a mother with two minor children who fled after her son was murdered in Honduras. The family tried to seek asylum at the POE in Matamoros, but CBP officers turned them away because they did not have a CBP One appointment.

111. During a fact-finding mission to Reynosa in mid-July 2023, the Women's Refugee Commission interviewed an Armenian man, who had been trying unsuccessfully for over two months to secure a CBP One appointment. CBP officers had turned him back at the McAllen-Hidalgo International Bridge on three different occasions.

112.  The Women's Refugee Commission also spoke to a Mexican woman with four children who fled their home after being pursued by a criminal group that had previously disappeared her husband. After seeing someone from her home state in Reynosa, she feared that the individual would inform the criminal group of her whereabouts and sought to present herself and her children at the Hidalgo POE. Due to their lack of a CBP One appointment, an INM officer turned them away.

*Nogales POE – Nogales, Mexico/Nogales, AZ*

113. At the DeConcini POE in Nogales, Arizona, CBP has prevented virtually all those waiting in line at the POE without CBP One appointments from presenting. On most days in July 2023, CBP reportedly inspected and processed only one family from the line. On July 17, people who were next in line to be processed reported that they had been waiting and sleeping there for six nights but still had not been inspected by CBP officers. Also in July, a young Mexican woman with her infant son approached the POE to ask what she could do to seek asylum, and was told by the CBP officer that there was nothing she could do.

114. A Mexican municipal agency called Bienestar Social (Social Wellbeing) established a QR code system to manage the line of waiting asylum seekers without CBP One appointments. Bienestar Social assigns codes to the first 100 people in line and allows only a small number of those people to remain in line near the DeConcini POE. Local authorities in Nogales have told waiting asylum seekers that they could only seek asylum through the QR code system.

115. Bienestar Social has at times restricted access to the POE in Nogales and spread misinformation about U.S. asylum law. Since July 2023, the Kino Border Initiative has received consistent reports from asylum seekers who have tried to add their names to the waitlist, but Bienestar Social has refused to add them. Bienestar Social has also allowed certain asylum seekers to bypass the line altogether and enter the POE, raising concerns about irregularities in the agency's administration of the list.

## G.   The CBP One Turnback Policy Places Arriving Asylum Seekers in Grave Danger

116. The unreasonable delays and denials of access to the U.S. asylum process resulting from the CBP One Turnback Policy violate the statutory and due process rights of Individual Plaintiffs and proposed class members, forcing them to live under perilous conditions in Mexico. *See E. Bay Sanctuary*, 2023 WL 4729278, at *15 (noting that asylum seekers waiting in Mexico "are generally at heightened risk of violence by both state and non-state actors").

117. Migrants in Mexico face military, law enforcement, and immigration officials who are hostile to their presence in the country.

118. The United States has outsourced a substantial portion of immigration enforcement to the Mexican government and encouraged the militarization of Mexico's response to migration flows. Indeed, the Mexican government has deployed 30,000 National Guard soldiers alongside agents from

41

INM, the Mexican immigration agency, to monitor, interdict, and turn back noncitizens seeking to reach the U.S.-Mexico border. INM officials and National Guard soldiers have set up checkpoints on major roads and carry out surprise inspections at hotels and in public parks, effectively criminalizing migrants.

119.   When they reach the U.S.-Mexico border after a costly journey that can take months, migrants find few safe shelters, no job prospects, and unreliable access to food, water, and medical treatment. Migrants who appear not to be from Latin America or who do not speak Spanish, such as those from Haiti, Eastern Europe, and Indigenous communities, face even more challenges accessing these basic services, in addition to racial discrimination and abuse from local police and cartels.

120.       CBP turns back arriving noncitizens into areas of Mexico that are so dangerous that the U.S. State Department warns U.S. citizens not to travel there. The U.S. State Department warns that "[v]iolent crime—such as homicide, kidnapping, carjacking, and robbery—is widespread and common in Mexico."[11] Arriving migrants experience these dangers with high frequency and must routinely contend with Mexican law enforcement officers who engage in acts of extortion, violence, and arbitrary detention. Further, arriving migrants are in danger of torture and kidnapping by powerful cartels that control illegal border passages.[12] Mexican citizens stuck in the country from which they are trying to flee because of the CBP One Turnback Policy face particular dangers, as they are often forced to disclose their identities to Mexican municipal authorities to be placed on asylum waitlists.

[11] U.S. Dep't of State, Bureau of Consular Affairs, *Mexico Travel Advisory* (Oct. 5, 2022), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[12] U.S. Dep't of State, Bureau of Democracy, Human Rights, & Labor, *2022 Country Reports on Human Rights Practices: Mexico* 2 (Mar. 20, 2023).

121.    Defendants' own policies have exacerbated many of the dangers that Individual Plaintiffs and proposed class members face in Mexican border towns. Because Defendants have blocked legal migration pathways by turning back arriving noncitizens at Class A POEs, they have effectively empowered criminal organizations in Mexico to exploit the waiting migrants. The Sinaloa, Juarez, Jalisco, and Northeast cartels operate with impunity in many communities on the U.S.-Mexico border. For instance, in Matamoros, cartel members extract profits "from all the migrants that are going through the area" according to a May 2023 interview with Mark Lippa, the Assistant Special Agent in Charge of Defendant DHS's Homeland Security Investigations' San Ivanio Field Office.

122.    In Nuevo Laredo, near the international bridges leading to the Laredo POE, taxi cabs linger and offer rides to noncitizens who have recently been turned back from the POE. The migrants that accept these rides do not know that the taxi drivers are frequently working for the Northeast Cartel and that they will soon be delivered into the hands of kidnappers. Ransoms demanded by the cartel can be as high as $10,000.  Thus, at the Laredo POE, the CBP One Turnback Policy is directly benefiting and enriching a Mexican cartel at the expense of asylum seekers who should have been inspected and processed at the POE.

123.   In the weeks since the implementation of the CBP One Turnback Policy on May 12, many people have suffered horrific harm and threats of violence due to their inability to access a POE. One Honduran woman was raped and threatened with death in late-May 2023 while waiting for a CBP One appointment in the Matamoros encampment. When she attempted to approach the Matamoros POE, she was turned away. Her rapist returned another night in early-June 2023 and attempted to rape her again, but she escaped. She returned to the POE after filing a police report, but was again refused access.

124.   In July 2023, 22 non-profits that work along the border reported that kidnappings and extortion of migrants were increasing in the states of Sonora, Chihuahua, and Tamaulipas, all of which border the United States. Kidnappings often occur as migrants attempt to board buses heading towards the border, and result from collaboration between government officials, private bus companies, and organized crime.

125.   Compounding the problem, migrants are often pushed onto the streets because shelters quickly reach maximum capacity. For example, Tijuana has 30 shelters, which house roughly 5,600 people. In March 2023, however, nearly 15,000 migrants arrived in Tijuana, leaving many with inadequate access to housing and other resources when CBP failed to process them. The infrastructure in Tijuana is simply inadequate, and migrants must endure living on the streets.

126.   For those who find space in the shelters, conditions are often cramped and unsanitary, leading many migrants to contract diseases or to experience worsening of existing medical conditions, such as diabetes and hypertension.

127.   In July 2023, HBA's legal director visited encampments of Haitian migrants in Matamoros and Reynosa. In Matamoros, the encampment was at an abandoned gas station, with no toilet facilities, no running water, and no drinking water. In both Reynosa and Matamoros, the encampments included vulnerable populations living in exposed conditions with extremely high temperatures. A Haitian man passed away in an encampment in Reynosa the day before she visited.

128.   As of mid-June 2023, there were over 5,000 people living in the principal migrant camp in Matamoros, primarily people attempting to get CBP One appointments or waiting for their scheduled appointments. The camp lacks sufficient clean water and has poor sanitation, and residents often do not have enough food. Most people sleep in small tents that cannot protect them from

extreme weather conditions. Many bathe in the river, where they are at greater risk of being targeted by criminal groups and contracting illnesses. Doctors without Borders, a non-profit operating in the camp, has reported suspected cases of malaria and dengue fever in the camp. Moreover, Mexican cartels are active in the encampments, particularly in the evenings, jeopardizing the security of the residents.

129. Faced with these conditions, some migrants attempt to enter the United States between POEs without inspection, believing that to be their only way to reach safety. In fiscal year 2022, U.S. authorities recovered the bodies of 890 migrants, a 58% increase over 2021. This does not include the unrecovered bodies of migrants whose corpses have not been found. In Texas, local officials keep a refrigerated truck to hold the bodies of migrants who drown in the currents of the Rio Grande while trying to cross the border into the U.S.

130.   The CBP One Turnback Policy that Defendants have implemented at POEs, like prior turnback policies, is unconscionable and immoral, particularly given the life-threatening circumstances that prompt most arriving noncitizens to flee their home countries, the arduous journeys that they endure to reach the U.S.-Mexico border, and the dangerous conditions they face in northern Mexico while waiting to access the U.S. asylum process.

**H.    The CBP One Turnback Policy Has Caused Severe Harm to Each of the Plaintiffs**

131.   **Harm to Elena Doe.** Elena is a survivor of domestic violence, and her reports to the police elicited no response. Elena stayed with her aunt in hiding for a month, fearing that her ex-husband would find and harm her. She had trouble downloading and using the app, and even after receiving assistance, she has not been able to obtain an appointment through CBP One. Elena left her aunt's house and entered a shelter to prevent her ex-husband from finding her. She has had

great difficulty finding essentials for her children, including the diapers and milk her infant needs. Elena has suffered psychologically with the fear that her ex-husband will locate her, and U.S. officials laughed at her for not having a CBP One appointment when she attempted to present herself at a port of entry.

132. **Harm to Alexander Doe.** After being kidnapped and threatened in Chechnya by security services, Alexander was forced to seek refuge in the United States. When he attempted to present at the San Ysidro POE, Alexander was pushed by a CBP officer and suffered bruising from the encounter. Because Tijuana police are hostile to Eastern European migrants, Alexander has rarely left his hotel room while trying to get an appointment on CBP One. Alexander fears that his persecutors will discover his identity and location, and harm him or his family.

133. **Harm to Laura Doe.** Laura, who is only 23, is attempting to care for her three young children on her own while they wait to seek protection in the United States. Four months ago, her husband was disappeared by a powerful cartel that controls large swaths of Mexico, and maintains a significant presence in Tijuana. A month before that, the cartel kidnapped her father-in-law. Two of Laura's brothers-in-law were also murdered. After the disappearance of her husband, the cartel threatened to harm Laura and her children if the family continued to ask questions about his whereabouts. They subsequently fled to a shelter in Tijuana. Laura has been trying to get an appointment via CBP One since June 1, 2023, but has encountered numerous obstacles, including a smartphone that did not support CBP One and error messages that do not explain what she did wrong. Because she has been unable to obtain an appointment, CBP officers turned her away from the Otay Mesa POE when she tried to present with her children. Out of fear that the cartel will find them, Laura and her children have

only left the shelter on a few occasions, such as when her daughter was ill and required care at the hospital and medicine from a pharmacy.

134.   **Harm to Luisa Doe.** Luisa has already experienced a brutal attack due to her cooperation with local authorities against narcotraffickers who operated in the market where she worked. This assault added to her fear of remaining in Mexico, where she is also a target because of her ties to her children's father who refused to work for a criminal organization. Luisa witnessed the kidnapping of her partner's uncle and has received threats since then. She has been trying to obtain an appointment for herself and her two children via CBP One since early June 2023, and has grown frustrated. Luisa and her children have tried to present at the San Ysidro POE on two occasions but were turned back and forced to return to the shelter in Tijuana where they have been living. Having received threatening messages stating, "we know where you are," Luisa is too fearful to leave the shelter.

135.   **Harm to Diego Doe.** Diego Doe fled his home state in Mexico after working in various positions for the Mexican government, most recently researching organized criminal groups. Through this work, he became a target of corrupt government officials and organized crime. He narrowly escaped a kidnaping in his home state and fled first to Nogales and then Tijuana, Mexico. His wife recently joined him in Tijuana, and he fears for her life and his own. They are currently in hiding. Diego fears that the longer he stays in Mexico, the greater chance his persecutors will find and kill him.

136.   **Harm to Michelle Doe.** Michelle Doe fled her abusive ex-partner, a narco-trafficker and member of a Mexican cartel, with her newborn daughter. Michelle and her daughter are currently living in hiding at a shelter in Tijuana. She lives in fear that her ex-partner will locate her and try to kill her, as he threatened to do. She is using a fake name at the shelter and cannot disclose her

location to her loved ones for fear that her ex-partner will find out where she is hiding. She fled with nothing and must rely on the shelter to help her with necessities for her newborn. Because her ex-partner broke her phone, Michelle Doe did not have a working phone until Al Otro Lado recently provided her with one, so she was unable to download CBP One until Al Otro Lado intervened.

137.    **Harm to Pablo Doe.** After six years of gang-imposed extortion, Pablo Doe fled Honduras in 2023 when armed gang members assaulted him for a missed payment. On his journey to the border, he was assaulted and robbed of his life's savings in Mexico. He is currently hiding in Ciudad Juarez, where he fears widespread cartel violence.

138.    **Harm to Natasha Doe.** Natasha Doe fled Haiti after being forced into a car and assaulted by masked men and later received a death threat on her phone. She did not have a phone when she arrived in Matamoros in March 2023 because her phone broke while she was in transit to the U.S.-Mexico border. She has been attempting to get a CBP One appointment since April 2023, when a friend loaned her a phone and helped her register. She regularly does not have enough money to buy food for herself or her child; they often go a day or more without eating. Cars drive dangerously close to their tent. Recently, her daughter slipped and fell, causing alarming swelling in her arm. Natasha Doe worries about the unsafe conditions for her and her child.

139.    **Harm to Guadalupe Doe.** Guadalupe fled domestic violence with her children and mother, Plaintiff Somar Doe. She was turned back at the San Ysidro POE when she tried to present herself. Since then, Guadalupe and her family have been living at a migrant shelter in Tijuana. They fear leaving the shelter because of violence in the surrounding areas. They have run out of money. During their time at the shelter, Guadalupe's children have gotten the flu, contracted sore throats, and contracted gastrointestinal illnesses that cause them

48

to vomit at night, likely due to the poor quality of the food they receive at the shelter, which is often well past its expiration date. Guadalupe fears that her husband will find them and harm her, the children, or her mother.

140. **Harm to Somar Doe.** Somar fled her hometown in Mexico along with her daughter, Plaintiff Guadalupe Doe, and her grandchildren due to the violence and threats of violence her son-in-law inflicted on their family. Somar fears that her son-in-law will find them in Tijuana and will harm or kill them when he does. Somar also fears leaving the migrant shelter where she and her family have been staying. They rarely leave the shelter due to the level of danger and violence in Mexico. Somar briefly worked after arriving in Tijuana, but she quit after a frightening incident because she did not feel safe traveling to and from her job. The family has run out of money.

141. **Injury to Al Otro Lado.** AOL has been on the frontlines of the humanitarian crisis at the border for years, and was compelled to expend and divert substantial programmatic, financial, and emotional resources to manage the distinct harms associated with the rollout of the CBP One Turnback Policy. Since January 2023, AOL has hired three additional staff in its Tijuana office and raised funds to provide emergency humanitarian aid to certain migrants who have been turned back under the CBP One Turnback Policy. The funds for these positions would otherwise have been allocated to advancing AOL's mission, including advocating for immigration reform, providing direct services to people seeking asylum in the United States, engaging in litigation to advocate for the rights of asylum seekers at the border and while seeking protection within the United States, and reunifying families separated under the Trump administration.

142. The CBP One Turnback Policy has required AOL to divert resources to conduct POE monitoring to document how the CBP One Turnback Policy plays out in practice so that they can properly advise clients and engage with policy-

makers and advocates. AOL staff have expended hundreds of hours assisting migrants with the app, as well as accompanying and advocating for those who want to present at a POE without a CBP One appointment.

143.   When AOL learned that individuals approaching POEs were being turned away, and that CBP was coordinating with Mexican authorities to ensure that asylum seekers could not wait at POEs to be processed, AOL staff had to update all of their "know your rights" materials in multiple languages and go back to shelters they had previously visited to communicate what they had learned about the CBP One Turnback Policy. AOL also expended resources to produce educational materials regarding CBP One in multiple languages so that asylum seekers who do not speak Spanish, English, or Haitian Creole can understand how the app affects their rights.

144.   AOL has spent countless hours in stakeholder engagement meetings—hours that could have been spent assisting desperate migrants—in the hope of convincing DHS to end its CBP One Turnback Policy.

145.   The CBP One Turnback Policy frustrates AOL's core mission of assisting migrants in seeking relief in the United States and severely disrupts the work of its Border Rights Project by flagrantly violating the rights of asylum seekers. Although AOL frequently intervenes on behalf of Mexican noncitizens, who are not subject to the Rule, and other noncitizens fleeing imminent harm, who should receive exceptions to CBP One under the Rule, many such individuals are turned back at POEs. The CBP One Turnback Policy has created human desperation of such volume and magnitude that AOL has had to hire additional staff in its Tijuana office and raise funds for emergency humanitarian aid for affected migrants.

146.   In addition, responding to the CBP One Turnback Policy has jeopardized the safety of AOL staff and subjected them to almost unbearable

emotional stress. AOL staff work in shelters located in dangerous areas, consistently exposing them to grave harm. One of AOL's staff members was robbed while providing services to asylum seekers. Smugglers and cartels remain active along the border, but AOL has been steadfast in helping individuals to navigate the process of seeking asylum. This presents particularly acute security concerns when AOL assists individuals fleeing organized crime and/or government persecutors who are actively searching for them.

147.    AOL staff and leadership also shoulder a painful emotional burden watching their clients suffer and die for lack of access to POEs. Desperate for AOL's assistance, migrants send disturbing photos of their injuries, illnesses, threats, and tortured or deceased family members to AOL staff through WhatsApp messages. AOL's executive director personally received so many of these photos that she had to change the settings on her phone to not automatically download photos because she could not bear the continued emotional toll of seeing the desperation and harm caused by the CBP One Turnback Policy. Some AOL staff receive dozens or even hundreds of these messages each day. AOL has had to obtain supplementary mental health insurance for their staff because of the traumatic effects of receiving these messages and photos, coupled with their limited capacity to provide assistance despite their monumental efforts. Many of AOL's staff belong to the communities most impacted by CBP's border policies, which makes witnessing Defendants' abuses particularly harrowing.

148.    **Injury to Haitian Bridge Alliance.** The CBP One Turnback Policy has caused HBA to divert significant resources away from its core programmatic work. HBA's primary mission is to support recently arrived Black immigrants in adjusting to life in the United States. This includes assisting individuals with applications for Temporary Protected Status, providing legal services for individuals in immigration proceedings, and easing adjustments for individuals

coming out of immigration detention. A significant portion of HBA's resettlement and legal support is based in California, but it also conducts policy work in Washington D.C., at the United Nations in New York, and in other international fora.

149. The CBP One Turnback Policy has required HBA to divert time, money, and resources to meet the material needs of migrants at the southwest border. HBA has been forced to prioritize humanitarian services at the border, including finding housing, medical assistance, and other social services; devising new "know your rights" programs for people stranded in Mexico for extended periods; providing assistance to Haitians struggling to use CBP One; and raising funds to provide life-saving services to Haitian and other Black migrants in Tijuana, Matamoros, and Reynosa.

150. The CBP One Turnback Policy has caused significant financial disruption to HBA. California provides vital funds in exchange for HBA's provision of direct representation and legal orientations to asylum seekers in the United States. To continue to receive these funds, HBA must meet certain benchmarks that are becoming increasingly difficult to attain given the significant strain on HBA staff and diversion of resources to the border. Although HBA previously provided monetary support to many of the shelters in Tijuana, they have been forced to divert additional funds for longer-term accommodations due to the longer waiting times resulting from the CBP One Turnback Policy. In June 2023, HBA also diverted funds to secure office space in Reynosa because of the continuing need to support the many Haitians subject to the CBP One Turnback policy.

151. The implementation of the CBP One Turnback Policy has also put HBA staff at serious risk, endangering the safety of multiple team members. Several staff have been threatened with violence; two were forced to flee because

of threats against them. In addition, HBA staff—many of whom are Black migrants themselves—have been traumatized by the effects of the CBP One Turnback Policy. The emotional and mental toll of watching and worrying while community members suffer and sometimes die while waiting to enter the United States is often overwhelming.

## VI.   CLASS ACTION ALLEGATIONS

152.   Individual Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as:

> All noncitizens who seek or will seek to present themselves at a Class
> A POE on the U.S.-Mexico border to seek asylum, and were or will be
> prevented from accessing the U.S. asylum process by or at the direction
> of Defendants based on the CBP One Turnback Policy.

153.   **Fed. R. Civ. P. 23(a)(1) – Numerosity.** The class is so numerous that joinder of all class members is impractical. Pursuant to the CBP One Turnback Policy, Defendants have denied or unreasonably delayed thousands of arriving noncitizens from accessing the U.S. asylum process and deprived them of benefits to which they are entitled under Defendants' binding agency guidance. Moreover, class members are geographically dispersed along the U.S.-Mexico border, making joinder of all class members impractical.

154.   **Fed. R. Civ. P. 23(a)(2) – Commonality.** There are questions of law and fact common to the proposed class. The implementation and legality of the CBP One Turnback Policy are systemic questions capable of common proof. There are also other questions of law and fact that are common to the proposed class, including (a) whether Defendants have unlawfully denied noncitizens arriving at Class A POEs on the U.S.-Mexico border access to the U.S. asylum process, (b)

whether class members have been adversely affected or aggrieved by the CBP One Turnback Policy, (c) whether Defendants denied class members due process in violation of the Fifth Amendment, (d) whether Defendants have violated the *Accardi* doctrine, and (e) whether the CBP One Turnback Policy violates the United States' non-refoulement obligations. Even if there are "different factual circumstances between each class member's particular experience," that "does not destroy commonality because there is still a common underlying legal question regarding whether each and every class member was illegally denied access to the asylum system because of the Defendants' overarching policy." *Al Otro Lado, Inc. v. Wolf*, 336 F.R.D. 494, 503 (S.D. Cal. 2020).

155.   **Fed. R. Civ. P. 23(a)(3) – Typicality.** Individual Plaintiffs' claims are reasonably coextensive with those of the proposed class because the Individual Plaintiffs and all proposed class members were denied access to the U.S. asylum process by or at the direction of Defendants. Even if the CBP One Turnback Policy prompted some members of the proposed class to wait in Mexico instead of attempting to present themselves at a POE, there is "no meaningful difference" between a noncitizen who is denied entry to the United States by a CBP officer enforcing the CBP One Turnback Policy and a noncitizen who decides to wait in a Mexican border town because she knows that she will be turned back at or while in the process of arriving at the POE. *Al Otro Lado, Inc.*, 336 F.R.D. at 505.

156.   **Fed. R. Civ. P. 23(a)(4) – Adequacy.** Each of the Class Plaintiffs is able to prosecute this litigation vigorously through qualified counsel—almost exactly the same counsel as this Court previously found to be qualified. *Al Otro Lado, Inc.*, 336 F.R.D. at 505. Moreover, none of the Class Plaintiffs have antagonistic or conflicting interests. They all share a common interest in enjoining and vacating the CBP One Turnback Policy and being able to access the U.S. asylum process at a POE along the U.S.-Mexico border. Moreover, Plaintiffs'

counsel will adequately protect the interests of the class because they have demonstrated expertise in litigating similar causes of action and have dedicated significant resources to litigating this matter.

157.   **Fed. R. Civ. P. 23(b)(2).** The proposed class should also be certified because Defendants have acted and refused to act on grounds that apply generally to the class. Namely, Defendants have implemented, enforced, and perpetuated the CBP One Turnback Policy at Class A POEs on the U.S.-Mexico border with respect to all proposed class members. Pursuant to the CBP One Turnback Policy, Defendants have deprived noncitizens who are in the process of arriving at Class A POEs on the U.S.-Mexico border of access to the U.S. asylum process, in violation of the INA, the Administrative Procedure Act, and the Due Process Clause. As in *Al Otro Lado, Inc. v. Wolf*, CBP officers' "refusal to process asylum-seekers . . . is the generally applicable ground for class-wide relief under Rule 23(b)(2)." 336 F.R.D. at 506-07.

## VII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Violation of the *Accardi* Doctrine

158.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

159.   Under elementary principles of administrative law, as well as fundamental fairness, agencies are required to follow their own policies. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). According to well-established case law, failure to do so constitutes a violation of the *Accardi* doctrine.

160.   The November 1, 2021 memorandum issued by Acting CBP Commissioner Miller regarding the processing of undocumented noncitizens at land POEs states that "asylum seekers or others seeking humanitarian protection

cannot be required to submit advance information [i.e., use the CBP One app] in order to be processed at a Southwest Border land POE." Guidance at 2. This Guidance, which constitutes CBP's binding internal guidance governing the processing of asylum seekers arriving at POEs along the southern border, remains effective and has not been rescinded or superseded by CBP.

161.  The recently promulgated "Circumvention of Lawful Pathways" rule similarly sets forth the government's binding guidance that noncitizens presenting at POEs will not be turned away or denied the opportunity to seek protection in the United States. The Rule specifies that noncitizens can "present[] at a port of entry without a pre-scheduled time and place" and will not be turned away, and the Preamble to the rule repeatedly articulates Defendants' position that individuals without appointments will not be turned away.

162.  Defendants have failed to comply with the November 2021 Guidance, as well as the binding agency guidance reflected in the preamble to the Rule and the Rule itself regarding access to POEs. Instead they have adopted and implemented a policy of turning back asylum seekers who do not have CBP One appointments. In so doing, Defendants have denied Individual Plaintiffs access to the asylum process at POEs due to their lack of a CBP One appointment.

163.  The CBP One Turnback Policy constitutes a final agency action. Furthermore, each instance where Defendants, through their officers, employees, and agents, fail to comply with binding agency guidance regarding access to POEs and thus deny Individual Plaintiffs access to the asylum process, constitutes a final agency action.

164.  By violating the *Accardi* doctrine, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm.

165. In addition, by violating the *Accardi* doctrine, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs to counteract CBP's unlawful CBP One Turnback Policy.

166. Plaintiffs have no other remedy in a court to redress the violations alleged herein.

## SECOND CLAIM FOR RELIEF

## Violation of Administrative Procedure Act, § 706(2)(A), (C), Agency Action Not in Accordance with Law and in Excess of Statutory Authority

167. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

168. Under the Administrative Procedure Act, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

169. The INA gives any noncitizen "who is physically present in the United States or who arrives in the United States" the right to seek asylum, regardless of such individual's immigration status. 8 U.S.C. § 1158(a)(1).

170. When a noncitizen presents at a POE and indicates an intention to apply for asylum or a fear of persecution, CBP officers must refer the noncitizen for a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. § 235.3(b)(4) or place the noncitizen directly into regular removal proceedings under 8 U.S.C. § 1229(a)(1).

171. None of these provisions authorize CBP officers or their agents to turn back asylum seekers arriving at a POE based on lack of a CBP One appointment.

172. Individual Plaintiffs presented themselves or attempted to present themselves at POEs, and either asserted an intention to apply for asylum or a fear

of persecution in their countries of origin or would have done so but for Defendants' unlawful conduct. Nevertheless, CBP officers did not refer Individual Plaintiffs for credible fear interviews pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii) or place Individual Plaintiffs directly into regular removal proceedings under 8 U.S.C. § 1229a.

173. Instead, in direct contravention of the INA, Defendants, through the implementation of the CBP One Turnback Policy, have denied Individual Plaintiffs access to the statutorily prescribed asylum process and turned them back to Mexico. In so doing, CBP officers have not acted and continue not to act in accordance with the provisions of the INA and in excess of the authority granted to them by Congress.

174. CBP officers, in coordination with Mexican authorities, implemented the CBP One Turnback Policy at the instigation, under the control or authority, or with the knowledge, consent, direction, and/or acquiescence of Defendants.

175. The CBP One Turnback Policy constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A) and (C).

176. Furthermore, each instance where Defendants, through their officers, employees, and agents, deny Individual Plaintiffs access to the asylum process constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A) and (C).

177. By implementing the CBP One Turnback Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm.

178. In addition, by implementing the CBP One Turnback Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by

1  frustrating their missions and forcing them to divert substantial resources away
2  from their core programs.

3  179.   Plaintiffs have no other adequate remedy in a court to redress the violations
4  alleged herein.

**THIRD CLAIM FOR RELIEF**

**Violation of Administrative Procedure Act, § 706(2)(A),**

**Arbitrary & Capricious**

8  180. Plaintiffs reallege and incorporate by reference each and every
9  allegation contained in the preceding paragraphs as if set forth fully herein.

10  181.  The Administrative Procedure Act provides that courts "shall … hold
11  unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of
12  discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

13  182.  The CBP One Turnback Policy is arbitrary and capricious because, in
14  adopting it, Defendants have failed to articulate a reasoned explanation for their
15  decision; considered factors that Congress did not intend to be considered; entirely
16  failed to consider important aspects of the problem; and offered explanations for
17  their decision that run counter to the evidence before the agency.

18  183.  CBP officers, in coordination with Mexican authorities, implemented
19  the CBP One Turnback Policy at the instigation, under the control or authority, or
20  with the knowledge, consent, direction, and/or acquiescence of Defendants.

21  184.  The CBP One Turnback Policy constitutes a final agency action under
22  5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A).

23  185.  Furthermore, each instance where Defendants, through their officers,
24  employees, and agents, deny Individual Plaintiffs access to the asylum process
25  constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C.
26  § 706(2)(A).

27
28

186. By implementing the CBP One Turnback Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm.

187. In addition, by implementing the CBP One Turnback Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs.

188. Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

## FOURTH CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, § 706(1), Agency Action Unlawfully Withheld or Unreasonably Delayed

189. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

190. The Administrative Procedure Act provides that courts "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

191. In coordination with Mexican authorities, CBP officers, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have engaged in an unlawful and widespread pattern or practice of denying or unreasonably delaying asylum seekers' access to the asylum process by requiring them to obtain a CBP One appointment in order to access the asylum process at a POE.

192. In coordination with Mexican authorities, CBP officers, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have adopted and implemented the CBP

One Turnback Policy, which restricts or unreasonably delays access to the asylum process at POEs.

193.  Through this conduct, CBP officers have failed, in violation of APA § 706(1), to take actions mandated by the following statutes:

      (a)  8 U.S.C. § 1158 (a)(1) ("Any alien who … arrives in the United States … irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b).");

      (a)  8 U.S.C. § 1225(a)(1)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.");

      (b)  8 U.S.C. § 1225(b)(1)(A)(ii) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer . . . .");

      (c)  8 U.S.C. § 1225(b)(2) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."); and

194.  Through this conduct, CBP officers have also failed, in violation of the APA, to take the above-listed mandated actions without unreasonable delay.

195.  Defendants' repeated and pervasive failures to act, and/or to act within a reasonable time, which denied or unreasonably delayed Individual Plaintiffs' access to the statutorily prescribed asylum process, constitute unlawfully withheld and/or unreasonably delayed agency action.

196.  As a result of Defendants' acts constituting violations of APA § 706(1), Defendants have irreparably injured Individual Plaintiffs by denying or unreasonably delaying their access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution or other serious harm.

197.  In addition, as a result of the acts constituting violations of APA § 706(1), Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs to counteract Defendants' unlawful practices.

198.  Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

## FIFTH CLAIM FOR RELIEF
### Violation of Due Process

199.  Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

200.  The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. Amend. V.

201.  Congress has granted certain statutory rights to asylum seekers, including Individual Plaintiffs and proposed class members, and has directed DHS to establish a procedure for providing such rights. The Due Process Clause thus

requires the government to establish a fair procedure and to abide by that procedure.

202. The INA provides Individual Plaintiffs the right to be inspected and processed at a POE and granted access to the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2).

203. By implementing the CBP One Turnback Policy, CBP officers have denied or unreasonably delayed Individual Plaintiffs' access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations.

204. CBP officers' treatment of Individual Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction, or acquiescence of Defendants.

205. By denying or unreasonably delaying Individual Plaintiffs' access to the asylum process, Defendants have violated Individual Plaintiffs' due process rights under the Fifth Amendment to the U.S. Constitution and the Immigration and Nationality Act.

206. As a result of the Defendants' violations of the Fifth Amendment to the U.S. Constitution and the Immigration and Nationality Act, Defendants have irreparably injured Individual Plaintiffs by denying or unlawfully withholding their access to the asylum process and by forcing them to return to Mexico or other countries where they face threats of further persecution.

207. As a result of Defendants' violations of the Fifth Amendment to the U.S. Constitution and the Immigration and Nationality Act, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs.

208. Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

### SIXTH CLAIM FOR RELIEF

### Violation of the Non-Refoulement Doctrine Actionable Via the Alien Tort Statute, 28 U.S.C. § 1350

209. Individual Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

210. CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Individual Plaintiffs, and the asylum seekers they represent, in violation of customary international law reflected in treaties that the United States has ratified and implemented: namely, the specific, universal, and obligatory norm of non-refoulement, which has also achieved the status of a jus cogens norm, and which forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture, whether it is her home country or another country. This norm is universally understood to apply at the border.

211. The duty of non-refoulement also requires the adoption of procedures to ensure prompt, efficient, and unbiased access to the asylum process.

212. CBP officials' treatment of Individual Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction, or acquiescence of Defendants.

213. Defendants' conduct is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes declaratory and injunctive relief.

214. As a result of the acts constituting violations of the jus cogens norm of non-refoulement, Individual Plaintiffs have been damaged by being denied access, or being unreasonably delayed in gaining access, to the asylum process and by

being forced to return to Mexico or other countries where they face threats of further persecution.

215. Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Individual Plaintiffs and further violations of their rights under international law.

216. Individual Plaintiffs do not have an adequate remedy at law to redress the violations.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Issue an order certifying the class defined in this Complaint pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), and 23(b)(2);

B. Appoint the undersigned counsel to serve as class counsel pursuant to Fed. R. Civ. P. 23(g);

C. Issue an order and judgment declaring that the CBP One Turnback Policy violates one or more of the following: (1) the *Accardi* doctrine, (2) Section 706(2)(A) of the Administrative Procedure Act, (3) Section 706(2)(C) of the Administrative Procedure Act, (4) Section 706(1) of the Administrative Procedure Act, (5) the Due Process Clause of the Fifth Amendment, and/or (6) the non-refoulment doctrine;

D. Issue an order and judgment permanently enjoining the CBP One Turnback Policy;

E. Issue an order and judgment setting aside the CBP One Turnback Policy;

F. Issue an order and judgment finding that any injunctive relief issued by this Court binds other persons who are in active concert or participation with any of the Defendants pursuant to Fed. R. Civ. P. 65(d)(2)(C);

G. Award Plaintiffs their reasonable attorneys' fees, costs, and other expenses pursuant to 28 U.S.C. § 2412 and any other applicable law; and

H.      Grant any and all such other relief as the Court deems just and equitable.

Dated: July 27, 2023

MAYER BROWN LLP
Matthew H. Marmolejo
Ori Lev*
Michelle Webster*
Matthew Fenn*

VINSON & ELKINS LLP
Stephen M. Medlock*
Evan Miller*
Nataly Farag*
Rami Abdallah E.
Rashmawi*
Alex Rant*

CENTER FOR GENDER
AND REFUGEE STUDIES
Melissa Crow*
Neela Chakravartula
Robert Pauw*

CENTER FOR CONSTITUTIONAL
RIGHTS
Baher Azmy*
Angelo Guisado*

AMERICAN IMMIGRATION
COUNCIL
Katherine Melloy Goettel*
Gianna Borroto*
Suchita Mathur*

By: */s/ Matthew H. Marmolejo*
Matthew H. Marmolejo

*Attorneys for Plaintiffs*

* Pro Hac Vice motion forthcoming

66

COMPLAINT