MAYER BROWN LLP
Matthew H. Marmolejo (CA Bar No. 242964)
*mmarmolejo@mayerbrown.com*
333 S. Grand Avenue
47th Floor
Los Angeles, CA 90071-1503
Telephone: +1.213.229.9500
Ori Lev (DC Bar No. 452565)
(*pro hac vice*)
*olev@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

VINSON & ELKINS LLP
Stephen M. Medlock (VA Bar No. 78819)
(*pro hac vice*)
*smedlock@velaw.com*
2200 Pennsylvania Ave., N.W., Ste. 500 W
Washington, DC 20037
Telephone:  +1.202.639.6500
Facsimile:   +1.202.879.8939

CENTER FOR GENDER AND REFUGEE
STUDIES
Melissa Crow (DC Bar No. 453487)
(*pro hac vice*)
*crowmelissa@uclawsf.edu*
1121 14th Street, N.W., Suite 200
Washington, DC 20005
Telephone: +1.202.355.4471
Facsimile: +1.415.581.8824

*Additional Attorneys for Plaintiffs Listed
on Next Page*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., *et al.* | Case No.: 3:23-cv-01367-AGS-BLM |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| ALEJANDRO N. MAYORKAS, *et al.*, | |
| Defendants. | |

MAYER BROWN LLP
Michelle N. Webster (DC Bar No. 985265)
(*pro hac vice*)
*Mwebster@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300
Matthew E. Fenn (NY Bar No. 5391149)
(*pro hac vice*)
*Mfenn@mayerbrown.com*
71 S. Wacker Dr.
Chicago, IL 60606
Telephone: +1.312.782.0600

VINSON & ELKINS LLP
Evan Miller (DC Bar No. 219310)
(*pro hac vice*)
*emiller@velaw.com*
Nataly Farag (DC Bar No. 90006516)
(*pro hac vice*)
*nfarag@velaw.com*
Alex Rant (DC Bar No. 1780786)
(*pro hac vice*)
*arant@velaw.com*
Rami Abdallah E. Rashmawi (DC Bar No. 1780184)
(*pro hac vice*)
*rrashmawi@velaw.com*
2200 Pennsylvania Ave., N.W., Ste. 500 W
Washington, DC 20037
Telephone:  +1.202.639.6500
Facsimile:   +1.202.879.8939

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740)
(*pro hac vice forthcoming*)
*bazmy@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688)
(*pro hac vice forthcoming*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

AMERICAN IMMIGRATION COUNCIL
Gianna Borroto (IL Bar No. 6305516)
(*pro hac vice*)
*gborroto@immcouncil.org*
Katherine Melloy Goettel (IA Bar No. 53821)
(*pro hac vice forthcoming*)
*kgoettel@immcouncil.org*
Suchita Mathur (NY Bar No. 5373162)
(*pro hac vice*)

23cv01367

*smathur@immcouncil.org*
1331 G St. NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

CENTER FOR GENDER & REFUGEE STUDIES
Neela Chakravartula (CA Bar No. 254746)
*neela@uclawsf.edu*
UC College of the Law, San Francisco
200 McAllister Street
San Francisco, CA  94102
Telephone: +1.415.565.4877
Facsimile: +1.415.581.8824

CENTER FOR GENDER & REFUGEE STUDIES
Robert Pauw (WA Bar No. 13613)
(*pro hac vice*)
*rpauw@ghp-law.net*
c/o GIBBS HOUSTON PAUW
1000 Second Avenue, Suite 1600
Seattle, WA  98104
Telephone: +1.206.682.1080
Facsimile: +1.206.689.2270

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND.........................2

    A.    The Government's Binding Guidance on Access to
       Asylum at POEs ........................................................2

    B.    Despite The Binding Guidance, The Government Has
       A Policy Of Turning Back Arriving Noncitizens Without A
       CBP One Appointment ................................................5

    C.    The Government's Conduct Has Irreparably Harmed
       The Class ..................................................................8

III.  ARGUMENT ..................................................................12

    A.    Plaintiffs Are Likely To Succeed on the Merits of the
       *Accardi* Claim ...........................................................13

        1.    The *Accardi* Doctrine ........................................13

        2.    Defendants Have Adopted Binding Guidance To Not
           Turn Back Asylum Seekers Without CBP One
           Appointments ...............................................15

        3.    Plaintiffs are Entitled to Relief under *Accardi* ...............17

        4.    *Aleman Gonzalez* Does Not Preclude Injunctive
           Relief ........................................................19

    B.    A Preliminary Injunction is Warranted Because Plaintiffs
       Will Otherwise Suffer Irreparable Injury.................................21

    C.    The Balance of Equities and the Public Interest Favor
       Entry of an Injunction ..................................................26

CONCLUSION ........................................................................27

23cv01367

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ....................................................................... *passim*

*Al Otro Lado, Inc. v. McAleenan*,
   423 F. Supp. 3d 848 (S.D. Cal. 2019) .......................................20

*Al Otro Lado v. Mayorkas*,
   2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ...........................18

*Al Otro Lado v. Wolf*,
   952 F. 3d 999 (9th Cir. 2020) ....................................................23

*Alcaraz v. INS*,
   384 F.3d 1150 (9th Cir. 2004) ...............................12, 13, 14, 18

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ....................................................12

*Battle v. FAA*,
   393 F.3d 1330 (D.C. Cir. 2005) .................................................12

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) ....................................................19

*Carnation Co. v. Sec'y of Labor*,
   641 F.2d 801 (9th Cir. 1981) ......................................................13

*Catholic Social Servs., Inc. v. INS*,
   232 F.3d 1139 (9th Cir. 2000) ....................................................19

*Church of Scientology of Cal. v. United States*,
   920 F.2d 1481 (9th Cir. 1990) ....................................................12

*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018) .....................................16, 17

*Doe v. Wolf*,
   432 F. Supp. 3d 1200 (S.D. Cal. 2020) ....................................23

ii

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014)........................................................11, 23

*E. Bay Sanctuary Covenant v. Trump*,
   349 F. Supp. 3d 838 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir.
   2020)................................................................................8, 20, 21

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018)...............................................................23

*East Bay Sanctuary Covenant v. Biden*,
   2023 WL 4729278 (N.D. Cal. July 25, 2023).........................................3, 8

*Emami v. Nielsen*,
   365 F. Supp. 3d 1009 (N.D. Cal. 2019).......................................15, 16, 18

*Emami v. Nielsen*,
   465 F. Supp. 3d 991 (N.D. Cal. 2020)..........................................12, 16

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057 (2022) ......................................................17, 19

*Gonzales v. DHS*,
   508 F.3d 1227 (9th Cir 2007)...............................................................19

*Huisha-Huisha v. Mayorkas*,
   560 F. Supp. 3d 146 (D.D.C. 2021), *aff'd and remanded*, 27 F.4th
   718 (D.C. Cir. 2022)........................................................................22

*Innovation Law Lab v. Nielsen*,
   342 F. Supp. 3d 1067 (D. Or. 2018).....................................................12

*Jefferson v. Harris*,
   285 F. Supp. 3d 173 (D.D.C. 2018) .....................................................12

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011)...............................................................20

*Lopez v. FAA*,
   318 F.3d 242 (D.C. Cir. 2003) .............................................................13

*M.R. v. Dreyfus*,
   697 F.3d 706 (9th Cir. 2012)...............................................................19

*Montilla v. INS,*
   926 F.2d 162 (2d Cir. 1991) ...................................................12

*Morton v. Ruiz,*
   415 U.S. 199 (1974) ....................................................2, 12, 13

*Ramirez v. U.S. Imm. & Customs Enf't,*
   310 F. Supp. 3d 7 (D.D.C. 2018) ...........................................23

*Rodriguez v. Robbins,*
   715 F.3d 1127 (9th Cir. 2013) ...............................................23

*Saravia for A.H. v. Sessions,*
   905 F.3d 1137 (9th Cir. 2018) ...............................................11

*Service v. Dulles,*
   354 U.S. 363 (1957) .............................................................13

*Small v. Avanti Health Sys., LLC,*
   661 F.3d 1180 (9th Cir. 2011) ...............................................23

*Vanover v. Hantman,*
   77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*, 38 F. App'x 4
   (D.C. Cir. 2002) ...................................................................12

*Vitarelli v. Seaton,*
   359 U.S. 535 (1959) .............................................................13

**Statutes and Regulations**

8 U.S.C. § 1158(b) ......................................................................20

8 U.S.C. § 1225(a)(3) ..................................................................14

8 U.S.C. § 1231(a)(6) .............................................................17, 18

8 U.S.C. § 1231(b)(3) ..................................................................20

8 U.S.C. § 1252(f)(1) .............................................................17, 19

Administrative Procedure Act,
   5 U.S.C. § 706(2) .............................................................12, 16

8 C.F.R. § 208.33(a)(1) .................................................................3

8 C.F.R. § 208.33(a)(2)(ii)(B) ....................................................4, 14

8 C.F.R. § 208.33(a)(3)(i) ...................................................................................4

8 C.F.R. § 1208.16(a) ......................................................................................20

8 C.F.R. § 1208.33(a)(1) ...................................................................................3

Circumvention of Lawful Pathways,
    88 Fed. Reg. 31,314 (May 16, 2023)....................................3, 4, 14, 15, 18

23cv01367

The individual Plaintiffs, on behalf of themselves and the class they seek to represent, move for a preliminary injunction to enjoin Defendants' failure to follow their Binding Guidance to inspect and process asylum seekers at Class A Ports of Entry ("POE") regardless of whether they have a "CBP One" appointment, and to cease their practice of turning back asylum seekers who arrive at POEs without CBP One appointments. Defendants' failure has caused irreparable harm, both in denying Plaintiffs access to the asylum process and in forcing them to wait for that access in precarious and dangerous conditions in Mexico.

## I.    INTRODUCTION

Old habits are hard to break, even when those habits violate the law. After years of illegally metering asylum seekers, and despite a professed policy of not turning back arriving noncitizens at POEs, the Government has returned to its old ways.

Here is what is supposed to happen: The U.S. government is supposed to follow the official guidance it adopted. That guidance states that Defendants will inspect and process all asylum seekers arriving at POEs, regardless of whether they have a CBP One appointment. Defendants have publicized this position over the course of several years.

Here is what is actually happening: Since May 12, 2023, CBP has been turning back arriving asylum seekers at POEs because they lack an appointment made with through the CBP One mobile app. Use of the CBP One smartphone app has effectively become the sole mechanism to access the U.S. asylum process at a POE on the southern border. Individual Plaintiffs and proposed class members are forced to wait in Mexico while they try for weeks, if not months, to make an appointment on the smartphone app. Those who are not lucky enough to speak one of the three "right" languages or who lack sufficient financial resources to afford an up-to-date smartphone are blocked from

accessing asylum at U.S. POEs—even if they are in exigent circumstances or immediate need of protection. Despite the Government's Binding Guidance to the contrary, asylum seekers who walk up to POEs are being turned back and directed to make an appointment using CBP One.

Individual Plaintiffs and proposed class members seek a preliminary injunction that requires the government to do what it said it would do—allow noncitizens to be processed at POEs without having to navigate an app that (if it works at all) requires them to wait for months, often in dangerous Mexican border towns. *See Accardi v. Shaughnessy*, 347 U.S. 260, 265-66 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

As discussed below, if this Court does not act now, individual Plaintiffs and proposed class members will continue to suffer serious and irreparable injuries. Namely, they will be denied the access to the U.S. asylum process that Defendants explicitly promised. And given the precarious and dangerous conditions that migrants must endure while waiting in northern Mexico, the balance of the equities tips sharply in favor of these proposed class members. Finally, the government has no interest in contravening its own stated immigration policies. All factors thus weigh in favor of granting this motion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Government's Binding Guidance on Access to Asylum at POEs

The government's Binding Guidance regarding inspecting and processing asylum seekers at POEs is clear and unambiguous. On November 1, 2021, Acting CBP Commissioner Troy Miller issued a memorandum titled *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (the "November 2021 Memo"). Ex. 1.[1]

---

[1] All references to "Ex." refer to the exhibits to the contemporaneously filed Declaration of Ori Lev.

The memorandum "provides updated guidance for the management and processing" of undocumented noncitizens who present at POEs along the southern border. *Id.* at 1. The memorandum states that "asylum seekers or others seeking humanitarian protection cannot be required to submit advance information [*e.g.*, use the CBP One app] in order to be processed at a Southwest Border land POE." *Id.* at 2. This memorandum, which constitutes CBP's binding internal guidance governing the processing of asylum seekers arriving at POEs along the southern border, remains in effect and available on the CBP's website, and has not been rescinded or superseded by CBP.

On May 11, 2023, Defendants promulgated a new Rule, dubiously titled "Circumvention of Lawful Pathways" (the "Rule"), which went into effect on May 11, 2023, and similarly sets forth the government's binding guidance that noncitizens presenting at POEs will not be turned away or denied the opportunity to seek protection in the United States. See 88 Fed. Reg. 31,314 (May 16, 2023), codified at 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1).[2] The Rule bars asylum for all individuals who transited through a third country en route to the United States (*i.e.*, all non-Mexicans). 8 C.F.R. § 208.33(a)(1). It includes three principal exceptions for individuals who: (i) applied for and received a denial of protection in a transit country; (ii) obtained advance permission to travel to the United States through an approved parole program; or (iii) obtained an appointment to present through CBP One. Despite the other exceptions, as a

---

[2] The provisions governing asylum eligibility in section 208.33 and 1208.33 are identical. For simplicity, we cite only to section 208 throughout. On July 25, 2023, a California district court vacated the Rule on the basis that it is contrary to law, arbitrary and capricious, and procedurally invalid. *See East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. July 25, 2023). The Court of Appeals for the Ninth Circuit has stayed that order pending appeal. *See East Bay Sanctuary Covenant v. Biden,* No. 23-16032 (9th Cir. filed July 26, 2023).

practical matter for the vast majority of people at the southern border, CBP One is the exclusive means through which they can seek asylum at a POE.

The Rule did not change or invalidate the relevant guidance from the November 2021 Memo. Instead, it reiterates that POEs will remain accessible for all noncitizens seeking protection. For example, the preamble states that "CBP's policy is to inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app," that "[i]ndividuals without appointments will not be turned away," and that an advance appointment is "not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed." 88 Fed. Reg. at 31,358. In fact, the preamble repeatedly asserts that CBP will process all individuals who present at a POE without regard to whether the individual has a CBP One appointment. *See* 88 Fed. Reg. at 31,358, 31,365, 31,392, 31,396, 31,399, 31,401, n.240.

This official policy is consistent with the structure of the Rule, which provides an exception to its asylum eligibility bar for those without a CBP One appointment who "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," 8 C.F.R. § 208.33(a)(2)(ii)(B), or who "demonstrate by a preponderance of the evidence that exceptionally compelling circumstances" exist, such as facing "an acute medical emergency" or "imminent and extreme threat to life or safety," or having been a "victim of a severe form of trafficking." 8 C.F.R. § 208.33(a)(3)(i). In order to "demonstrate by a preponderance of the evidence" that an individual meets one of these exceptions, however, the individual needs to be in asylum proceedings. That is, the structure of the Rule clearly envisions, as the preamble of the Rule expressly states, that noncitizens arriving at a POE without a CBP One appointment will be given access to the asylum process—*i.e.*, they will be inspected and processed and not turned away.

Collectively, this memorandum refers to the November 2021 Memo, the DHS policy as reflected in statements in the preamble to the Rule, and the structure of the Rule as the "Binding Guidance" governing how CBP officers must treat asylum seekers arriving at POEs without a CBP One appointment.

**B.**     **Despite The Binding Guidance, The Government Has A Policy Of Turning Back Arriving Noncitizens Without A CBP One Appointment**

CBP has a policy (the "CBP One Turnback Policy") under which CBP officials refuse to process asylum seekers at POEs who present without a CBP One appointment, despite the Binding Guidance. For example, each of the Named Plaintiffs sought to present at a POE in order to seek asylum. Almost uniformly, CBP officers turned them back to Mexico. These turnbacks occurred even though several Named Plaintiffs explained their inability to use the app to the CBP officers from whom they sought assistance. *See, e.g.*, Ex. 3 ¶ 11 (Named Plaintiff Elena Doe turned back by CBP officer and told that she needed to use CBP One instead);[3] Ex. 4 ¶ 9 (same for Named Plaintiff Guadalupe Doe); Ex. 5 ¶ 8 (same for Named Plaintiff Somar Doe); Ex. 6 ¶ 14 (same for Named Plaintiff Diego Doe); Ex. 7 ¶¶ 15-17 (same for Named Plaintiff Laura Doe); Ex 12 ¶ 6 (describing turnback of Laura Doe); Ex. 8 ¶¶ 14-16 (CBP officer told Named Plaintiff Luisa Doe, "Don't you understand that's only possible through CBP One?" and turned her back to Mexico); Ex. 12 ¶ 6 (describing turnback of Luisa Doe); Ex. 9 ¶¶ 13-14 (CBP officer turned back Named Plaintiff Michelle Doe despite the fact that she did not have a working phone); Ex. 10 ¶ 9 (CBP officer told Named Plaintiff Pablo Doe that his technical difficulties with the app were not "their problem" and that he "should learn English" if he wanted

---

[3] After signing her declaration, Elena Doe received a CBP One appointment scheduled for August 22, 2023.

to live in the U.S. and turned him back);[4] Ex. 11 ¶¶ 9-12 (turnback at Nogales POE).

Defendants cannot dispute this fact. CBP officers have been recorded turning back arriving noncitizens at POEs despite the binding guidance that instructs them not to do so. *See, e.g.*, Ex. 12 ¶¶ 6-8, 10, 11, and 14 (summarizing audio recordings); Ex. 13 (audio recordings).[5]

Each of the Named Plaintiffs experienced either technical, language, or other obstacles in using the CBP One app, or experienced exceptionally compelling circumstances, or both, that would exempt them from being barred from asylum eligibility under the Rule. *See, e.g.*, Ex. 7 ¶¶ 14-15; Ex. 8 ¶ 11; Ex. 9 ¶ 13; Ex. 10 ¶ 8; Ex. 15 ¶ 7. Indeed, many of the Named Plaintiffs are Mexicans, to whom the bar does not even apply. However, CBP officials have turned back the individual Named Plaintiffs and refused to consider their circumstances.

Problems using the app are not unique to the Named Plaintiffs. *See, e.g.*, Ex. 14 ¶¶ 26-27 (detailing reports of the "app crash[ing] frequently" and the many error messages asylum seekers receive); Ex. 17 ¶ 5 (describing the "inexplicable error messages [asylum seekers] received in English in the app, which prevented them from registering for an appointment"); Ex. 19 ¶ 15 ("I have personally witnessed dozens of migrants attempting to complete the lengthy CBP One registration and/or appointment process for themselves and their families, only to have the app drop connection with their phone and crash. Many of these people successfully completed the application, hit submit, and watched the app freeze and give them an error message."). CBP provides no

---

[4] After signing his declaration, Pablo Doe received a CBP One appointment scheduled for August 18, 2023.

[5] Plaintiffs have lodged copies of the audio recordings with the Court and produced them to Defendants.

tech support for migrants struggling to navigate the complex app. Ex. 6 ¶¶ 13-14 (describing Diego Doe's attempt to request assistance with app from CBP officers at POE and officers directing him to speak to Mexican officials); Ex. 20 ¶ 36 (noting lack of helpline and that Legal Director of HBA has never received a response to requests for assistance with app sent to CBP email address).

Nor are turnbacks of asylum seekers without a CBP One appointment limited to the Named Plaintiffs. Humanitarian organizations working at the border have repeatedly observed CBP officials turning back asylum seekers without CBP One appointments in direct violation of CBP's Binding Guidance. *See, e.g.*, Ex. 14 ¶ 38; Ex. 20 ¶ 29; Ex. 17 ¶¶ 7-8; Ex. 27 ¶¶ 15-16, 25. Turnbacks have occurred at POEs all along the border, beginning on May 12, 2023, and continuing to the present. *See, e.g.*, Ex. 24 ¶¶ 12-17 (describing border-wide turnbacks); Ex. 11 ¶ 12 (describing turnbacks at Nogales POE); Ex. 27 ¶¶ 15-16, 25 (describing turnbacks at Paso del Norte POE; when Venezuelan asylum seeker told CBP officer that he missed a prior CBP One appointment because he was assaulted, detained, and his phone had been stolen, the officer responded, "Who cares?"); Ex. 19 ¶¶ 24, 27-31 (INM works in coordination with CBP to block asylum seekers without a CBP One appointment from approaching the POE; on one occasion, at the Matamoros POE, two CBP officers stood and watched as an INM officer cleared off individuals in line seeking to present themselves at the POE); Ex. 14 ¶ 47 (describing multiple turnbacks of individuals and families from the San Ysidro POE); Ex. 25 at 42-46 (describing several incidents of asylum seekers turned away at various POEs).

In addition, Mexican officials likewise have been witnessed turning asylum seekers back at the direction or behest of CBP. *See, e.g.*, Ex. 19 ¶ 25 ("The INM officers ask the people in line to present their CBP One appointment

confirmations and promptly send away those who do not have one."); Ex. 24 ¶ 17 ("CBP gives Grupo Beta [INM] the number of appointments per time slot, and if Grupo Beta is concerned that an asylum seeker is arriving without a CBP One appointment, Grupo Beta will write or call CBP directly to confirm the individual's appointment before allowing that individual to enter the POE."); Ex. 2 at 2 ("[A]dvocates have first-hand accounts of INM officers calling the CBP Port Director to ask if a particular asylum seeker is allowed to present" at the POE; INM officers have referenced "CBP orders" when preventing asylum seekers from approaching U.S. POEs).

### C.   The Government's Conduct Has Irreparably Harmed The Class

As a direct result of Defendants' CBP One Turnback Policy, asylum seekers who would have sought asylum at POEs but for Defendants' conduct are left waiting for months, in dire conditions and in areas of Mexico that are so dangerous that the U.S. State Department warns U.S. citizens not to travel there. *See* Ex. 16 (State Department Mexico Travel Advisory); *E. Bay Sanctuary*, 2023 WL 4729278, at *15 (asylum seekers waiting in Mexico "are generally at heightened risk of violence by both state and non-state actors"). These individuals, who fled their homes to escape violence, are met with similar and new threats in border towns near POEs. They find few safe shelters, no job prospects, and unreliable access to food, water, and medical treatment while they try repeatedly to use the CBP One app to request an appointment. *See, e.g.*, Ex. 14 ¶¶ 46-57; Ex. 17 ¶ 9; Ex. 20 ¶¶ 26, 32, 34. These perilous conditions result in significant physical and mental harm to the Named Plaintiffs and members of the proposed class. *See, e.g.*, Ex. 21 at 2-3 (detailing trauma-related symptoms). Tragically, it is not uncommon for asylum seekers, including children, to die in these conditions. *See, e.g.*, Ex. 14 ¶¶ 34, 57 (describing death of ten clients and an infant); Ex. 20 ¶¶ 34-42 (describing deaths of many Haitian asylum seekers due to stress, lack of water, nutritious food and medical

treatment, and lack of protection from cartel violence); Ex. 22 ¶¶ 13-17 (describing the murder of Isabel Doe's husband by cartel members in Tijuana).[6]

Each of the Plaintiffs has their own harrowing account of fleeing violence and persecution to seek protection in the United States; common among them is that the risk of harm persists and increases the longer they are stranded near POEs awaiting a CBP One appointment. Elena Doe fears that her abusive ex-husband will find and harm her, and suffers psychologically as a result. Ex. 3 ¶¶ 5-10. Laura Doe fears that the same cartel that disappeared her husband and father-in-law will find and harm her and her children, and rarely leaves her Tijuana shelter as a result. Ex. 7 ¶¶ 6, 8-12. Luisa Doe witnessed her family member's kidnapping, was attacked by narcotraffickers due to her cooperation with government authorities, and has received threatening messages while waiting for a CBP One appointment. Ex. 8 ¶¶ 5-9, 17. Diego Doe escaped corrupt Mexican governmental officials, organized crime, and an attempted kidnapping in Mexico and fears that the longer he is forced to remain in Mexico, the greater the chance his persecutors will find and kill him. Ex. 6 ¶¶ 5-6, 9, 16. Michelle Doe fled political persecution in her home country, later escaped her abusive ex-partner, a member of a Mexican cartel, with her newborn daughter and is currently living in hiding at a shelter in Tijuana. Ex. 9 ¶¶ 9-13, 16. Pablo Doe fled gang violence and extortion in his home country, was assaulted and robbed on his journey to the border, and now lives in hiding. Ex. 10 ¶¶ 2, 5-7. Natasha Doe fled Haiti after being forced into a car and assaulted; she later received death threats. Ex. 15 ¶¶ 4-5. Somar Doe and Guadalupe Doe fled an

---

[6] *See also Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*, InSight Crime, June 2023, (https://insightcrime.org/wp-content/uploads/2023/06/HGBF-US-Policy-OC-and-Migration-Policy-Brief-InSight-Crime-June-2023-FINAL-ENG.pdf) (describing high risks of extortion, kidnapping, and smuggling in and around border towns).

abusive family member with ties to organized crime and fear that he will find and harm them and their family. Ex. 4 ¶¶ 5-7, 16; Ex. 5 ¶¶ 6-7. Other members of the proposed class similarly have sought access to POEs in order to escape violence and persecution in their home countries. *See, e.g.*, Ex. 22 ¶¶ 13-17 (describing the murder of Isabel Doe's husband by cartel members in Tijuana); Ex. 18 ¶¶ 5-8 (describing death threats to Carlos Doe and his family by MS-13 members); Ex. 23 ¶¶ 4-6 (describing Angela Doe fleeing abuse and threats by ex-partner). Defendants' illegal conduct, which has prevented Plaintiffs from accessing the U.S. asylum process, has exacerbated the danger that they are facing.

In addition to the dangers that Plaintiffs and other proposed class members fled, these individuals are at extreme risk of further harm while they wait for CBP One appointments. In July 2023, twenty-two nonprofits that work along the border reported that kidnappings and extortion of migrants were increasing in the Mexican states of Sonora, Chihuahua, and Tamaulipas, which border Arizona and Texas.[7] Asylum seekers have reported being raped, kidnapped, robbed, and extorted while waiting for a CBP One appointment, including by Mexican officials. *See, e.g.*, Ex. 10 ¶ 10 (Pablo Doe stopped by armed men and extorted when attempting to enter bridge to POE after first turnback by CBP officers); Ex. 14 ¶ 58 (LGBTQ+ couple kidnapped and raped in Mexico, causing both partners to contract HIV); ¶ 61 (Mexican police tasered infant because migrant family could not afford bribe). Criminal gangs act with impunity, preying on refugees who do not appear to be from Mexico or do not

---

[7] Adam Isaacson, Washington Office on Latin America, *Weekly U.S.-Mexico Border Update: Heat wave hits migrants, trends along migration route, fentanyl seizures*, (July 7, 2023), https://www.wola.org/2023/07/weekly-u-s-mexico-border-update-heat-wave-hits-migrants-trends-along-migration-route-fentanyl-seizures/.

speak Spanish. *See, e.g.*, Ex. 19 ¶ 19 (families forced to travel along the border for CBP One appointments reportedly kidnapped or assaulted along the way); ¶ 23 (cartels in Matamoros kidnap, beat, rape, and steal from migrants in encampment).

In addition to the persistent threat of violence, asylum seekers experience perilous living conditions at shelters and camps near the POEs. Natasha Doe and her young child often go a day or more without eating because they cannot afford food or clean water and live outside an abandoned gas station. Ex. 15 ¶¶ 10, 13. Diego Doe was forced to beg for money and food in the street. Ex. 6 ¶¶ 7, 11, 15. Elena Doe is currently at a shelter near the San Ysidro POE and struggles to find necessities, such as diapers and milk, for her baby. Ex. 3 ¶¶ 11, 12. Guadalupe Doe's children have repeatedly become ill after eating expired food at their shelter, and she and her mother Somar Doe feared that they would be kicked out of the shelter if they could not pay the weekly fee. Ex. 4 ¶ 12, Ex. 5 ¶ 11. Laura Doe's daughter recently had to be taken to the hospital from their Tijuana shelter. Ex. 7 ¶ 18. These are not isolated incidents; proposed class members must endure precarious living conditions across the border as they wait for CBP One appointments. *See, e.g.*, Ex. 17 ¶ 9 (describing dire, squalid conditions in shelters and encampments in Matamoros and Reynosa); Ex. 20 ¶ 32 (describing Haitian migrant recovering from a cesarean section and caring for her newborn in a tent on top of mud and trash). The extended periods of time that proposed class members must endure these conditions because of the CBP One Turnback Policy acutely harms the most vulnerable among them, such as children, the elderly, those marginalized by race, indigeneity, gender and sexual identity, or language, and those with medical conditions. *See, e.g.*, Ex. 14 ¶ 57 (medically vulnerable asylum seeker who was hospitalized in Mexico remains in a coma due to brain trauma that could have been avoided had he been paroled into the United States earlier); Ex. 20 ¶ 34 (baby who stopped eating and whose

fever spiked while in Mexico required emergency care after being paroled into the U.S.).

Defendants' failure to abide by their own Binding Guidance has wreaked havoc on the lives of Plaintiffs and proposed class members by denying them access to the U.S. asylum process and forcing them to live in dangerous Mexican border towns.

## III.   ARGUMENT

When moving for a preliminary injunction, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A preliminary injunction may also issue where the plaintiff raises "serious questions going to the merits . . . and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### A.   Plaintiffs Are Likely To Succeed on the Merits of the *Accardi* Claim

Plaintiffs are likely to succeed on the merits of their *Accardi* claim that Defendants are failing to follow their own Binding Guidance not to turn back asylum seekers arriving at POEs without a CBP One appointment.

#### 1.   The *Accardi* Doctrine

The *Accardi* doctrine is "the legal proposition that agencies may be required to abide by certain internal policies." *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004); *see Accardi*, 347 U.S. at 265-266; *Morton*, 415 U.S. at 235 ("Where the rights of individuals are affected, it is incumbent upon agencies

to follow their own procedures."). The doctrine "is premised on fundamental notions of fair play underlying the concept of due process." *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991).[8] "*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005).

The definition of "internal policy" for purposes of an *Accardi* claim includes both formal agency regulations and informal internal agency policies, operating procedures, and instructions. *Alcaraz*, 384 F.3d at 1162; *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) ("Pursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."); *Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1079 (D. Or. 2018); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 103 (D.D.C. 1999) (judicial review under *Accardi* available for "claims that an agency has acted in violation of its own binding procedures where those procedures are promulgated for the protection of individuals, even where the procedures were not issued as formal regulations"), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002).

The doctrine applies "'even where the internal procedures are possibly more rigorous than otherwise would be required.'" *Alcaraz*, 384 F.3d at 1162 (quoting *Morton*, 415 U.S. at 235); *see also Service v. Dulles*, 354 U.S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539-540 (1959). That is, the focus of an *Accardi* claim is on whether an agency is complying with its own regulation or internal procedures, as opposed to whether it is complying with

---

[8] Whether considered as an Administrative Procedure Act ("APA") claim under Section 706(2) of the APA, a claim grounded in due process, or a free-standing claim, the contours of the claim are the same. *See Emami v. Nielsen*, 465 F. Supp. 3d 991, 997 (N.D. Cal. 2020) (discussing analytic grounding of *Accardi* claim); *Jefferson v. Harris*, 285 F. Supp. 3d 173, 185-86 (D.D.C. 2018) (same).

the requirements of a statute. As such, a court order granting relief under the *Accardi* doctrine requires the agency to comply only with the relevant internally binding policy, and is not directed at compliance with any related law.

Where, as here, an agency adopts a policy or procedure that affects individual rights and then fails to follow that policy or procedure in a manner that prejudices the individual, impacted parties are entitled to relief. *Morton*, 415 U.S. at 235; *Carnation Co. v. Sec'y of Labor*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) ("courts have indicated that the standard is whether violation of the regulation prejudiced the party involved"); *see Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003) (distinguishing rules benefiting the agency from rules benefitting private parties).

### 2. Defendants Have Adopted Binding Guidance To Not Turn Back Asylum Seekers Without CBP One Appointments

Defendants' Binding Guidance to *not* turn back asylum seekers without CBP One appointments is evident both from the Defendants' public pronouncements in the November 2021 Memo discussed above and from the Rule itself.

The Rule makes clear that Defendants' official policy is to allow noncitizens arriving at POEs access to the asylum process and not to turn them back even if they do not have a CBP One appointment. The Rule's preamble states this over and over again:

- *CBP will inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app. In other words, the use of the CBP One app is not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed under the INA. CBP will not turn away individuals without appointments.* (88 Fed. Reg. at 31,365 (citing November 2021 Memo));

- *CBP's policy is to inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app. In other words, the use of the CBP One app is not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed under 8 U.S.C. 1225(a)(3). Individuals*

14                                                          23cv01367

*without appointments will not be turned away.* (*Id.* at 31,358 (citing November 2021 Memo));

- *[I]n no instance will CBP turn a noncitizen away from a POE, regardless of whether they utilize the CBP One app.* (*Id.* at 31,396);

- *Officers will process all individuals who present at a POE regardless of a CBP One app appointment.* (*Id.* at 31,399);

- *In addition, under this rule, any noncitizen will be able to present at a POE, and CBP will not turn away any individuals—regardless of manner of entry into the United States—or deny them the opportunity to seek admission to the United States.* (*Id.* at 31,401 n.240.)[9]

This official policy is consistent with the structure of the Rule, which provides that its presumption of asylum ineligibility does not apply (or is considered rebutted) upon a showing that "it was not possible to access or use [CBP One] due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," 8 C.F.R. § 208.33(a)(2)(ii)(B), or that the noncitizen faced "exceptionally compelling circumstances" such as "an acute medical emergency," an "imminent and extreme threat to life or safety," or having been a "victim of a severe form of trafficking," § 208.33(a)(3). The requirement to make such a showing to establish that one of these exceptions applies necessarily envisions a process by which a noncitizen can demonstrate that the relevant exception is satisfied. The Rule contemplates that determination being made by an asylum adjudicator (either an asylum officer or an Immigration Judge). §§ 208.33(b), 1208.33(b). Asylum seekers who hope to establish that they meet one of the exceptions can only do so if they have access to such an adjudicator via the asylum process. *See* 88 Fed. Reg. at 31,399 ("a noncitizen who presents at a POE without an appointment . . . will be able to present any protection claims, as well as any evidence to rebut the

---

[9] *See Alcaraz*, 384 F.3d at 1156 (citing to preamble to proposed rule in determining government's official policy).

presumption or establish an exception to its application—including evidence related to their inability to access the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle— during either expedited removal or section 240 removal proceedings, with an AO or IJ, as applicable."). The Rule, therefore, contemplates that noncitizens will be able to access the asylum process even if they do not have a CBP One appointment; otherwise, the exceptions laid out in the Rule would be impossible to access, nullifying those exceptions.

This official policy is also consistent with the government's purported approach to use of the CBP One app since its adoption. As discussed above, the November 2021 guidance expressly states that "asylum seekers or others seeking humanitarian protection *cannot be required to submit advance information in order to be processed at a Southwest Border land POE*." November 2021 Memo at 2 (emphasis added).

It is abundantly clear, therefore, that Defendants have adopted Binding Guidance to inspect and process noncitizens arriving at a POE, regardless of whether they have a CBP One appointment.

### 3.   Plaintiffs are Entitled to Relief under *Accardi*

As detailed above, on numerous occasions across the U.S.-Mexico border, CBP officers have systematically turned back arriving noncitizens, informing them that they cannot enter the United States to seek asylum without a CBP One appointment. *See* supra Sec. II.B. Defendants' practice of turning back asylum seekers contravenes the Binding Guidance and thus violates the *Accardi* doctrine.

*Emami v. Nielsen*, 365 F. Supp. 3d 1009 (N.D. Cal. 2019), is particularly instructive. There, as here, a putative class of plaintiffs challenged the government's failure to implement its avowed policy to accommodate exceptions to President Trump's Presidential Proclamation 9645, which

prohibited the issuance of visas to individuals from several Muslim-majority countries. *Id.* at 1011. The Proclamation provided for exceptions to its visa ban, and State Department materials similarly stated that waivers were available. Plaintiffs brought an *Accardi* claim alleging that the State Department failed to follow its own waiver guidance. *Id.* at 1019-20.

In pressing their *Accardi* claim, the plaintiffs in *Emami* "expressly disclaimed an APA claim premised on any 'particular provision of the INA' or any claim that defendants violated 'any specific section of the INA.' . . . Plaintiffs also acknowledged . . . that they 'do not challenge the Proclamation itself.'" *Emami*, 365 F. Supp. 3d at 1019. Here, Plaintiffs' *Accardi* claim is similarly not "premised on 'any particular provision of the INA'" and does "not challenge the [Rule] itself."[10] In considering the plaintiffs' *Accardi* claim on a motion to dismiss, the *Emami* district court looked to the facts alleged (including summary denial of visas without interviews or the opportunity to submit documents) in concluding that "plaintiffs allege facts plausibly demonstrating that a *de facto* policy of blanket denials has usurped individualized waiver decisions" in contravention of the State Department's "avowed process." *Id.* at 1021. Similarly here, Defendants' repeated turnbacks of arriving noncitizens without CBP One appointments demonstrate a "de facto policy" that contravenes Defendants' "avowed" policy to "not turn away any individuals."

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018), provides similar support for Plaintiffs' claim. There, individual asylum seekers representing a

---

[10] That Plaintiffs are separately challenging the legality under the INA and the Constitution of the government's practice of turning back noncitizens without CBP One appointments has no impact on the validity or viability of Plaintiffs' *Accardi* claim, the sole basis upon which Plaintiffs are seeking preliminary injunctive relief.

class alleged that DHS was no longer following its own Parole Directive, and rather than providing individualized parole determinations and procedural safeguards as required by the Directive, DHS was engaging in systematic detention of asylum seekers. *Id.* at 322-23. The court held that the Parole Directive was the kind of policy enforceable under *Accardi* because "the policies and procedures contained within the Directive establish a set of minimum protections for those seeking asylum, including an opportunity to submit documentation," and the Directive "therefore falls squarely within the ambit of those agency actions to which the doctrine may attach." *Id.* at 337-38. *See also id.* at 343 (granting preliminary injunction and provisional class certification, noting that "[t]o mandate that ICE provide these baseline procedures to those entering our country—individuals who have often fled violence and persecution to seek safety on our shores—is no great judicial leap. Rather, the issuance of injunctive relief in this case serves only to hold Defendants accountable to their own governing policies and to ensure that Plaintiffs receive the protections they are due under the Parole Directive.").

### 4. *Aleman Gonzalez* Does Not Preclude Injunctive Relief

Nor do 8 U.S.C. § 1252(f)(1) and the Supreme Court's decision in *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022), preclude injunctive relief on this claim. Section 1252(f)(1) prohibits certain injunctions that "enjoin or restrain *the operation of the provisions of part IV of [the INA]*." (emphasis added). In *Aleman Gonzalez*, the Supreme Court held that "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them" and that therefore "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out *the specified statutory provisions*." 142 S. Ct. at 2064-65 (emphasis added).

Applying that rule to the case before it, the Court held that the injunctions entered in that case, requiring bond hearings for noncitizens detained pursuant to 8 U.S.C. § 1231(a)(6), violated § 1252(f)(1) because they "require officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6). Those injunctions thus interfere with the Government's efforts to operate §1231(a)(6)." *Id.* at 2065.

Here, however, any injunction would not be directed at the operation of any part of the INA. Plaintiffs' *Accardi* claim is based solely on Defendants' failure to follow their Binding Guidance—or their own "avowed process," *Emami*, 365 F. Supp. 3d at 1021—of allowing noncitizens arriving at POEs to be inspected and processed regardless of whether they have CBP One appointments. Plaintiffs' claim is not based upon, does not rely upon, and does not require the interpretation of any provision of the INA. Plaintiffs' claim would succeed whether or not the INA were held to require the inspection and processing of arriving noncitizens without CBP appointments. It is based on Defendants' own internal policies, which are enforceable "even where the internal procedures are possibly more rigorous than otherwise would be required" by law. *Alcaraz*, 384 F.3d at 1162.

Defendants have not asserted that their Binding Guidance of no turnbacks is required by any provision of the INA or by this Court's prior decision declaring that turning back arriving asylum seekers is unlawful. *See Al Otro Lado v. Mayorkas*, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021). To the contrary, Defendants have appealed that prior decision (indicating their disagreement that such a policy is required by the INA) and expressly, with respect to the declaratory judgment, stated that the "the use of CBP One app appointments as contemplated by this rule *does not implicate that holding*. CBP's *policy* is to inspect and process all arriving noncitizens at POEs, regardless of whether they

have used the CBP One app." 88 Fed. Reg. at 31,358 (emphasis added). An injunction to enforce Defendants' compliance with their own "policy" would have nothing to do with the "operation of the provisions of the INA," but rather only the "operation" of Defendants' avowed policy. Under *Accardi*, the government is required to comply with that avowed policy regardless of whether the conduct at issue is otherwise required by law.

At most, any injunction compelling Defendants to comply with their own internal policy would have collateral effects on the operation of Part IV of the INA. But such collateral effects on a process provided for in Part IV are not foreclosed by Section 1252(f). *See, e.g.*, *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir 2007); *Catholic Social Servs., Inc. v. INS*, 232 F.3d 1139, 1149-50 (9th Cir. 2000); *see also Aleman Gonzalez*, 142 S. Ct. at 2067 n.4 (describing Gonzales as standing for the "unresponsive proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision"). While an injunction here would impact the conduct of CBP officers at POEs, any effect on the operation of Section 1225 or any other INA provision would be at most collateral to the court's vindication of the government's own Binding Guidance as reflected in the Rule and November 2021 Memo.

Therefore, Plaintiffs are likely to succeed on the merits of their *Accardi* claim.

### B.   A Preliminary Injunction is Warranted Because Plaintiffs Will Otherwise Suffer Irreparable Injury

"A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (*quoting Winter*, 555 U.S. at 22). Importantly, a plaintiff "need not . . . show that the action sought to be enjoined

is the exclusive cause of the injury." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012).

Defendants' violation of their own Binding Guidance prevents Plaintiffs from accessing asylum and other forms of humanitarian protection for which they would otherwise be eligible under U.S. law.[11] Plaintiffs are adults, children, and families who fear persecution and torture in their home countries. *See supra* Section II.C (detailing Individual Plaintiffs' fear of persecution). The gravity of the dangers they fled is evident from their choice to undertake the perilous journey to the border and endure dangerous conditions in Mexico for a chance to seek asylum in the United States. *See* Ex. 14 ¶ 31 (describing asylum seeker turned back by CBP whose entire family was killed, whose village was burned down, and who was sexually assaulted twice in Mexico); Ex. 20 ¶ 20 (discussing sexual assaults experienced by Haitian women transiting through the Darien Gap on their way to the U.S.-Mexico border), ¶¶ 40-42 (describing the vulnerability of Black asylum seekers in Mexico to abuse, violence, and discrimination).

Without injunctive relief, Plaintiffs risk persecution, torture, and death if they are forced to return to or remain in their countries of origin. As this Court has noted, "[o]ne potential component of irreparable harm in an asylum case can be the claim that the individual is in physical danger if returned to his or her home country." *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 876 (S.D. Cal. 2019); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (holding that persecution consisting of extortion or beatings "would certainly constitute irreparable harm"); *E. Bay Sanctuary Covenant v. Trump*,

---

[11] This includes asylum, withholding of removal under the INA, and protection under the Convention Against Torture, all forms of fear-based relief that can only be granted to individuals in the United States. *See* 8 U.S.C. §§ 1158(b), 1231(b)(3); 8 C.F.R. § 1208.16(a).

349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) (loss of the right to seek asylum constitutes irreparable harm), *aff'd*, 950 F.3d 1242 (9th Cir. 2020), and *aff'd sub nom. E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021). Migrants traveling through Mexico face the risk of detention and deportation by Mexican authorities if not permitted to access POEs; Mexican asylum seekers face the similarly frightening prospect of having to wait indefinitely in the country where they fear harm. *See* Ex. 22 ¶¶ 11-13, 17-28 (Mexican asylum seeker turned back at San Ysidro POE had made several attempts to seek asylum due to threats from cartel because of her husband's political position in Mexico; her husband was murdered and stepchildren stabbed in Tijuana while she waited for access to the POE); Ex. 14 ¶¶ 47, 49 (threats by Mexican law enforcement and immigration officers to detain and deport non-Mexican migrants at POEs to their home countries); Ex. 11 ¶¶ 12, 31, 33-35 (Mexican asylum seekers waiting near Nogales POE face ongoing threat of persecution in country they are trying to escape and report feeling unsafe due to monitoring by Mexican officials); Ex. 26 at 2 (pregnant Mexican woman fleeing cartel violence blocked from reaching U.S. officials at a Texas port of entry);  Ex. 27 ¶ 25 (Mexican family fleeing active threat in Ciudad Juarez turned back from POE despite fearing for lives waiting in Mexico).

In addition, proposed class members face irreparable injury due to the dangers they face while being forced to wait in Mexico for extended periods. *See E. Bay Sanctuary Covenant*, 349 F. Supp. 3d at 864 (finding that "high rates of violence and harassment" that asylum seekers waiting in Mexico experience qualify as irreparable injury). These harms include a heightened risk that migrants in particular face of kidnapping, sexual violence, and extortion, perpetrated by organized crime, cartels, and even Mexican authorities. *See* Ex. 14 ¶¶ 58, 61-62; Ex. 20 ¶ 41 (describing incidents in which kidnappers took Haitian migrants off buses in Mexico and subjected them to beatings, sexual

abuse, and ransom); Ex. 18 ¶ 10 (describing being extorted by armed, uniformed Mexican officials); Ex. 27 ¶¶ 21, 27 (Mexican law enforcement often steals migrants' phones, has turned migrants over to cartel); Ex. 25 at 10 (Honduran woman raped and threatened with death while waiting for a CBP One appointment in the Matamoros encampment; after she was turned back her rapist returned and attempted to rape her again). Proposed class members will also likely be irreparably injured due to discrimination that many confront in accessing housing, medical care, and other basic needs in northern Mexico. *See* Ex. 14 ¶ 59; Ex. 20 ¶¶ 32-34, 40-42. Plaintiffs Al Otro Lado and Haitian Bridge Alliance, who have worked with hundreds of proposed class members since May 2023, describe in vivid detail the violence and harmful discrimination that migrants confront in Mexico because they are unable to seek protection at POEs. *See* Ex. 14 ¶ 59 (noting that anti-migrant discrimination in medical care contributed to death of a Haitian man waiting for a CBP One appointment who was discharged from a hospital in Tijuana despite ongoing complications); Ex. 20 ¶ 42 (Haitian man standing with other Haitians on the international bridge in Tijuana was shot and killed by someone in a passing car). Organizations working on the ground in other parts of the border region describe similar harm that awaits proposed class members in Mexico. *See* Ex. 11 ¶¶ 31-38; Ex. 19 ¶¶ 23, 27-32. These first-hand experiences of service providers are further corroborated by recent reports about the conditions for migrants in northern Mexico. *See, e.g.*, Ex. 25 at 10-16; 50-52; Ex. 21 at 3 (detailing trauma-related symptoms observed in individuals interviewed in migrant camps and shelters in Reynosa and Matamoros, including repeated flashbacks, panic attacks, and daily terror of repeated sexual violence).

Individual Plaintiffs' specific circumstances further demonstrate the irreparable injury that will likely befall proposed class members absent this Court's intervention. As detailed above, *see* Section II.C. *supra*, their

experiences with precarious living conditions, threats, violence, and extortion while waiting for a CBP One appointment in Mexico have caused and will continue to cause them significant harm.

These types of injuries—resulting in trauma, serious physical harm or even death—are "beyond remediation." *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd and remanded*, 27 F.4th 718 (D.C. Cir. 2022). As even the Biden administration has acknowledged, the evidence regarding the irreparable harms that asylum seekers are likely to experience while stranded in Mexico is overwhelming. *Huisha-Huisha*, 27 F.4th at 734. There, the defendants argued that sending asylum seekers back to Mexico under MPP "'exposes migrants to unacceptable risks' of 'extreme violence'" (quoting Petition for Writ of Certiorari at 11, 15, *Biden v. Texas*, No. 21-954 (U.S. Dec. 29, 2021)). Plaintiffs are thus likely to suffer irreparable injury without the requested judicial intervention.

Here, while Defendants' illegal CBP One Turnback Policy may not be the sole cause of Plaintiffs' injuries, "it is enough to find that injunctive relief will prevent additional suffering, persecution and torture." *Doe v. Wolf*, 432 F. Supp. 3d 1200, 1212-13 (S.D. Cal. 2020) (citing *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004)).

### C.     The Balance of Equities and the Public Interest Favor Entry of an Injunction

The third and fourth preliminary injunction factors—the balance of the equities and the public interest—merge here, as the government is a party. *Drakes Bay*, 747 F.3d at 1092. The public interest is always served by the correct application of federal law. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011); *Ramirez v. U.S. Imm. & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018). The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715

F.3d 1127, 1145 (9th Cir. 2013). Any logistical or bureaucratic challenges that result from enjoining Defendants' violation of their own Binding Guidance cannot constitute a "burden."

Moreover, the public interest here lies decidedly with the individuals Plaintiffs and the class, given Defendants' numerous public statements regarding any noncitizen being able to access the asylum process at a POE after the end of Title 42. *See supra* Section III.A.2. Having told proposed class members that ports would be open to all asylum seekers, it would be "quintessentially inequitable" for Defendants to now say that was never true. *Al Otro Lado v. Wolf*, 952 F. 3d 999, 1015 (9th Cir. 2020) (quoting *Al Otro Lado*, 423 F. Supp. 3d at 877).

The burden on Plaintiffs if no injunction is entered will be severe and potentially deadly. They will continue to be prevented from accessing the U.S. asylum process and the protections it provides. They will be turned back at POEs and stranded in dangerous Mexican border towns, vulnerable to kidnapping, assault, rape, and murder.

Thus, the balance of the equities and the public interest strongly favor granting preliminary injunctive relief to Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to grant their motion for a preliminary injunction enjoining Defendants from turning back, or directing or encouraging others to turn back, non-citizens arriving or attempting to arrive at a Port of Entry on the U.S.-Mexico border, regardless of whether those arriving non-citizens have an appointment made on the CBP One App.

Dated: August 9, 2023

MAYER BROWN LLP
   Matthew H. Marmolejo
   Ori Lev
   Michelle N. Webster
   Matthew E. Fenn

VINSON & ELKINS LLP
   Stephen M. Medlock
   Evan Miller
   Nataly Farag
   Alex Rant
   Rami Abdallah E. Rashmawi

CENTER FOR GENDER AND
REFUGEE STUDIES
   Melissa Crow
   Neela Chakravartula
   Robert Pauw

CENTER FOR CONSTITUTIONAL
RIGHTS
   Baher Azmy*
   Angelo Guisado*

AMERICAN IMMIGRATION
COUNCIL
   Katherine Melloy Goettel*
   Gianna Borroto
   Suchita Mathur

By: */s/ Ori Lev*
   Ori Lev

*Attorneys for Plaintiffs*

* Pro Hac Vice motion forthcoming

26                                  23cv01367