BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General,
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
EREZ REUVENI
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:23-cv-01367-AGS-BLM |
| *Plaintiffs*, | Hon. Andrew G. Schopler |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION (ECF No. 37)** |
| Alejandro MAYORKAS, Secretary, Department of Homeland Security, *et al.*, | |
| *Defendants*. | **Hearing Date: October 13, 2022** |

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................... ii

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS ............................................................................2

    A.  Ports of Entry on the U.S.-Mexico Land Border............................2

    B.  Metering, the *Al Otro Lado I* Order, and Subsequent Guidance..................3

    C.  The Title 42 Orders and The Circumvention of Lawful Pathways Rule.........6

    D.  Current CBP Processing of Undocumented Noncitizens. ...........9

ARGUMENT ..............................................................................................12

    I.  Provisional Class Certification Should Be Denied Because the Underlying Requested Relief is Unavailable on a Classwide Basis.........13

    II.  Plaintiffs Have Not Satisfied Their Burden to Demonstrate Numerosity. ...........13

    III.  Plaintiffs Cannot Identify a Common Question That Would Drive Resolution of this Litigation.........14

    IV.  The Named Plaintiffs' Claims Are Not Typical of the Putative Class.........22

    V.  The Named Plaintiffs are Not Shown to Be Adequate Representatives. .........23

    VI.  Plaintiffs Cannot Satisfy the Requirements for an Injunctive-Relief Class Under Rule 23(b)(2).........24

CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Al Otro Lado, Inc. v. Mayorkas*,
    619 F. Supp. 3d 1029 (S.D. Cal. 2022) .......................................................... 5, 6

*Al Otro Lado, Inc. v. Mayorkas, No.*
    17-CV-02366-BAS-KSC, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ....... 3, 4

*Al Otro Lado, Inc. v. Wolf*,
    336 F.R.D. 494 (S.D. Cal. 2020) .................................................................. 14

*Arnold v. United Artists Theatre Circuit, Inc.*,
    158 F.R.D. 439 (N.D. Cal. 1994) .................................................................. 13

*B.K. v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) ................................................................ 18, 21, 22

*Carnation Co. v. Sec'y of Labor*,
    641 F.2d 801 (9th Cir. 1981) .......................................................................... 22

*Cholakyan v. Mercedes-Benz, USA, LLC*,
    281 F.R.D. 534 (C.D. Cal. 2012) .................................................................. 25

*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) .................................................................... 18, 19

*Crawford v. Honig*,
    37 F.3d 485 (9th Cir. 1994) ............................................................................ 24

*Dellums v. U.S. Nuclear Regul. Comm'n*,
    863 F.2d 968 (D.C. Cir. 1988) ...................................................................... 18

*East Bay Sanctuary Covenant v. Biden*,
    2023 WL 4729278 (N.D. Cal. July 25, 2023) .................................................. 9

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ............................................ 12, 15, 18, 23, 24, 25

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) .................................................................................. 13

*Gen. Telephone Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) ................................................................................ 12, 22

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................... 15

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ............................................................... 23

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) ............................................................... 25

*Lightfoot v. D.C.*,
273 F.R.D. 314 (D.D.C. 2011) ............................................................... 15

*Marcus v. BMW of North America, LLC*,
687 F.3d 583 (3d Cir. 2012) ............................................................... 22

*McCurley v. Royal Seas Cruise, Inc.*,
331 F.R.D. 142 (S.D. Cal. 2019) ............................................................... 13

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ............................................................... 13

*Ruiz Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ............................................................... 21

*Rutledge v. Elec. Hose & Rubber Co.*,
511 F.2d 668 (9th Cir. 1975) ............................................................... 12

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ............................................................... 20

*Schulken v. Washington Mut. Bank*,
2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ............................................................... 24

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
899 F.3d 1064 (9th Cir. 2018) ............................................................... 18, 23

*Spinelli v. Capital One Bank*,
265 F.R.D. 598 (M.D. Fla. 2009) ............................................................... 23

*United Steel Workers v. ConocoPhillips Co.*,
593 F.3d 802 (9th Cir. 2010) ............................................................... 12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................... 12, 15, 21, 24

iii

*Wang v. Chinese Daily News, Inc.*,
   737 F.3d 538 (9th Cir. 2013) ............................................................... 5

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ......................................................... 22

**STATUTES**

6 U.S.C. § 211 ......................................................................................... 2

8 U.S.C. § 1225 ........................................................................ 4, 5, 13, 25

8 U.S.C. § 1252 ........................................................................... 5, 13, 25

**REGULATIONS**

8 C.F.R. § 208.33 ..................................................................................... 8

**FEDERAL REGISTRAR**

86 Fed. Reg. 42,828 (Aug. 5, 2021) ....................................................... 6

88 Fed. Reg. 11,704 (Feb. 23, 2023) ................................................... 7, 8

88 Fed. Reg. 31,314 (May 16, 2023) ......................................... 7, 8, 9, 19

# INTRODUCTION

Plaintiffs seek provisional class certification solely for purposes of obtaining preliminary injunctive relief. The Court should deny this request. Not only does the Immigration and Nationality Act (INA) preclude the classwide injunctive relief they seek, but the underlying premise of their proposed class claim—that Defendants have a borderwide policy or practice of turning back certain noncitizens from ports of entry to the United States—is defeated by the evidence. Without any borderwide policy, Plaintiffs cannot establish that their claims are capable of classwide resolution or typical of those of the proposed class.

Plaintiffs ask the Court to provisionally certify a class of noncitizens who present themselves at a Class A Port of Entry (POE) on the U.S.-Mexico border and are "denied access to the U.S. asylum process by or at the instruction of Defendants on or after May 12, 2023." Mem. in Support of Mot. for Class Certification (ECF No. 37-1) (Mem.) at 21. In support of this request, Plaintiffs assert that Defendant U.S. Customs and Border Protection (CBP) has a borderwide policy to turn back class members who have not prescheduled their arrival at the POE through an appointment system. Mem. at 5. They currently seek to certify a class only with respect to their *Accardi* theory, which asserts that the claimed "turnbacks" violate CBP's stated policy that appointments are not required for noncitizens without documents sufficient for admission who seek to enter the United States at a POE to be inspected and processed. Mem. in Support of Mot. for Preliminary Injunction (ECF No. 39-1) (PI Mem.) at 12-18. Yet, contrary to these assertions, the evidence demonstrates that CBP regularly inspects and processes those without appointments at POEs across the border. Moreover, despite the sweeping nature of Plaintiffs' allegations, their claims and proffered evidence of "turnbacks" actually focus primarily on one POE. Plaintiffs' evidence also reveals material differences in how noncitizens without appointments are treated at different POEs, eliminating any possibility that the Court can resolve their claims in a single, uniform order, as required by Rule 23.

Plaintiffs' request to certify a class should be rejected at the threshold because Congress has precluded entry of classwide injunctions, like the one requested here, that interfere with or impose requirements on the government's implementation of its immigration inspection obligations. Plaintiffs' proposed class also does not satisfy the requirements of 23(a) or (b)(2). First, Plaintiffs do not present evidence to show that their proposed class is sufficiently numerous because they do not show that noncitizens have been "denied access to the U.S. asylum process," rather than having to wait some period of time for inspection at a POE, like any other applicant for admission. Next, Plaintiffs cannot identify a common question sufficient to drive resolution of their *Accardi*-based claim because the evidence defeats a finding of a common policy or practice across all Class A POEs, and because differences in practice across the border are material to resolution of that claim. Similarly, the Plaintiffs' individual claims—which involve only 3 of the 25 POEs, and which are subject to individual variation—are not typical of the claims of putative class members borderwide. Nor do Plaintiffs present any evidence that they will pursue their claims vigorously on behalf of the class, particularly now that they have entered the United States and been processed. Finally, the class does not satisfy Rule 23(b)(2) because Defendants have not acted in a common manner across the class such that a single injunction would be appropriate, and because the final injunctive relief Plaintiffs seek is nonetheless precluded by statute. The Court should deny Plaintiffs' Motion.

## STATEMENT OF FACTS

### A.    Ports of Entry on the U.S.-Mexico Land Border.

CBP's Office of Field Operations (OFO) is responsible for "coordinat[ing] the enforcement activities of U.S. Customs and Border Protection at United States air, land, and sea ports of entry." 6 U.S.C. § 211(g). These statutory obligations—including but not limited to deterring and preventing entry of terrorists; guarding against illegal entry of individuals, illicit drugs, agricultural pests, and contraband; and facilitating and expediting the flow of legitimate travelers and trade, *id.*—apply

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

at all U.S. POEs, including the 25 land POEs on the U.S.-Mexico border. Those 25 POEs fall under the jurisdictions of four different field offices. The San Diego Field Office covers the San Ysidro (Tijuana),[1] Tecate, Otay Mesa, Calexico (Mexicali), and Andrade border POEs. *See* Defs.' Ex. 1[2] at ¶ 5.  The Tucson Field Office covers the San Luis, Douglas, Naco, Sasabe, Lukeville, and Nogales border POEs. *See* Defs.' Ex. 2 at ¶ 2. The El Paso Field Office covers the Santa Teresa, Columbus, Presidio, Ysleta, Marcelino Serna (Tornillo), and El Paso (Ciudad Juarez) border POEs. *See* Defs.' Ex. 3 at ¶¶ 6–12. The Laredo Field Office covers the Laredo (Nuevo Laredo), Roma, Del Rio (Ciudad Acuna), Brownsville (Matamoros), Eagle Pass (Piedras Negras), Hidalgo (Reynosa), Rio Grande City, and Progreso border POEs. *See* Defs.' Ex. 4 at ¶¶ 9–13.

**B.    Metering, the *Al Otro Lado I* Order, and Subsequent Guidance.**

In 2016, facing a sustained surge of migrants without documents sufficient for admission (undocumented noncitizens) arriving at land POEs on the U.S.-Mexico border to seek admission to the United States, CBP's land POEs began to implement, as needed, a practice known as metering (or queue management) to manage the flow of these high numbers of noncitizens. Metering was implemented to assist in providing a safe and secure environment for all travelers, including migrants, and to prevent severe strains on border resources and diversion of those resources from crucial missions, including national security. *See generally Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *2-4 (S.D. Cal. Sept. 2, 2021). In April 2018, CBP issued a Metering Guidance memorandum that provided: "When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs [Directors

---

[1] Because Plaintiffs' proffered evidence often refers to the name of the Mexican town or city across the border from the U.S. POE, Defendants include the Mexican city/town name in parentheses where helpful to the Court's understanding.

[2] "Defs.' Ex." refers to Defendants' Exhibits, attached to the accompanying Declaration of Katherine Shinners.

of Field Operations] may elect to meter the flow of travelers at the land border to take into account the port's processing capacity." *Id.* at \*3. In June 2018, the Department of Homeland Security (DHS) issued a memorandum instructing CBP to "to prioritize staffing and operations" at southwest-border POEs in the following order of priority: "(1) national security efforts, (2) counter-narcotics operations, (3) economic security, and (4) trade and travel facilitation," and to use queue management as necessary to protect these priority missions. *Id.* CBP issued additional prioritization-based queue management and metering guidance in 2019 and 2020. *See id.* at \*4.

Plaintiff Al Otro Lado and other individual plaintiffs challenged metering and other practices, claiming that CBP had engaged in what they termed "turnbacks" at Class A POEs along the U.S.-Mexico Border. *See generally* Second Am. Compl., *Al Otro Lado v. Mayorkas (AOL I)*, No. 17-cv-2366, ECF No. 189 (Nov. 13, 2018). Plaintiffs claimed this conduct was unlawful on several grounds, including that CBP and DHS had an obligation to inspect and process noncitizens who approach a POE, even if they are not yet in the United States, and because the agency action was purportedly based on pretextual assertions of lack of capacity. *See id.* The government argued, on the other hand, that CBP did not owe any inspection and referral duties to those who are not yet within U.S. territory, and that the agency's actions were reasonable and not pretextual. *See, e.g.*, *Al Otro Lado*, 2021 WL 3931890, at \*2. After certifying a class, the *AOL I* Court considered the plaintiffs' claims on summary judgment. *Id.* at \*2. While the court's September 2, 2021 summary-judgment order did not address Plaintiffs' claims of pretext, it found that "turnbacks" of asylum-seekers through metering, prioritization-based queue management, and similar practices that occur without express statutory authority constitute a withholding of CBP's duty under the Immigration and Nationality Act (INA) to inspect and refer asylum seekers pursuant to 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(ii). *Id.* at \*18. The

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

*AOL* I court described the "turnbacks" at issue in the litigation as CBP officers "affirmatively turning asylum seekers away from the border" through a variety of practices. *Id.* at *9. The court did not define the "turnbacks" addressed in its opinion to include coordination "with Mexican officials to 'control the flow' of migrants seeking asylum before they reached the border." *Id.*; *see also id.* at 22 n.20. The court determined that the "turnbacks" at issue were unlawful because they require a noncitizen to leave and then "arrive again" at the POE in order to pursue asylum. *Id.* at *17-18. It is for this reason that the court determined that these turnbacks constitute a withholding (rather than delay) of the required agency actions of inspection and referral. *Id.* at *15-18. The court subsequently entered a declaratory judgment on the basis of this ruling but determined that a classwide injunction was prohibited under 8 U.S.C. § 1252(f)(1), because any such order would enjoin or restrain CBP's efforts to operate 8 U.S.C. § 1225. *Al Otro Lado v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022), *judgment entered,* 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022).

In November 2021, DHS and CBP rescinded their 2018 and 2019 metering/queue management memoranda, and the Acting CBP Commissioner issued new guidance titled "Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry" (Nov. 1, 2021) ("November 2021 Guidance"). Pls.' Ex. 1 & Defs.' Ex. 5, Ex. A. The November 2021 Guidance recognized that "the ability to process undocumented noncitizens in a timely manner is impacted by a wide range of factors," and instructed southwest-border OFO management "to consider and take appropriate measures, as operationally feasible, to increase capacity to process undocumented noncitizens at Southwest Border POEs, including those who may be seeking asylum and other forms of protection," including by leveraging technological and processing efficiencies, such as the use of the CBP One mobile application ("CBP One") to collect advance information from intending entrants. *Id.* at 1, 2. The guidance provides that migrants seeking protection

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

"cannot be required to submit advance information in order to be processed at a Southwest Border land POE." *Id.* at 2. The guidance states that "POEs must strive to process all travelers, regardless of documentation status, who are waiting to enter, as expeditiously as possible, based on available resources and capacity." *Id.* The memo allows CBP to staff the border line to manage safe and orderly travel into the POE, but "undocumented noncitizens who are encountered at the border line should be permitted to wait in line, if they choose, and proceed into the POE for processing as operational capacity permits." *Id.* "Absent a POE closure, officers also may not instruct travelers that they must return to the POE at a later time or travel to a different POE for processing." *Id.* Finally, the guidance acknowledges that "[b]ased on past, current, and expected volumes of individuals seeking entry at Southwest Border land POEs, there may be extended wait times in processing lines." *Id.* at 3.

## C.   The Title 42 Orders and The Circumvention of Lawful Pathways Rule.

While *AOL I* was pending, the COVID-19 pandemic altered the processing of undocumented noncitizens at POEs. From March 20, 2020, until May 11, 2023, most noncitizens without entry documents who sought to enter the United States at its borders were prevented from entry at the border line or, if they entered irregularly, were subject to expulsion, under a series of public health orders in effect to combat the pandemic ("Title 42 Orders"). *See, e.g.*, Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021). These Title 42 Orders were thus in place at the time the metering memoranda were rescinded and the November 2021 guidance issued. *See* Pls.' Ex. 1 at 1. Under the Title 42 Orders, covered noncitizens were generally stopped at the border or expelled to Mexico or their home countries without processing under the INA, including processing for asylum. Such noncitizens were, however, able to be considered for an exception to the Title 42 Orders on a case-by-case basis. 86 Fed. Reg. at 42,829. Beginning in 2021, CBP implemented a mechanism under which noncitizens could

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

schedule appointments to be considered for Title 42 exceptions. Non-governmental organizations began using CBP One for this purpose in mid-2021, and the application was made available directly to noncitizens for this purpose in January 2023. Pl. Ex. 13 ¶¶ 11–24.

In early 2023, the President announced the expiration of the public health emergency on May 11, 2023, which would cause the then-operative Title 42 order to end. *See* Circumvention of Lawful Pathways (NPRM), 88 Fed. Reg. 11,704, 11,708 (Feb. 23, 2023). The end of the Title 42 Order was expected to cause the number of migrants seeking to illegally enter the United States at the southwest border to rise to or remain at all-time highs—an estimated 11,000 migrants daily. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314, at 31,331 (May 16, 2023). To address this expected increase in the number of migrants at the southwest border seeking to enter the United States without authorization, the Department of Justice and DHS promulgated the Circumvention of Lawful Pathways Rule ("CLP Rule"). *Id.* at 31,314, 31,324; *see also* 88 Fed. Reg. at 11,704. The CLP Rule was effective as of May 11, 2023, and provides that most noncitizens who enter the United States during the next two years at the southwest land border or adjacent coastal borders after traveling through a country other than their native country are subject to a re- buttable presumption of ineligibility for asylum unless they avail themselves of or- derly processes for entry into the United States or seek and are denied protection in a third country. 88 Fed. Reg. at 31,321–23. The presumption does not apply to un- accompanied minors, and other noncitizens may be excepted from the presumption if they seek and are denied protection in a third country through which they traveled en route to the United States, were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"; or "pre- sented at a port of entry without a pre-scheduled time and place" but can "demon- strate[] by a preponderance of the evidence that it was not possible to access or use

the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 8 C.F.R. §§ 208.33(a)(2), 1208.33(a)(2). Noncitizens who are otherwise subject to presumptive asylum ineligibility may also rebut the presumption by demonstrating that "exceptionally compelling circumstances exist." *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Noncitizens who cannot rebut the presumption are still considered for statutory withholding of removal and protection under the Convention Against Torture (CAT) and may not be removed to a country where it is likely that they will be persecuted on account of a protected ground or tortured. *See id.* §§ 208.33(b)(2), 1208.33(b)(2)(ii), (4); 88 Fed. Reg. at 11,733.

The CLP Rule aims to reduce irregular migration and to correspondingly decrease crowding in border facilities and avoid projected severe strains on DHS border resources and facilitate safe, humane processing. *See, e.g.*, 88 Fed. Reg. at 31,324. It does so by encouraging migrants to seek asylum or protection in other countries or take advantage of lawful, safe, and orderly migration pathways to enter the United States by generally conditioning the discretionary grant of asylum on migrants' availing themselves of such pathways (or demonstrating exceptionally compelling circumstances). *Id.* at 31,235. Thus, noncitizens who have already traveled to Mexico with the intent of entering the United States can avoid the presumption of asylum ineligibility by pre-scheduling an appointment to present at a POE for orderly processing. 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). CBP currently uses CBP One to allow noncitizens to make such appointments. 88 Fed. Reg. at 31,317. For this purpose, CBP One allows "noncitizens located in Central or Northern Mexico who seek to travel to the United States" to "submit information in advance and schedule an appointment to present themselves at" eight southwest-border POEs: Nogales, Brownsville, Eagle Pass, Hidalgo, Laredo, El Paso, Calexico, and San Ysidro. *See* "Advance Submission and Appointment Scheduling," https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Sept. 13,

2023). Use of appointments allows these POEs to manage the flow of migrants without documents sufficient for admission into the POE facility, efficiently allocate border enforcement resources, and streamline processing through advanced vetting for public safety and national security concerns, thus reducing overall burdens on immigration enforcement at the border. 88 Fed. Reg. at 31,318; Defs.' Ex. 5 at ¶¶ 8–9, 11–12. As the CLP Rule's preamble states, an appointment is "not a prerequisite to approach a POE . . . [or be] inspected or processed," but use of a CBP One appointment will allow noncitizens to avoid the presumption of asylum ineligibility and avoid "waiting in long lines of unknown duration at POEs." 88 Fed. Reg. at 31,317-18, 31,332, 31,365.

In July, a U.S. District Court in California vacated the CLP Rule, *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. July 25, 2023), but that order has been stayed pending appeal. *See East Bay Sanctuary Covenant*, No. 23-16032 (9th Cir. Aug. 3, 2023).

**D.     Current CBP Processing of Undocumented Noncitizens.**

Although appointments made through CBP One enhance CBP's ability to process noncitizens without documents sufficient for admission by streamlining the resource-intensive process, CBP's policy remains that noncitizens without documents sufficient for admission may not be turned away absent a port closure. *E.g.*, Defs.' Ex. 5 at ¶¶ 6–7. POEs at which CBP One appointments are scheduled prioritize the processing of those with appointments, but these and other Class A POEs continue to process noncitizens without appointments. Between May 12 and August 23, 2023, noncitizens without appointments made up approximately 29 % of the total number of noncitizens without entry documents processed by OFO at southwest-border POEs. *See* Defs.' Ex. 5 at ¶ 10. At the 8 POEs that process CBP One appointments, the number is approximately 27 %. *See id.*

*Tucson Field Office*. Of the six Class A land POEs in the Tucson Field Office, only the Nogales POE processes noncitizens with CBP One appointments.  Both

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

Plaintiffs' and Defendants' evidence demonstrates that the Nogales POE is regularly processing noncitizens without CBP One appointments from a physical line that begins at the DeConcini entrance to the POE, and which began to form after the Title 42 Order ended. *See, e.g.*, Defs.' Ex. 2 at ¶ 10; Defs.' Ex. 6 at 9; Pls.' Ex. 5 ¶ 9; Pls.' Ex. 10 ¶¶ 8, 10.[3] As Defendants' evidence shows, the remaining POEs in the Tucson Field Office—where there are no CBP One appointments—are also processing undocumented noncitizens. *See* Defs.' Ex. 2 at ¶ 11; Defs.' Ex. 6 at 8. No named Plaintiff alleges having been turned back from the Nogales POE or any other POE within the Tucson Field Office.

*San Diego Field Office.* Of the five Class A land POEs in the San Diego Field Office, San Ysidro and Calexico schedule CBP One appointments. Defs.' Ex. 1 at ¶¶ 5, 17. At San Ysidro, the busiest land border crossing in the western hemisphere, noncitizens with CBP One appointments generally enter and are processed at the Pedestrian West entrance. *Id.* ¶¶ 6, 17. Those without CBP One appointments typically present at the Pedestrian East entrance, although they are accepted at both entrances. *See id.* ¶ 17. Contrary to Plaintiffs' allegations, the San Ysidro and Calexico POEs inspect and process noncitizens without CBP One Appointments, including those who present at the other three POEs in the Field Office (Otay Mesa, Tecate, and Andrade) and are transported to the San Ysidro and Calexico POEs for processing. *See id.* ¶¶ 17–19; Defs.' Ex. 7 at 10–11; *see also* Defs.' Opp. to Mot. for Prelim. Inj. (PI Opp.) at 17. On May 19, one week after the Title 42 Order ended,

---

[3] The Declaration of Caitlyn Yates states that at Nogales, noncitizens without appointments "are being processed via allowances by" Mexico's immigration agency, INM. Pls.' Ex. 24 at ¶ 12(b). But that statement contradicts the contents of the CAMPI Report the declarant purports to summarize, which does not mention "INM allowances" at all with respect to the Nogales POE. Instead, it states that such noncitizens are processed "via a physical line at the port of entry," *see* Defs.' Ex. 6 at 9. Further, it appears from Plaintiffs' evidence that Mexican municipal authorities, not INM, undertook to create a waitlist for those without appointments waiting at Nogales, and Plaintiffs do not allege that CBP has any involvement in that waitlist. *See* Pls.' Ex. 10 at ¶13.

the Assistant Port Director of the San Ysidro POE, after receiving media inquiries concerning accounts of CBP Officers turning away noncitizens who lacked appointments, asked supervisors to issue daily reminders that a "[n]oncitizen without documents sufficient for entry to the United States should be advised that they may wait to be processed or they may utilize CBP One™ to obtain an appointment to present at the POE for processing. Under no circumstances will these individuals be turned away, redirected, or discouraged from waiting to be processed." Defs.' Ex. 1 at ¶ 12 & Ex. C.

*Laredo Field Office.* The Laredo Field Office encompasses eight POEs, four of which schedule CBP One appointments: Laredo, Hidalgo (Reynosa), Brownsville (Matamoros), and Eagle Pass (Piedras Negras). *See* Defs.' Ex. 4 at ¶¶ 9–13. As with the other field offices, the Laredo Field Office has reminded its staff of their obligations to process noncitizens consistent with all applicable guidance. *Id.* ¶¶ 13–14. All eight POEs process noncitizens who approach without CBP One appointments as capability permits. *Id.* ¶¶ 9(d), 10(d), 11(e), 12(d), 13; *cf.* Defs.' Ex. 5 at ¶ 10. No named Plaintiffs or any other declarants allege to have been affirmatively turned back by CBP officers or otherwise at any of these POEs.

*El Paso Field Office.* Of the six Class A land POEs in the El Paso Field Office, only El Paso schedules CBP One appointments. Defs.' Ex. 3 at ¶¶ 7-12, 17. There are three crossings at El Paso: the Paso del Norte bridge, the Bridge of the Americas, and the Stanton crossing. *Id.* ¶ 3. Noncitizens with CBP One appointments present at the Paso del Norte bridge. *Id.* ¶ 17. One Plaintiff claims to have been told by CBP Officers at the Paso del Norte Bridge that he "could not apply for asylum without a CBP One appointment." Pls.' Ex. 9 at ¶ 9. Plaintiffs also cite to reports of incidents at El Paso in which CBP Officers instructed noncitizens without appointments who had crossed onto U.S. soil to wait at the international boundary or told them that they needed an appointment. *See* Pls.' Ex. 23 at ¶¶ 15-16. However, the POEs within the

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

El Paso Field Office inspect and process noncitizens without CBP One Appointments. Defs.' Ex. 3 at ¶ 19; *see also* Defs.' Ex. 5 at ¶ 10 (citing numbers of noncitizens without a pre-scheduled arrival processed at the El Paso POE).

## **ARGUMENT**

A party seeking class certification must satisfy the four elements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). "[A]ctual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982). These class certification requirements are generally "intimately involved with the merits of the claims," and "a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980, 981 (9th Cir. 2011). "What matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The party seeking certification must also satisfy one of the elements of Rule 23(b); here, that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). Failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975). Here, Plaintiffs' proposed class does not satisfy any of these requirements.

## I.    Provisional Class Certification Should Be Denied Because the Underlying Requested Relief is Unavailable on a Classwide Basis.

Plaintiffs' Motion should be denied because Congress has precluded district courts from issuing the classwide injunctive relief Plaintiffs seek. Thus, the Court cannot certify a class "for the purposes of obtaining preliminary injunctive relief." Mem. at 1. Specifically, 8 U.S.C. 1252(f)(1) bars the issuance of relief "on behalf of an entire class of aliens" that requires, commands, positively directs, or interferes with, the implementation of any provision of 8 U.S.C. §§ 1221-1231. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064-65, 2067-68 (2022); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481-82 (1999). Plaintiffs' requested injunction, which would prohibit what Plaintiffs term "turnbacks" with respect to a class of noncitizens, seeks to compel inspection under the covered provision 8 U.S.C. § 1225(a)(3), the prerequisite to processing for an appropriate disposition under covered provisions 8 U.S.C. §§ 1225(b) and 1229a. *See* Defs.' Opp. to Mot. for Prelim. Inj. (PI Opp.) at 22. As Plaintiffs' requested injunction thus runs afoul of § 1252(f)(1), the Court lacks the authority or jurisdiction to certify a class for purposes of entering that injunction.

## II.    Plaintiffs Have Not Satisfied Their Burden to Demonstrate Numerosity.

Numerosity requires the Court to determine whether the class is so numerous that it would make joinder impracticable, Fed. R. Civ. P. 23(a)(1), which "depends on the facts and circumstances of each case." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994). "Generally, the numerosity factor is satisfied if the class comprises 40 or more members and courts will find that it has not been satisfied when the class comprises 21 or fewer.'" *McCurley v. Royal Seas Cruise, Inc.*, 331 F.R.D. 142, 167 (S.D. Cal. 2019) (cleaned up). Here, Plaintiffs define their class as noncitizens who present at a Class A POE on the U.S.-Mexico border "and who are or will be denied access to the U.S. asylum process by or at the instruction of Defendants on or after May 12, 2023." Defendants do not concede that

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

the number of noncitizens who have been "denied access" to the asylum process since May 12, 2023, is sufficiently numerous to support certification.

Plaintiffs do not attempt to even estimate the number of noncitizens who have been "denied access" to the asylum process whose claims are still live, or who will prospectively be "denied access." Plaintiffs argue they can rely on "reasonable inferences," and "general common sense" to show numerosity, Mem. at 13-14, but the evidence does not support the inference that "hundreds, if not thousands of" noncitizens will prospectively be denied access to the asylum process by CBP officers affirmatively turning them away or telling them appointments are required to seek asylum. *See* Mem. at 14. Instead, the evidence presented by Plaintiffs shows that a small number of noncitizens assert that this has happened, but that, generally, noncitizens without appointments may at certain POEs have to wait in line to be processed, may determine that they prefer to seek an appointment rather than wait in line, or may be subject to exit controls by Mexican authorities. *See supra* at 9-12; *infra* at 16-20. Although Plaintiffs may intend the term "denied access" to have a broader meaning (they do not expressly define the term), Defendants do not concede that a noncitizen who is permitted to wait to enter the POE to be processed is denied access to the asylum process. Here, unlike in the *AOL I* decisions Plaintiffs cite, Defendants do not concede the existence of a practice implemented sufficiently broadly to support an inference that numerous noncitizens will be subject to it. *See Al Otro Lado, Inc. v. Wolf*, 336 F.R.D. 494, 501 (S.D. Cal. 2020) (noting concession of existence of metering policy).[4]

## III. Plaintiffs Cannot Identify a Common Question That Would Drive Resolution of this Litigation.

Even if the class were defined broadly enough to be sufficiently numerous, there is no common question capable of providing common answers across that

---

[4] Plaintiffs are also incorrect that Defendants conceded numerosity as to the "denial of access" class in *AOL I. See Al Otro Lado*, 336 F.R.D. at 501 (noting that Defendants argued that the proposed class "does not meet the numerosity requirement").

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

class. To satisfy Rule 23(a)(2)'s commonality requirement, the proposed class members must "have suffered the same injury." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. This does not mean that class members merely "suffered a violation of the same provision of law" or raise some common questions. *Id.*; *Ellis*, 657 F.3d at 981 ("[I]t is insufficient to merely allege any common question ... ."). Rather, class members' claims must depend upon a common contention, the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Thus, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* Although "[t]he existence of shared legal issues with divergent factual predicates" can establish commonality, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), where a plaintiff alleges that there is a "common pattern and practice that could affect the class *as a whole*," plaintiffs must provide evidence that the common policy or practice actually exists; otherwise, there is "no question common to the class." *Ellis*, 657 F.3d at 983 & n.7 (citing *Wal-Mart Stores, Inc.*, 564 U.S. at 355–56)); *see also Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) (commonality cannot be established by identifying "a constellation of disparate but equally suspect [alleged] practices ... distilled from the varying experiences of the class" and then asking the Court to enjoin them all as a "policy or custom").

Here, the evidence defeats Plaintiffs' assertion that there is a common policy or practice of "turnbacks" that can be evaluated on a common basis under an *Accardi* theory for compliance with CBP's internal policies. There is no borderwide "CBP One Turnback Policy" under which CBP officers allegedly turn back, or direct others to turn back, noncitizens from Class A POEs if they do not have a CBP One appointment. *See* Mem. at 5; Compl. ¶ 5. First, OFO has affirmed, at a headquarters level, that its policies and practices continue to conform with its November 2021 guidance

and statements in the preamble to the CLP Rule: undocumented noncitizens are not required to schedule a CBP One appointment in order to be processed, and such noncitizens may not be turned away from POEs. *See* Defs.' Ex. 5 at ¶¶ 6–7. The data showing that noncitizens without appointments are being processed across all four Southwest-border field offices supports that assertion. *See supra* at 9. POEs have also issued reminders to their staff that noncitizens without appointments may not be turned away. Defs.' Ex. 1 at ¶¶ 13-15 & Exs. C-D; *see also* Defs.' Ex. 4 at ¶ 14.

To the extent that Plaintiffs argue there is nonetheless an informal pattern or practice of turnbacks that violate CBP's stated policies, the evidence again shows this is not the case. The practices Plaintiffs allege vary by region or by POE. The majority of the individual Plaintiffs' claims center on the San Diego Field Office, which contains the San Ysidro and Otay Mesa POEs. Of the nine individual Plaintiffs who seek to represent the proposed class, seven claim to have been refused access (or directed or encouraged to use CBP One) by officers at the San Ysidro or Otay Mesa POEs. *See* Pls.' Exs. 2-8; *see also* Pls.' Exs. 17, 21. One Plaintiff claims to have been turned back at the Paso del Norte pedestrian entrance to the El Paso POE. Pls.' Ex. 9 at ¶ 9. No named Plaintiffs or any other noncitizen declarant allege having been turned back at any POEs within the Nogales or Laredo Field Offices. Indeed, one Plaintiff (Natasha Doe) does not claim to have been turned back at all; Natasha Doe instead decided not to approach the Eagle Pass (Piedras Negras) POE on the advice of other migrants she encountered. Pls.' Ex. 14 ¶¶ 11-12; *see also* Mem. at 16 (acknowledging that Natasha Doe was not turned back).

There are thus, at a minimum, Field-Office-level differences in practices that are material to resolution of the proposed class claim. At the Nogales POE, for instance, noncitizens without appointments wait in, and are taken into the port from, a physical line at the entry to the POE. *Supra* at 9-10. No named Plaintiff or other noncitizen declarant alleges having been turned back from the Nogales POE or any other POE within the Tucson Field Office, nor do Plaintiffs' other exhibits contain

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

evidence of turnbacks in that Field Office. Although Plaintiffs allude in their briefs to evidence of "turnbacks" at Nogales, *see* Mem. at 8 (citing Pls.' Ex. 10 at ¶ 12), the cited evidence does not support this characterization. The cited declaration refers to two incidents that the declarant did not witness firsthand, neither of which constitute evidence of CBP Officers affirmatively turning someone away from the POE. The first constitutes someone being told to use a different pedestrian entrance,[5] and the second is a vaguely-described interaction between a Mexican woman and a CBP Officer that contains no indication that the CBP Officer affirmatively turned the woman back. *See* Pls.' Ex. 10 at ¶ 12.

No named Plaintiff or any other declarant witness allege to have been affirmatively turned back at a POE within the Laredo Field Office that processes CBP One appointments. Plaintiffs do not make clear what their legal theory is with respect to this Field Office, but they assert that Mexican immigration officials are controlling physical entry to the four POEs that take CBP One appointments and are making "allowances" for those without appointments to cross the pedestrian bridges to the U.S. POEs to be processed. *See* Pls.' Ex. 24 at ¶ 12(b); Pls.' Ex. 19 at ¶ 29; Pls.' Ex. 25 at p. 46 (describing INM access controls at Brownsville (Matamoros) and Hidalgo (Reynosa) and acknowledging that those without appointments who made it past such checks were processed by CBP after a wait). Plaintiffs do not provide any evidence regarding the remaining four POEs.

Plaintiffs argue that these differences in practice at the POEs across the border do not destroy commonality because they are merely "slight variations in how class members experience the government's failure to comply with its own regulations or guidance." Mem. at 15. That is not so.

*First*, these differences go to the heart of whether CBP actually *has* a common

---

[5] The Nogales POE is one port consisting of 3 pedestrian entrances: DeConcini, Morely, and Mariposa . Defs.' Ex. 2 at ¶ 9.

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

practice or policy to begin with. As in *Ellis*, where regional differences in how employees were treated were crucial to whether there were any common questions as to a nationwide class in an employment discrimination case, here, the existence of a common practice or policy that extends to all four CBP OFO Field Offices is crucial to the commonality inquiry for the proposed *borderwide* class. *Ellis*, 657 F.3d at 983-84 ("If no such *nationwide* discrimination exists, Plaintiffs would face an exceedingly difficult challenge in proving that there are questions of fact and law common to the *nationwide* class."). And the evidence of differing practices here—including the *absence* of evidence of CBP turnbacks in the Nogales and Laredo Field Offices—negate a finding of a borderwide practice or policy.

*Second*, even if these varying practices could be considered to be some variation on "turnbacks" (they cannot), these differences would be material to the resolution of the *Accardi* claim because they affect the inquiry into whether CBP has failed to comply with its stated policy. *See B.K. v. Snyder*, 922 F.3d 957, 976 (9th Cir. 2019) (finding district court abused discretion in certifying subclass on theory of failure to comply with the Medicaid statute where it was not clear that the elements of the claim could be evaluated on a classwide basis). For instance, whether Mexican officials' actions which impact access to the bridge to a U.S. POE violates CBP's stated policy—which applies only to CBP Officers—requires a different factual and legal inquiry than whether CBP officials' conduct violates that policy. Further, claims arising from Mexican officials' conduct is subject to particular defenses such as the act-of-state doctrine, *see Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018), and cannot be redressed in this action because the effectiveness of relief depends entirely on the unforeseeable actions of a foreign country. *Dellums v. U.S. Nuclear Regul. Comm'n*, 863 F.2d 968, 976 (D.C. Cir. 1988). And coordination between CBP or DHS and the Government of Mexico regarding migration would in any event present a non-justiciable political question. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007) ("The conduct of the foreign

relations of our government is committed by the Constitution to the executive and legislative [branches] . . . and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.") (alteration in original). Similarly, whether the physical line of undocumented noncitizens without appointments at the Nogales POE violates CBP's stated policies presents another entirely different inquiry, particularly given that CBP's November 2021 Guidance and the CLP Rule acknowledge that there may be long lines for processing. *See* Pls.' Ex. 1 at 2, 3; 88 Fed. Reg. at 31,317-18, 31,332, 31,365. Thus, unlike in the civil rights cases Plaintiffs cite—and unlike in *AOL I*—there is no underlying core practice that can be evaluated on a common basis against a regulatory, statutory, or constitutional requirement in a way that will generate common answers.

Additionally, even when examining alleged turnbacks within one Field Office, individual differences in language used by CBP Officers may be material to whether CBP Officers are complying with the stated policy. Seven of the named Plaintiffs and two unidentified declarants allege they were not permitted access by CBP Officers to the San Ysidro or Otay Mesa POEs or were told that a CBP One appointment was required to seek asylum. *See* Pls.' Ex. 2 at ¶ 11; Pls.' Ex. 3 at ¶¶ 13-14; Pls.' Ex. 4 at ¶ 13; Pls.' Ex. 5 ¶ 14; Pls.' Ex. 6 at ¶¶ 16-17; Pls.' Ex. 7 at ¶ 14; Pls.' Ex. 8 at ¶¶ 13-14; Pls.' Ex. 17 at ¶¶ 15-16 (encounter allegedly occurred on May 12); Pls.' Ex. 21 (encounters allegedly occurred between May 12 and May 19). However, it is often unclear whether these individuals are attesting they were affirmatively turned back by U.S. government officials or whether they are instead attesting they were not immediately allowed to cross the border or were encouraged or decided to use CBP One to avoid having to wait in line, which would be consistent with CBP policy. *See* Pls.' Ex. 1. For example, Diego Doe states that he was not allowed to proceed into the San Ysidro POE at the Pedestrian East entrance, but he does not explain whether he was permitted to wait in line to enter at a later time. Pls.' Ex. 5 at ¶ 14. Guadalupe and Somar Doe acknowledged that Guadalupe Doe

was told at the San Ysidro POE that she could wait in line to be processed, but they both determined not to wait in line. Pls.' Ex. 3 at ¶¶ 9-10, Pls.' Ex. 4 at ¶¶ 8-9.[6] These differences both belie the existence of a uniform policy or practice and demonstrate the existence of individual differences in each class member's claim that are material to whether each event constitutes an *Accardi* violation, because it is consistent with CBP Policy to manage intake at the border line. *See* Pls.' Ex. 1 at 2.

Plaintiffs may claim that what tethers the putative class members' claims is that they were all "denied access" to the asylum process. However, for the same reasons already discussed, noncitizens who are subject to different practices at different Field Offices have not "suffered the same [legal] injury" for purposes of the *Accardi* claim, because the relevant injury is defined by whether CBP has complied with its stated policies.[7] Thus, there is no common question capable of generating answers that are common to the class and will "drive the resolution of the litigation."

---

[6] Further, Plaintiffs submitted at Exhibit 12 six native audio files that purport to correspond to certain of the named Plaintiffs' experiences in July 2023 at the San Ysidro and Otay Mesa POEs, *see* Pls.' Ex. 11 at ¶¶ 5-13, but the metadata indicates that the files were last modified *before* July 2023, on September 4, 2022 (as to the files titled "Chaparral POE 7.25.23 – 8_15 am" and "Chaparral POE - in the Plaza -MX Immigration Officer - 7.25.23 – 8_34 am"), September 5, 2022 (as to "San Ysidro POE 7.26.23 7_41 am"), January 20, 2023 (as to "TJ POE (San Ysidro) 7.17.23 5pm."), and January 21, 2023 (as to "TJ POE (San Ysidro) 7.18.23" and "TJ POE (Otay) 7.18.23"). Defs.' Ex. 8 at ¶¶ 3-4. The issues raised in these motions should not be decided on a preliminary basis where further discovery into the authenticity of these audio files, including forensic examination, may be required. As the metadata at least calls into question that the audio files are what they purport to be, the Court cannot rely on these files or the corresponding information in the declarations and should thus deny the instant motions for preliminary classwide injunctive relief. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (holding that the court may consider at class certification whether the plaintiff's proof is, or will likely lead to, admissible evidence).

[7] Moreover, it would be improper to equate "denial of access" to non-compliance with the policy. And Plaintiffs cannot evade the commonality requirement by defining their class in a manner that presumes liability. *See Ruiz Torres v. Mercer Canyons Inc.,* 835 F.3d 1125, 1138 n.7 (9th Cir. 2016) ("[D]efining the class to include only those individuals who were 'injured' . . . threatens to create a fail safe class, one that is defined so narrowly as to preclude membership unless the liability of the defendant is established.") (cleaned up).

1    *Wal-Mart*, 564 U.S. at 350.

2    Plaintiffs' proffered "common questions" do not satisfy Rule 23(a)(2). "Any

3    competently crafted class complaint literally raises common questions." *See Wal-*

4    *Mart,* 564 U.S. at 349 (cleaned up)*.* Again, the question is whether those questions

5    are capable of generating common *answers* that will drive resolution of the litigation.

6    Plaintiffs argue that "[w]hether an agency is correctly interpreting and enforcing its

7    own regulations is a common question of law and fact sufficient for class certifica-

8    tion." Mem. at 15. But there is no question here of agency interpretation or enforce-

9    ment of regulations; rather, the question presented by Plaintiffs is whether CBP is

10   complying with policy guidance, statements in a regulatory preamble, and the "struc-

11   ture" of a regulation. PI Mem. at 5. Regardless, as explained, the differences in prac-

12   tices on the ground mean that the precise policy-interpretation question will vary *at*

13   *least* by Field Office, and this is thus not a common question in this context. Plain-

14   tiffs also suggest that "whether Defendants have adopted a policy of turning back

15   arriving noncitizens who do not have a CBP One appointment" is a common ques-

16   tion.  Mem. at 2. This, however, is an example of a threshold question intertwined

17   with the merits that must be resolved before certifying a class. *See B.K.*, 922 F.3d at

18   974-75. To establish commonality across the class, Plaintiffs must demonstrate that

19   Defendants have adopted such a policy. If the class were to be certified and this

20   question later resolved in a judgment in Defendants' favor, that would hardly be fair

21   to class members who may have individual *Accardi* claims based on isolated con-

22   duct, but who are now bound by that classwide judgment. Finally, "whether class

23   members are harmed by Defendants' refusal to follow their own Binding Guidance,"

24   Mem. at 2, is not a common question because it presumes non-compliance. Unlike

25   in certain Eighth Amendment or substantive due process cases, a "risk" of harm is

26   not a key element of the substantive claim; instead, an *Accardi* claim requires a

27   showing of actual prejudice, which is a different, individualized inquiry into the im-

28   pact of the failure to follow policy on the outcome of an administrative proceeding.

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

*Compare B.K.*, 922 F.3d at 968-69 *with Carnation Co. v. Sec'y of Labor*, 641 F.2d 801, 804 & n.4 (9th Cir. 1981) (the *Accardi* supervisory power should only be invoked where there is a showing of prejudice). Whether each putative class member can show any prejudice to their immigration processing is a highly individualized inquiry. But even if prejudice could be evaluated on a classwide basis, this would not drive resolution of the claim.

Plaintiffs thus have not established commonality as to the proposed class.

**IV.    The Named Plaintiffs' Claims Are Not Typical of the Putative Class.**

Typicality requires a party to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* This requirement "derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 598 (3d Cir. 2012) (internal quotation omitted). Thus, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class member." *Falcon*, 457 U.S. at 156. A named plaintiff does not satisfy the typicality requirement when his "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Here, for the same reasons that the proposed borderwide class lacks common-

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

ality, the named Plaintiffs cannot satisfy the typicality requirement because their experiences were different from those experienced in other Field Offices. The named Plaintiffs claim to have been refused access or encouraged to use CBP One by CBP Officers at the San Ysidro, Otay Mesa, and El Paso POEs. *See* Pls.' Exs. 2-9. For the reasons discussed (*supra* § III), the analysis and resolution of whether CBP has followed its policy in San Diego or El Paso will be different, for example, from those who approached the Nogales POE and waited to be processed. These two scenarios present different *Accardi* claims. The named Plaintiffs cannot represent noncitizens who present at POEs in the Nogales and Laredo Field Offices.

Moreover, the government can raise factual defenses to certain individual Plaintiffs' claims based on the "factual situation[s]" of each Plaintiff. *See Hanon*, 976 F.3d at 508; *Ellis*, 657 F.3d at 984. Natasha Doe's claim is subject to a complete standing defense because she does not even assert that she was turned back or affirmatively denied access at any POE. *See* Pls.' Ex. 14. Diego Doe states that he interacted with a CBP Officer, but he does not assert that he was affirmatively turned back, only that he was not permitted to immediately proceed into the POE. *See* Pls. Ex. 5 at ¶ 14. To the extent any Plaintiff bases their claim on the assertion that they were turned back by Mexican authorities (allegedly "at the instruction of" CBP), *see* Mem. at 17; Pls.' Ex. 2 at ¶ 9; Pls.' Ex. 7 at ¶ 12, this claim is subject to an act-of-state doctrine defense based on the Mexican government's decision to intercept them. *See Sea Breeze Salt,* 899 F.3d at 1069. And each of the named Plaintiff's individual claims are moot because they have already entered the United States. Defs.' Ex. 5 at ¶¶ 18–19. The existence of such defenses to the named Plaintiffs' claims defeats typicality. *See Ellis*, 657 F.3d at 984–85 (discussing unique factual defenses).

## V.   The Named Plaintiffs are Not Shown to Be Adequate Representatives.

Plaintiffs have also not presented evidence that the named Plaintiffs would "vigorously represent" the interests of the class as required by Rule 23(a)(4). *See Spinelli v. Capital One Bank*, 265 F.R.D. 598, 614 (M.D. Fla. 2009). The nature of

class certification under Rule 23(b)(2) amplifies the need to confirm the commitment of the class representatives, because members of a Rule 23(b)(2) class are not afforded the right to opt out of the class and are bound by any judgment. *See Crawford v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994), *as amended on denial of reh'g* (Jan. 6, 1995) ("In a Rule 23(b)(2) class action for equitable relief, the due process rights of absent class members generally are satisfied by adequate representation alone."). Plaintiffs have not submitted a sworn statement from any proposed class representative regarding their willingness to accept the duties of a class representative. Each Plaintiff's declaration states that the Plaintiff wants to participate in the lawsuit, but does not indicate whether they can take on the duties of a representative plaintiff. The absence of any such assurance is particularly significant given that each of the named Plaintiffs have now entered the United States at POEs to be inspected and processed and thus lacks a continuing, shared interest in the resolution of the class claims and in prospective injunctive relief. Defs.' Ex. 5 at ¶¶ 18–19; *Ellis*, 657 F.3d at 986 (concluding that former employees are not adequate representatives of a class of current employees seeking injunctive relief); *Schulken v. Washington Mut. Bank*, 2012 WL 28099, at *5 & n.2 (N.D. Cal. Jan. 5, 2012) (analogizing Rule 23(a)(4) analysis to a standing analysis).

## VI. Plaintiffs Cannot Satisfy the Requirements for an Injunctive-Relief Class Under Rule 23(b)(2).

The requirements of a Rule 23(b)(2) injunctive-relief class cannot be met for at least three reasons. *First*, because there is no borderwide policy or practice of a failure to comply with CBP's stated policy, Plaintiffs cannot show that the government "has acted or refused to act on grounds that apply generally to the class." *See* Fed. R. Civ. P. 23(b)(2). The "key" to the Rule 23(b)(2) class "is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (citation

omitted). In the absence of a common policy or practice, there is no injunctive relief that could be appropriate to address disparate *Accardi* claims.

*Second*, because 8 U.S.C. § 1252(f)(1) prohibits classwide relief that would interfere with the operation of § 1225, Plaintiffs cannot show that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). As discussed above, any injunction that Plaintiffs seek enjoining "turnbacks," whether as final or preliminary relief, would run afoul of 8 U.S.C. § 1252(f)(1). *See supra* § I; PI Opp. Arg. § I(E). Accordingly, because the injunctive relief they seek is not available, final injunctive relief is not "appropriate" as required to certify and maintain a Rule 23(b)(2) class. And because injunctive relief on this claim is not appropriate, there can be no "corresponding" declaratory relief for purposes of Rule 23(b)(2). *See Jennings v. Rodriguez*, 138 S.Ct. 830, 851 (2018) (questioning whether declaratory relief alone that does not *correspond* to injunctive relief can sustain a class). Thus, any declaratory judgment would be stand-alone declaratory relief, which is not contemplated by Rule 23(b)(2). Moreover, the Court cannot issue a declaratory order that "would provide relief to each member of the class," *Wal-Mart Stores*, 564 U.S. at 360, because it is barred from doing so by § 1252(f)(1).

*Third,* certification under Rule 23(b)(2) for purposes of prospective injunctive relief is not appropriate because the named Plaintiffs have ceased to be subject to the conduct complained of. *See Ellis*, 657 F.3d at 988; *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) ("It appears that none of the named plaintiffs has standing to pursue injunctive relief on behalf of the class, as none of them is a current ... employee."); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (same, with regard to former car owners).

## CONCLUSION

The Court should deny Plaintiffs' Motion for Provisional Class Certification.

//

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

DATED: September 13, 2023       Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov

*Counsel for Defendants*

DEFS.' OPP'N TO PLS.' MOT. FOR
PROV. CLASS CERTIFICATION
Case No. 3:23-cv-01367-AGS-BLM

## <u>CERTIFICATE OF SERVICE</u>

No. 23-cv-01367-AGS-BLM

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: September 13, 2023          Respectfully submitted,

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice

27