```
1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4   AL OTRO LADO, INC. et al.,      )
                                    )  CASE NO.: 3:23-cv-01367-AGS-BLM
5           Plaintiff,              )  FRIDAY, OCTOBER 13, 2023
                                    )  SAN DIEGO, CALIFORNIA
6   v.                              )
                                    )  MOTION HEARING
7   ALEJANDRO N. MAYORKAS, et al., )
                                    )  HONORABLE ANDREW G. SCHOPLER
8           Defendant.              )  UNITED STATES DISTRICT JUDGE
    ─────────────────────────────── )  SOUTHERN DISTRICT OF CALIFORNIA
9

    APPEARANCES:
10
    (All parties appearing via Zoom)
11
    For the Plaintiffs:
12
         AMERICAN IMMIGRATION COUNCIL
13       1331 G Street NW
         Washington D.C.  20005
14       (240) 461-9448
         BY:  SUCHITA D. MATHUR, ESQ.
15            smathur@immcouncil.org

16
    For the Defendant:
17
         UNITED STATES DEPARTMENT OF JUSTICE
18       OFFICE OF IMMIGRATION LITIGATION
         Post Office Box 868
19       Ben Franklin Station
         Washington, D.C.  20044
20       (202) 598-8259
         BY:  KATHERINE J. SHINNERS, ESQ.
21            katherine.j.shinners@usdoj.gov

22   (Appearances continued on page 2)
     ───────────────────────────────────────────────────────────────
23           Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891
                    tricia_rosate@casd.uscourts.gov
24                   333 West Broadway, Suite 420
                     San Diego, California  92101
25       Reported stenographically; Transcribed with CAT software
```

(Appearances continued on page 2)

```
 1    APPEARANCES (Continued):

 2   For the Plaintiffs:

 3        VINSON & ELKINS LLP
          2200 Pennsylvania Avenue NW
 4        Suite 500
          Washington, D.C.  20037
 5        (202) 639-6605
          BY:  EVAN DAVID MILLER, ESQ.
 6             emiller@velaw.com

 7

 8        MAYER BROWN, LLP
          1999 K Street NW
 9        Washington, D.C.  20006
          (202) 263-3714
10        BY:  MICHELLE N. WEBSTER, ESQ.
               mwebster@mayerbrown.com
11

12        CENTER FOR GENDER & REFUGEE STUDIES
13        1121 14th Street NW
          Suite 200
14        Washington, D.C.  20005
          (202) 355-4471
15        BY:  MELISSA E. CROW, ESQ.
               crowmelissa@uclawsf.edu
16

17        CENTER FOR CONSTITUTIONAL RIGHTS
18        666 Broadway
          Seventh Floor
19        New York, New York  10012
          (212) 614-6464
20        BY:  BAHER AZMY, ESQ.
               bazmy@ccrjustice.org
21

22

23

24

25
```

| 1 | SAN DIEGO, CALIFORNIA; FRIDAY, OCTOBER 13, 2023 |
|---|---|
| 2 | 10:00 a.m. - 11:29 a.m. |
| 3 | - - - - |

1                SAN DIEGO, CALIFORNIA; FRIDAY, OCTOBER 13, 2023

2                      10:00 a.m. - 11:29 a.m.

3                            -  -  -  -

4          THE COURT:  All right.  It is 10:00 a.m. on Friday,

5   October 13, 2023.

6          This is the case of Al Otro Lado, Incorporated v.

7   Mayorkas, Case No. 23-cv-01367-AGS.

8          May I please have the appearances of the parties.

9          We'll start first with the plaintiffs.

10         MS. MATHUR:  Good morning, Your Honor.

11         My name is Suchita Mathur, American Immigration

12  Council, on behalf of plaintiffs.

13         THE COURT:  Good morning.

14         MR. MILLER:  Good morning, Your Honor.

15         My name is Evan Miller from Vinson & Elkins on behalf

16  of the plaintiffs.

17         THE COURT:  All right.  Good morning, Mr. Miller.

18         And it's pronounced Ms. Mathur?  Is that correct?

19         MS. MATHUR:  That's correct, Your Honor.

20         Thank you.

21         THE COURT:  Okay.  Yes.  Yes.

22         All right.  And then for the defense?

23         MS. CROW:  I'm sorry, Your Honor.

24         I am Melissa Crow from the Center for Gender &

25  Refugee Studies on behalf of the plaintiffs.

1    Good morning.

2    THE COURT:  All right.  Good morning, Ms. Crow.

3    Anyone else for the plaintiffs?

4    MS. WEBSTER:  Michelle Webster from Mayer Brown, LLP,

5    on behalf of the plaintiffs.

6    THE COURT:  Good morning, Ms. Webster.

7    MR. AZMY:  Good morning, Your Honor.

8    Baher Azmy from the Center for Constitutional Rights,

9    also on behalf of the plaintiffs.

10    THE COURT:  Good morning, Mr. Azmy.

11    Any other counsel for plaintiffs?

12    All right.  I think it is safe to move on to the

13    defense now.

14    Counsel for the defense?

15    MS. SHINNERS:  Good morning, Your Honor.

16    Katherine Shinners for the defendants from the

17    Department of Justice.  I'm the only one appearing on behalf of

18    defendants today, although there are other counsel on the line.

19    THE COURT:  All right.  Good morning, Ms. Shinners --

20    or perhaps good afternoon where you are -- and to all of your

21    co-counsel.

22    All right.  I'll start today's hearing by giving the

23    parties a tentative ruling based on my review of the papers.

24    I'm happy to be convinced out of that ruling or to modify it in

25    some way.

1        I do want to address, first of all, the motion to

2   proceed pseudonymously, which is at ECF 36.  My tentative is to

3   grant that motion.

4        The Federal Rules of Civil Procedure generally

5   require parties to be identified when filing a lawsuit.  I'd

6   cite to Federal Rule of Civil Procedure 10(a).  The

7   Ninth Circuit has held that many -- or has noted that many

8   federal courts have permitted parties to proceed anonymously

9   when special circumstances justify secrecy.  I'd cite to *Does I*

10  *thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067

11  (9th Cir. 2000).  In that case, the Ninth Circuit held that

12  "A district court must balance the need for anonymity against

13  the general presumption that parties' identities are public

14  information and the risk of unfairness to the opposing party."

15       In applying that balancing test, the Ninth Circuit

16  held that courts have permitted plaintiffs to use pseudonyms in

17  three situations:  First, when identification creates a risk of

18  retaliatory physical or mental harm; second, when anonymity is

19  necessary to preserve privacy in a matter of sensitive and

20  highly personal nature; and, third, when the anonymous party is

21  compelled to admit his or her intention to engage in illegal

22  conduct, thereby risking criminal prosecution.  That's all at

23  page 1068 of the *Does I thru XXIII* opinion.

24       Here, all class representatives are attempting to

25  flee their home countries because they were persecuted or

| | |
|---|---|
| 1 | feared that they would be persecuted if they remained.  The |
| 2 | harms that the individual plaintiffs identify and which they |
| 3 | fear will occur again if their true names are revealed seem to |
| 4 | me to fall squarely within the types of harms that establish a |
| 5 | need to proceed pseudonymously. |
| 6 | I would cite for support to *Al Otro Lado, Inc. v.* |
| 7 | *Nielsen*, 2017 WL 6541446, 4 (S.D. Cal. 2017).  In fact, I would |
| 8 | adopt Judge Bashant's analysis in that case in full regarding |
| 9 | this issue. |
| 10 | In addition, I'll note two other things on this |
| 11 | motion.  First, this is an unopposed request, which means |
| 12 | there's no suggestion before this Court that there's any |
| 13 | prejudice to the defense in granting the motion.  Second, |
| 14 | federal regulations require the protection of asylum-seeker |
| 15 | identities in general to avoid these sorts of specific harms |
| 16 | that the plaintiffs have identified.  The federal regulations |
| 17 | that I'm thinking of explicitly exempt the courts from the |
| 18 | reach of those regulations.  So I'm not bound by that, but I do |
| 19 | take that as persuasive authority about the need for secrecy in |
| 20 | these matters.  I would cite to 8 C.F.R. § 208.6, which |
| 21 | requires confidentiality of all asylum records and |
| 22 | 8 C.F.R. § 1208.6, which does the same. |
| 23 | In all events, I would find the plaintiffs have |
| 24 | provided sufficient evidence of fear of harm to justify |
| 25 | granting this unopposed request. |

1          The next motion I'm going to address is the motion

2    for preliminary injunction, which is the main reason we're here

3    today, at ECF 39.  The first matter that I'd like to hear

4    argument on is the threshold issue about whether injunctive

5    relief is barred under Aleman Gonzalez and 8 U.S.C. § 1252.

6          I'll give you my tentative thoughts based on the

7    briefing so that you have a detailed understanding of where my

8    head's at on this issue legally before we begin the argument,

9    and then I'll open it up for argument from the parties.

10          I intend to give each side 20 minutes maximum for

11    argument on this issue.  My courtroom deputy will keep track of

12    the time.  You may get an intermediate time warning, but please

13    keep track of your own time.  If you want to save time for

14    rebuttal, just make sure you stop talking before your

15    20 minutes is up.

16          My tentative thought on this is that I must deny the

17    motion for preliminary injunction based on this threshold

18    issue.

19          So, as an initial hurdle, the defense has argued that

20    injunctive relief is barred by the Supreme Court's opinion in

21    *Garland v. Aleman Gonzalez*, 142 S. Ct., 2057 -- it's a '22

22    case -- as well as the statute at issue there, which was

23    8 U.S.C. § 1252.  That statute states that "regardless of the

24    nature of the action or claim or of the identity of the party

25    or parties bringing the action, no court (other than the

1    Supreme Court) shall have jurisdiction or authority to enjoin

2    or restrain the operation of the provisions of part IV of this

3    subchapter, as amended by the Illegal Immigration Reform and

4    Immigrant Responsibility Act of 1996, other than with respect

5    to the application of such provisions to an individual alien

6    against whom proceedings under such part have been initiated."

7    That's (f)(1) of 8 U.S.C. § 1252.

8            The part IV that's referenced in that notation does

9    include § 1225(b)(1), which is the statutory authority and

10   procedure for inspection of aliens arriving in the

11   United States, including procedures for asylum interviews.  The

12   Supreme Court recently explained that § 1252(f)(1) generally

13   prohibits lower courts from entering injunctions that order

14   federal officials to take or to refrain from taking actions to

15   enforce, implement, or otherwise carry out the specified

16   statutory provisions.  That's the Aleman Gonzalez case, 142,

17   S.Ct., 2065.

18           If this court grants the injunctions sought here and

19   forces defendants to follow binding guidance and inspect and

20   process asylum seekers regardless of whether they have a

21   CBP One appointment, then the Court would be ordering them to

22   take actions to implement the specified statutory provisions of

23   asylum inspections under § 1225(b)(1), quoting in part

24   *Aleman Gonzalez,* 142 S.Ct. at page 2065.

25           Much like when plaintiffs requested permanent

1  injunctive relief in Judge Bashant's similar case in this

2  district, § 1252(f) forbids the sort of classwide reliefs that

3  they're seeking, it seems to me.  I would cite to *Al Otro Lado,*

4  *Inc. v. Mayorkas*, 619 F.Supp.3d, 1029, 1045 (S.D. Cal. 2022) as

5  well as § 1225(b)(1)(A)(ii), which delineates immigration

6  officers' duty to refer asylum seekers.

7         That section, § 1225, is among the covered provisions

8  under § 1252(f)(1).  Thus, after Aleman Gonzalez, it seems to

9  me that such an injunction must be construed as enjoining or

10  restraining the operation of § 1225, because it would have the

11  effect of interfering with the government's efforts to operate

12  § 1225.

13         The plaintiffs do raise several arguments to the

14  contrary, but thus far, I'm unpersuaded by those arguments.

15  Plaintiffs claim that their preliminary injunction request is

16  not based upon, does not rely upon, and does not require the

17  interpretation of any provision of the INA.  The claim for

18  injunctive relief stems, according to them, from "defendant's

19  own internal policies."  Defendants have failed to assert their

20  binding guidance of no turnbacks is required by any provision

21  of the INA, according to plaintiffs.

22         They go on to argue that a preliminary injunction

23  then force's defendant's compliance with their own policy is

24  separate from the INA provisions, and instead, any injunction

25  compelling defendants to comply with their own internal policy

1    would at most result in collateral effects on the operation of

2    part IV of the INA.

3          I disagree with that argument, at least tentatively.

4    It seems to me that by issuing an injunction restricting

5    Customs & Border Protection from turning back asylum applicants

6    for whatever reason, the Court would directly implicate how CBP

7    implements its duty to inspect asylum seekers under § 1225 and

8    the procedures set out therein.  For the same reasons that

9    Judge Bashant gave in Al Otro Lado v. Mayorkas, it seems to me

10   that I also lack jurisdiction to issue an injunction in this

11   matter.  So I would adopt her legal analysis, which I've

12   summarized somewhat here in this tentative ruling.

13         So that's my tentative opinion.  I think I should

14   stop there before moving on to some of the other issues that

15   may be rendered moot, such as the standing issue that was

16   raised and the merits of a preliminary injunction and that we

17   should really dig into the meat of this very important

18   threshold issue.

19         Because the Court's tentative ruling is to deny the

20   motion for preliminary injunction, I'm going to give the

21   plaintiffs first argument here, and I'll let the defense

22   respond.

23         So, Ms. Mathur, are you the one who's going to be

24   doing the argument or one of your co-counsel?

25         MS. MATHUR:  Yes.  Yes, sir.

1          Thank you, Your Honor.

2          THE COURT:  Okay.

3          MS. MATHUR:  And I'll just repeat for the record.  My

4     name is Suchita Mathur.  I'm from the American Immigration

5     Council.

6          I'll address any questions Your Honor has raised

7     about the preliminary injunction, and then my co-counsel,

8     Mr. Miller, will be happy to talk about the motion for

9     provisional class certification.

10         I also want to just note that some of our named

11    plaintiffs are joining the hearing today with an interpreter.

12         THE COURT:  Okay.

13         MS. MATHUR:  So, Your Honor, I'll of course address

14    your concerns regarding the bar to injunctive relief first.

15         I'd like to take Your Honor through our arguments a

16    little bit and then address the specific points that the Court

17    has made.  I'll attempt to reserve a few minutes for rebuttal,

18    as well.

19         So first, Your Honor, the requested order isn't

20    directed at 1225 -- I'm just going to focus on 1225, as that's

21    the provision that you've identified -- because requiring

22    compliance with the CBP's binding guidance doesn't interfere

23    with the government's efforts that operate 1225, because the

24    agency's decision to allow asylum seekers to -- without

25    appointments to present at ports doesn't represent their

1   efforts to carry out the statute.  As we mentioned in our

2   papers, the guidance is the product of an upheld choice by the

3   executive.

4         Before we get into that point, I want to distinguish

5   Judge Bashant's decision --

6         THE COURT:  Before we get to that, it seems to me --

7   wouldn't that --

8         If I accepted that argument, wouldn't it really tear

9   the heart out of Aleman Gonzalez?  Because you could say that

10   anytime that -- I mean, it seems like it creates --

11         How do I limit that loophole?  If they haven't --

12         A policy that goes against the statutory guidance,

13   basically that takes us out of the world of Aleman Gonzalez.

14         MS. MATHUR:  Well, Your Honor, what is actually very

15   helpful about Aleman Gonzalez vis-a-vis this case is that it

16   puts the focus of the inquiry on the government's view of how

17   the statute should be operated.

18         So under Supreme Court's interpretation of (f)(1),

19   the requested injunction here doesn't actually enjoin the

20   operation of 1225, because it doesn't interfere with the

21   government's efforts to operate the statute.  An order would

22   merely require defendants to take actions they've already

23   stated they believe are required.

24         Aleman, in contrast, was about telling the government

25   to do something it disagreed with as a legal matter or to stop

1    doing something the government thought it had authority to do.

2           So, in this case, Your Honor, the required compliance

3    actually just supports the government's interpretation of the

4    statute.  I think what's really relevant here is the order that

5    we seek is only valid so long as the guidance remains in

6    effect, and whether the guidance remains in effect or not is

7    entirely the decision of the government, of the agency.

8           So, Your Honor, Judge Bashant's decision we think is

9    entirely distinguishable here, because an entirely distinct

10   claim and legal theory was at issue there.  It was a statutory

11   argument, and Judge Bashant had already determined that 1225

12   imposed certain duties on CBP regarding inspection and

13   processing.  There was no internal agency policy that the

14   government had adopted of its own volition which bounds CBP

15   officers to provide the additional provisional safeguards that

16   exist here.  There, the Court had found that to operate 1225,

17   the government had to take certain steps because of its

18   statutorily imposed obligations, but the government actually

19   disagreed with that and has appealed that decision.

20          So here, in this case, the government continues to

21   disclaim the idea that 1225 imposes any obligations on officers

22   vis-a-vis asylum seekers in Mexico.  Instead, all that's at

23   issue is a voluntarily adopted internal agency procedure that

24   says in order to accomplish our goal -- our political goals of

25   managing migration effectively, we're not going to turn people

1    back without appointments.

2            To that end, this policy is more analogous to the

3    District Court's decision in the preliminary injunction in

4    Al Otro Lado.  The cite to that is 423 F.Supp.3d at page 64, a

5    2019 decision, granting a preliminary injunction to a subclass.

6    That injunction was affirmed by the Ninth Circuit.  That's

7    currently subject to an appeal, as well, by the federal

8    government.  There, the Court was examining the earlier

9    iteration of the asylum ban, of the asylum rule.  The Court

10   noted that nothing in the language of the ban discusses

11   1225(b)(1) or cites to 1225 or otherwise indicates that it

12   implements expedited removal under 1225; so the Court sees no

13   basis for concluding that the asylum ban implements 1225.

14           So here we have a very similar situation, which is

15   that the binding guidance doesn't mention 1225.  What it

16   mentions is an internal policy that's based on the judgment of

17   the commissioner of CBP that it increase capacity to process at

18   ports but incentivize an alternative to unlawful crossings.

19   The only legal authority cited is an executive order, which

20   again does not cite 1225.  It instead announces its approach to

21   managing migration in line with values and political goals.

22           So defendant's position has actually been consistent

23   and very clear for years now, which is that they don't believe

24   that 1225 requires CBP to do anything vis-a-vis undocumented

25   citizens who are not yet in U.S. territory as the proposed

1    class members in this case.  Actually, the statutory basis that

2    defendants themselves have pointed to in prior cases and in the

3    briefing in this case per CBP's general authority to manage

4    travelers at ports is the Homeland Security Act at

5    6 U.S.C. § 211.

6            Focusing on CBP's guidance itself conforms with

7    Ninth Circuit case law holding that a party claim can be based

8    on agency procedures that are not coextensive or are more

9    rigorous than the statutory requirements.  So the only place

10   the defendants have mentioned 1225 in relation to this guidance

11   is their brief in this case.  Defendant's counsel's statements

12   here can't establish a new statutory basis for the agency's

13   preexisting political choice; that the guidance really is not

14   tethered to defendant's efforts to carry out 1225.

15           And, Your Honor, the viability of the injunction that

16   we seek is supported by recent case law in this circuit which

17   confirms the collateral effects.  I think East Bay Sanctuary

18   Covenant, the District Court, in July noted that the

19   Circumvention of Lawful Pathways rule merely had a collateral

20   effect on the operation of any provision covered by (f)(1) and

21   that there was no bar to relief, even though the rule has an

22   indirect impact on how CBP inspects and processes undocumented

23   noncitizens.

24           Similarly, in Al Otro Lado I, the decision converted

25   the PI to a permanent injunction.  The district court found

1   similarly after Aleman Gonzalez came out regarding the previous

2   iteration of the rule.

3           So similarly here, any impact on CBP's efforts to

4   implement 1225 is indirect.  The requested injunction only

5   directly implicates compliance with the guidance and the policy

6   determination that defendants have made about how to treat

7   asylum seekers still in Mexico.  Again, as I noted -- which I

8   don't know if I noted this, yet -- our party claim based on

9   asylum would survive even if the Ninth Circuit overruled

10  Al Otro Lado I and said 1225 does not include any administerial

11  duty to inspect by officers.

12          And then lastly, in the alternative, as your court

13  seems to accept defendant's argument that their policy is tied

14  to 1225, we have an alternative reason why the requested

15  injunction is still permissible under Aleman Gonzalez, and

16  that's because it would not "require officials to take actions

17  that, in the government's view, are not required by statute and

18  to refrain from actions that again, in the government's view,

19  are allowed by statute."

20          So under the Supreme Court's interpretation of

21  (f)(1), what we're requesting doesn't enjoin the operation

22  of -- and the Court really focuses on that phrase, "the

23  operation of" -- because it merely requires defendants to take

24  actions that they believe -- they've already stated they

25  believe are required.  It aligns precisely with the

1    government's internal binding view of how the statute should be

2    implemented, and that is meaningfully distinct from the

3    injunction the Supreme Court found to be prohibited in

4    Aleman Gonzalez, which forced DHS to provide volunteers for

5    individuals under a clearly covered provision when the

6    government didn't believe the statute required volunteering.

7            So, Your Honor, I'll just save a little bit of time

8    for rebuttal if that's acceptable.

9            THE COURT:  Okay.  All right.  Thank you, Ms. Mathur.

10           Let's hear now from Ms. Shinners.

11           MS. SHINNERS:  Thank you, Your Honor.

12           Again, this is Katherine Shinners on behalf of the

13   defendants.

14           I think that Your Honor's ruling is correct, and that

15   this is a fairly straightforward application of 1252(f)(1).  In

16   other words, what we're looking at here is the effect of the

17   injunction that plaintiffs are seeking.  It doesn't matter that

18   their claim is that they're seeking to enforce a CBP policy,

19   because § 1252(f)(1) applies regardless of the nature of the

20   action or the claim.

21           It also doesn't matter that the policy at issue -- in

22   talking about the November 2021 guidance -- does not expressly

23   seek to implement § 1225 or whether CBP agrees that their

24   policy requires that those individuals should be permitted to

25   wait in line as a matter of that policy, because as the AOLI

1    court reasoned, the authority for the memo is sort of besides

2    the point.

3         What we're looking at is the effect of the injunction

4    on the operation of the covered statutes and the inverse of

5    enforcing -- I think we'll just try to be precise about the

6    terms of the November 2021 guidance, which are that individuals

7    may not be required to submit advanced information in order to

8    be processed.  Assuming that that creates some sort of

9    individual procedural right -- which defendants do not

10   concede -- but assuming it does, that is the action and the aim

11   of the injunction that plaintiffs are seeking; that individuals

12   who remain outside the United States at the time that their

13   waiting in line or presenting at the international boundary or

14   approaching the international boundary be processed.  That

15   processing falls under -- well, first it falls under

16   1225(a)(3), which is the precursor to any processing decision,

17   which is the requirement of inspection, and that's within a

18   covered statute.  Then, as Your Honor noted, there's under

19   expedited removal procedures an obligation to refer asylum

20   seekers under 1225(b)(1).

21        There's no dispute that those are covered provisions,

22   and there's no dispute that that is what each of plaintiffs

23   motions seek as the goal of the injunction, which is inspection

24   and processing.

25        THE COURT:  Well, how do you respond to Ms. Mathur's

1    argument that --

2              You were saying the effect of the injunction, that we

3    need to keep the focus on the effect of the injunction on the

4    operation of the covered statutes.  She says that the

5    injunction she's requesting isn't aimed at those covered

6    statutes; it's aimed at a policy that goes beyond those

7    statutes.

8              How do you respond to that argument?

9              MS. SHINNERS:  So while we agree that the

10   government's position remains that the statute does not impose

11   obligations to those that are not yet in the United States,

12   that does not mean --

13             I think that what they are seeking to enforce with

14   the injunction is inspection and processing.  So they're saying

15   they are seeking to enforce a policy that they say goes beyond

16   what the statutes require, but they're still seeing to compel

17   inspection and processing.  Through that -- that is what runs

18   afoul of 8 U.S.C. 1251(f)(2).  I think, again, the key to

19   plaintiffs' claims is a direction that asylum seekers or others

20   seeking humanitarian protection cannot be required to submit

21   advanced information in order to be processed at a southwest

22   land border, land POE, port of entry.  They define the asylum

23   process as the right to be inspected and processed at a port of

24   entry.

25             Again, there's no question that those obligations

1    fall under 1225.  So even if the policy -- even if they're

2    seeking to enforce the policy, the goal and the impact of that

3    policy is to compel inspection and processing.  If individuals

4    are waiting on the other side of the boundary, they are waiting

5    to present at a port of entry, and they are -- then when they

6    present and cross the border, they are inspected, and that is

7    precisely the relief that plaintiffs seek in this litigation.

8    Although they disclaim -- and that's good -- they disclaim

9    seeking immediate inspection, it's not clear that they're

10   disclaiming seeking or placing any sort of time frame.  Their

11   examples are a little unclear on this.  I think the goal, their

12   aim, is to provide inspection and processing and access to the

13   asylum process.  So, again, to the extent that they say that it

14   doesn't matter, because they are seeking to enforce the

15   government's policy, again, we look at the direct effect.  The

16   direct inverse of that policy is a requirement of inspection

17   and processing, and thus this falls squarely under the same

18   framework as the claims at issue in the initial Al Otro Lado I

19   litigation.

20          As to the argument that Aleman Gonzalez only applies

21   or that 1252(f)(1) only applies when the government disagrees,

22   I don't think that that really is applicable here, because as

23   stated, the government does not agree that the statute itself

24   imposes any obligations to those who are still outside of U.S.

25   territory.

1          The interpretation of 1252(f)(1) set forth in

2    Aleman Gonzalez is not restricted to cases where they are

3    seeking to enforce -- where the plaintiffs are seeking to

4    enforce an interpretation of the statute of which the

5    government disagrees.  What matters for purposes of

6    Aleman Gonzalez is whether the injunction here seeks to compel

7    action -- that is, require, command, or positively direct an

8    action -- that relates to the operation of and the function

9    and/or working of that thing.

10         Here, the action compelled relates to the operation

11   of 1225.  It's the inverse in an inverse way.  It's direct,

12   however.  It's not merely collateral, like in the examples that

13   plaintiffs cite.  It's a direct inverse of allowing individuals

14   to wait in line, which, again, regardless of whether or not CBP

15   agrees, that is their policy:  Compelling any actions related

16   to -- that is, compelling eventually or more immediately,

17   depending on the time frame -- inspection and processing.

18         So although the government has consistently taken the

19   position that this is not required by statute, and thus this

20   case is really not that different from Aleman Gonzalez, that's

21   not really a distinction that affects the application of

22   1252(f)(1) in this matter.

23         Have I addressed all of Your Honor's questions?

24         THE COURT:  Yes.

25         Anything further, Ms. Shinners?

1           MS. SHINNERS:  Just one moment.  I just want to make

2    sure that I've addressed all their points.

3           Oh.  I will say in terms of the -- I did touch on

4    this, but in terms of the cases involving collateral impacts,

5    again, I think the relationship here between people waiting to

6    present at a port of entry and the requirement of inspection

7    and processing is much more direct.  It's not attenuated; it is

8    not collateral.  Again, regardless of what the policy

9    implements, if there is a particular procedural right -- which,

10   as I said, the government doesn't concede -- that procedural

11   right or procedural privilege provided by the policy would be

12   inspection and processing.

13          THE COURT:  All right.  Thank you, Ms. Shinners.

14          Ms. Mathur.

15          MS. MATHUR:  Yes.  Thank you, Your Honor.  I'll be

16   brief.

17          So the government's interpretation and focus on the

18   impact of an injunction here would vastly overread and expand

19   on Aleman Gonzalez.  In fact, Aleman Gonzalez very clearly

20   stated that the line of Ninth Circuit case, for example,

21   Gonzalez v. NASA, a 2004 Ninth Circuit case, survives.

22          The government's argument is that anytime a policy

23   touches on inspection and processing in any way, that would be

24   barred by Aleman Gonzalez.  The plain text of Aleman tells us

25   that that's not true.

1          Further, Your Honor, the goal of plaintiffs'

2    injunction is not inspection and processing.  It's asking the

3    government to comply with their policy.  The procedural benefit

4    at issue for asylum seekers or proposed class members is the

5    right not to be turned back by CBP officers.  This is not just

6    semantics.  I think what makes that really clear is the idea

7    that if the policy was to be rescinded, then the Accardi claim

8    goes away, because it's very directly tied to the injunction

9    itself.

10          Your Honor, we've discussed some of the authority

11   that supports the collateral effect doctrine application in

12   this case, but actually defendants don't point to any authority

13   supporting their proposition, which is that an internal policy

14   that doesn't mention a covered provision, that the government

15   continues to disclaim is required by statute, somehow becomes a

16   covered provision because now defendants later are saying so.

17          In this case, I think that the indirect impact is on

18   who must be inspected once they're in the United States, and

19   that's a collateral effect of an injunction, the injunction

20   sought in this case.  The direct impact of turnbacks of people

21   who are still in Mexico, and that's the subject of the policy

22   and the guidance, and that's what plaintiffs are seeking to

23   uphold for as long as it remains valid under the government's

24   choice through this injunction.

25          THE COURT:  Is it your position that the decision

1    whether to turn back asylum seekers or to let them kind of stay

2    in a waiting area is not covered by part IV?

3            MS. MATHUR:  That's correct.  That's correct,

4    Your Honor, under the government's own interpretation of the

5    statute.

6            Under Aleman Gonzalez, the focus is very much on the

7    government's view of the statute, and that's why the court

8    endorsed -- had a discussion of how even the unlawful operation

9    of a statute -- that is, even if this court were to issue a

10   declaratory judgment saying 1225 requires everyone to be

11   processed immediately, and the government wasn't doing that --

12   then that would still be operation of the statute.

13           So, Your Honor, yes, we believe that the focus should

14   be on the government's view as articulated here.

15           THE COURT:  Thank you, Ms. Mathur.

16           Ms. Shinners?

17           MS. SHINNERS:  Well, I just want to touch on that

18   last part.

19           I believe it's plaintiffs' view that there is an

20   obligation under 1225 toward those -- this is under the

21   statute -- to those who are waiting in line.

22           Again, I want to be very careful here, because they

23   state that the right is the right not to be turned back, but

24   any injunction that imposes any sort of condition on what

25   happens to those people would be an injunction that covers --

1    or, sorry -- that relates to the operation of a covered

2    provision.  That's all I want to say on that.  I just note the

3    inconsistency with plaintiffs' own position as to what

4    statutory rights apply to those waiting in line.

5            And I'll also just reiterate the government's concern

6    that what plaintiffs are seeking through their injunction,

7    which uses big terms like "turnback" and is not tied to the

8    language of the guidance, actually goes beyond what the

9    government's actual policy is.

10           THE COURT:  So hum me a few more bars, I guess, in

11   your response to Ms. Mathur's argument here that their focus is

12   really on who you're letting stay in the waiting area, not the

13   specific inspection of aliens arriving in the United States or

14   asylum interviews, which is the language that's relevant in

15   part IV here.

16           MS. SHINNERS:  Well -- so I understand plaintiffs to

17   be saying that the decision whether or not to turn individuals

18   back or to let them stay in the waiting area is what they are

19   seeking to compel.  Again, I think as noted before, I think

20   that that's the inverse of inspection and processing in the

21   sense that those individuals waiting in line to be inspected

22   and processed.

23           I guess what I'm concerned with is that that is not

24   actually what their injunction seeks to do, and I want to be

25   very careful that any --

1          In other words, I do believe and the government's

2    position is that that injunction still runs afoul of 1225(f)(1)

3    in the sense that what they're, in fact, seeking is inspection

4    and processing, and the goal of the injunction is inspection

5    and processing, and that is in all of their briefs, and that

6    seeks to enforce 1225.

7          Even under this more narrow proffer of the decision

8    whether to let individuals stay in the waiting area, that still

9    runs afoul of 1252(f)(1), but I'm also skeptical that that's

10   actually the limit of the relief that plaintiffs are seeking.

11         THE COURT:  All right.  Well, I think I'm going to

12   take a brief recess at this point.  I'll be back to give the

13   parties my ruling on this threshold issue.

14         Thanks in advance for your patience.

15         (Recess 10:42 a.m. - 11:19 a.m.)

16         THE COURT:  We are back on the record at 11:19 a.m.

17         It looks like we still have all the attorneys.

18   I appreciate everyone's patience.

19         This is an important issue, and I certainly wanted to

20   make sure that this court is staying within the bounds of

21   binding Supreme Court precedent here.

22         So I've considered the parties' arguments, re-looked

23   at the cases and briefing.

24         This is how I come out on this:  I don't see any

25   daylight between our situation here and what was confronting

1    Judge Bashant, and I still agree with her reasoning.  She was

2    dealing with a complete turnback policy, whereas what I had

3    before me is a partial turnback policy.  It only applies to

4    people who fail to set up an interview appointment using the

5    CBP One smartphone application or smartphone app.  That

6    distinction is immaterial, I think, to the constitutional

7    analysis, and ultimately I agree with Judge Bashant's view of

8    the constitutional -- the Supreme Court's guidance here.  I

9    shouldn't have said constitutional analysis but the

10   Supreme Court's guidance.

11           As a preliminary matter, I think that it's important

12   to define what the plaintiffs are requesting here in terms of

13   an injunction.  When we're talking about the waiting area or

14   who's going to be turned back, it's turned back from what and

15   waiting area for what?  It's not waiting in line to go to the

16   cafeteria or something.  It's waiting to get inspections and

17   asylum interviews, which are clearly covered in the statutory

18   framework of part IV.  I think this case is a very clear

19   parallel to the facts of Aleman Gonzalez.  The Aleman Gonzalez

20   court basically said at page 2065 that the Court needs to ask:

21   "Would the injunction interfere with the government's efforts

22   to operate a covered statutory provision?"

23           In Aleman Gonzalez, the plaintiffs were requesting

24   bond hearings and that bond hearings were not mentioned in IV

25   or the statutory framework, but that was of no moment to the

1    Supreme Court.  The Supreme Court held that imposing such bond

2    hearings would interfere with the covered statutory duties,

3    which included the government's detention authority.

4    Therefore, they said that the injunctions that were being

5    requested or the injunctions that had been entered by the

6    district courts were invalid.

7         Similarly here, the plaintiffs are focusing on who

8    can stay in the waiting area and who's going to get turned

9    back, and they argue these are not things that are mentioned

10   anywhere in part IV of the statutory framework, but I think

11   similar to Aleman Gonzalez, it would interfere with the

12   government's operation of covered statutory provisions,

13   specifically the inspection and asylum interview provisions.

14   Therefore, the injunction, I think, is similarly barred by

15   Aleman Gonzalez.

16        The last note I'll make on Aleman Gonzalez is that

17   the Supreme Court didn't seem to be concerned with where the

18   right that was being asserted came from, whether it came from

19   the Constitution or an internal policy or some other source of

20   authority.  The focus on the remedy-stripping, exclusionary

21   language had nothing to do with where the asserted right came

22   from.  So it doesn't seem to make a difference to me whether

23   this is an Accardi claim enforcing an internal policy or a more

24   direct constitutional claim or anything else.  I don't think

25   that makes a difference in the Aleman Gonzalez analysis.

1          The final footnote I would add that I've considered

2    is that if I were to grant an injunction that forced federal

3    officials to permit asylum seekers to wait at the port of entry

4    until CBP can process them, that itself, I think, would

5    interfere with the government's ability to carry out specified

6    statutory provisions in that they can schedule these asylum

7    interviews and inspections anywhere.  It happens to be at the

8    port of entry right now, but they could specify another

9    location.  So if I required them to do it at a particular

10   location, that too, I think, would interfere with the operation

11   of a covered statutory provision.

12          So ultimately I would confirm my tentative ruling,

13   which I read at the outset of this hearing and deny the

14   preliminary injunction motion here on the grounds that it's

15   simply barred under Aleman Gonzalez.

16          That does not end the case, I think the next thing we

17   need to address is how much time the government's going to need

18   to file their answer.  But I would say --

19          I know that Judge Bashant's case is up on appeal.

20   Obviously if the Ninth Circuit takes a different view of her

21   reasoning, then I would revisit this analysis entirely, but at

22   this point, it seems to me that her analysis is correct and the

23   additional points I made only buttress that analysis given the

24   facts before me.

25          So unless there are any questions about the Court's

1   ruling or need for clarification, I would want to move on and

2   find out how much time the government thinks it needs to

3   answer.

4           MS. SHINNERS:  Thank you, Your Honor.

5           As set forth in our prior request, we would request

6   30 days, having received the Court's ruling from today.  I just

7   need to get together our response to the complaint reviewed by

8   the clients and internally now that we have had the benefit of

9   the Court's ruling on this.

10          THE COURT:  That's sort of what I was thinking,

11  anyway.

12          Is that acceptable to the plaintiffs?

13          Ms. Mathur.

14          MR. MILLER:  Hold on one second, Your Honor.

15          THE COURT:  Certainly.

16          I'm sorry.  Mr. Miller, can you state your appearance

17  for the benefit of the court reporter?

18          MR. MILLER:  Absolutely, Your Honor.  My name is

19  Ben Miller on behalf of the plaintiffs.

20          THE COURT:  Thank you.

21          MR. MILLER:  So I think we are fine to agree to that

22  timeline.

23          The one thing I did want to ask this court is if you

24  were planning to memorialize your ruling in writing for

25  purposes of appeal.

1          THE COURT:  I would just leave the ruling as the

2    transcript of this proceeding.  So you have the ruling as of

3    today.

4          MR. MILLER:  Okay.

5          THE COURT:  Given the thoroughness of Judge Bashant's

6    order, I don't see the need to delay anything with a further

7    written ruling in this case.

8          MR. MILLER:  Thank you, Your Honor.

9          THE COURT:  Certainly.  So if we go 30 days out,

10   that's Sunday, November 12th.  So I would say Monday,

11   November 13th, as the deadline for the answer.  If that works

12   for all parties, we'll go ahead and set that in stone.

13         MS. SHINNERS:  Thank you, Your Honor.  That works.

14         THE COURT:  Okay.

15         MR. MILLER:  Thank you, Your Honor.

16         THE COURT:  All right.  Well, I appreciate the

17   briefing and the argument.  Unless there's anything else, I'll

18   let everybody head off to lunch or their midday activities

19   depending on which part of the country you're in right now.

20   All right.

21         MS. MATHUR:  Thank you, Your Honor.

22         THE COURT:  Yep.  Take care.

23         MR. MILLER:  Thank you, Your Honor.

24         (Proceedings concluded at 11:29 a.m.)

25                        -   -   -   -

1                              CERTIFICATE

2              I, Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891,

3    certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

      /s/ Tricia Rosate, CSR No. 10891      Date: October 19, 2023
6    Registered Diplomate Reporter
     Registered Merit Reporter
7    Federal Certified Realtime Reporter
     Certified Realtime Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25