MAYER BROWN LLP
Matthew H. Marmolejo (CA Bar No. 242964)
*mmarmolejo@mayerbrown.com*
333 S. Grand Avenue
47th Floor
Los Angeles, CA 90071-1503
Telephone: +1.213.229.9500
Michelle N. Webster (DC Bar No. 985265)
(*pro hac vice*)
*mwebster@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

VINSON & ELKINS LLP
Stephen M. Medlock (VA Bar No. 78819)
(*pro hac vice*)
*smedlock@velaw.com*
2200 Pennsylvania Ave., N.W., Ste. 500 W
Washington, DC 20037
Telephone:  +1.202.639.6500
Facsimile:   +1.202.879.8939

CENTER FOR GENDER AND REFUGEE
STUDIES
Melissa Crow (DC Bar No. 453487)
(*pro hac vice*)
*crowmelissa@uclawsf.edu*
1121 14th Street, N.W., Suite 200
Washington, DC 20005
Telephone: +1.202.355.4471
Facsimile: +1.415.581.8824

*Additional Attorneys for Plaintiffs Listed
on Next Page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, *et al.*,<br><br>Defendants. | Case No. 3:23-cv-01367-AGS-BLM<br><br>Hon. Andrew G. Schopler<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**HEARING DATE: [DATE]** |

761062229.5

MAYER BROWN LLP
Matthew E. Fenn (NY Bar No. 5391149)
(*pro hac vice*)
Mfenn@mayerbrown.com
71 S. Wacker Dr.
Chicago, IL 60606
Telephone: +1.312.782.0600

VINSON & ELKINS LLP
Evan Miller (DC Bar No. 219310)
(*pro hac vice*)
emiller@velaw.com
Nataly Farag (DC Bar No. 90006516)
(*pro hac vice*)
nfarag@velaw.com
Alex Rant (DC Bar No. 1780786)
(*pro hac vice*)
arant@velaw.com
Rami Abdallah E. Rashmawi (DC Bar No. 1780184)
(*pro hac vice*)
rrashmawi@velaw.com
2200 Pennsylvania Ave., N.W., Ste. 500 W
Washington, DC 20037
Telephone:  +1.202.639.6500
Facsimile:   +1.202.879.8939

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740)
(*pro hac vice forthcoming*)
bazmy@ccrjustice.org
Angelo Guisado (NY Bar No. 5182688)
(*pro hac vice forthcoming*)
aguisado@ccrjustice.org
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

AMERICAN IMMIGRATION COUNCIL
Gianna Borroto (IL Bar No. 6305516)
(*pro hac vice*)
gborroto@immcouncil.org
Katherine Melloy Goettel (IA Bar No. 53821)
(*pro hac vice*)
kgoettel@immcouncil.org
Suchita Mathur (NY Bar No. 5373162)
(*pro hac vice*)
smathur@immcouncil.org
1331 G St. NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

CENTER FOR GENDER & REFUGEE STUDIES
Neela Chakravartula (CA Bar No. 254746)

761062229.5

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

1    *neela@uclawsf.edu*
     Dulce Rodas (CA Bar No. 352188)
2    *rodasdulce@uclawsf.edu*
     UC College of the Law, San Francisco
3    200 McAllister Street
     San Francisco, CA 94102
4    Telephone: +1.415.565.4877
     Facsimile: +1.415.581.8824
5
     CENTER FOR GENDER & REFUGEE STUDIES
6    Robert Pauw (WA Bar No. 13613)
     (*pro hac vice*)
7    *rpauw@ghp-law.net*
     c/o Gibbs Houston Pauw
8    1000 Second Avenue, Suite 1600
     Seattle, WA 98104
9    Telephone: +1.206.682.1080
     Facsimile: +1.206.689.2270

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

761062229.5

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................... 1

    A.     All Plaintiffs Were Harmed By The Policy ......................................... 1

    B.     Defendants Promised Not To Turn Back Arriving Noncitizens ........... 2

    C.     Despite Their Promises, Defendants Turned Back Arriving
           Noncitizens ...................................................................................... 3

    D.     Defendants' Turnbacks Have Caused Serious And Ongoing
           Harm ................................................................................................ 5

    E.     Defendants Have Forced Arriving Noncitizens To Use A
           Flawed App To Access The U.S. Asylum Process .............................. 6

    F.     Plaintiffs' Complaint And Procedural History ..................................... 7

LEGAL STANDARD ...................................................................................... 8

ARGUMENT .................................................................................................. 9

III.   The Individual Plaintiffs' Claims Are Not Moot, and They Have
      Standing. ...................................................................................... 9

    A.     Mootness ........................................................................................... 9

    B.     Standing ........................................................................................... 11

IV.    The Organizational Plaintiffs Have Standing ....................................... 15

V.     Plaintiffs State a Valid Claim for Relief Under the *Accardi* Doctrine ......... 18

VI.    Plaintiffs Have Plausibly Alleged Claims Under Both APA § 706(1)
      and § 706(2). ................................................................................ 23

    A.     Defendants' Refusal to Inspect And Process Asylum Seekers
           Constitutes Discrete Agency Action For Purposes Of Plaintiffs'
           § 706(1) Claim. ............................................................................... 24

    B.     Plaintiffs Plausibly Allege A CBP One Turnback Policy ................. 26

    C.     Both the CBP One Turnback Policy and Each Individual
           Turnback Constitute Final Agency Action for Purposes of
           Plaintiffs' 706(2) Claims. ............................................................... 29

    D.     Defendants Do Not Have Discretion To Flout Their Statutory
           Obligations to Inspect and Process Asylum Seekers at POEs. ......... 32

VII.   Sections 1225 and 1158 of the INA Reach Noncitizens in the Process
      of Arriving at POEs. ....................................................................... 35

VIII.  Plaintiffs State a Valid Due Process Claim Based on Their Statutory
      Entitlements ................................................................................... 39

IX.    Plaintiffs' Non-Refoulement Claim is Actionable Under the Alien
      Tort Statute ................................................................................... 41

CONCLUSION ............................................................................................. 45

761062229.5

i

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Aguayo v. Jewell*,
827 F.3d 1213 (9th Cir. 2016) ................................................................. 30

6

7

*Al Otro Lado, Inc. v. Mayorkas*,
2021 WL 3931890 (S.D. Cal. 2021) ........................................................ *passim*

8

9

*Al Otro Lado, Inc. v. Mayorkas*,
619 F. Supp. 3d 1029 (S.D. Cal. 2022) ................................................... 35

10

11

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019) ................................................... *passim*

12

13

*Al Otro Lado v. Nielsen*,
327 F. Supp. 3d 1284 (S.D. Cal. 2018) ................................................... *passim*

14

15

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) .................................................. 31, 34, 36, 37

16

17

*Alcaraz v. INS*,
384 F.3d 1150 (9th Cir. 2004) .............................................. 18, 19, 20

18

*American Farm Lines v. Black Ball Freight Serv.*,
397 U.S. 532 (1970) .................................................................. 21, 22

19

20

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) ......................................... 27, 30

21

22

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ................................................................ 8

23

24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................. 8, 29

25

26

*Augustine v. United States*,
704 F.2d 1074 (9th Cir. 1983) ............................................................. 9

27

*Backcountry Against Dumps v. FAA*,
77 F.4th 1260 (9th Cir. 2023) ............................................................. 20

28

*Bark v. United States Forest Serv.*,
　37 F. Supp. 3d 41 (D.D.C. 2014) ....................................................................... 25

*Barrios v. Holder*,
　581 F.3d 849 (9th Cir. 2009 ........................................................................... 37

*Belgau v. Inslee*,
　975 F.3d 940 (9th Cir. 2020) ......................................................................... 10

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ......................................................................................... 8

*Bennett v. Spear*,
　520 U.S. 154 (1997) ....................................................................................... 29

*Biden v. Texas*,
　597 U.S. 785 (2022) ................................................................. 13, 14, 16, 39

*Blazevska v. Raytheon Aircraft Co.*,
　522 F.3d 948 (9th Cir. 2008) ......................................................................... 43

*Bostock v. Clayton Cnty.*,
　140 S. Ct. 1731 (2020) ................................................................................... 33

*Boumediene v. Bush*,
　553 U.S. 723 (2008) ....................................................................................... 40

*Brown v. Haaland*,
　2023 WL 5004358 (D. Nev. 2023) ............................................................... 19

*Chrysler Corp. v. Brown*,
　441 U.S. 281 (1979) ....................................................................................... 22

*Church of Scientology of Cal. v. United States*,
　920 F.2d 1481 (9th Cir. 1990) ....................................................................... 20

*City & Cty of San Francisco v. USCIS*,
　944 F.3d 773 (9th Cir. 2019) ......................................................................... 17

*City of Chicago v. Morales*,
　527 U.S. 41 (1999) ......................................................................................... 34

*City of Lincoln v. United States*,
　283 F. Supp. 3d 891 (E.D. Cal. 2017) ........................................................... 11

761062229.5

iii

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2019) ....................................................................... 17

*Clinton v. Babbitt,*
  180 F.3d 1081 (9th Cir. 1999) ....................................................... 45

*Collins v. D.R. Horton, Inc.,*
  505 F.3d 874 (9th Cir. 2007) ......................................................... 23

*Columbia Riverkeeper v. U.S. Coast Guard,*
  761 F.3d 1084 (9th Cir. 2014) ....................................................... 30

*County of Riverside v. McLaughlin,*
  500 U.S. 44 ............................................................................... 9, 10

*Ctr. for Bio. Diversity v. Mattis,*
  868 F.3d 803 (9th Cir. 2017) ......................................................... 17

*D.D. v. Spain,*
  U.N. Doc. CRC/C/80/D/4/2016 ..................................................... 44

*Damus v. Nielsen,*
  313 F. Supp. 3d 317 (D.D.C. 2018) ............................................... 21

*Dee M.A. and Others v. Lithuania*
  (no. 59793/17), Eur. Ct. H.R. (Dec. 11, 2018) ............................. 44

*Dep't of Homeland Sec. v. Thuraissigiam,*
  140 S. Ct. 1959 (2020) .................................................................. 41

*Doucette v. U.S. Dep't of Interior,*
  849 F. App'x 653 (9th Cir. 2021) ................................................... 22

*East Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ............................................. 16, 17, 18

*East Bay Sanctuary Covenant v. Garland,*
  994 F.3d 962 (9th Cir. 2020) ......................................................... 16

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010) ....................................................... 35

*Emami v. Nielsen,*
  365 F. Supp. 3d 1009 (N.D. Cal 2019) .......................................... 21

761062229.5

iv

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Fair Hous. of Marin v. Combs*,
     285 F.3d 899 (9th Cir. 2002) ................................................................ 15, 17

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
     543 F.3d 586 (9th Cir. 2008) ...................................................................... 31

*Filartiga v. Pena-Irala*,
     630 F.2d 876 ............................................................................................... 42

*Firebaugh Canal Co. v. United States*,
     203 F.3d 568 (9th Cir. 2000) ...................................................................... 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,
     528 U.S. 167 (2000) ...................................................................................... 9

*Garland v. Aleman Gonzalez*,
     596 U.S. 543 (2022) ......................................................................... 12, 13, 14

*Gorbach v. Reno*,
     219 F.3d 1087 (9th Cir. 2000) (en banc) ................................................... 33

*Guerrier v. Garland*,
     18 F.4th 304 (9th Cir. 2021) ...................................................................... 41

*Hebbe v. Pliler*,
     627 F.3d 338 (9th Cir. 2010) ........................................................................ 8

*Heckler v. Chaney*,
     470 U.S. 821 (1985) ..................................................................................... 34

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
     593 F.3d 923 (9th Cir. 2010) ...................................................................... 23

*Hispanic Affairs Project v. Acosta*,
     901 F.3d 378 (D.C. Cir. 2018) .................................................................... 29

*Humboldt Baykeeper v. Simpson Timber Co.*,
     2006 WL 3545014 (N.D. Cal. 2006) ........................................................... 19

*Ibrahim v. Dep't of Homeland Sec.*,
     669 F.3d 983 (9th Cir. 2012) ...................................................................... 40

*Immigrant Defenders Law Ctr. v. Mayorkas*,
     2023 WL 3149243 (C.D. Cal. 2023) ........................................................... 13

761062229.5

v

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Indep. Mining Co. v. Babbitt*,
 105 F.3d 502 (9th Cir. 1997) ................................................................... 23

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*,
 408 F.3d 638 (9th Cir. 2005) ................................................................... 31

*Innovation Law Lab v. McAleenan*,
 924 F.3d 503 (9th Cir. 2019) ................................................................... 32

*INS v. Legalization Assistance Project*,
 510 U.S. 1301 (1993) ............................................................................... 18

*Iran Thalassemia Soc'y v. Off. of Foreign Assets Control*,
 2022 WL 9888593 (D. Or. 2022) ............................................................ 45

*Jama v. U.S. INS*,
 22 F. Supp. 2d 353 (D.N.J. 1998) ........................................................... 45

*Jamaa v. Italy*,
 App. No. 27765/09 Eur. Ct. H.R. (Feb. 23, 2012) ................................. 44

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
 478 U.S. 221 (1986) ................................................................................ 35

*Jefferson v. Harris*,
 285 F. Supp. 3d 173 (D.D.C. 2018) ........................................................ 19

*Jennings v. Rodriguez*,
 138 S. Ct. 830 (2018) .............................................................................. 13

*Jesner v. Arab Bank, PLC*,
 138 S. Ct. 1386 (2018) ....................................................................... 42, 46

*Jiali T. v. Mayorkas*,
 2023 WL 5985509 (S.D. Cal. 2023) ....................................................... 11

*Johnson v. Eisentrager*,
 339 U.S. 763 (1950) ................................................................................ 40

*Johnson v. Hernandez*,
 69 F. Supp. 3d 1030 (E.D. Cal. 2014) .................................................... 10

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
 681 F.3d 1006 (9th Cir. 2012) ................................................................... 9

761062229.5

vi

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ......................................................................... 23

*Lopez v. Scully*,
   2019 WL 2902696 (C.D. Cal. 2019) ............................................................... 10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 12

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ......................................................................................... 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ......................................................................................... 18

*McBride Cotton & Cattle Corp. v. Veneman*,
   290 F.3d 973 (9th Cir. 2002) ........................................................................... 11

*Meland v. Wever*,
   2 F.4th 838 (9th Cir. 2021) ................................................................................ 8

*Mendoza-Linares v. Garland*,
   51 F.4th 1146 (9th Cir. 2022) .......................................................................... 41

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) (en banc) ........................................................... 14

*Mogan v. Sacks, Ricketts & Case, LLP*,
   2023 WL 2983577 (9th Cir. 2023) .................................................................. 46

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ......................................................................................... 14

*Montes-Lopez v. Holder*,
   694 F.3d 1085 (9th Cir. 2012) ......................................................................... 22

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ......................................................................................... 20

*Munoz v. Ashcroft*,
   339 F.3d 950 (9th Cir. 2003) ........................................................................... 45

*Murray v. The Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804) ............................................................................ 45

761062229.5

vii

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Navajo Nation v. Dep't of the Interior*,
   876 F.3d 1144 (9th Cir. 2017) ........................................................................ 45

*Nestlé USA, Inc. v. Doe*,
   141 S. Ct. 1931 (2021) ................................................................................... 38

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................... 14

*Northwest Env't Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ........................................................................ 23

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ................................................................................ 15, 24

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998) .................................................................29, 30

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ........................................................................ 29

*Pitts v. Terrible Herbst*,
   653 F.3d 1081 (9th Cir. 2011) ...................................................................... 10

*Powell v. McCormack*,
   395 U.S. 486 (1969) ...................................................................................... 13

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .........................................................27, 28, 29

*Ramirez v. U.S. ICE*,
   310 F. Supp. 3d 7 (D.D.C. 2018) .........................................................24, 25, 28

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ................................................................................ 14, 34

*Reno v. Catholic Social Services*,
   509 U.S. 43 (1993) ........................................................................................ 15

*RJR Nabisco, Inc. v. European Community*,
   579 U.S. 325 (2016) ...................................................................................... 38

*Roberts v. Corrothers*,
   812 F.2d 1173 (9th Cir. 1987) ...................................................................... 11

761062229.5

viii

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Rodriguez v. Hayes*,
  591 F. 3d 1105 (9th Cir. 2010) ..................................................... 13, 14

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ......................................................... 8, 9

*Safer Chems., Healthy Families v. U.S. EPA*,
  943 F.3d 397 (9th Cir. 2019) ............................................................. 20

*Sale v. Haitian Centers Council, Inc.*,
  509 U.S. 155 (1993) .......................................................................... 43

*Salsman v. Access Sys. Americans, Inc.*,
  2011 WL 1344246 (N.D. Cal. 2011) .................................................. 19

*Sanchez-Espinoza v. Reagan*,
  770 F.2d 202 (D.C. Cir. 1985) ........................................................... 13

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
  899 F.3d 1064 (9th Cir. 2018) ........................................................... 35

*Shell v. Burlington N. Santa Fe Ry.*,
  941 F.3d 331 (7th Cir. 2019) ............................................................. 38

*Siderman de Blake v. Rep. of Argentina*,
  965 F.2d 699 (9th Cir. 1992) ........................................... 41, 42, 43, 45

*Sosna v. Iowa*,
  419 U.S. 393 (1975) .......................................................................... 10

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ............................................................. 8

*Taniguchi v. Kan. Pac. Saipan, Ltd.*,
  566 U.S. 560 (2012) .......................................................................... 37

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) .............................................................. 14

*Torres v. U.S. DHS*,
  2017 WL 4340385 (S.D. Cal. 2017) .................................................. 21

*Town of Castle Rock, Colo. v. Gonzales*,
  545 U.S. 748 (2005) ..................................................................... 33, 34

761062229.5

ix

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ........................................................................ 36

*TwoRivers v. Lewis*,
   174 F.3d 987 (9th Cir. 1999) ......................................................... 12

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   578 U.S. 590 (2016) ...................................................................... 31

*United States v. Balint*,
   201 F.3d 928 (7th Cir. 2000) ......................................................... 38

*United States v. Fifty-Three Eclectus Parrots*,
   685 F.2d 1131 (9th Cir. 1982) ................................................. 21, 22

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................................. 16, 34

*United States v. Ubaldo*,
   859 F.3d 690 (9th Cir. 2017) ......................................................... 39

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ...................................................................... 40

*United States v. Villanueva*,
   408 F.3d 193 (5th Cir. 2005) ......................................................... 41

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ................................................................*passim*

*Vietnam Veterans of Am. v. Cent. Intel. Agency*,
   811 F.3d 1068 (9th Cir. 2016) ....................................................... 26

*Wagafe v. Trump*,
   2017 WL 2671254 (W.D. Wash. 2017) .................................... 29, 30

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018) .................................................................. 39

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ......................................................... 8

*Wild Fish Conservancy v. Jewell*,
   730 F.3d 791 (9th Cir. 2013) ......................................................... 25

761062229.5

x

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Yousuf v. Samantar,*
 699 F.3d 763,776 (4th Cir. 2012) ........................................................ 45

**Statutes, Rules & Regulations**

5 U.S.C. § 551(13) ........................................................................................ 30

5 U.S.C. § 553 .............................................................................................. 22

5 U.S.C. § 702 .............................................................................................. 45

5 U.S.C. § 706(1) .................................................................................. *passim*

5 U.S.C. § 706(2) .................................................................................. *passim*

6 U.S.C. § 111 .............................................................................................. 32

6 U.S.C. § 111(b)(1)(E) .............................................................................. 33

6 U.S.C. § 202 .............................................................................................. 32

6 U.S.C. § 211 .............................................................................................. 32

6 U.S.C. § 211(c)(8)(A) .............................................................................. 33

6 U.S.C. § 211(g)(3)(B) .............................................................................. 33

8 U.S.C. § 1103 ............................................................................................ 32

8 U.S.C. § 1103(a) ....................................................................................... 33

8 U.S.C. § 1158 ..................................................................................... *passim*

8 U.S.C. § 1158(a) ....................................................................................... 32

8 U.S.C. § 1158(a)(1) .................................................................................. 36

8 U.S.C. § 1158(d)(4)(A)-(B) ..................................................................... 18

8 U.S.C. § 1225 ..................................................................................... *passim*

8 U.S.C. § 1225(a)(1) .................................................................................. 36

8 U.S.C. § 1225(a)(<u>3</u>) ........................................................................... 32, 39

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................. 32, 37, 39

761062229.5

xi

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

8 U.S.C. §1226(e) .............................................................................................. 14

8 U.S.C. §1252(f)(1) ............................................................................ 12, 13, 14, 18

8 U.S.C. § 1443(h) .............................................................................................. 18

28 U.S.C §2201(a) ............................................................................................... 13

8 C.F.R. § 1.2 ...................................................................................................... 38

Circumvention of Lawful Pathways,
    88 Fed. Reg. 31,314 (May 16, 2023) .............................................. 2, 17, 20

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 8

Fed. R. Civ. P. 23(b)(2) ......................................................................................... 7

**Other Authorities**

Austria - Administrative Court of the Province of Styria, LVwG 20.3-
    912/2016 (Sep. 9, 2016) ............................................................................ 44

Cathryn Costello, *The Human Rights of Migrants and Refugees in
European Law* (2015) ................................................................................. 44

Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International
Law* 208 (3d ed. 2007) ............................................................................... 44

*Judgment of the Court in Case C-143/22 | ADDE and Others*, Eur. Ct.
J. (2023) .................................................................................................... 44

UNHCR Exec. Comm., *Note on International Protection*, ¶ 16, U.N.
Doc. A/AC.96/951 (Sept. 13, 2001) ........................................................... 44

UNHCR Executive Comm., *Conclusion No. 22* (XXXII)-1981-
Protection of Asylum-Seekers in Situations of Large-Scale Influx. .................. 44

761062229.5

xii

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

## I.     INTRODUCTION

Defendants pulled the rug out from under hundreds of asylum seekers. Ignoring the fact that many refugees waiting to be inspected at Class A Ports of Entry on the U.S.-Mexico border ("POEs") have little money, unreliable access to the internet, and limited knowledge of English, they adopted a policy that requires arriving noncitizens at POEs to make an appointment on a smartphone app that many noncitizens do not understand, cannot easily access, or cannot afford to use. Under this policy, nearly every arriving noncitizen at a POE must use the "CBP One" app to make an appointment before they can access the asylum process. If a noncitizen does not do so, CBP officers standing at the physical demarcation point between U.S. and Mexican territory (the "limit line") turn them back to Mexico or direct Mexican officials to do so.

But the Immigration and Nationality Act ("INA") makes the asylum process available to *all* arriving noncitizens, regardless of whether they have the right phone, speak the right language, or can afford a data plan. And, indeed, Defendants' own binding guidance states that those without appointments should not be turned away. But for those refugees with the wrong phone, wrong language, or without enough money, the hope of seeking asylum in the United States and escaping persecution is a dead letter. Many others are forced to wait for weeks or months in dangerous conditions in Mexican border towns, hoping to obtain an appointment to come to a POE and be inspected. This policy is patently illegal. The INA, Due Process Clause of the Fifth Amendment, and international legal principles all guarantee arriving noncitizens a right to access the U.S. asylum process without being turned away simply because they did not successfully use Defendants' preferred app.

## II.     FACTUAL BACKGROUND

### A.     All Plaintiffs Were Harmed By The Policy

Plaintiffs are nine individuals (the "Individual Plaintiffs") who attempted to seek asylum at POEs and two nonprofit immigrant rights organizations that support

1

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

migrants at the U.S.-Mexico border (the "Organizational Plaintiffs"). Compl. ¶¶ 10-21. All of them were harmed when Defendants, who collectively set and enforce policies for inspecting and processing asylum seekers at those POEs, began turning away arriving noncitizens who did not have CBP One appointments. *Id.* ¶¶ 23-25, 61, 86-87, 91-151. Defendants' conduct denied the Individual Plaintiffs and the putative class (the "Class") rights provided to them by Defendants' own stated policy, the INA, the Due Process Clause of the Fifth Amendment, and international legal principles, and put their lives at grave risk. *Id.* ¶¶ 29-37, 116-140.

**B.    Defendants Promised Not To Turn Back Arriving Noncitizens**

The worst part of Defendants' conduct is that they know it is wrong. After years of using different tactics to turn back arriving noncitizens at POEs, Compl. ¶¶ 46-50, on November 1, 2021, Defendants issued a memorandum prohibiting U.S. Customs and Border Protection ("CBP") officers at POEs from turning back noncitizens without proper travel documents who are in the process of arriving in the United States. *Id.* ¶ 51. That memorandum is clear: "asylum seekers or others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a [POE]." *Id.*

On May 11, 2023, Defendants promulgated a new rule that, while erecting barriers to asylum eligibility, contemplates that all noncitizens in the process of arriving at a POE will be able to access the U.S. asylum process regardless of whether they have a CBP One appointment. Compl. ¶ 52; *see also* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314, 31,358 (May 16, 2023) ("CLP Rule"). The preamble to the CLP Rule explains that CBP's policy "is to inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app," and that any arriving noncitizens without CBP One appointments "will not be turned away." Compl. ¶ 59; 88 Fed. Reg. at 31,358.

761062229.5

2

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

**C.    Despite Their Promises, Defendants Turned Back Arriving Noncitizens**

Despite these public pronouncements, starting on May 12, 2023, Defendants began turning back arriving noncitizens without CBP One appointments from POEs. Compl. ¶¶ 61, 86-87, 91-115. This conduct followed a similar pattern at POEs along the U.S.-Mexico border. At the San Ysidro, California POE, CBP officials standing at the limit line told noncitizens without proper travel documents that they could not be inspected and processed unless they had a CBP One appointment before turning them back to Mexico. *See* Compl. ¶ 91. Similarly, at the Paso Del Norte POE in El Paso, Texas, CBP officers standing at the limit line told arriving noncitizens that they could not be inspected or processed unless they had a CBP One appointment and then turned them back to Mexico. *Id.* ¶ 101. Indeed, CBP officers even turned back noncitizens arriving at the Paso Del Norte POE who explained that they had suffered severe hardships making it impossible for them to wait for a CBP One appointment. *Id.* ¶¶ 103-04 (CBP officer told asylum seeker who feared returning to Mexico, where he had been previously kidnapped and beaten, to make a CBP One appointment because "everyone is saying they're kidnapped these days"). At the Matamoros POE in Brownsville, Texas, CBP officers turned away a Mexican Indigenous woman who had been previously raped in Mexico, telling her that she needed to return to Mexico and make a CBP One appointment. *Id.* ¶ 110. At the Reynosa POE in McAllen, Texas, CBP officers turned back an Armenian man to Mexico on three different occasions despite his pleas that he had been trying unsuccessfully to get a CBP One appointment for over two months. *Id.* ¶ 111. And at the DeConcini POE in Nogales, Arizona, CBP refused to process virtually all those waiting in line without CBP One appointments on most days in July 2023. *Id.* ¶ 113. When a young Mexican woman with her infant son approached the POE to ask how to seek asylum, a CBP officer told her there was nothing she could do. *Id.*

The Individual Plaintiffs suffered a similar fate. After fleeing domestic

761062229.5

3

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

violence in Mexico, Plaintiff Elena Doe attempted to use the CBP One app to get an appointment to seek asylum at a POE. Compl. ¶¶ 17, 131. Feeling desperate after she had trouble downloading the app, she went to the San Ysidro POE to seek asylum. *Id.* ¶ 17. However, the CBP officer standing at the limit line laughed at her for not having a CBP One appointment and refused to inspect and process her. *Id.*

Pablo Doe fled gang violence and extortion attempts in Honduras to seek asylum in the United States. Compl. ¶ 15. During his journey to the border, he was assaulted and lost his cell phone and life savings. *Id.* When he arrived in Ciudad Juarez, Mexico, Pablo Doe obtained another cell phone and attempted to use the CBP One app to make an appointment at the nearby Paso Del Norte POE. *Id.* However, the CBP One app froze frequently and displayed error messages in English that Pablo did not understand. *Id.* After many unsuccessful attempts to get a CBP One appointment, Pablo decided to seek asylum directly at the Paso Del Norte POE. *Id.* However, when he approached the POE, a CBP officer standing at the limit line told Pablo that he could not apply for asylum without a CBP One appointment. *Id.* When Pablo told the officer about his struggles to use the CBP One app, the CBP officer responded that those were not the officer's problem. *Id.*

Those stories are just the tip of the iceberg. CBP officers standing at the limit line have repeatedly told arriving noncitizens that they must have CBP One appointments to seek asylum in the United States before turning them back to Mexico. *See* Compl. ¶¶ 12-21, 91-107. CBP officers did so regardless of humanitarian exigencies; regardless of whether they were sending asylum seekers, including Mexican nationals, back to persecution; and regardless of whether the noncitizens could actually access and use the CBP One app. *See id.* ¶ 12 (asylum seeker who told CBP she did not have a working phone was turned back and instructed to use the CBP One app); ¶ 19 (CBP officers turned back Mexican citizen who was fleeing organized crime in Mexico); ¶ 103 (CBP officers discounted asylum seeker's statement that he had been kidnapped and beaten in Mexico and turned him back to

4

Mexico). At times, CBP officers turn back arriving noncitizens directly. At other times, CBP coordinates with Mexican officials to do CBP's bidding. *See* Compl. ¶¶ 97, 106.

The only logical explanation for the sudden, simultaneous, and border-wide nature of these turnbacks is that Defendants have adopted a policy of turning back noncitizens without CBP One appointments. *See* Compl. ¶¶ 1-6. Plaintiffs refer to this policy as the "CBP One Turnback Policy." Whether Defendants have committed this policy to writing is unknown to Plaintiffs. However, Defendants have a history of adopting similar policies but refusing to put them in writing for months or even years. *Id.* ¶ 49. Indeed, CBP officers frequently receive verbal "muster" orders that are never committed to writing. *Id.* ¶ 50.

### D.     Defendants' Turnbacks Have Caused Serious And Ongoing Harm

Defendants' CBP One Turnback Policy forces arriving noncitizens to wait indefinitely in dangerous conditions with a flawed app as their only lifeline. Migrants in Mexico often have little money, no job prospects, precarious accommodations, and inconsistent access to food, water, and medicine. Compl. ¶ 119. According to the U.S. State Department, "[v]iolent crime—such as homicide, kidnapping, carjacking, and robbery—is widespread and common in Mexico." *Id.* ¶ 120. Migrants are easy targets for criminals because many are destitute and often do not blend into the local population in border towns. *Id.* They must also routinely contend with corrupt local officials whose tactics include extortion and arbitrary detention. *Id.* The CBP One Turnback Policy facilitates the efforts of cartels and gangs to victimize migrants. *Id.* ¶¶ 121-22. For example, on the Mexican side of the Laredo, Texas POE, the Northeast Cartel routinely kidnaps noncitizens who have been turned back by CBP and holds them for ransom. *Id.* ¶ 122.

Migrants who are unable to access POEs and are forced to wait in Mexico for a CBP One appointment have suffered horrific harm. One such migrant in Matamoros was raped in late May 2023. Compl. ¶ 123. In June 2023, while she was still trying

761062229.5

5

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

to obtain a CBP One appointment, her assailant returned and attempted to rape her again. *Id.*

Migrant camps in Mexican border towns are overcrowded due to CBP's refusal to regularly process arriving noncitizens without CBP One appointments. In Matamoros (across the border from Brownsville, Texas), some migrants have been forced to seek shelter at an abandoned gas station that has no water, air conditioning, or electricity. Compl. ¶ 127.

**E.   Defendants Have Forced Arriving Noncitizens To Use A Flawed App To Access The U.S. Asylum Process**

All these problems are exacerbated by Defendants' reliance on the CBP One app. To use the app, migrants must download it from the Apple or Google app stores, accept terms and conditions that may not be available in their native language, and then create an account at Login.gov, a separate website that Defendants use for authentication purposes. Compl. ¶ 64. Users must provide extensive personally identifying information, create a password, and provide some form of two-factor authentication (which requires, for example, a working phone number). *Id.* Only then can a noncitizen begin the process of logging into the CBP One app. *Id.*

After accessing the app, a noncitizen must provide extensive information to the U.S. government, including their name, date of birth, place of birth, country of citizenship, country of residence, height, weight, hair and eye color, marital status, parentage, travel document number (including its issuance and expiration dates), employment history, and a destination address and emergency contact number in the United States. Compl. ¶ 65. The noncitizen may then attempt to get an appointment at a POE, but only after they turn on the geolocation feature on their phone and take a live video selfie showing that a real person matching their biometric information is seeking the appointment. *Id.* If during any step in this process, the noncitizen makes a mistake, there is no way to correct that error. *Id.* ¶ 66. CBP One is only available in English, Spanish, and Haitian Creole. *Id.* ¶ 76. If a noncitizen does not understand

761062229.5

6

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

1  how to navigate the app, there is no helpline—just a 47-page user guide that is written

2  only in English and Spanish and an email address that no one answers. *Id.* ¶ 67.

3          The CBP One app creates an insurmountable barrier for many noncitizens

4  seeking to access the U.S. asylum process. Many cannot afford smartphones with the

5  type of operating systems that support and have sufficient space for the gargantuan

6  220 MB CBP One app. Compl. ¶¶ 71, 75. Others do not speak any of the three

7  languages currently supported by the app. *Id.* ¶¶ 76-77. In addition, the Haitian Creole

8  version of the app is riddled with translation problems that make certain language

9  nonsensical or confusing. *Id.* ¶ 79. Many migrants do not have access to electrical

10 outlets to charge their phones or reliable Wi-Fi. *Id.* ¶¶ 71-73. People with disabilities

11 may be entirely unable to use the app or have extreme difficulty getting the app to

12 recognize their faces. *Id.* ¶ 80. Finally, people with darker complexions have reported

13 that the app routinely fails to recognize them. *Id.* ¶¶ 81-82.

14      **F.    Plaintiffs' Complaint And Procedural History**

15          Access to the U.S. asylum process is not supposed to depend on an individual's

16 ability to navigate a smartphone app in order to obtain an appointment. The INA,

17 Due Process Clause, and international law clearly require Defendants to inspect and

18 process all noncitizens who are in the process of arriving in the United States at a

19 POE. Compl. ¶¶ 29-32. Moreover, Defendants cannot publicly adopt a binding policy

20 requiring them to inspect and process all arriving noncitizens and then do the opposite.

21 On July 27, 2023, Plaintiffs filed their Complaint, seeking declaratory and injunctive

22 relief as well as vacatur of the CBP One Turnback Policy for Defendants' violations

23 of the *Accardi* doctrine, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S.

24 260, 268 (1954); Sections 706(1) and 706(2) of the Administrative Procedure Act

25 ("APA"); the Due Process Clause of the Fifth Amendment; and the non-refoulement

26 doctrine (via the Alien Tort Statute ("ATS")). Pursuant to Federal Rule of Civil

27 Procedure 23(b)(2), Plaintiffs seek to certify a class consisting of all noncitizens who

28 seek or will seek to present themselves at a Class A POE on the U.S.-Mexico border

to seek asylum, and who were or will be prevented from accessing the U.S. asylum process by or at the direction of Defendants based on the CBP One Turnback Policy.

### LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the [Plaintiffs'] favor." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016); *Hebbe v. Pliler*, 627 F.3d 338, 341-42 (9th Cir. 2010). Courts must deny a motion to dismiss if the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiffs' complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). This plausibility standard is not a "probability requirement." *Id.* at 1217 (emphasis omitted). Rather, it simply "asks for more than a sheer possibility that a defendant has acted unlawfully." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests whether the Court has subject matter jurisdiction. *See Meland v. Wever*, 2 F.4th 838, 843-44 (9th Cir. 2021). Jurisdictional dismissals for suits premised on federal question jurisdiction "are exceptional." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A Rule 12(b)(1) motion may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Under a factual attack, like the one here, a defendant challenges the truth of the alleged facts that would otherwise be sufficient for jurisdiction. *Id.* In a factual attack, the Court may rely on allegations outside the pleadings without converting the motion to dismiss into a motion for summary judgment. *Meyer*, 373 F.3d at 1039. However, it may not do so when "the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits."

761062229.5

8

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

*Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). "The question of jurisdiction and the merits of an action are intertwined where 'a statute provides the basis for both subject matter jurisdiction and the plaintiff's substantive claim for relief.'" *Meyer*, 373 F.3d at 1039 (quoting *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983)).

## ARGUMENT

### III.  THE INDIVIDUAL PLAINTIFFS' CLAIMS ARE NOT MOOT, AND THEY HAVE STANDING.

#### A.  Mootness

Defendants claim that the Individual Plaintiffs' claims are moot because "there is no indication that they will be subject to the same alleged conduct again." ECF No. 68-1 at 12. Defendants are wrong for several reasons. First, a party claiming mootness bears a "heavy burden" of proof. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (quotation marks omitted). Here, Defendants have the burden of proof backwards. As the party claiming mootness, they must prove that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 170 (2000). But Defendants have not established that the Individual Plaintiffs will not be subject to the CBP One Turnback Policy in the future or demonstrated the kind of formal and final reversal of that policy that would be required to render an otherwise live claim moot.[1]

Second, the Plaintiffs' claims are not moot because they seek to represent a class of individuals whose claims are "inherently transitory." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S.

---

[1] Given the cursory nature of the expedited removal process, it is not uncommon for noncitizens such as the Individual Plaintiffs to be removed and later seek to return to the United States. Defendants have not offered any assurance at all that in such a situation the Individual Plaintiffs will not be subjected to the challenged CBP One Turnback Policy.

761062229.5

9

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

388, 399 (1980). Where an individual plaintiff seeks to represent a class, the class claims remain live as long as there is a "controversy . . . between a named defendant and a member of the class represented by the named plaintiff." *Sosna v. Iowa*, 419 U.S. 393, 402 (1975). In such cases, as long as the individual plaintiffs' claims were not moot when the lawsuit was filed, the class certification decision "relates back" to the time the complaint was filed. *County of Riverside*, 500 U.S. at 51–52.

The government claims that the "relation-back" rule does not apply in this case because "it is not 'certain that other persons similarly situated will continue to be subject to the challenged conduct.'" ECF No. 68-1 at 12.[2] At best, that presents a factual issue that is not ripe for decision at the motion to dismiss stage. Countless other similarly situated individuals have been turned back since May 11, 2023, and are currently trying to obtain CBP One appointments, along with many others who will try to present at POEs without CBP One appointments. The Complaint plausibly alleges a policy and widespread practice of turnbacks that will continue to affect hundreds, if not thousands, of individuals. *See* Compl. ¶¶ 91-115. In similar situations, the Ninth Circuit has applied the "inherently transitory" rule to preserve the plaintiffs' class claims. *See, e.g., Pitts v. Terrible Herbst*, 653 F.3d 1081, 1086-91 (9th Cir. 2011); *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir. 2020).

Finally, Defendants argue further that Plaintiffs' claims are moot because they have "obtained the relief they sought." ECF No. 68-1 at 12. That is not true, and at the very least it is a disputed fact that cannot be decided at the motion to dismiss stage.[3] All the Individual Plaintiffs allege that they were turned back when they

---

[2] Defendants do not dispute that the duration of the challenged action—i.e. a turnback—is too short to allow full litigation before the challenged action ceases.

[3] Mootness is a jurisdictional issue that is intertwined with the merits when a defendant argues that a claim is moot because the plaintiff has already received the relief requested. *See, e.g., Lopez v. Scully*, 2019 WL 2902696, at *2-3 (C.D. Cal. 2019) (declining to decide mootness on motion to dismiss); *Johnson v. Hernandez*, 69 F. Supp. 3d 1030, 1034-35 (E.D. Cal. 2014) (same). In such cases, "[a] court may

761062229.5

10

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

should have been given access to the U.S. asylum process. Compl. ¶¶ 12-21, 131-40; *see also* ECF No. 46-1, ¶¶ 3-13, 15-18. They further allege that each of those turnbacks was agency action that was unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1). *Id.* ¶¶ 189-98. The mere fact that the Individual Plaintiffs were inspected and processed *after* they were denied access to the U.S. asylum process does not mean that they were not harmed or that their claims are somehow moot. They were still harmed by being turned back, and they still seek to represent a class of arriving noncitizens seeking to invalidate the very policy that caused them to be turned back. Accordingly, their dispute remains "live." *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 982 (9th Cir. 2002). The Individual Plaintiffs seek an order on behalf of putative class members declaring unlawful and vacating the CBP One Turnback Policy, ECF No. 1 at 65, and this Court can grant that relief.

The contrast between this case and *Jiali T. v. Mayorkas*, 2023 WL 5585509 (S.D. Cal. 2023) demonstrates why this is the case. In *Jiali T.*, two individuals sought to compel the government to process their applications to register as legal permanent residents. *Id.* at *1. When the plaintiffs filed suit, those applications had not been processed, but they were subsequently processed. *Id.* The district court found that the plaintiffs' claims were moot because all that they wanted was to have their own applications processed. *Id.* at *2. Unlike the plaintiffs in *Jiali T.*, who sought relief only for themselves, *id.* at *1, the Individual Plaintiffs here seek to represent a class consisting of arriving noncitizens who seek or will seek to present themselves at Class A POEs to seek asylum and were or will be turned back pursuant to Defendants' illegal policy. Compl. ¶ 152. Thus, *Jiali T.* does not control here.

**B.    Standing**

To establish standing, a plaintiff must establish (1) an "injury in fact" that (2)

---

not resolve genuinely disputed facts" in response to a 12(b)(1) motion. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Instead, "[w]here intertwined factual issues are disputed, discovery should be allowed." *City of Lincoln v. United States*, 283 F. Supp. 3d 891, 897 (E.D. Cal. 2017).

761062229.5

11

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

was caused by the defendant's challenged action and that (3) is redressable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants challenge only redressability. Their arguments are without factual or legal merit.

Defendants claim that Plaintiffs' injuries are not redressable because Plaintiffs "have not alleged the existence of an actual policy that could be 'set[] aside' under the APA." *See* ECF No. 68-1 at 12, 13, 22. That, however, is a disputed factual claim. *See, e.g.*, Compl. ¶ 61 (there is a "practice of turning back arriving noncitizens at POEs" under the guise that an appointment must be made using the CBP One app); ¶ 69 (Defendants have made "successful navigation of CBP One a prerequisite to inspection at POEs"); ¶ 92 ("Border-wide data shows that, as of May 2023, the eight Class A POEs that are processing asylum seekers are turning back almost all those who do not have a CBP One appointment."); ¶ 100 (regular monitoring shows that "CBP officers routinely turn back asylum seekers who cannot access CBP One"). Disputed factual claims are not an appropriate basis for a motion to dismiss. The court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party."[4] *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).

Defendants also argue that redressability is lacking because class wide injunctive relief is prohibited by 8 U.S.C. §1252(f)(1) and *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). ECF No. 68-1 at 12.[5] That argument is meritless.

---

[4] Whether there is an agency-adopted turnback policy or simply a widespread practice of turnbacks is of no moment. A pattern of unlawful agency action is sufficient for class wide relief as long as the class of people affected is sufficiently numerous. *See* Pls.' Motion for Class Cert., Dkt. 37-1, pp. 13-16.

[5] Plaintiffs maintain that injunctive relief is permissible, at least with respect to their *Accardi* claim. That issue is currently pending before the Ninth Circuit. Docketing Notice, *Al Otro Lado, Inc. v. Mayorkas*, No. 23-3396 (9th Cir. filed Nov. 9, 2023). Moreover, the Supreme Court has authority to grant injunctive relief. 8 U.S.C. §1252(f)(1); *Aleman Gonzalez*, 596 U.S. at 572, n.9 (Sotomayor, J, concurring in part and dissenting in part) (noting that §1252(f)(1) strips authority to issue injunctive

Plaintiffs seek declaratory relief under the Declaratory Judgment Act, which allows a federal court to declare the rights of any interested party "whether or not further relief is or could be sought." 28 U.S.C §2201(a). Declaratory relief provides a remedy because "it must be presumed that federal officers will adhere to the law as declared by the court." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.). Further, where injunctive relief is not available, individual class members can use a declaratory judgment "as a predicate to further relief, including an injunction." *Powell v. McCormack*, 395 U.S. 486, 499 (1969). And, by its terms, §1252(f)(1) does not preclude individual injunctive relief.

The Government argues further that because §1252(f)(1) precludes injunctive relief, no "corresponding" declaratory relief is permissible. ECF No. 68-1 at 13, citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018). The citation to *Jennings* is inapt. *Jennings* did not decide whether §1252(f)(1) bars declaratory relief, and the Supreme Court subsequently refused to endorse that argument. *See Aleman Gonzalez,* 596 U.S. at 571-72 (Sotomayor, J., concurring in part and dissenting in part) (noting that the majority does not embrace the Government's argument that §1252(f)(1) bars class wide declaratory relief). Further, the Ninth Circuit has considered and rejected the Government's argument that §1252(f)(1) bars class wide declaratory relief. *See Rodriguez v. Hayes*, 591 F. 3d 1105, 1119 (9th Cir. 2010) ("Section 1252(f) was not meant to bar class wide declaratory relief. Congress knew how to say 'declaratory relief' in enacting the [Illegal Immigration Reform and Immigrant Responsibility Act], but it chose not to use it in Section 1252(f)."). *See also Immigrant Defenders Law Ctr. v. Mayorkas*, 2023 WL 3149243, *13 (C.D. Cal. 2023) ("The best reading

---

relief "from all courts 'other than the Supreme Court'" and that Defendants' standing argument "would prevent any such case from reaching this Court, rendering Congress' reservation of this Court's authority a nullity"). *See also Biden v. Texas*, 597 U.S. 785, 799 (2022) ("If section 1252(f)(1) deprived lower courts of subject matter jurisdiction to adjudicate any non-individual claims under sections 1221 through 1232, no such claims could ever arrive at this Court, rendering the provision's specific carveout for Supreme Court injunctive relief nugatory.").

761062229.5

13

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

of *Biden v. Texas* and *Aleman Gonzalez* is that district courts like this one retain jurisdiction to award declaratory relief in immigration class actions."). Because *Rodriguez v. Hayes* has not been overturned by and is not clearly irreconcilable with any Supreme Court decision, it remains binding law. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

In addition, Defendants argue that "setting aside," or vacating, the CBP One Turnback Policy "would seemingly … operate" as an injunction prohibited by §1252(f)(1). ECF No. 68-1 at 13. However, vacatur is distinct from injunctive relief, as evidenced by the fact that these remedies are addressed in different provisions of the APA. *See* 5 U.S.C. §706(1) (injunction); § 706(2) (vacatur). An injunction "directs the conduct of a party, and does so with the backing of [the court's] full coercive powers." *Nken v. Holder*, 556 U.S. 418, 428 (2009). The vacatur or setting aside of an agency action is a "less drastic remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The Supreme Court has indicated that "[b]y its plain terms, and even by its title, [§1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). It is not a limit on the "setting aside" of agency action. If Congress had intended §1252(f)(1) to preclude courts from setting aside agency action, it would have used different language. *See* 8 U.S.C. §1226(e). *See Texas v. United States*, 50 F.4th 498, 528-29 (5th Cir. 2022) ("§1252(f)(1) does not apply to vacatur … 'vacatur neither compels nor restrains further agency decision-making'" (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).

Finally, Defendants argue that even if the CBP One Turnback Policy is enjoined, vacated, or declared unlawful, CBP Officers can still exercise discretion in managing the border. ECF No. 68-1 at 13, citing *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring) (noting that vacatur of challenged prosecutorial guidelines would have no effect on underlying exercise of prosecutorial discretion). But here, Defendants' argument is a non sequitur. When an agency is

761062229.5

14

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

required by law to perform an act, a court can enjoin, vacate, or declare unlawful its refusal to act even if the court has no power to determine how the agency is to carry out the action. *See, e.g., Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004) ("[W]hen an agency is compelled by law to act . . . but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 578 (9th Cir. 2000) ("Although the district court can compel the Department of Interior to provide drainage service as mandated by the San Luis Act, the district court cannot eliminate agency discretion as to how it satisfies the drainage requirement."); *see also Reno v. Catholic Social Services*, 509 U.S. 43, 66-67 (1993) (where the Immigration and Naturalization Service ("INS") was alleged to have unlawfully rejected applications submitted by legalization applicants, the district court had jurisdiction to order INS to accept the applications even though the agency had discretion as to how to manage and adjudicate the applications). Here, Defendants are under a legal obligation to inspect and process asylum seekers arriving at ports of entry. Their discretion to determine how inspection and processing is done does not change the fact that they are legally obligated to act or impact the Court's authority to compel them to comply with their obligations. *See* Section IV.D, *infra.*

## IV.   THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING

To establish standing, organizations must show that the defendant's conduct has frustrated the organization's mission and caused a diversion of resources. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). Here, the Complaint plausibly alleges that the CBP One Turnback Policy has frustrated Al Otro Lado's (AOL) and Haitian Bridge Alliance's (HBA) respective missions, Compl. ¶¶ 10–11, and forced both organizations to divert resources away from their core programs. Compl. ¶ 85 (diverting resources to provide technical assistance to asylum seekers trying to navigate the CBP One app); ¶¶ 141–47 (AOL) (diverting resources to

761062229.5

15

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

monitor POEs and document turnbacks, accompany and advocate for people seeking to present at a POE without CBP One appointments, update materials in various languages, and visit shelters to inform asylum seekers about current border policies); ¶¶ 148–51 (HBA) (shifting programmatic focus areas to prioritize humanitarian services at the border, devising new "know your rights" programs for people stranded in Mexico, and providing assistance to Haitians struggling to use CBP One; diverting funds to secure office space in Reynosa and to provide longer-term accommodations due to longer waiting times resulting from CBP One Turnback Policy). The Ninth Circuit has repeatedly held that organizational plaintiffs experiencing similar consequences have standing. *See East Bay Sanctuary Covenant v. Biden ("EBSC I")*, 993 F.3d 640, 663–64 (9th Cir. 2021); *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974–75 (9th Cir. 2020); *see also Al Otro Lado v. Nielsen*, 327 F. Supp. 3d 1284, 1296–97 (S.D. Cal. 2018).

Relying on *United States v. Texas*, 599 U.S. 670 (2023), Defendants argue that the harms suffered by AOL and HBA do not constitute legally cognizable injuries because the Organizational Plaintiffs "are not the subject of the alleged policy or practice." ECF No. 68-1 at 14. *Texas* has no bearing here because this is not an "extraordinarily unusual" case where a state is asking a federal court to order the federal government to arrest and prosecute a third party. *See Texas*, 599 U.S. at 677, 683 n.5, 686 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973), and *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 887 (1984), as examples of such "extraordinarily unusual" cases); *see also* ECF No. 68-1 at 14. The organizational plaintiffs in this case challenge CBP's turnbacks of asylum seekers without CBP One appointments, not their failure to arrest or prosecute noncitizens. Defendants' attempts to analogize to *Texas* must fail because cases involving executive discretion to arrest and prosecute are "categorically different" from garden-variety cases involving "statutory requirements or prohibitions on the Executive" like this one. *Texas*, 599 U.S. at 684; *see also* discussion of *Texas* at 34, *infra*. Thus, this case involves

traditional organizational standing in which Defendants' conduct has frustrated Plaintiffs' missions and forced them to divert resources from their core programs. *See EBSC I*, 993 F.3d at 663; *see also Combs*, 285 F.3d at 905. *Texas* simply does not apply here.[6]

Defendants argue further that some of the harms to the Organizational Plaintiffs are not fairly traceable to the CBP One Turnback Policy. ECF No. 68-1 at 15-16. But that misreads the Complaint. Contrary to what Defendants say, the cost of hiring three additional staff for AOL's Tijuana office in 2023 was incurred to assist migrants turned back under the CBP One Turnback Policy, Compl. ¶¶ 87, 141. Plaintiffs have not "voluntarily incurred" costs to counteract government action that will only speculatively occur. The Complaint makes clear that the costs of providing assistance with the CBP One app are incurred because people are turned back and told to use CBP One in order to access the asylum process, Compl. ¶¶ 142, 149-50; the emotional toll on staff is a direct result of having to assist people who have been turned back and who then suffer harm while waiting at the border. *Id.* ¶¶ 147, 151.[7]

Defendants also argue that the Organizational Plaintiffs' harms are not

---

[6] Defendants' claim that there are foreign-policy interests underlying their actions is not relevant to the standing analysis. ECF 68-1, p. 15. *See Ctr. for Bio. Diversity v. Mattis*, 868 F.3d 803, 823 (9th Cir. 2017) (if "Congress has expressed its intent regarding an aspect of foreign affairs" through a legislative command and a court is asked to "evaluat[e] the Government's compliance" with that command, the court "is 'not being asked to supplant a foreign policy decision of the political branches,'" (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)). Moreover, the CLP Rule itself (which Defendants cite in support of their foreign-policy argument) recognizes that asylum seekers without CBP One appointments should be processed; as Defendants state, it provides "incentives for use of appointments," ECF 168-1 at 15, but does not require appointments.

[7] The Defendants rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2019), ECF No. 68-1 at 16, a case in which the Court found that the plaintiffs lacked standing because it was "highly speculative" that they would be targeted by the challenged policy. *Id.* at 410. *Clapper* is not relevant here, where the plaintiffs "are not making assumptions about their claimed injuries" which are "currently happening." *See City & Cty of San Francisco v. USCIS*, 944 F.3d 773, 788 (9th Cir. 2019).

761062229.5

17

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

redressable in light of § 1252(f)(1). However, this argument fails for the same reasons that the same argument regarding the Individual Plaintiffs fails. *See* Part I.B, *supra*.

Finally, Defendants argue that even if the Organizational Plaintiffs can establish Article III standing, their resource-diversion injuries are not within the zone of interests of the relevant INA provisions. But the zone-of-interests test precludes standing only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Indeed, the INA expressly contemplates a role for nonprofit organizations to provide immigration legal services to noncitizens. *See Al Otro Lado*, 327 F. Supp. 3d at 1297, 1301-02; 8 U.S.C. § 1443(h); 8 U.S.C. § 1158(d)(4)(A)-(B). Thus, "[t]he Organizations' claims fall within the zone of interests of the INA." *EBSC I*, 993 F.3d at 668.[8]

## V. PLAINTIFFS STATE A VALID CLAIM FOR RELIEF UNDER THE *ACCARDI* DOCTRINE

Plaintiffs allege that Defendants' failure to comply with their own guidance prohibiting turnbacks of noncitizens without CBP One appointments violates the *Accardi* doctrine. This well-established doctrine reaches internal agency guidance that affects the rights of individuals. *See Accardi*, 347 U.S. at 265-67; *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004) (collecting cases). Plaintiffs' claim relies on CBP's November 1, 2021 Memo ("Nov. 2021 Memo"), which creates mandatory, public-facing procedures that benefit proposed class members (referred to here as the "Binding Guidance"). That the Memo is intended to be binding on agency officers has been articulated by Defendants in numerous places over two years; it affects asylum seekers' procedural rights; Defendants themselves have described it as

---

[8] Defendants' reliance on *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302 (1993) (O'Connor, J.), is meritless because that case concerned the zone of interests of the Immigration Reform and Control Act, not the INA, which has been interpreted more expansively. *Id.* at 1305-06.

1   binding. *See* Compl. ¶¶ 51, 54-60; ECF No. 68-3 ("Watson Decl.") ¶¶ 3-7.

2          Defendants assert that the Complaint "does not expressly identify any cause of

3   action" for the *Accardi* claim and suggest that it should thus be dismissed for not

4   specifically citing 5 U.S.C. § 706(2). ECF No. 68-1 at 18. But, as Defendants

5   themselves acknowledge, *id.*, Plaintiffs have a cause of action under the APA. As

6   such, Defendants' highly formalistic argument, which has no support in precedent,

7   fails. Defendants' own authority supports finding Plaintiffs' claim sufficient: in

8   *Brown v. Haaland*, the court held that although the plaintiffs pled their *Accardi* claim

9   as based in due process, they could nevertheless proceed with the claim under the

10  APA, which was cited elsewhere in the complaint. 2023 WL 5004358, at *4-5 (D.

11  Nev. 2023); *see* ECF No. 68-1 at 18. Other courts have reached similar conclusions.

12  *See Jefferson v. Harris*, 285 F. Supp. 3d 173, 185-86 (D.D.C. 2018) ("Regardless of

13  whether Jefferson's *Accardi* claim fits squarely under his due-process heading, the

14  Court concludes that it is adequately pled at this stage in the proceedings."). Here,

15  too, Plaintiffs included APA allegations elsewhere in the complaint, such that

16  Defendants and the Court can infer that Plaintiffs' *Accardi* claim falls under the APA.

17  *See* Compl. ¶¶ 168, 181, 190.[9]

18          Contrary to Defendants' argument, the Binding Guidance prohibiting

19  turnbacks is binding and thus judicially enforceable. The Ninth Circuit has held that

20  courts may look to "various" sources to determine whether an agency policy is

21  binding under *Accardi*. *Alcaraz*, 384 F.3d at 1162. First, Defendants have bound

---

[9] Defendants' reliance on *Salsman v. Access Sys. Americans, Inc.*, 2011 WL 1344246 (N.D. Cal. 2011) is misplaced. *Compare Salsman*, 2011 WL 1344246, at *3 (plaintiff failed to provide adequate notice of his claim because he did not identify which provision of the UCC, "a code containing hundreds of provisions," was allegedly violated), *with Humboldt Baykeeper v. Simpson Timber Co.*, 2006 WL 3545014, at *5 (N.D. Cal. 2006) (refusing to dismiss for failure to identify element of cause of action where plaintiff alleged specific facts that put defendant on notice of the claim). Here, the Complaint adequately puts the Defendants on notice of the *Accardi* claim. *See* Compl. ¶¶159-66. Rule 8 requires no more. Defendants' argument to the contrary is baseless.

761062229.5                                   19

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

themselves with the "operating procedures" laid out in the Nov. 2021 Memo. *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990). And in this litigation, Defendants have affirmed that the Nov. 2021 Memo is binding on CBP officers. Watson Decl. ¶¶ 3-7 (describing the memo as "formal guidance" that sets "expectations for the field to follow," and explaining CBP's creation of detailed guidance operationalizing the memo and expectations that officers comply with it). That the prohibition against turnbacks is binding is further confirmed by the preamble to the CLP Rule, which repeatedly states that those without appointments will not be turned back, and in the exceptions to the Rule's rebuttable presumption, which recognize that certain individuals without appointments will have their asylum claims considered. *See* Compl. ¶¶ 51, 54-60.[10]

Second, the Binding Guidance prescribes procedures "intended to protect the interests of a party before the agency." *Backcountry Against Dumps v. FAA*, 77 F.4th 1260, 1267 (9th Cir. 2023); *accord Morton v. Ruiz*, 415 U.S. 199, 235 (1974);[11] *Alcaraz*, 384 F.3d at 1162. Specifically, the texts that memorialize CBP's policy create procedural rules that benefit proposed class members, e.g., by specifying that asylum seekers "cannot be required to submit advance information in order to be

---

[10] The preamble to the CLP Rule is relevant insofar as it establishes the ongoing validity of the Nov. 2021 Memo. While the Ninth Circuit has held that a preamble can be legally binding where "there is every reason to believe that the Agency intended to bind itself," *Safer Chems., Healthy Families v. U.S. EPA*, 943 F.3d 397, 422 (9th Cir. 2019), it is not the preamble that itself binds the agency; the preamble *confirms* that the agency continues to be bound by the Nov. 2021 Memo.

[11] Defendants err in attempting to distinguish *Morton* by pointing to language in the agency manual regarding the "purpose of" the program at issue there. ECF 68-1 at 19. Defendants' cited language comes from a section of the manual not under consideration in *Morton* – it addressed the purpose of the assistance program generally, 415 U.S. at 204 n.6, whereas the relevant language analyzed by the Supreme Court was a procedural requirement that the agency publish directives that relate to the public, *id.* at 233-235.

761062229.5

20

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

processed" at a POE, that those at the "border line should be permitted to wait in line," and that "officers may not instruct travelers that they must return to the POE at a later time or travel to a different POE for processing." ECF No. 68-2 (Nov. 2021 Memo) at 3. And the memo establishes that the policy aims to incentivize presenting at POEs; in other words, it provides undocumented noncitizens the benefit of access to POEs in order to dissuade them from crossing between ports. *See id.*

While the procedures required by the Binding Guidance do not provide for notice to noncitizens, as was required by the procedures at issue in *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) and *Emami v. Nielsen*, 365 F. Supp. 3d 1009 (N.D. Cal 2019), *see* ECF No. 68-1 at 20, that is not determinative. The Nov. 2021 Memo lays out clear and specific processes that CBP officers must follow; all these processes benefit asylum seekers by giving them certainty that they will not be turned back and thus will eventually be able to access POEs and the asylum process. *See* ECF No. 68-2 at 3; *see also Torres v. U.S. DHS*, 2017 WL 4340385, at *5 (S.D. Cal. 2017) (granting preliminary injunction on *Accardi* claim based on DACA standard operating procedures).[12]

Defendants' argument that the Binding Guidance constitutes a "non-substantive rule of agency procedure" fails because it confuses two distinct strands of administrative law. Defendants mistakenly conflate an *Accardi* claim with a claim that the Binding Guidance is a binding "legislative rule." ECF No. 68-1 at 19-20. Defendants' error is illustrated by their reliance on *United States v. Fifty-Three Eclectus Parrots*, 685 F.2d 1131 (9th Cir. 1982), which is not about an *Accardi* claim at all. The Ninth Circuit in *Eclectus Parrots* analyzed whether a statement in an

---

[12] *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532 (1970), does not help the Defendants. There, the Supreme Court found that the agency procedure at issue did not provide a benefit for the plaintiffs but was created only for the purpose of providing information to the Interstate Commerce Commission that it needed to decide applications submitted to it. *Id.* at 538-39. In contrast, Defendants here have not specified any purpose of the Binding Guidance that benefits the agency as opposed to undocumented noncitizens. *See* ECF 68-1 at 20.

761062229.5

21

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

agency manual had the "force and effect of law"—an inquiry that pertains to whether Congress has granted an agency quasi-legislative authority to promulgate a rule and whether the agency has complied with APA rulemaking provisions. *Id.* at 1135-36 (quoting *Rank v. Nimmo*, 677 F.2d 692, 698 (9th Cir. 1982)); *accord Chrysler Corp. v. Brown*, 441 U.S. 281, 301-03 & n.30 (1979) (discussing substantive and procedural requirements for a regulation to have the "force and effect of law" under 5 U.S.C. § 553). Notably, *Eclectus Parrots* has never been cited by the Ninth Circuit in discussing the requirements for an *Accardi* claim.[13] As such, the case is inapposite, and Defendants' argument is unfounded.

Finally, the Ninth Circuit has rejected Defendants' assertion, ECF No. 68-1 at 21, that individuals must show "substantial prejudice" as to the "ultimate outcome" of the agency's action before challenging a policy. *Montes-Lopez v. Holder*, 694 F.3d 1085, 1091, 1093–94 (9th Cir. 2012) ("No showing of prejudice is required, however, when a rule is 'intended primarily to confer important procedural benefits upon [individuals].'"). As discussed above, the Binding Guidance confers important procedural benefits on asylum seekers—namely the right not to be turned back at POEs. *Cf. Am. Farm Lines*, 397 U.S. at 538-39. Regardless, the prejudice to Plaintiffs from CBP's violation of the Binding Guidance is indisputable: the "ultimate outcome" of the administrative process that they challenge was being unlawfully turned back at POEs and forced to endure additional dangers and harm in Mexico, when they should have been inspected and processed, or permitted to wait in line and then inspected and processed. For these reasons, Plaintiffs state a valid *Accardi* claim.

---

[13] *Doucette v. U.S. Dep't of Interior*, 849 F. App'x 653 (9th Cir. 2021), is instructive: the Circuit analyzes two distinct claims regarding whether an agency's decisions constitute a binding policy, and cites *Eclectus Parrots* only in support of its first finding that the decisions are not a "substantive rule" and are merely procedures "not promulgated in accordance with the APA." *Id.* at 655. The court's entirely separate discussion of the *Accardi* claim makes no mention of *Eclectus Parrots* at all. *Id.*

761062229.5

22

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

1
2

**VI.  PLAINTIFFS HAVE PLAUSIBLY ALLEGED CLAIMS UNDER BOTH APA § 706(1) AND § 706(2).**

3
4
5
6
7
8
9
10
11
12
13
14

Plaintiffs' claims under APA § 706(1) and § 706(2) are separate and distinct. Plaintiffs' § 706(1) claim targets Defendants' refusal to comply with their mandatory statutory duties to inspect and process asylum seekers arriving at POEs. Plaintiffs' § 706(2) claim alleges that Defendants' CBP One Turnback Policy exceeds their statutory authority. Despite Defendants' attempts to conflate these claims, ECF No. 68-1 at 32–36, the Ninth Circuit has repeatedly indicated that final agency action is not required for § 706(1) claims. *See, e.g., Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010); *Northwest Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 n.10 (9th Cir. 2007); *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997). For the reasons discussed below, Plaintiffs have properly pled their claims under both § 706(1) and § 706(2). Defendants' arguments regarding non-reviewability and lack of jurisdiction are unfounded.

15
16
17
18
19
20

Plaintiffs note that many of these issues have already been litigated to preclusive effect before another court in this district in *Al Otro Lado v. Mayorkas*, No. 17-cv-02355. As Defendants acknowledge, Judge Bashant's prior *Al Otro Lado* decisions carry preclusive effect while on appeal. *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007); ECF No. 68-1 at 34 n.12. Collateral estoppel applies when

21
22
23

(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action.

24
25
26
27
28

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (quoting *U.S. Internal Revenue Serv. v. Palmer*, 207 F.3d 566, 568 (9th Cir. 2000)). Here, mutual issue preclusion applies to claims between Defendants and plaintiff Al Otro Lado, as well as claims between Defendants and any putative class members in this case who are also part of the certified class of asylum seekers in the prior *Al Otro Lado*

761062229.5

23

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

case—namely, those asylum-seeking noncitizens who were turned back at POEs on the U.S.-Mexico border by or at the instruction of CBP officials on or after January 1, 2016. For example, Judge Bashant already determined that each turnback is "a discrete agency action" for purposes of a §706(1) claim. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1195-96 (S.D. Cal. 2019); *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *9-10 (S.D. Cal. 2021). Thus, many of Defendants' arguments are precluded, but Plaintiffs address those issues for completeness.

### A.   Defendants' Refusal to Inspect And Process Asylum Seekers Constitutes Discrete Agency Action For Purposes Of Plaintiffs' § 706(1) Claim.

A § 706(1) claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64, 65 (2004) (distinguishing challenge to agency's failure to take a "discrete agency action" from a challenge to an impermissible "broad programmatic attack"). Here, Plaintiffs allege that Defendants have failed to inspect and process noncitizens without CBP One appointments arriving at the border. Compl. ¶ 193. Each act of inspecting an arriving noncitizen is a "discrete agency action," as is the act of processing the noncitizen to determine if they intend to apply for asylum. *See Al Otro Lado*, 2021 WL 3931890, *9 (finding that plaintiffs had established discrete agency action under § 706(1) where they alleged that defendants had unlawfully withheld or unreasonably delayed inspection and processing of asylum seekers at POEs). Thus, each individual whom CBP refuses to inspect and process and then turns back has a claim that the agency failed to take a required "discrete agency action." As long as the requirements for maintaining a class action are met (as they are), Plaintiffs are entitled to class wide relief on their § 706(1) claim. *See, e.g., Ramirez v. U.S. ICE*, 310 F. Supp. 3d 7, 21 n.4 (D.D.C. 2018) (where plaintiff complains that there are multiple "specific, discrete instances" in which defendants violated the statute, the fact that they "seek to join multiple instances of such alleged agency failure into one

24

class action does not render their complaint an attack on an ongoing program or policy of the sort that is not actionable under the APA").

Defendants improperly analogize the relevant agency action to activities that other courts have found insufficiently discrete to constitute the basis for an APA challenge. ECF No. 68-1 at 34. *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800-802 (9th Cir. 2013) (vague allegation that federal defendants "operate dams 2 and 5 in a manner that obstructs fish passage through Icicle Creek during some or all of the year" was not final agency action under APA § 706(2) because challenged Forest Service interpretation did not constitute a formal statement of agency policy, and Forest Service's periodic closure of dam gates constituted part of its day-to-day operations, not "consummation of the agency's decisionmaking process"); *Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41, 50-51, 53 n.4 (D.D.C. 2014) (finding that plaintiffs' "amorphous description of Forest Service's practices" was not a policy, but instead a "generalized complaint about agency behavior" that did not constitute final agency action under APA § 706(2); however, defendants' issuance of permits pursuant to the purported policy did provide a basis for APA § 706(2) claim.

Defendants' argument that the practices alleged in the Complaint are too varied to amount to discrete agency action also misses the mark. Each individual turnback involves the withholding of a discrete agency action, which is sufficient for a § 706(1) claim. *Ramirez*, 310 F. Supp. 3d at 21 & n.4 (ICE's placement of unaccompanied child plaintiffs in adult detention facilities without mandated consideration of less restrictive placements were discrete agency actions). Moreover, the Complaint provides a solid factual basis to support allegations that Defendants have a widespread pattern or practice of refusing to inspect and process individuals arriving at the border who do not have CBP One appointments. *See, e.g.*, Part II.C, *supra*.

Defendants also suggest that the meaning of "turnbacks" is unclear. ECF No. 68-1 at 33. But the Complaint indicates that Plaintiffs challenge Defendants' refusal to do what they are required to do: inspect and process noncitizens who approach the

limit line, including those without CBP One appointments. The Complaint explicitly states that if asylum seekers approach the limit line without "a CBP One appointment confirmation or present at a date or time different from the designated appointment slot, they are turned back to Mexico" without being inspected. Compl. ¶¶ 5, 162. When an individual who approaches the border is told that they must have a CBP One appointment in order to be inspected and processed and otherwise returned to Mexico, that action constitutes a turnback—a failure to take a discrete agency action. And Plaintiffs allege such failure withholds a statutorily mandated duty and violates Defendants' own binding policy. *See* ECF No. 68-2 (Nov. 2021 Memo); ECF No. 68-3, Ex. B at 18; ECF No. 68-3 ¶ 3 (describing Defendants' own policies instructing CBP line officers not to "turn back" noncitizens without appropriate documents at POEs). Accordingly, Plaintiffs' have stated a claim under APA § 706(1). *See Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1081 (9th Cir. 2016) (where there is a "specific, unequivocal command" that the agency must act, "Section 706(1) of the APA provides that a reviewing court 'shall . . . compel agency action unlawfully withheld'").

## B.    Plaintiffs Plausibly Allege A CBP One Turnback Policy

Plaintiffs' § 706(2) claim alleges an unlawful "border-wide policy and widespread practice of turning back arriving noncitizens without CBP One appointments at or near Class A POEs and thereby denying [Plaintiffs] access to the asylum process." Compl. ¶ 1. Plaintiffs allege that when asylum seekers without a CBP One appointment approach the limit line, they are typically turned back to Mexico by or at the direction of CBP officers. Compl. ¶ 5; *see also id.* ¶¶ 46-50 (discussing Defendants' longstanding policy of turning back asylum seekers); ¶ 56 ("the CBP Turnback Policy precludes most individuals without CBP One appointments . . . from presenting at POEs or even asserting that they fall into any of the [Rule's] exception categories"); ¶ 61 (describing Defendants' continued practice of turning back asylum seekers under the guise of CBP One); ¶¶ 91-115 (describing

Defendants' policy and widespread practice of turning back asylum seekers without CBP One appointments). Taken as true and construed in the light most favorable to Plaintiffs, as required at this early stage, these allegations, combined with the Complaint's numerous accounts of turnbacks of asylum seekers without CBP One appointments, plausibly establish the existence of the CBP One Turnback Policy.

Even if the CBP One Turnback Policy constitutes an unwritten policy, it would still be an agency action reviewable under § 706(2). *See Al Otro Lado,* 327 F. Supp. 3d at 1319 (agency action "'need not be in writing to be final and judicially reviewable' pursuant to the APA." (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015)); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018) (finding, based on evidence of an unwritten policy, that plaintiffs were likely to succeed on the merits at the preliminary injunction stage). A contrary rule "would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing." *R.I.L-R*, 80 F. Supp. 3d at 184 (quoting *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)).[14]

First, both the Individual and Organizational Plaintiffs' first-hand accounts demonstrate effects consistent with the alleged policy. *See, e.g.*, Compl. at ¶ 12 (CBP supervisory officer at San Ysidro POE told Michelle Doe that people could not cross without using the CBP One application); ¶ 13 (Diego Doe turned back from San Ysidro POE due to lack of a CBP One appointment); ¶ 15 (CBP officers at Paso Del Norte Bridge told Pablo Doe he could not apply for asylum without a CBP One appointment); ¶ 16 (CBP officer turned Laura Doe back at Otay Mesa POE because she did not have a CBP One appointment); ¶ 17 (CBP officers refused to allow Elena Doe to approach the San Ysidro POE without a CBP One appointment and, following

---

[14] Indeed, Plaintiffs allege that Defendants purposefully abstained from memorializing their prior turnback policy and that the CBP One Turnback Policy is merely an extension of that policy. Compl. ¶¶ 49–50.

27

a separate attempt, laughed at her and refused to let her proceed); ¶ 19 (CBP officers blocked Luisa Doe from the POE on two occasions and told her she needed a CBP One appointment); ¶¶ 20-21 (Guadalupe and Somar Doe turned back from San Ysidro POE due to lack of CBP One appointments). Organizational Plaintiff Al Otro Lado's staff and volunteers' firsthand observations during regular port monitoring likewise support the existence of a turnback policy. Compl. ¶ 96 (observed regular turnbacks by CBP of individuals and families without CBP One appointments, including CBP officers telling asylum seekers they could not be processed without an appointment).

Second, Plaintiffs' allegations are supported by data demonstrating effects consistent with the alleged policy, Compl. ¶ 92 (border-wide data showing the eight Class A POEs processing asylum seekers are turning back almost all those without CBP One appointments), and first-hand accounts from a range of observers. *Id.* ¶¶ 100-05 (reporter, nonprofit staff, and attorney observed CBP officers denying asylum seekers without CBP One appointments access to the Paso del Norte POE); ¶ 110 (nonprofit staff observed several CBP turnbacks of asylum seekers without CBP One appointments at Matamoros POE); ¶ 111 (nonprofit staff interviewed asylum seeker whom CBP had turned back three times from McAllen-Hidalgo International Bridge POE due to lack of CBP One appointment).

Defendants wrongly assert that Plaintiffs are "amalgamat[ing] a variety of individual decisions into one class action." ECF 68-1 at 35. In fact, Plaintiffs "attack *particularized* agency action," *R.I.L-R*, 80 F. Supp. 3d at 184; specifically, Defendants' purposeful restrictions of access to the asylum process in violation of their statutory obligations. *See Ramirez*, 310 F. Supp. 3d at 20–21 (finding that "aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action" constituted "agency action" under the APA); *R.I.L-R*, 80 F. Supp. 3d at 174-75 (plaintiffs established existence of a challengeable policy based on declarations from immigration experts, attorneys,

761062229.5

28

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

and data); *see also Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (allowing a challenge to an alleged widespread "pattern and practice" of routinely extending temporary H-2A visas beyond the statutorily required temporary period). Accordingly, Plaintiffs' factual allegations "allow[] the court to draw the reasonable inference" of the existence of the CBP One Turnback Policy. *Iqbal*, 556 U.S. at 678.

### C. Both the CBP One Turnback Policy and Each Individual Turnback Constitute Final Agency Action for Purposes of Plaintiffs' 706(2) Claims

Agency action is "final" when (1) it "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) as a result of the action, "'rights or obligations have been determined,' or . . . 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Courts interpret finality in "a pragmatic and flexible manner," "focus[ing] on the practical and legal effects of the agency action." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

Here, Plaintiffs have adequately identified two distinct final agency actions: the CBP One Turnback Policy and each individual turnback, both of which satisfy 706(2)'s requirements. The CBP One Turnback Policy marks the consummation of the agency's decisionmaking process because it reflects a "conscious" and "deliberate" decision by Defendants to deny noncitizens without CBP One appointments access to the asylum process at POEs. *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998); *see, e.g.*, Compl. ¶¶ 6, 47. Far from being tentative or interlocutory, the CBP One Turnback Policy is "an active program implemented by the agency." *Wagafe v. Trump*, 2017 WL 2671254, at *10 (W.D. Wash. 2017); *see R.I.L-R*, 80 F. Supp. 3d at 184 (an implemented policy directing an ongoing practice affecting individual cases is final agency action).

Moreover, legal consequences flow from the CBP One Turnback Policy because its active implementation has "actual or immediately threatened effects" on

761062229.5

29

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

certain asylum seekers. *Aracely, R.*, 319 F. Supp. 3d at 139; *Wagafe*, 2017 WL 2671254, at *10 (finding final agency action when a policy "affect[ed] the thousands of applicants whose qualified applications [we]re allegedly indefinitely delayed or denied" as a result). Through the CBP One Turnback Policy, Defendants have deprived Individual Plaintiffs and thousands of other asylum seekers of the opportunity to seek asylum, violating their rights under the INA and putting their lives at risk. *See* Compl. ¶¶ 169-74. Without the policy, Plaintiffs and putative class members would be permitted to seek asylum. As a result of the policy, Defendants have forced asylum seekers to wait indefinitely in dangerous Mexican border towns, facing threats of refoulement, pursuit by persecutors, physical and sexual violence, kidnapping, and death. *Id.* ¶¶ 131, 133-40 (describing harm to Individual Plaintiffs); 116-30 (describing harm asylum seekers face in Mexico). Contrary to Defendants' assertions, there is no guarantee that these individuals will ever obtain a CBP One appointment or be inspected and processed at a later time. *See, e.g., id.* ¶ 69-85 (insurmountable obstacles faced by asylum seekers trying to obtain CBP One appointments). Out of desperation, some turned-back asylum seekers have attempted to enter the United States without inspection despite significant safety risks. *Id.* ¶ 129. These "actual or immediately threatened effect[s]" satisfy the finality test's second prong. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

Similarly, each individual turnback identified in the Complaint represents a final agency action. As with the CBP One Turnback Policy, each turnback marks the consummation of the agency's decision-making process because it reflects a "conscious" and "deliberate" decision to limit access to the asylum process at POEs. *ONRC Action*, 150 F.3d at 1137; *see, e.g.*, Compl. ¶¶ 6, 47. Moreover, each turnback functionally denies the affected individual access to the U.S. asylum process. *See Aguayo v. Jewell*, 827 F.3d 1213, 1223 (9th Cir. 2016) (noting "denial" of relief and "failure to act" are "agency action" that can be "final" under 5 U.S.C. § 551(13)); *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014)

1    (considering the practical effect of agency action).

2          Defendants argue that an asylum seeker who has been turned back may later

3    obtain a CBP One appointment. ECF No. 68-1 at 36. However, the mere possibility

4    of later accessing the U.S. asylum process through some "future yet distinct

5    administrative process" does not negate the finality of a completed turnback.

6    *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th

7    Cir. 2008); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598

8    (2016) (possibility that agency could revise action within five years upon receipt of

9    new information did not make otherwise definitive decision nonfinal). Defendants do

10   not "hold" applications for admission after an asylum seeker is turned back; indeed,

11   Defendants keep no records of those they turn back. Therefore, once an asylum

12   seeker is turned back, there are no "'further steps to be taken'" by the agency. *Indus.*

13   *Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir.

14   2005) (quoting *Dalton Equip. Co. v. Brown*, 594 F.2d 195, 197 (9th Cir. 1979)); *see*

15   *Al Otro Lado v. Wolf*, 952 F.3d 999, 1014 (9th Cir. 2020) (with respect to an earlier

16   turnback policy, observing that "each arrival triggers a right to apply for asylum and

17   be interviewed").

18         Moreover, legal consequences flow from each individual turnback, which

19   unlawfully denies an arriving noncitizen's statutory right to seek asylum and subjects

20   them to immense danger in Mexico, along with the risk of refoulement by Mexican

21   authorities, kidnapping, physical and sexual assault, and death—which would lead to

22   a permanent loss of access to the U.S. asylum process. *See* Compl. ¶¶ 131, 133-40

23   (describing harm to Individual Plaintiffs); ¶¶ 116-30 (describing harm asylum

24   seekers face in Mexico). Given the gravity of these consequences, Defendants'

25   argument that turned-back asylum seekers are somehow "in the same legal position

26   that they would be otherwise," ECF No. 68-1 at 36, is unavailing.[15]

27

28   _____

761062229.5

31

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

**D.**     **Defendants Do Not Have Discretion To Flout Their Statutory Obligations to Inspect and Process Asylum Seekers at POEs.**

Congress created a statutory scheme that specifically addresses how Defendants must treat noncitizens arriving at POEs, including an "exhaustive inspection regime for all noncitizens who seek admission to the United States," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 507 (9th Cir. 2019), and specific requirements for processing asylum seekers. Congress did not give Defendants any authority to refuse to inspect and process asylum seekers without CBP One appointments or otherwise limit the number of arriving asylum seekers who may access the asylum process. *See* 6 U.S.C. §§ 111, 202, 211; 8 U.S.C. § 1103; *see also* 8 U.S.C. § 1158(a) (right to apply for asylum), § 1225(a)(3) (requiring inspection of all arriving noncitizens), § 1225(b)(1)(A)(ii) (providing for referral of arriving asylum seekers for interviews).

Defendants argue that general authorizing statutes permit CBP to block asylum seekers from entering POEs, thereby preventing their inspection and processing. ECF No. 68-1 at 25-26. But this interpretation would thwart Congress's goal of protecting asylum seekers and allow Defendants to shirk their mandatory statutory duties. As Judge Bashant previously held, "Defendants' citations to broad delegations of statutory authority… are insufficient, as a matter of law, to establish that their ability to meter asylum seekers is 'committed to agency discretion by law.'" *See Al Otro Lado*, 2021 WL 3931890, at *11.

The statutes upon which Defendants rely do not indicate that Congress intended to supersede Defendants' mandatory inspection and processing duties. Section 111(b)(1) outlines the agency's "primary mission"—which includes "carry[ing] out all functions of entities transferred to [DHS]." That section further indicates that DHS's "primary mission" is to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland," such as inspection and processing of asylum seekers, "*are*

32

*not diminished or neglected except by a specific explicit Act of Congress*." 6 U.S.C. § 111(b)(1)(E) (emphasis added). Defendants point to no such Act of Congress that would permit them to deprioritize inspection and processing of asylum seekers at POEs for any reason. *See also id.* § 202 (similarly broad grant of general authority that does not authorize turnbacks); 8 U.S.C. § 1103(a) (containing no authorization to limit the number of asylum seekers at POEs). Section 211 lists CBP's duties— including inspection and processing of noncitizens arriving at POEs, *see* 6 U.S.C. § 211(c)(8)(A), (g)(3)(B)—supporting *Plaintiffs'* position that Defendants have no power to block such individuals' access to ports. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) (when Congress passes a statute and includes no exceptions, no "tacit exception" may be inferred). In short, these general authorizing statutes provide no basis "to infer an implicit delegation" of agency authority to override explicit statutory requirements. *Gorbach v. Reno*, 219 F.3d 1087, 1093 (9th Cir. 2000) (en banc). *See also Al Otro Lado*, 2021 WL 3931890, at *11-12.

In a last-ditch effort to evade their statutory obligations, Defendants cite several inapposite cases regarding the use of prosecutorial discretion in the context of law enforcement. In *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748 (2005), for example, the Supreme Court held that a municipality was not required to enforce a domestic abuse restraining order against the respondent's husband, where the respondent had no entitlement under state law, and thus no protected property interest under the Due Process Clause, to police enforcement. *Id.* at 766-68. By contrast, the putative class members in this case have a clear statutory right to apply for asylum, and Defendants have mandatory statutory duties to inspect and process them. *See* Part V, *infra*. This case is not about prosecutorial discretion. As Judge Bashant has repeatedly found, "[8 U.S.C.] § 1225 codifies Congress's specific and detailed instructions regarding 'how immigration officers are to "manage the flow" of arriving aliens who express to an immigration officer an intention to apply for asylum or a fear of persecution.'" *Al Otro Lado,*2021 WL 3931890, at *11; *Al Otro Lado*, 394 F.

761062229.5

33

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

Supp. 3d at 1210. Unlike the municipality in *Castle Rock*, Defendants have no discretion to deviate from these instructions.

Defendants' attempt to categorize CBP's inspection and processing duties as immigration law enforcement efforts has no support in their cited, or indeed any, case law. *See* ECF 68-1 at 26 (citing *City of Chicago v. Morales*, 527 U.S. 41 (1999), and *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999)). At issue in *City of Chicago* was a criminal statute and its failure to provide sufficient guidelines to limit police officers' discretion to arrest, 527 U.S. at 41-42; *Reno* dealt squarely with the Executive's discretion to place people in removal proceedings, an action that the Supreme Court has recognized is tied to law enforcement, 525 U.S. at 488-91. In contrast, inspection and processing duties at POEs are not a traditional law enforcement or prosecutorial function. *See, e.g., Texas*, 599 U.S. at 678-80 (discussing immigration enforcement discretion only in the context of arresting and removing noncitizens).

While Defendants have some latitude regarding how inspection at POEs is carried out, as both a Ninth Circuit motions panel and Judge Bashant have found, "a class member's first arrival [at a POE] trigger[s] a statutory right to apply for asylum and have that application considered." *Al Otro Lado*, 952 F.3d at 1013-14, (citing 8 U.S.C. §§ 1158, 1225(a)(3), 1225(b)(1)(A)(ii)); *Al Otro Lado*, 394 F. Supp. 3d at 1203-05. If CBP is allowed to refuse inspection, the individual's first arrival would lose its legal significance. See *id*. Plaintiffs' APA claims are thus judicially reviewable. *See Heckler v. Chaney*, 470 U.S. 821, 834-35 (1985) ("If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, … courts may require that the agency follow that law …").[16]

---

[16] In a footnote, Defendants briefly suggest that the act of state doctrine or the political question doctrine deprives this Court of jurisdiction. ECF 68-1 at 35 n.8. Their suggestion is meritless. Plaintiffs claim that by refusing to inspect and process

## VII.   SECTIONS 1225 AND 1158 OF THE INA REACH NONCITIZENS IN THE PROCESS OF ARRIVING AT POES.

Defendants next reprise their argument that Plaintiffs' claims should be dismissed because noncitizens who approach a POE are not entitled to inspection and processing under 8 U.S.C. §§ 1158 or 1225. ECF No. 68-1 at 27-30. Defendants readily acknowledge that they are making this argument largely to "preserve" it, as the issue was extensively briefed and resolved in Plaintiffs' favor in the dismissal and summary judgment opinions in Judge Bashant's prior *Al Otro Lado* decisions. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d at 1198-1202; *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *11-12; *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1049-50 (S.D. Cal. 2022). A Ninth Circuit motions panel subsequently held that the district court's statutory interpretation is "likely correct" and has "considerable force." *Al Otro Lado,* 952 F.3d at 1013. In short, both a motions panel of the Ninth Circuit and another court in this district have now rejected Defendants' arguments several times, because the plain language and legislative

---

noncitizens standing at the limit line, Defendants violate a clear statutory duty to inspect and process individuals who are at the limit line seeking entry. That claim is not barred by either the act of state doctrine or the political question doctrine. *See, e.g.*, *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018) (act of state doctrine bars suit where (1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed would require a court in the United States to declare invalid the foreign sovereign's official act); *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (refusing to find a political question in a case "which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (distinguishing claims that question whether military action was "wise" as nonjusticiable "policy choice" committed to executive discretion from claims "presenting purely legal issues such as whether the government had legal authority to act") (cleaned up). *See also Al Otro Lado,* 394 F. Supp. 3d at 1192 n.6 (rejecting Defendants' argument that the act of state doctrine barred injunctive or declaratory relief relating to allegations that Mexican officials acted unlawfully).

761062229.5

35

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

history of these statutes support the conclusion that they apply to asylum seekers in the process of arriving in the United States. *See Al Otro Lado*, 952 F.3d at 1010-13; *Al Otro Lado*, 394 F. Supp. 3d at 1199-1205.[17]

First, as the Ninth Circuit and this Court have both recognized, these statutes use terms that necessarily refer to noncitizens who are not yet present in the United States. *Al Otro Lado*, 952 F.3d at 1011; *Al Otro Lado*, 394 F. Supp. 3d at 1199. Sections 1225(a)(1) and 1158(a)(1) discuss two categories of noncitizens: (1) those "physically present in the United States" and (2) those "who arrive[] in the United States." *Al Otro Lado*, 952 F.3d at 1011; *Al Otro Lado*, 394 F. Supp. 3d at 1199. If people "arrive[] in" the United States only when they are physically "present," then including both terms in each section of the statute would be redundant. Following the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant," *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks and citation omitted), the term "arrives in" must cover those noncitizens who are not geographically "present in" the United States. *Al Otro Lado*, 394 F. Supp. 3d at 1199 (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *see also Al Otro Lado*, 952 F.3d at 1011.

Defendants' interpretation that "arrives in" is limited to persons "physically present in" the United States runs afoul of the rule that "[w]hen a term goes undefined

---

[17] Notably, Judge Bashant's interpretation of the relevant statutory language carries preclusive effect; her determination of the meaning of "arrive" and "arriving" in 8 U.S.C. § 1158 and § 1225 should control this Court's analysis of the statutory question here. *See Al Otro Lado*, 394 F. Supp. 3d at 1198-1202; *Al Otro Lado*, 2021 WL 3931890, at *11-12; *see also* Part IV, *supra*, at __. Although Defendants are correct that neither this Court nor the Ninth Circuit are "bound by" the Ninth Circuit motions panel's analysis, it nonetheless has "considerable force," *Al Otro Lado*, 952 F.3d at 1013, and is a persuasive authority that addresses the exact arguments Defendants now seek to rehash. Moreover, Defendants themselves rely heavily on Judge Bress's dissent from the Ninth Circuit motions panel's opinion in support of their position on the merits. They cannot have it both ways.

in a statute, [the Court] give[s] the term its ordinary meaning." *Taniguchi v. Kan. Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). "Physically present in the United States" means just what it says—physically on U.S. soil. *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009) (noting that "physical presence" as used in the INA is not a term of art), *abrogated on other grounds*, *Hernandez-Rodriguez v. Barr*, 776 F. App'x 477, 478 (9th Cir. 2019). And so, the inclusion of a reference to noncitizens who "arrive[] in the United States" must refer to something different: people who have not yet crossed the border.

Second, as Judge Bashant determined, Congress's choice of verb tense in sections 1158(a)(1) and 1225(a)(1) demonstrates that "arrive[] in" refers to noncitizens who have not crossed the border. *Al Otro Lado*, 394 F. Supp. 3d at 1200 (concluding that § 1158(a)(1)'s "use of the present tense of 'arrives' plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE"); *see also Al Otro Lado*, 952 F.3d at 1011.

Third, § 1225(b)(1)(A)(ii) uses the term "arriving" in the present progressive tense. Again, the verb tense is significant—here, to indicate that arrival is an ongoing process.[18] *See Al Otro Lado*, 394 F. Supp. 3d at 1199; *Al Otro Lado*, 952 F.3d at 1011; *see also Shell v. Burlington N. Santa Fe Ry.*, 941 F.3d 331, 336 (7th Cir. 2019) ("a present participle [is] used to form a progressive tense . . . [to signal] continuous and concurrent processes"); *United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) ("[U]se of the present progressive tense . . . generally indicates continuing action.").

---

[18] *See Al Otro Lado*, 394 F. Supp. 3d at 1201 (quoting Representative Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims, who noted that the term "arriving alien" "'was selected specifically by Congress in order to provide a flexible concept that would include all aliens *who are in the process of physical entry* past our borders[.]. . . . 'Arrival' in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process … [including a]n alien apprehended at any stage of this process, *whether attempting to enter*, at the point of entry, or just having made entry[...]'" (emphasis added)).

761062229.5

37

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

1  Noncitizens are necessarily in the process of "arriving in" the United States before

2  they physically enter it.

3       Defendants concede that the present progressive tense in Section 1225 "could

4  denote a process of arrival." ECF No. 68-1 at 29. But Defendants attempt to explain

5  that away by arguing that the "overall statutory scheme" of Section 1225 concerns

6  removal, which Defendants argue cannot happen unless one is first "present in that

7  location." *Id*. at 30. But the government's own regulations counter its proposed

8  statutory interpretation by defining the term "arriving alien" as "an applicant for

9  admission coming or *attempting to come into the United States* at a port-of-entry." 8

10  C.F.R. § 1.2 (emphasis added). This definition again uses the present progressive,

11  emphasizing the ongoing nature of the action. Moreover, "attempting to come into

12  the United States" clearly encompasses individuals who have not yet crossed the

13  border. Accordingly, these provisions of the INA cover, at a minimum, Plaintiffs who

14  were attempting to enter the United States and would have crossed the border but for

15  Defendants' unlawful conduct.

16       While the government has not raised the presumption against extraterritoriality,

17  *see Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936-37 (2021), that two-step doctrinal

18  framework further supports application of Sections 1158 and 1225 to arriving class

19  members. For the foregoing reasons and those set forth in Judge Bashant's prior *Al

20  Otro Lado* opinions, *see Al Otro Lado*, 394 F. Supp. 3d at 1201-02; *Al Otro Lado*,

21  2021 WL 3931890, at *13, both statutes give a "clear affirmative indication" of their

22  extraterritorial reach to individuals such as class members, and thus survive the

23  presumption at Step One. *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325,

24  337 (2016). Even if this Court were to disagree that the statutory text applies to

25  arriving aliens, these statutes should still have extraterritorial application under Step

26  Two of the framework.

27       At Step Two, a court must ask "whether the case involves a domestic

28  application of the statute" by "identifying the statute's focus and asking whether the

761062229.5

38

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

conduct relevant to that focus" occurred in the United States. *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (cleaned up). The focus of these statutes is regulation of asylum processing for those arriving in the United States and the "conduct relevant" to this "focus" plainly concerns a United States agency (CBP) and the mandatory statutory duties of its officers standing on U.S. soil to "inspect" and "refer" noncitizens—duties that involve the application of U.S. law on U.S. soil. *See, e.g.*, 8 U.S.C. § 1225(a)(3) ("shall be inspected by immigration officers"); 8 U.S.C. § 1225(b)(1)(A)(ii) ("officer shall refer the alien for an interview"). Although the individuals seeking inspection and processing were one whit's distance outside of U.S. territory, application of the statute is permissible given the substantial U.S.-based conduct. *WesternGeco*, 138 S. Ct. at 2137. In nearly all border legislation, conduct relevant to the statute's regulatory focus occurs inside the United States even if it frequently reaches some activity that occurs across the border. *See, e.g., Biden v. Texas*, 597 U.S. at 792; *United States v. Ubaldo*, 859 F.3d 690, 700 (9th Cir. 2017).

## VIII. PLAINTIFFS STATE A VALID DUE PROCESS CLAIM BASED ON THEIR STATUTORY ENTITLEMENTS

The government has again asked the Court to adopt a bright-line rule that would deny all noncitizens any constitutional rights whatsoever outside the United States. This Court should follow Judge Bashant's prior *Al Otro Lado* decisions and reject the government's argument. *See, e.g., Al Otro Lado*, 394 F. Supp. 3d at 1218-1221 (concluding that "there is nothing 'impracticable [or] anomalous' in applying elementary due process protection at the U.S. border"). There are two parts to understanding the availability of due process to class members in this case: (1) whether the Constitution reaches extraterritorially, just across the U.S. border and (2) assuming it does, the scope of due process protections available to Plaintiffs.

Regarding the first question, the government claims the Constitution categorically does not apply abroad, regardless of the circumstances, by relying on

plainly outdated cases such as *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950), and *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). However, the watershed case of *Boumediene v. Bush*, 553 U.S. 723 (2008), rejected the brightline formulations of the *Eisentrager* and *Verdugo-Urquidez* cases and held that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* at 764 ("[n]othing in *Eisentrager* says that de jure sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus."). When "determining the geographic scope of the Constitution," *Boumediene*, 553 U.S. at 759, courts must take into account the "specific circumstances of each particular case" and ask whether application of the constitutional right in those particular circumstances would be "impracticable and anomalous." *Id.*; *see also Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 995–97 (9th Cir. 2012) (because the "border of the United States is not a clear line" determining whether the Constitution will apply, courts should use a "functional approach).

Under the governing *Boumediene* framework, there is nothing impracticable or anomalous about protecting asylum seekers against unlawful conduct, especially where their rights are coextensive with the statutory rights Congress afforded. Defendants have not proffered any added hardship that they might face by conferring due process rights on asylum seekers at the U.S.-Mexico border, and it is hard to fathom how this situation would change if the putative class members were one foot inside U.S. territory. Nor could it be anomalous to accord such due process rights to protect the underlying statutory rights under Sections 1158 and 1225, given Congress's intention to have those statutes reach noncitizens on the Mexican side of the border who are arriving in the United States. See *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005) ("It is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders.").

Regarding the second inquiry, the scope of the due process rights Plaintiffs seek to protect are those that "are coextensive with the statutory rights Congress provides."[19] *Guerrier*, 18 F.4th at 313; *see also Thuraissigiam*, 140 S. Ct. at 1983 (non-resident noncitizens entitled to "rights regarding admission that Congress has provided by statute"). Judge Bashant's reasoning affirming that individual plaintiffs' due process rights "extend as far as their rights under [the inspection and referral statutes]" should apply here, too. *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at \*20.

## IX.   PLAINTIFFS' NON-REFOULEMENT CLAIM IS ACTIONABLE UNDER THE ALIEN TORT STATUTE

The norm of non-refoulement has reached *jus cogens* status, "an elite subset of . . . customary international law" from which no derogation is ever permitted, *Siderman de Blake v. Rep. of Argentina*, 965 F.2d 699, 714-15 (9th Cir. 1992). Although the 1951 Refugee Convention is silent on the issue, the norm is currently understood to prohibit "rejection at the frontier."[20] It is this norm that is sufficiently specific to qualify for jurisprudential recognition. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1409 (2018) (violation of norm must be "specific, universal and

---

[19] Nothing in *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020), changed the availability of such rights outside the expedited removal context. *Thuraissigiam*—like *Mendoza-Linares v. Garland*, 51 F.4th 1146 (9th Cir. 2022)— involved challenges to the expedited removal statutes, *Thuraissigiam*, 140 S. Ct. at 1966. Because Congress specifically limited judicial review of expedited removal processes, *Thuraissigiam* merely holds that there is no independent due process entitlement to challenge such processes. *See Guerrier v. Garland*, 18 F.4th 304, 308-09 (9th Cir. 2021). Here, Plaintiffs do not raise a due process challenge to the inspection and referral statutes; they seek to protect the arbitrary deprivation of these statutory entitlements via due process. *See Guerrier*, 18 F.4th at 312-13.

[20] UNHCR, Non-Refoulement No. 6 (XXVIII) - 1977, ¶¶ (a), (c), U.N. DOC. A/32/12/Add.1 (Oct. 12, 1977) ("the principle of non-refoulement … [applies] both at the border and within the territory of a State," a principle that "was generally accepted by states."); *see also* UNHCR Exec. Comm., Conclusion No. 22 (XXXII) – 1981, Protection of Asylum-Seekers in Situations of Large-Scale Influx, ¶ II.A.

obligatory," quoting *Sosa v. Alvarez-Machain,* 542 U.S. 692, 732 (2004)) (Alito, J. concurring). The universality and robustness of the norm confirm that it would not be an "extraordinary exercise of judicial power" to recognize an Alien Tort Statute (ATS) non-refoulement norm. ECF No. 68-1 at 32.

Disregarding an overwhelming international consensus that non-refoulement is a *jus cogens* norm prohibiting rejection at the border, Defendants' singular authority in support of their argument that the norm is not universal is Judge Bashant's holding that, because Australia and "some European countries" are not respecting this norm, the United States should not have to do so. *See Al Otro Lado*, 2021 WL 3931890, at *22. However, as the plaintiffs in the prior *Al Otro Lado* case have stressed in their cross-appeal of this ruling, *see* Appellees/Cross-Appellants' Redacted Principal and Response Brief 53, Nos. 22-55988, 22-56036 (9th Cir. Feb. 21, 2023), ECF No. 23, violations of a norm do not diminish or undermine its "binding effect as a norm of international law." *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 n.15; *Siderman*, 965 F.2d at 715 (*jus cogens* "'is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations'" (quoting David F. Klein, *A Theory for the Application of the Customary International Law of Human Rights by Domestic Courts,* 13 Yale J. Int'l L. 332, 351 (1988))).

Defendants also rely on an overbroad and plainly incorrect reading of *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), to foreclose any extraterritorial application of this fundamental norm. First, *Sale* was not an ATS case; it only considered the extraterritorial reach of Article 33 of the 1951 Refugee Convention, not the multiplicity of sources courts must consider—including treaties, state practices and scholarship, *Siderman*, 965 F.2d at 714–15—to assess the binding nature of the norm. Second, despite dicta regarding Article 33's extraterritorial reach, *Sale*'s actual holding was narrow: Article 33 does not "appl[y] to action taken by the Coast Guard on the high seas," *Sale*, 509 U.S. at 159, and its text does not apply "to

761062229.5

42

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

aliens interdicted on the high seas." *Id.* at 187; *see also id.* at 160, 166–67, 173, 179–80 (all emphasizing noncitizens' presence on the high seas); *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008) (*Sale* involved the "deportation of aliens from international waters").[21]

Even if there may be ambiguity about the application of the norm to the *high seas*, there is universal consensus that the norm applies *at the border*. That is manifested in multiple treaties (including the Refugee Convention, the 1967 Protocol, and the Convention Against Torture), UNHCR principles,[22] state practices,[23] and

---

[21]   Indeed, *Sale* recognized that the INA provision at issue there *would* have applied had the Haitian petitioners "arrived at the border of the United States," 509 U.S. at 160, as the putative class members have here. The Court determined that the English translation of "refouler" from Article 33 is not synonymous with "return," but rather is akin to "repulse," "repel," "drive back," and "expel." *Id.* at 181. Accordingly, "these translations imply that 'return' [in Article 33] means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination." *Id.* at 181–82. Defendants' "exclusion at [the] border" would thus violate Article 33 under *Sale*'s terms.

[22] In 1981, UNHCR's Executive Committee reaffirmed that "in all cases the fundamental principle of non-refoulement *including non-rejection at the frontier* must be scrupulously observed." UNHCR Executive Comm., *Conclusion No. 22* (XXXII)-1981-Protection of Asylum-Seekers in Situations of Large-Scale Influx, para. II.A. Most emphatically, in 2007, the UNHCR Executive Committee opined specifically that "Article 33 [of the Refugee Convention] encompasses 'non-admission[s] at the border.'" *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, ¶ 8 (Jan. 26, 2007). The UNHCR Executive Committee has also stated that the "duty not to *refoule*" is a prohibition against "any measure attributable to a State which could have the effect of returning an asylum-seeker or refugee to the frontiers of territories where his or her life or freedom would be threatened, or where he or she would risk persecution ... [including] *rejection at the frontier* ...." UNHCR Exec. Comm., *Note on International Protection*, ¶ 16, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) (emphasis added).

[23] *See, e.g.*, *Dee M.A. and Others v. Lithuania* (no. 59793/17), Eur. Ct. H.R. (Dec. 11, 2018) ("States have a fundamental obligation to 'ensure that no one shall be subjected to refusal of admission at the frontier'"); *Hirsi Jamaa v. Italy*, App. No. 27765/09 Eur. Ct. H.R. (Feb. 23, 2012); Austria - Administrative Court of the Province of

1   scholarship.[24]

2   Defendants' remaining prudential arguments are meritless. First, as Judge

3   Bashant correctly held, the APA's unqualified waiver of sovereign immunity applies

4   to the ATS claims asserted in this case. *Al Otro Lado*, 327 F. Supp. 3d at 1308. The

5   government, without citing any authority, speculates that Congress did not intend for

6   Section 702's waiver to reach ATS claims. *But see Navajo Nation v. Dep't of the

7   Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017) ("§ 702 waives whatever sovereign

8   immunity the United States enjoyed from prospective relief with respect to *any action

9   for injunctive relief*") (internal quotations omitted) (emphasis added); *Clinton v.

10   Babbitt*, 180 F.3d 1081, 1087 (9th Cir. 1999) (§ 702 "expressly waived" immunity

11   for non-statutory claims for "nonmonetary relief against the United States."); *Iran

12   Thalassemia Soc'y v. Off. of Foreign Assets Control*, 2022 WL 9888593, at *7 (D.

13   Or. 2022) (holding that APA § 702 is sufficient waiver for an ATS claim to proceed).

14   Moreover, any nominal interest in sovereign immunity—a creature of common

15   law—would be outweighed in the face of a violation of *jus cogens* norms. *Yousuf v.

16   Samantar*, 699 F.3d 763,776 (4th Cir. 2012); *Siderman*, 965 F.2d at 718.

17   Defendants also reprise a preemption argument, suggesting that Congress

18   foreclosed an ATS remedy through its broad statutory enactments regarding asylum

19   and withholding. But while congressional enactments may preempt direct application

---

22   Styria, LVwG 20.3-912/2016 (Sep. 9, 2016) (asylum seekers cannot be rejected at
23   the border crossing without having the possibility to state reasons for obtaining
    international protection); *D.D. v. Spain*, U.N. Doc. CRC/C/80/D/4/2016 (same);
24   *Judgment of the Court in Case C-143/22 | ADDE and Others*, Eur. Ct. J. (2023)
    (condemning pushbacks as violating non-refoulement).

25   [24] *See, e.g.,* Cathryn Costello, *The Human Rights of Migrants and Refugees in
26   European Law* 236 (2015) ("The weight of authority is now that [non-refoulement]
    also applies to rejection at the frontier."); Guy S. Goodwin-Gill & Jane McAdam,
27   *The Refugee in International Law* 208 (3d ed. 2007) ("States in their practice and in
28   their recorded views . . . have recognized that non-refoulement applies . . . [when]
    asylum seekers present themselves for entry, either within a State or at its border").

of customary international law,[25] which is not sought here, one statute, such as the INA, cannot preempt another statutory enactment, the ATS. *See Al Otro Lado*, 327 F. Supp. 3d at 1307 n.10 ("Contrary to defendants' argument, there is no absolute preclusion of international law claims by the availability of domestic remedies for the same alleged harm."); *see also Jama v. U.S. INS*, 22 F. Supp. 2d 353, 364 (D.N.J. 1998).

Finally, Defendants correctly identify the purpose of the ATS—"to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable," *Jesner*, 138 S. Ct. at 1406—but fail to perceive how this *compels* ATS relief in this case. It is the "absence" of a judicial remedy for foreign nationals that would produce "international discord," *id.*; providing a remedy would fulfill the congressional purpose behind the ATS and this court's role in protecting separation of powers.[26]

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[25] Wherever possible, courts are urged to harmonize congressional mandates with well-established international legal norms. *See Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804) ("act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.").  This Court can harmonize the law of nations—which has decisively prohibited rejection at the frontier—and 8 U.S.C. §§ 1158 and 1225 by holding that Defendants' duties to inspect and process asylum seekers apply at the limit line.

[26] Defendants assert that they are entitled to a judgment on the ATS claim through collateral estoppel. ECF No. 68-1 at 34 & n.12. But most Individual Plaintiffs in this action are not in privity with the individual plaintiffs in the prior *Al Otro Lado* case and could not reasonably expect to be bound by that decision. *Mogan v. Sacks, Ricketts & Case, LLP*, 2023 WL 2983577, at *2 (9th Cir. 2023).

761062229.5

45

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM

Dated: January 12, 2024          Respectfully submitted,

MAYER BROWN LLP
        Matthew H. Marmolejo
        Michelle N. Webster
        Matthew E. Fenn

VINSON & ELKINS LLP
        Stephen M. Medlock
        Evan Miller
        Nataly Farag
        Alex Rant
        Rami Abdallah E. Rashmawi

CENTER FOR GENDER AND
REFUGEE STUDIES
        Melissa Crow
        Neela Chakravartula
        Robert Pauw
        Dulce Rodas

CENTER FOR CONSTITUTIONAL
RIGHTS
        Baher Azmy*
        Angelo Guisado*

AMERICAN IMMIGRATION
COUNCIL
        Katherine Melloy Goettel
        Gianna Borroto
        Suchita Mathur

By: /s/ Michelle N. Webster
        Michelle N. Webster

*Attorneys for Plaintiffs*
* Pro Hac Vice motion forthcoming.

46

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: January 12, 2024

Respectfully submitted,

s/ Michelle N. Webster
Michelle N. Webster

*Attorney for Plaintiffs*

47

Pls.' Opp. to Defs.' Mot. to Dismiss, CASE NO. 3:23-CV-01367-AGS-BLM