UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., et al., | Case No.:  23-cv-1367-AGS-BLM |
| Plaintiffs, | **ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS (ECF 68)** |
| v. | |
| Alejandro N. MAYORKAS, Secretary of U.S. Department of Homeland Security, et al., | |
| Defendants. | |

In this putative class action, plaintiffs accuse U.S. border officials of illegally turning away asylum applicants who don't schedule an appointment through a specific smartphone application. The government denies any such policy exists and seeks dismissal.

## BACKGROUND

In a prior lawsuit, immigrant-rights group Al Otro Lado, Inc., and others challenged the "Government's practice of systematically denying asylum seekers access to the asylum process at ports of entry . . . along the U.S.-Mexico border." *Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-02366-BAS-KSC, 2021 WL 3931890, at *1 (S.D. Cal. Sept. 2, 2021). If the ports were "at capacity," U.S. Customs and Border Protection officers purportedly refused to "inspect [and process] asylum seekers" and would instead "turn them back to Mexico." *Id*. In 2022, the judge in that case declared this turnback practice "unlawful." *Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-02366-BAS-KSC, 2022 WL 3970755, at *1 (S.D. Cal. Aug. 23, 2022).

The parties dispute whether Customs and Border Protection later resumed a more nuanced version of this turnback procedure. Plaintiffs claim that, following the end of COVID-era restrictions, CBP adopted an unwritten "CBP One Turnback Policy," in which officers "turned back to Mexico" any asylum applicants who failed to schedule an appointment using the "CBP One" mobile app. (ECF 1, at 7–8.) For example, in June 2023 Mexican citizen Luisa Doe endured days of "repeated error messages and glitches" with

1

the CBP One app, before finally seeking asylum at the San Ysidro port of entry without an appointment. (*Id*. at 15–16.) "CBP officials blocked her from entering and told her she needed a CBP One appointment." (*Id*. at 16.) When she tried again the next month, CBP staff reiterated that "the only way" to seek asylum "was through a CBP One appointment" and "threatened to call Mexican officials to take her away if she did not leave." (*Id*.) Denied asylum seekers like Luisa Doe reputedly face "perilous conditions in Mexico," including "cramped and unsanitary" shelters, "abuse from local police and cartels," and even "kidnapping," "torture," and "rape." (*Id.* at 47–49.)

The government denies that the CBP One Turnback Policy exists. According to CBP's public guidance, it will "inspect and process all arriving noncitizens," with or without appointments, and "regardless of whether they have used the CBP One app." Circumvention of Lawful Pathways, 88 Fed. Reg. 31314, 31358 (May 16, 2023).

Al Otro Lado, Luisa Doe, and the other plaintiffs sued various government officials here to block the alleged CBP One Turnback Policy. They raise claims under the *Accardi* doctrine, the Administrative Procedure Act, Fifth Amendment due process, and the Alien Tort Statute. The government moves to dismiss all claims.

## **DISCUSSION**

Before addressing the merits, this Court must ensure it has authority to hear this case.

## **I**

### **MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**

The government moves to dismiss on jurisdictional grounds under Federal Rule of Civil Procedure 12(b)(1). Such a challenge "may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Although the government never specifies which type of attack it intends, the Court treats the mootness challenge as a factual one and the arguments about standing as facial challenges.

## A.    Standing

Federal courts may only hear cases when the plaintiffs have a "personal stake" in the litigation, known as "standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish standing to sue, plaintiffs have the burden of showing that: "(1) they have suffered an injury-in-fact, meaning an injury that is 'concrete and particularized' and 'actual and imminent,' (2) the alleged injury is 'fairly traceable' to the defendants' conduct, and (3) it is 'more than speculative' that the injury is judicially redressable." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662–63 (9th Cir. 2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). As to the organizational plaintiffs—Al Otro Lado and Haitian Bridge Alliance—the government challenges all three of these prongs. For the individual plaintiffs, however, it contests only redressability.

### 1.  *Injury in Fact*

The government argues that the organizational plaintiffs lack an injury in fact because they "do not challenge any exercise of governmental power directed at them," but instead "claim they are harmed by incidental effects of the government's choices" regarding others. (ECF 68-1, at 26.) But this is not the only avenue to standing. "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *East Bay*, 993 F.3d at 663. To demonstrate injury in fact under this theory, organizations must show that defendants' practices "'perceptibly impaired' their ability to perform the services they were formed to provide." *Id*.

At a minimum, the CBP One Turnback Policy caused the organizational plaintiffs to divert resources and "perceptibly impaired" their ability to provide mission-essential services, evidencing injury in fact. *See East Bay*, 993 F.3d at 663. Take Al Otro Lado. Its "mission is to uplift immigrant communities by defending the rights of migrants against systemic injustices." (ECF 1, at 10.) It does so by offering "free direct legal services on both sides of the U.S.-Mexico border" and more particularly by providing "representation, accompaniment, and human rights monitoring for thousands of asylum seekers in Tijuana

3

every year." (*Id.* at 10–11.) Since the CBP One Turnback Policy's "rollout" in "January 2023," Al Otro Lado has purportedly "hired three additional staff in its Tijuana office"; "raised funds to provide emergency humanitarian aid to certain migrants who have been turned back" under that policy; and spent hundreds of staff hours "assisting migrants with the app, as well as accompanying and advocating for those who want to present at a [port of entry] without a CBP One appointment." (*Id.* at 55–56.) These funds and resources "would otherwise have been allocated to advancing [Al Otro Lado's] mission." (*Id.* at 55.)

In a similar vein, Haitian Bridge Alliance's "mission is to assist Haitian and other immigrants to acclimate to the United States and ensure their success in navigating their new lives." (ECF 1, at 11.) To pursue that goal, this nonprofit organization "regularly brings delegations to the border" to: "provide legal orientations and Know Your Rights trainings to migrants from Haiti, the Caribbean, and Africa"; "interview individuals and family units to identify systemic issues uniquely affecting Black migrants"; assess "individuals' eligibility for relief"; and identify "those with vulnerabilities that may require immediate assistance." (*Id.*) Due to the CBP One Turnback Policy, the group "has been forced to prioritize humanitarian services at the border," to devise "new 'know your rights' programs for people stranded in Mexico," to provide "assistance to Haitians struggling to use CBP One," to raise "funds to provide life-saving services to Haitian and other Black migrants" in Mexico, and to "secure office space in Reynosa [Mexico] . . . to support the many Haitians subject to" this policy. (*Id.* at 58.)

In addition, Haitian Bridge Alliance claims that the CBP One Turnback Policy has endangered one of its funding sources: "California provides vital funds in exchange for HBA's provision of direct representation and legal orientations to asylum seekers in the United States." (*Id.*) "To continue to receive these funds, HBA must meet certain benchmarks that are becoming increasingly difficult to attain given the significant strain on HBA staff and diversion of resources to the border." (*Id.*)

The Ninth Circuit's *East Bay* decision blessed nearly identical factual scenarios and arguments for organizational injury, including for Al Otro Lado itself. *See East Bay*,

993 F.3d at 663 (holding that Al Otro Lado and other groups established injury in fact—and standing—when an asylum policy "caused the Organizations to divert their already limited resources in response to the collateral obstacles [the policy] introduces for asylum-seekers" and when "funding on which the Organizations critically depend [wa]s also jeopardized by the" policy); *see also Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1297 (S.D. Cal. 2018) (finding Al Otro Lado had organizational standing based, in part, on its allegations of diverting "significant time and resources" in response to policy).

Attempting to wrench this case from *East Bay*'s protective embrace, the government seeks to distinguish it factually and to undermine its precedential value. As for the facts, the government supposes that the organizational plaintiffs' complained-of resource expenditures may be the result of "general migration circumstances or other policies," not the CBP One Turnback Policy. (ECF 68-1, at 27.) The problem is that the current record doesn't support this speculation. According to plaintiffs' uncontradicted evidence, these expenses were in direct response to the challenged policy, just as in *East Bay*. (*See, e.g.*, ECF 39-16, at 30–31 (Al Otro Lado "hired four additional staff" to aid "migrants who have been turned back for lack of a CBP One appointment."); ECF 39-22, at 26–27 (detailing Haitian Bridge Alliance's resources diverted in "response to the CBP One Turnback Policy").)

Even if it cannot distinguish *East Bay*'s facts, the government suggests that Circuit precedent must bow to two Supreme Court decisions: *United States v. Texas*, 599 U.S. 670 (2023), and *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). This Court remains "bound" by Ninth Circuit case law unless and until some "intervening higher authority" is "clearly irreconcilable" with it. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Yet both High Court cases can be harmonized with *East Bay*. In *United States v. Texas*, the Court held that two states lacked standing to sue the federal government to "alter its arrest policy so that [it] arrests more noncitizens." 599 U.S. at 676. But the *Texas* holding was strictly limited to the "rare" lawsuits that seek to force the Executive Branch into "making more arrests." *Id*. at 684–85. For cases outside that arrest-and-prosecution

5

context (like *East Bay*), however, the *Texas* majority took pains to emphasize that "the Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive." *Id*. at 684.

*East Bay* likewise fits within *FDA v. Alliance for Hippocratic Medicine*. In *Hippocratic Medicine*, the Supreme Court rejected associational standing for plaintiff medical associations who wished "to make a drug less available *for others*," although they admittedly did "not prescribe or use" that drug themselves. 602 U.S. at 374. According to the Court, a pure "issue-advocacy organization" cannot "spend its way" to an injury in fact "simply by expending money to gather information and advocate against" a policy. *Id*. at 394–95. By contrast, an advocacy organization that also provided *services* could have standing if the disputed policy "directly affected and interfered with"—or "perceptibly impaired" its ability to offer—those services. *Id*. In *East Bay*, the Ninth Circuit held that Al Otro Lado and other groups fell into this latter category. That is, the federal rule at issue "'perceptibly impaired' their ability to perform the services they were formed to provide," which was an injury sufficient to support standing. 993 F.3d at 663.

Thus, rather than being "clearly irreconcilable," *East Bay* is in line with the Supreme Court's guidance. *See Miller*, 335 F.3d at 900. Because the diversion of resources here alone qualifies as injury in fact, this Court need not address the organizational plaintiffs' arguments regarding physical and emotional injuries. (*See, e.g.*, ECF 1, at 56–59.)

### 2. *Fairly Traceable*

The organizational plaintiffs must also show that their injuries are "'fairly traceable' to the defendants' conduct." *East Bay*, 993 F.3d at 663. The government suggests that such a finding is foreclosed by *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), which was a case about "one-step-removed" injuries arising from "the independent action of some third party not before the court." *See id*. at 1986. In *Murthy*, plaintiffs accused third-party social-media platforms of "suppress[ing] protected speech," yet they sued the government—not the platforms—for this injury. *Id.* at 1981. Although plaintiffs claimed government officials pressured these platforms into censorship, the Court held that the allegations failed "to

6

link" the third-party "social-media restrictions to the defendants' communications with the platforms." *Id.* at 1988–89. By contrast, there's no similar third-party-linkage concern here. According to the complaint, government officials themselves were often the ones turning away the asylum applicants who are the organizational plaintiffs' clientele. As a direct result of those actions, these plaintiffs purportedly incurred substantial costs and frustration of their core business model. That causal connection suffices for standing purposes.

### 3. *Redressability*

Finally, the government insists that no plaintiff satisfies the last requirement of standing: that their injuries are "judicially redressable." *See East Bay*, 993 F.3d at 663. According to the defense, a court order cannot remedy the alleged harms because: (1) the "classwide injunctive relief Plaintiffs seek is precluded"; (2) as a result, "there can be no 'corresponding' declaratory relief"; (3) at all events, "the CBP One Turnback Policy doesn't exist"; and (4) "even if it did exist," this Court cannot take away CBP officers' discretion "to manage intake at the international boundary line." (ECF 68-1, at 23–24.)

First, it is true that 8 U.S.C. § 1252(f)(1) deprives district courts of "jurisdiction" to order "class-wide injunctive relief" regarding how federal officials implement or enforce the immigration laws at issue here. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 546, 549–50 (2022). But this principle is best thought of as an affirmative defense, not a jurisdiction-divesting issue of standing. *Cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (cautioning against "erroneously conflat[ing]" jurisdictional rulings and "merits-related determination[s]"). Although § 1252(f)(1) explicitly uses the term "jurisdiction," the Supreme Court has held that this statute merely "deprives courts of the power to issue a specific category of remedies" and does not strip them of "subject matter jurisdiction." *Biden v. Texas*, 597 U.S. 785, 798, 801 (2022); *see Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1106 n.4 (9th Cir. 2006) (noting that "standing is an aspect of subject matter jurisdiction"). The question of whether a remedy is "available under federal law is not part of the redressability analysis," but rather the "inquiry into whether plaintiffs have a valid cause of action." *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 34 (D.D.C. 2018).

7

Second, the government believes that—with a classwide injunction impossible—the proposed class action cannot be sustained on declaratory relief alone. It points out that even the Supreme Court has questioned whether Federal Rule of Civil Procedure 23(b)(2)'s class-certification requirement can be met in this situation. *See Jennings v. Rodriguez*, 583 U.S. 281, 313 (2018) (discussing Rule 23(b)(2)'s reference to "final injunctive relief or *corresponding* declaratory relief"). But a potential class-certification problem does not undermine plaintiffs' *standing* to seek such certification in the first instance. Plaintiffs' request for class certification may ultimately be denied. But for jurisdictional purposes, this Court has authority to issue a declaration, "whether or not further relief is or *could be* sought." 28 U.S.C. § 2201 (emphasis added); *see, e.g.*, *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (ruling that district court "had jurisdiction to entertain the plaintiffs' request for declaratory relief" under § 1252(f)(1), even if it lacked jurisdiction to enter an injunction); *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018) (holding that "8 U.S.C. § 1252(f)(1)" "does not affect classwide declaratory relief" even though it bars "classwide injunctive relief").

The government's third objection is that plaintiffs seek relief from "a policy that does not exist." (ECF 68-1, at 24.) Of course, plaintiffs emphatically assert the policy does exist. (*See, e.g.*, ECF 1, at 41.) That factual debate is perhaps this suit's primary bone of contention. "[W]hen the issue of subject-matter jurisdiction is intertwined with an element of the plaintiff's claim," "a court must leave resolution of material factual disputes to the trier of fact." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.3 (9th Cir. 2014). For standing purposes, plaintiffs have sufficiently alleged that there is such a policy.

Finally, the government points out that equitable relief would be fruitless, as this Court cannot stop officers from exercising their statutory discretion at the border. This seems to be another form of the "unreviewable agency discretion" argument that the prior *Al Otro Lado* court rejected and that the government is consequently estopped from relying on. *See* Part II.B, below (discussing collateral estoppel). Regardless, even if any unconstitutional conduct persisted after this case, "a favorable declaratory judgment may

8

nevertheless be valuable to the plaintiff." *See Steffel v. Thompson*, 415 U.S. 452, 469 (1974). Due solely to the "persuasive force" of a court opinion, "[e]nforcement policies . . . may be changed." *Id.* at 470. Also, by clarifying rights and obligations, a declaratory judgment may stop a dispute from "escalating into additional wrongful conduct." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 405 (S.D.N.Y. 2002). Immigration officials' discretion, then, does not render this case unsuitable for judicial disposition.

In sum, the motion to dismiss on standing grounds is denied.

**B.    Mootness**

The government's remaining jurisdictional argument is that all the "individual claims are moot." (ECF 68-1, at 22.) Notably, it doesn't urge mootness based on the President's June 3, 2024 proclamation temporarily suspending certain noncitizen entries at the southern border. (*See* ECF 81, at 10 (defense brief on proclamation); *see also* ECF 78-1, at 10 (Presidential proclamation).) Rather, the defense contends that, since the complaint was filed, all individual plaintiffs "have been inspected and processed" for asylum. (ECF 68-1, at 22–23.)

Even so, the mootness inquiry doesn't end there. A "limited" mootness exception applies to claims that are "capable of repetition yet evading review." *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir. 2020). While the government "bears the burden to establish that a once-live case has become moot," *West Virginia v. EPA*, 597 U.S. 697, 719 (2022), plaintiffs have "the burden of showing that the [mootness] exception applies," *Department of Fish & Game v. Federal Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023) (cleaned up). A "pre-certification class-action claim" qualifies for this exception if: "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the named plaintiffs could themselves suffer repeated harm or it is certain that other persons similarly situated will have the same complaint." *Belgau*, 975 F.3d at 949 (cleaned up).

This case meets both requirements. First, the challenged delays here—which are measured in months (*see* ECF 1, at 14, 40; ECF 68-3, at 12)—are "too short for the judicial

review to 'run its course,'" thereby evading review if mooted. *See Belgau*, 975 F.3d at 949; *see also Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1019 (9th Cir. 2010) (deeming three years "too short"). Second, the claims are capable of repetition. The Court can reasonably expect that the individual plaintiffs themselves may seek asylum again, as each one "does not wish to return to his or her home country because of a fear of violence." *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1303–04 (S.D. Cal. 2018); (ECF 1, at 51–55). During any such asylum applications, the individual plaintiffs would reasonably expect to again face the CBP One Turnback Policy. In fact, on the current record, it is *certain* that future asylum seekers at our southern border will confront that policy. (*See, e.g.*, ECF 39-14, at 5 (declaration of an Al Otro Lado worker that relief workers "have observed CBP officers turning back asylum applicants on many occasions"); ECF 39-16, at 3 (Al Otro Lado executive director's declaration about similar observations that "CBP officers refused to process" the vast majority of asylum-seekers "without a CBP One appointment"); ECF 39-23, at 5 (report from a nonprofit describing several other CBP One-related turnbacks); ECF 39-26, at 9 (aid worker/Ph.D. candidate's similar observations); ECF 39-28 (PBS news article reporting same).)

Thus, plaintiffs have demonstrated that this dispute remains justiciable under the "capable of repetition, yet evading review" exception. *See Al Otro Lado*, 327 F. Supp. 3d at 1303–04 (rejecting mootness challenge for similar reasons after the government processed each plaintiff's asylum application).

## II

### COLLATERAL ESTOPPEL

Before resolving the other dismissal arguments, the Court must consider plaintiffs' request to bar the government from relitigating certain issues it lost in the earlier *Al Otro Lado* case. (ECF 72, at 38–39.) Under the doctrine of collateral estoppel or issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984). When

plaintiffs seek such issue preclusion against the defense, it is known as "offensive" collateral estoppel. Unlike most defendants, the federal government is protected from "*nonmutual* offensive collateral estoppel," that is, "use of collateral estoppel" by a plaintiff who was "a non-party to [the] prior lawsuit." *Id*. at 158–59. But "when the parties to the two lawsuits are the same," as here, the federal agency "may be estopped . . . from relitigating a question." *See id*. at 163. In both these actions, Al Otro Lado sued CBP and Department of Justice officers in their "official capacities," which is the "same as a suit against the entity of which the officer is an agent." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 n.2 (1997) (cleaned up).

A plaintiff invoking offensive collateral estoppel must prove that: "(1) there was a full and fair opportunity to litigate the identical issue in the prior action," "(2) the issue was actually litigated in the prior action," "(3) the issue was decided in a final judgment," and "(4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action." *See Syverson v. International Bus. Machines*, 472 F.3d 1072, 1078 (9th Cir. 2007). Trial courts retain "broad discretion to determine when [offensive issue preclusion] should be applied." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

## A.   "In" the United States and Fifth Amendment Rights

The government does not contest collateral estoppel as to two issues that were fully litigated and led to final judgment in the prior *Al Otro Lado* case. First, the government previously argued that the asylum and expedited-removal provisions didn't apply to plaintiffs because they were not yet "in" the United States. At summary judgment, the prior court rejected that view, holding that these statutes apply to "migrants who are 'in the process of arriving," even if they are still "physically outside the international boundary line." *Al Otro Lado*, 2021 WL 3931890, at *10; *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1011 (9th Cir. 2020) (denying a stay pending appeal in that same case in part because "the district court's interpretation" of "in" "is likely correct"). Second, in the prior case, the government maintained that plaintiffs who were turned back from the border could not

11

invoke the Fifth Amendment, because they were foreign citizens on foreign soil. The judge disagreed, ruling that "the Fifth Amendment applies" to CBP's refusal "to inspect and refer class members for asylum under statute." *Al Otro Lado*, 2021 WL 3931890, at *20.

There are several discretionary bases to decline offensive issue preclusion, but none seem to pertain here, nor does the defense press any of them. *See Syverson*, 472 F.3d at 1079 (listing discretionary considerations). Thus, the government is collaterally estopped from seeking a different result on these two questions in this suit. For that reason, the defense's motion to dismiss counts 2–4 is denied to the extent it relitigates these issues, and the motion to dismiss the Fifth Amendment due-process claim (count 5) is denied entirely. (*See* ECF 68-1, at 38–43.)

## B.   Unreviewable Agency Discretion

Finally, the government resists collateral estoppel on a third issue—whether CBP's border intake and processing decisions are unreviewable—on the grounds that it was not "actually litigated" nor "necessary to decide the merits" of the prior litigation. (ECF 75, at 19 n.6.) But the government is mistaken. In the original case, as here, the defense objected that 5 U.S.C. § 701(a)(2) exempts Administrative Procedure Act claims from judicial review when the "agency action is committed to agency discretion by law." *Compare Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-02366-BAS-KSC, ECF 192-1, at 24 (S.D. Cal. Nov. 29, 2018) (arguing against prior APA claims based on "the APA's prohibition on judicial review of agency action 'committed to agency discretion by law'" (quoting 5 U.S.C. § 701(a)(2))), *with* (ECF 68-1, at 36 (arguing that APA claims here "should be dismissed" because "CBP's management of intake and processing of undocumented noncitizens" are "'committed to agency discretion by law' and unreviewable under the APA" (quoting 5 U.S.C. § 701(a)(2)))). The original judge even noted: "Because the APA precludes review of 'agency action . . . committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), the Court must consider this argument before addressing the merits of Plaintiffs' claim that the alleged Turnback Policy is unlawful." *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1209 (S.D. Cal. 2019). That court

12

went on to spurn the argument repeatedly. *See, e.g.*, *Al Otro Lado*, 394 F. Supp. 3d at 1211 (rejecting argument that "claims are unreviewable on the asserted basis of discretion committed to the agency"); *Al Otro Lado*, 2021 WL 3931890, at *11 (holding that additional "provisions still do not provide a basis for agency discretion that supplants Defendants' duty to inspect and refer asylum seekers in [8 U.S.C.] § 1158(a)(1) and § 1225"). And this point was essential to deciding the merits of the last case. In fact, if § 701(a)(2)'s bar on judicial review applied, Al Otro Lado would have lost all its APA claims. *See Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (holding that "before any [APA] review at all may be had, a party must first clear the hurdle of § 701(a)").

All prerequisites for collateral estoppel are met on this last issue, and there are no apparent discretionary reasons to decline it. So, the government is estopped from arguing that the APA claims are unreviewable discretionary agency actions.

### III

### MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

With the foregoing rulings in mind, the Court turns to the remaining aspects of the government's Rule 12(b)(6) motion to dismiss. To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**A.   Zone of Interests**

The government argues that the organizational plaintiffs must be dismissed because "their claimed resource-diversion injuries are not within the zone of interests sought to be protected by the relevant immigration statutes." (ECF 68-1, at 27.) Specifically, the government contends that none of the relevant immigration laws "suggest that Congress intended to permit organizations to sue" to recoup their own "voluntary expenditures taken in response to an [agency's] alleged failure to implement these provisions toward noncitizens in a particular manner." (*Id.* at 28.)

13

Plaintiffs must indeed show that they "fall within the 'zone of interests' protected by the statute in question." *East Bay*, 993 F.3d at 667. But, in the Administrative Procedure Act context, that test is not "especially demanding." *Id*. In fact, the "zone-of-interests analysis forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id*. (cleaned up).

Once again, *East Bay* dictates our result. In that case, several organizational plaintiffs—including Al Otro Lado—challenged a different asylum rule because it "irreconcilably conflict[ed]" with the same asylum provisions relied on here. *See East Bay*, 993 F.3d at 659. The Ninth Circuit found that the organizational plaintiffs' claims fell "within the zone of interests" protected by the immigration provisions because the groups' "purpose is to help individuals apply for and obtain asylum, provide low-cost immigration services, and carry out community education programs with respect to those services." *Id*. at 668. "This is sufficient for the Court's lenient APA test: at the very least, the Organizations' interests are 'marginally related to' and 'arguably within' the scope of the statute." *Id*. The Court sees no meaningful difference between *East Bay* and our case, nor has the government suggested one. Thus, these claims too fall within the relevant zone of interests.

## B.   *Accardi* Claim

In their first claim for relief, plaintiffs contend that the unwritten CBP One Turnback Policy contravenes official CBP guidance, thereby violating the *Accardi* doctrine. (ECF 1, at 61–63.) Under that doctrine, "an administrative agency is required to adhere to its own internal operating procedures." *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (1990) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). The government moves to dismiss this claim for failing to adequately plead: (a) an enforceable policy, (b) sufficient prejudice, or (c) a citation to the relevant legal provision. The defense also seeks dismissal for the same reasons it challenges the other APA claims (counts 2–4), as addressed in the next section. *See* Part III.C, below.

14

### 1. *Enforceable Policy*

The defense's main argument is that the *Accardi* claim fails because the CBP memoranda and guidance that plaintiffs rely on do not bind it. (*See* ECF 68-1, at 30.) The *Accardi* doctrine "extends beyond formal regulations" and reaches "certain internal policies." *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004). Even "memoranda issued by the agency" may be "sufficient to establish a policy to which the agency was bound under the *Accardi* doctrine." *Id*. For *Accardi* purposes, "a policy capable of judicial review requires sufficient formality to bind the agency." *See Yavari v. Pompeo*, No. 2:19-cv-02524-SVW-JC, 2019 WL 6720995, at *6 (C.D. Cal. Oct. 10, 2019).

In a different context, the Ninth Circuit has explained the strict requirements for deeming an "agency pronouncement" "enforceable against [that] agency in federal court." *See United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982). To be judicially enforceable, the agency guidance must: "(1) prescribe substantive rules" and "(2) conform to certain procedural requirements." *Id*. Mere "interpretive rules, general statements of policy or rules of agency organization, procedure or practice" are not enough. *Id*.

Plaintiffs' strongest argument for an enforceable policy is found in the preamble to the final rule Circumvention of Lawful Pathways, which was promulgated by the Departments of Justice and Homeland Security. *See generally* Circumvention of Lawful Pathways, 88 Fed. Reg. 31314 (May 16, 2023). First, the preamble appears to set forth substantive rules. It makes specific statements of policy: "CBP's policy is to inspect and process all arriving noncitizens at [ports of entry], regardless of whether they have used the CBP One app." *Id*. at 31358. And key passages even suggest substantive rights, such as: "All noncitizens who arrive at a [port of entry] *will be inspected* for admission into the United States. . . . Individuals without appointments *will not be turned away*." *Id*. (emphasis added). Second, this rule—including its preamble—conforms to procedural standards, as it was published in the Federal Register after the rule-amendment process. *See Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v.*

15

*Federal R.R. Admin.*, 988 F.3d 1170, 1180 (9th Cir. 2021) (discussing the "APA's procedural requirements," including "notice of proposed rulemaking" and an opportunity for "interested persons" to express their views "for the agency's consideration"). These are not off-the-cuff remarks, but the agency's public policy statement after reasoned consideration. At this stage, the complaint plausibly establishes an enforceable policy for *Accardi* purposes.

### 2. *Substantial Prejudice*

Next, the government contends that an agency's "departure from internal rules 'is not reviewable except upon a showing of substantial prejudice to the complaining party,'" meaning that there is a "significant possibility" that the alleged violation affected "the ultimate outcome of the agency's action." (ECF 68-1, at 32 (quoting *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970), and *Carnation Co. v. Secretary of Labor*, 641 F.2d 801, 804 n.4 (9th Cir. 1981)).) According to the defense, plaintiffs have not pleaded "a 'significant possibility' that any departure from CBP's internal guidance" affected the "relevant administrative proceeding (here, inspection and processing)." (*Id.*)

But the government misconstrues the relevant agency action—and the relevant injury—for this *Accardi* claim. Plaintiffs are not suing CBP for failing to *grant* them asylum, but for *turning them away* from the port of entry without processing. That agency action (or failure to act)—which purportedly violated CBP's internal rules—"irreparably injured" the individual plaintiffs, per the complaint, "by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm." (ECF 1, at 62.) And it allegedly "irreparably injured" the organizational plaintiffs "by frustrating their missions and forcing them to divert substantial resources away from their core programs." (*Id.* at 63.) Plaintiffs have adequately pleaded substantial prejudice.

### 3. *Omission of APA Citation*

Finally, the government raises a formalistic objection to plaintiffs' failure to "expressly invoke the APA for their *Accardi* claim" or to otherwise "identify a provision of law supplying [them] with a cause of action." (ECF 68-1, at 29.) This argument is

16

"entirely meritless." *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008). Even if "the statute was not cited in the complaint itself," dismissal is improper when the "complaint and subsequent filings provided . . . 'fair notice' of that claim." *Id.*; *see also Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."). The government had fair notice here. Plaintiffs rely heavily on the Administrative Procedure Act throughout their complaint and make clear in their response that Count 1 is an APA claim. (*See* ECF 72, at 34.)

In sum, none of the arguments unique to the *Accardi* count warrant its dismissal. The Court now turns to the motion to dismiss all APA claims, including the *Accardi* claim.

## C.   APA Claims

As relevant here, the Administrative Procedure Act gives courts authority, under certain circumstances, to "compel" or to "hold unlawful and set aside *agency action*." 5 U.S.C. § 706(1), (2) (emphasis added). The potential agency actions at issue here are the CBP One Turnback Policy generally and each specific border turnback. The government insists that these do not qualify as reviewable agency actions, as they all fail the test of being "discrete" and the individual turnbacks are not "final." (ECF 68-1, at 33.) Also, the defense urges dismissal of any claims based on conduct by Mexican officials, since the APA doesn't recognize Mexico as an "agency." (*Id.* at 34.)

In their response, plaintiffs clarified that their § 706(1) claims to compel agency action are based only on the individual turnbacks, while the CBP One Turnback Policy is the focus of their § 706(2) claims to hold agency actions unlawful. (*See* ECF 72, at 38.)

### 1.   *"Discrete" Agency Action*

The government first criticizes these proffered agency actions for lacking the required discreteness. Under the APA, the term "agency action" includes five broad categories: "rule," "order," "license," "sanction," and "relief." 5 U.S.C. § 551(13). "All of those categories involve circumscribed, *discrete* agency actions," and plaintiffs must allege one to support each of their APA claims. *Norton v. Southern Utah Wilderness All.*, 542 U.S.

17

55, 62 (2004) (emphasis added). At bottom, the discreteness requirement forces plaintiffs to focus their attack on a "particular 'agency action' that causes [them] harm," rather than seeking expansive "programmatic improvements" of agency behavior. *Id*. at 64.

Starting with the § 706(2) claims—to "hold unlawful and set aside agency action"—plaintiffs rely on the CBP One Turnback Policy as the unlawful agency action. (*See* ECF 72, at 38.) If such a policy exists, it qualifies as a discrete "rule" and thus an "agency action." *See* 5 U.S.C. 551(4) (defining "rule"). The government doesn't quarrel with this reasoning, only with the lack of evidence for the rule. Plaintiffs' allegations don't amount to "a cohesive 'turnback' policy," it says, for the complaint is an unconnected series of "different types of actions with different impacts." (ECF 68-1, at 33–34.)

That argument may carry the day later, but not at the pleading stage. Plaintiffs have plausibly alleged that the CBP One Turnback Policy exists and is a discrete agency rule. According to the complaint, across several ports of entry, different officers (presumably under different supervisors) all started turning away asylum applicants at around the same time and for the same reason: lack of a CBP One appointment. (*See, e.g.*, ECF 1, at 41 (alleging that "as of May 2023," eight ports of entry "that are processing asylum seekers are turning back almost all those who do not have a CBP One appointment").) The alleged policy is unwritten, but "agency action need not be in writing to be judicially reviewable." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018). In other words, plaintiffs have plausibly identified a discrete agency action to challenge—the adoption and implementation of the alleged CBP One Turnback Policy—and are not seeking broad "programmatic improvements" to CBP writ large. *See Norton*, 542 U.S. at 64.

That leaves only plaintiffs' § 706(1) claim, which requires allegations of an "agency action" that was "unlawfully withheld." 5 U.S.C. § 706(1). Plaintiffs claim that the individual turnbacks constituted the unlawful withholding of a required agency action: inspection and asylum-processing relief. To satisfy the discreteness condition for this claim, plaintiffs must assert that CBP "failed to take a *discrete* agency action that it is *required to take*." *See Norton*, 542 U.S. at 64. With each individual turnback, CBP failed

18

to take a discrete agency action, that is, providing "relief." *See* 5 U.S.C. § 551(13), (11)(B). And these were actions it was required to take. As the prior *Al Otro Lado* court held, CBP had "specific statutory duties to inspect and refer every applicant for admission who approaches a [port of entry]." *See Al Otro Lado*, 2021 WL 3931890, at *9; *see also Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-02366-BAS-KSC, 2022 WL 3970755, at *1 (S.D. Cal. Aug. 23, 2022) (declaring unlawful CBP's "denial of inspection or asylum processing to [noncitizens] . . . who are in the process of arriving in the United States"). In addition to those statutory duties, this Court has already determined that plaintiffs adequately pleaded a parallel binding agency policy. *See* Part II.B, above.

For both APA theories, plaintiffs have sufficiently alleged "discrete" agency action.

### 2. *"Final" Agency Action*

According to the government, the § 706(1) claim suffers from a second problem: none of the alleged turnbacks were "final" actions. (ECF 68-1, at 35.) Under the APA, judicial review of an "agency action" must generally wait until it is "final." 5 U.S.C. § 704. Yet the prior *Al Otro Lado* court held that "no 'final agency action' is necessary for [a] § 706(1) claim" like the one here. *See Al Otro Lado*, 2021 WL 3931890, at *8 (collecting cases). That court reasoned that the finality requirement makes sense for challenging an agency action under § 706(2) ("hold unlawful and set aside agency action"), but it is an awkward prerequisite for a § 706(1) failure-to-act claim, when final action has been "unlawfully withheld or unreasonably delayed." This Court need not wade into that debate, however. To the extent § 706(1) claims require finality, each turnback was a final action.

For an "agency action to be 'final,'" the action must: (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The government contests only the second element, arguing that the individual turnbacks did "not fix the legal relations between the parties." (*See* ECF 68-1, at 36.) After all, it reckons, each individual plaintiff eventually received an asylum interview.

19

Much like its arguments on the *Accardi* claim, the defense misconstrues the legal rights allegedly denied. *See* Part III.B.2, above. Plaintiffs' case is not about the right to asylum, but the right to be inspected and processed—and not turned away—upon first presenting at a port of entry. At the very least, the turnback denied them that right. Put another way, with each turnback CBP wrongfully "determined" that plaintiffs lacked a "right[]" to inspection and asylum processing before being returned to Mexico. *See Bennett*, 520 U.S. at 178. In that sense, each one was a "final" agency action.

### 3. *Mexican Authorities' Actions*

Finally, the government asks this Court to dismiss all claims based on "actions taken by Mexican officials" or other actors outside the Department of Homeland Security, as these "are not *agency* actions that can be evaluated under the APA." (ECF 75, at 22; ECF 68-1, at 34.) It is true that "the APA does not extend to an entity that is not a federal agency." *Western State Univ. of S. Cal. v. American Bar Assn.*, 301 F. Supp. 2d 1129, 1133 (C.D. Cal. 2004); *see* 5 U.S.C. § 701(b)(1) (defining "agency"). Nor does the APA authorize this Court to compel or vacate the conduct of Mexican officials.

Nonetheless, the APA does extend to CBP, which allegedly works in "close coordination" with Mexican authorities to implement the CBP One Turnback Policy. (*See* ECF 1, at 42.) For instance, according to the complaint, CBP "regularly requests" help from "Mexican immigration and law enforcement officers" in "clearing the backlog of people at the San Ysidro [port of entry] who do not have CBP One appointments." (ECF 1, at 42; *see also id.* at 45 (describing similar teamwork at two other ports of entry).) While this Court may lack authority over Mexican officials, the APA empowers federal courts to address *CBP*'s actions, including any improper cross-border collaboration.

On the other hand, plaintiffs' expansive relief requests go well beyond addressing CBP's conduct. They seek an injunction that "binds other persons who are in active concert or participation with any of the Defendants," presumably including Mexican officials. (ECF 1, at 71.) Injunctive relief may be unavailable. *See* 8 U.S.C. § 1252(f)(1) (forbidding lower courts from "enjoin[ing]" immigration processing in some circumstances). But, to

20

the extent plaintiffs request a binding order to directly control the actions of Mexican and other non-agency personnel, that request is dismissed as outside the APA's ambit.[1]

### D.   Alien Tort Statute Claim (Non-Refoulement)

In their final cause of action, plaintiffs claim relief through the Alien Tort Statute, which gives district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. This statute was originally passed to "furnish jurisdiction" for three international offenses: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 720, 724 (2004). But the law does not "categorically preclude[] federal courts from recognizing [a new] claim under the law of nations." *Id.* at 725. Parties suing based on newer international norms face a "high bar" to show that the "international character" of that claim has been "accepted by the civilized world and defined with a specificity comparable to" the original three. *Doe I v. Cisco Sys.*, 73 F.4th 700, 714 (9th Cir. 2023). In particular, plaintiffs must "demonstrate that the alleged violation is of a norm that is specific, universal, and obligatory." *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 257–58 (2018) (cleaned up).

"Non-refoulement" is just such a norm, say plaintiffs. The non-refoulement duty forbids countries from deporting refugees anywhere that their "life or freedom would be threatened on account of" certain characteristics like their "race, religion, [and] nationality." Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 6276, T.I.A.S. No. 6577. The government's primary objection regards the universality requirement. It argues that this principle has not reached universal international acceptance, at least for the manner plaintiffs seek to use it. (*See* ECF 68-1, at 44–45.)

---

[1] In a footnote, the government states that the act-of-state and political-question doctrines require dismissal of the allegations concerning Mexican officials. (*See* ECF 68-1, at 35 n.8.) Given the importance and complexity of those doctrines, this Court declines to address these points, which "were bare assertions with no supporting argument" or "only argued in passing." *See Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (cleaned up).

This claim boils down to a "nuanced question": Is non-refoulement "universally understood to provide protection to those who present themselves at a country's borders but are not within [that] country's territorial jurisdiction"? *Al Otro Lado*, 2021 WL 3931890, at *21. No. The international community has not universally embraced "this specific extraterritorial application of non-refoulement." *Id*. at *22. The Supreme Court once surveyed the ongoing debate about whether this norm imposes extraterritorial obligations. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 182 & nn.40–41 (1993) (collecting authorities and noting that non-refoulement's "failure to prevent the extraterritorial reconduction of aliens has been generally acknowledged (and regretted)"). And the United States itself explicitly rejects any "extraterritorial" "non-refoulement obligation." U.S. Observations on UNCHR Advisory Opinion on Extraterritorial Application of Non-Refoulement Obligations (Dec. 28, 2007), https://2001-2009.state.gov/s/l/2007/112631.htm#_ftnref2 [https://perma.cc/9DKA-N3V4].

In addition, the last *Al Otro Lado* court pointed out that border "turnback" policies have "been implemented in some European Union member[] states and Australia." *Al Otro Lado*, 2021 WL 3931890, at *22. Plaintiffs criticize this rationale because violations of a "norm of international law" do not "diminish or undermine its 'binding effect.'" (ECF 72, at 57 (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 n.15 (2d Cir. 1980).) But the issue is whether "extraterritorial" non-refoulement is a norm in the first place. In the case plaintiffs rely on, "every actual State recognized"—and agreed to be bound by—the "prohibition of torture," even if that norm was only "honored in the breach." *Filartiga*, 630 F.2d at 884 n.15. Not so here. Non-refoulement has yet to clear the "high bar" of universal acceptance. *See Doe I*, 73 F.4th at 714. So, the Alien Tort Statute claim must fall.

## CONCLUSION

Thus, the government's motion to dismiss is granted in part as follows:

1. Any portion of the *Accardi* and APA claims (counts 1–4) that seeks to enjoin or bind persons outside of U.S. federal agencies, such as Mexican officials, is **DISMISSED**.

2.  The Alien Tort Statute claim (count 6) is **DISMISSED**.

Those dismissals are without leave to amend. For one, plaintiffs do not request an opportunity to amend or explain how they would qualify for one. (*See generally* ECF 72.) More importantly, for the two dismissed grounds any amendment appears to be "futile," since "no set of facts" can cure the identified defects. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017). The dismissal motion is otherwise denied.

Dated:  September 30, 2024

Hon. Andrew G. Schopler
United States District Judge