BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
EREZ REUVENI
Acting Deputy Director
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov
JASON WISECUP
Trial Attorney

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., *et al.*, <br> *Plaintiffs,* <br><br> v. <br><br> ALEJANDRO N. MAYORKAS, Secretary, U.S. Department of Homeland Security; TROY A. MILLER, Senior Official Performing the Duties of Commissioner, U.S. Customs and Border Protection; DIANE J. SABATINO, Acting Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection; <br><br> *Defendants.* | Case No. 3:23-cv-01367-AGS-BLM <br><br> **DEFENDANTS' ANSWER TO PLAINTIFFS' CLASS ACTION COMPLAINT** |

## DEFENDANTS' ANSWER TO PLAINTIFFS' CLASS ACTION COMPLAINT

Defendants hereby answer the allegations in Plaintiffs' class action Complaint (ECF No. 1). Defendants generally deny all allegations except those specifically admitted. Defendants' inclusion of the text, headings, and footnotes of Plaintiffs' allegations is done solely for the convenience of the Court and the parties and should not be understood as either an admission of or agreement with those allegations. Further, to the extent a response to the Complaint's headings is required, Defendants deny the allegations contained in the headings.

## I. INTRODUCTION

1.     Individual Plaintiffs are noncitizens who, after fleeing grave harm in their home countries, have tried to seek access to the U.S. asylum process by presenting themselves at Class A ports of entry along the U.S.-Mexico border ("POEs"), but have been denied that fundamental right due to their inability to obtain an appointment via Defendants' CBP One smartphone application. Plaintiffs challenge Defendants' border-wide policy and widespread practice of turning back arriving noncitizens without CBP One appointments at or near Class A POEs and thereby denying them access to the asylum process. This policy and widespread practice, referred to as the "CBP One Turnback Policy," contravenes statutory, constitutional, and international law, as well as Defendants' binding agency guidance.

**Answer:** This introductory paragraph is a statement of Plaintiffs' case that requires no response. To the extent a response to Paragraph 1 is required: With respect to the first sentence of Paragraph 1, Defendants admit only that the Individual Plaintiffs are noncitizens; Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiffs' reasons for presenting at a port of entry, and therefore deny them; Defendants deny the remainder of the allegations in this sentence. With respect to the second and third

1

sentences of Paragraph 1, Defendants admit only that Plaintiffs' complaint purports to challenge a so-called "turnback policy," but deny the remainder of the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. Defendants further aver that on June 3, 2024, well after the filing of the Complaint and well after the Individual Plaintiffs had entered the United States and been inspected and processed, the President issued a Proclamation providing for the suspension and limitation on entry of certain noncitizens ("Presidential Proclamation"). U.S. Customs and Border Protection (CBP) has stated that, during time periods when this suspension and limitation and entry is in effect, the Presidential Proclamation "will be implemented at ports of entry by preventing the entry of noncitizens described in the Proclamation at the international boundary line."

     **2.**    For many noncitizens, making an appointment to present at a POE is impossible. Some lack access to up-to-date smartphones, Wi-Fi, a cellular data plan, or reliable electricity, all of which are necessary to use CBP One. Others do not understand the few languages used in the app, are illiterate, lack technological know-how, or have disabilities that prevent them from successfully navigating the app. And the U.S. government has artificially capped the number of appointment slots far below the number of noncitizens who need them, meaning that even those who are able to use the app are repeatedly denied appointments. As a result, countless asylum seekers have been forced to wait indefinitely under precarious conditions in Mexico in the hope of obtaining scarce appointments.

     **Answer:** Defendants deny the allegations in the first sentence of Paragraph 2. With respect to the second and third sentences of Paragraph 2, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them. Defendants deny the allegations in the fourth sentence of paragraph 2 and specifically deny that the U.S. government has "artificially capped"

the number of available appointments. Defendants deny the allegations in the fifth sentence of Paragraph 2.

**3.**     The CBP One Turnback Policy is just the latest manifestation of the government's multi-year effort to block asylum access for asylum seekers in the process of arriving at the southern border. Indeed, this Court has already examined the 2017 iteration of a turnback policy, under which the government coordinated with Mexican officials to implement a "metering" or waitlist system, requiring asylum seekers to wait indefinitely in Mexico based on a demonstrably false pretext that CBP "lacked capacity" to inspect and process them. After extensive discovery and briefing, this Court issued a declaratory judgment finding that this version of the turnback policy violated the government's mandatory duties to inspect and process asylum seekers under the Immigration and Nationality Act ("INA") and the Due Process Clause, "regardless of the purported justification for doing so." *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1049-50 (S.D. Cal. 2022) ("*AOL I*").

**Answer:** Defendants deny the allegations in the first sentence of Paragraph 3 and specifically deny CBP's prior metering policy was a "turnback policy." With respect to the second sentence of Paragraph 3, Defendants admit only that Plaintiff Al Otro Lado brought a lawsuit in 2017 that alleged a "turnback policy," but otherwise deny the allegations in this sentence. With respect to the third sentence of Paragraph 3, Defendants admit only that Judge Bashant issued a declaratory judgment in that lawsuit in 2022, and state that the pleadings and orders issued in *AOL I* speak for themselves and are the best evidence of their contents, and deny any allegations and characterizations that are inconsistent therewith.

**4.**     The new CBP One Turnback Policy similarly violates Defendants' mandatory duties under the INA and the Due Process Clause, as well as their own binding internal guidance, which dictates that a CBP One appointment is not a prerequisite for inspection and processing at a POE.

**Answer:** Paragraph 4 consists of a legal conclusion to which no response is required. To the extent a response to Paragraph 4 is required, Defendants deny the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

5.     Under the CBP One Turnback Policy, when asylum seekers approach a POE, they are typically met at or near the "limit line," the physical demarcation point between U.S. and Mexican territory, by CBP officers or Mexican authorities who, upon information and belief, are acting at the behest of CBP. If the asylum seekers do not have a CBP One appointment confirmation or present at a date or time different from the designated appointment slot, they are turned back to Mexico.

**Answer:** With respect to the first sentence of paragraph 5, Defendants deny the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. With respect to the second sentence of paragraph 5, Defendants deny the allegations and specifically deny that at the time of this complaint and during any time periods relevant to this Complaint, it was or is CBP's policy and practice to "turn[] back" individuals without appointments or who present at date or time different from the designated appointment slot.

6.     CBP One essentially creates an electronic waitlist that restricts access to the U.S. asylum process to a limited number of privileged migrants. Defendants' implementation of the CBP One Turnback Policy means that at the southwest border, the only asylum seekers who can access the asylum process are those who (a) have access to an up-to-date, well-functioning smartphone; (b) fluently read one of the few languages currently supported by CBP One; (c) have access to a sufficiently strong and reliable mobile internet connection and electricity to submit the necessary information and photographs required by the app; (d) have the technological literacy to navigate the complicated multi-step process to create an account and request an appointment via CBP One; (e) are able to survive in a restricted area of Mexico for

an indeterminate period of time while trying to obtain an appointment; and (f) are lucky enough to obtain one of the limited number of appointments at certain POEs.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the characterizations of CBP One.

**7.** This Court held in *AOL I* that noncitizens arriving in the United States must be permitted to seek asylum whenever they present themselves at a POE. See *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at \*18, \*20 (S.D. Cal. 2021). There is nothing in U.S. statutes or regulations that allows Defendants to set an artificial cap on the number of noncitizens who can present at a POE to seek asylum. Nor does U.S. law permit Defendants to create a technological barrier that deprives individuals of their statutory right to seek asylum or produces unreasonable and dangerous delays in accessing the U.S. asylum process. Congress "mandated equity in its treatment of all refugees, however they arrived." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021).

**Answer:** The first sentence of Paragraph 7 is a legal conclusion characterizing the *AOL I* summary judgment order, to which no response is required; to the extent the Court requires a response, Defendants deny the allegations. Sentences two and three are legal conclusions containing broad and vague characterizations of U.S. statutes and regulations, which require no response; to the extent the Court requires a response, Defendants deny the allegations, and deny any implication that Defendants have "create[d] a technological barrier" of the sort alleged. Sentence four is a legal conclusion and characterization of caselaw that speaks for itself and requires no response; to the extent a response to sentence four is required, Defendants admit only that the quote from the cited case is accurate, and deny any allegation or implication that Defendants' conduct is not authorized by or does not comply with U.S. statutes or regulations.

**8.** Through the CBP One Turnback Policy, Defendants have injured both organizational and Individual Plaintiffs. This Policy has wreaked havoc on the lives

of Individual Plaintiffs by denying them access to the U.S. asylum process and forcing them to live in dangerous Mexican border towns where they are subject to assault, rape, kidnapping, extortion, and even murder. The CBP One Turnback Policy has harmed Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert a substantial portion of their limited time and resources away from their core programs to counteract the effects of the Policy.

**Answer:** Defendants deny the allegations in paragraph 8, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**9.**    Despite persistent advocacy by Al Otro Lado and Haitian Bridge Alliance, among other organizations, and despite the Individual Plaintiffs' urgent need and right to seek asylum in the United States, Defendants show no signs of ending their illegal CBP One Turnback Policy. Accordingly, Plaintiffs require the intervention of this Court to declare that Defendants' conduct violates U.S. and international law, enjoin Defendants from violating the *Accardi* doctrine, vacate the CBP One Turnback Policy, and order Defendants to implement procedures to ensure effective compliance with the law and Defendants' own written guidance. Absent this Court's intervention, Defendants' unlawful conduct will continue to imperil the lives and safety of countless vulnerable individuals seeking asylum.

**Answer:** Defendants deny the allegations in the first sentence of Paragraph 9, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. The second and third sentences of Paragraph 9 contain legal conclusions and characterizations of the relief sought, to which no response is required. To the extent the Court requires a response to the second and third sentences of Paragraph 9, Defendants deny the allegations, and specifically deny that Defendants have engaged in in conduct that violates U.S. and international law and the *Accardi* doctrine, and deny that Plaintiffs merit the relief sought.

## II. PARTIES

### A. Plaintiffs

**10.**    Plaintiff Al Otro Lado, Inc. ("AOL") is a non-profit advocacy and legal services organization incorporated in California and based in Los Angeles, with offices in San Diego, California, and Tijuana, Mexico. AOL's mission is to uplift immigrant communities by defending the rights of migrants against systemic injustices and fighting for all families that have been torn apart by unjust immigration laws. AOL prioritizes providing holistic legal and humanitarian support to refugees, and other migrants through a multidisciplinary, client-centered, harm reduction-based practice. AOL is the lead organizational plaintiff in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC. AOL provides free direct legal services on both sides of the U.S.-Mexico border and beyond. AOL's Border Rights Project provides legal education, representation, accompaniment, and human rights monitoring for thousands of asylum seekers in Tijuana every year. AOL also documents human rights violations committed by U.S. and Mexican government officials against refugees at the U.S.-Mexico border, which provide a basis for advocacy with U.S. policy makers and international human rights bodies. Defendants have frustrated AOL's mission and forced AOL to divert significant resources away from its core programs to serve individuals and families denied access to the U.S. asylum process based on the CBP One Turnback Policy.

**Answer:** With respect to the first sentence in Paragraph 10, Defendants admit only that Al Otro Lado, Inc. ("AOL") is a non-profit organization incorporated in California in 2014, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sentence, and therefore deny them. With respect to the second and third sentences in Paragraph 10, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them. With respect to the fifth sentence in Paragraph 10, Defendants admit that AOL is the lead organizational plaintiff in *Al Otro Lado, Inc.*

*v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC. With respect to the sixth through eighth sentences in paragraph 10, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them. With respect to the last sentence in paragraph 10, Defendants deny the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**11.**     Plaintiff Haitian Bridge Alliance ("HBA") is a grassroots, non-profit, community-based organization incorporated in California. HBA's main office is located in San Diego, California, and they also have offices in Tijuana, Reynosa, and Tapachula, Mexico. HBA's mission is to assist Haitian and other immigrants to acclimate to the United States and ensure their success in navigating their new lives. HBA focuses on Black people, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA regularly brings delegations to the border to provide legal orientations and Know Your Rights trainings to migrants from Haiti, the Caribbean, and Africa; interview individuals and family units to identify systemic issues uniquely affecting Black migrants; and support HBA's advocacy for fair U.S. immigration policies. Members of these delegations also assist HBA staff in assessing individuals' eligibility for relief and identifying those with vulnerabilities that may require immediate assistance. Defendants have frustrated HBA's mission and forced HBA to divert significant resources away from its core programs to serve noncitizens denied access to the U.S. asylum process based on the CBP One Turnback Policy.

**Answer:** With respect to the first through sixth sentences in paragraph 11, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them. With respect to the last sentence in paragraph 11, Defendants deny the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**12.**    Michelle Doe is a citizen of Nicaragua attempting to apply for asylum with her one-month-old baby after fleeing an abusive partner, a Mexican citizen, who threatened to kill her. She presented herself at the San Ysidro POE with her newborn child in mid-July 2023. At the San Ysidro POE, she told a CBP officer that she wanted to seek asylum. When asked if she had an appointment, Michelle explained she did not have a working phone. The officer called his supervisor, who said that people cannot cross without using the CBP One app. After being turned back at the POE, Michelle and her baby went to AOL's office to help find shelter. To date, Michelle has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**13.**    Diego Doe is a citizen of Mexico attempting to apply for asylum because he fears persecution and retribution on the basis of his work for the Mexican government. After fleeing his home state and traveling to Nogales, Mexico, Diego went to the Nogales, Arizona POE to seek asylum. He was told he needed to put his name on a list and wait outside the POE for two to three weeks. Diego then traveled to Tijuana, Mexico, and attempted to seek asylum at the bridge that crosses from the Tijuana airport, but the CBP officer on duty ignored him and turned his back. On July 26, 2023, Diego and his wife attempted to present at the San Ysidro East POE. Diego explained to CBP that his life is in danger in Mexico and he cannot use CBP One because he does not have a sponsor in the United States and the app will not allow him to request an appointment without that information. The CBP officer told Diego to speak to Mexican immigration officials about his issues with the app. To date, Diego has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

14.     Natasha Doe is a citizen of Haiti attempting to apply for asylum with her five-year-old child after fleeing violence in Haiti. She arrived at the border in Matamoros in mid-March 2023 without a cell phone. In April, a friend loaned her a phone and helped her register on the CBP One App. Over the next few months, Natasha participated in two group registrations and a second individual registration on another friend's phone in an effort to get a CBP One appointment. Out of desperation, Natasha set out for a POE in early-July 2023 to seek asylum. She and her child traveled to Piedras Negras, Mexico. There, she met other Haitians who told her that she would be turned back at the border without a CBP One appointment. Acting on this advice, she did not present herself at the POE and returned to Matamoros, where she lives outside under a gas station awning. To date, Natasha has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

15.     Pablo Doe is a citizen of Honduras attempting to apply for asylum after fleeing gang violence and extortion in April 2023. During his journey, he was assaulted and his telephone, life savings, and personal items were stolen. Pablo arrived in Ciudad Juarez, Mexico, in May 2023. He registered on CBP One; however, the application routinely stalls, freezes, and has an update that he has been unable to download. The error messages appear in English, a language that he does not understand, and sometimes the screen displays nothing but indecipherable computer code. In early-July 2023, Pablo went to the Paso Del Norte Bridge in El Paso, Texas, to seek asylum. At the midpoint of the bridge, two CBP officers told

him he could not apply for asylum without a CBP One appointment. Pablo told them he could not get the application to work, did not understand the error messages in English, and did not feel safe in Mexico. The officers told him that was not their problem. A few days later, Pablo again tried to present at the POE in El Paso. Before he arrived at the bridge, a group of armed men in a civilian car stopped him and told him he was not going to cross without paying them $600 to enter the bridge. He instead returned to Ciudad Juarez to wait. To date, Pablo has been unable to obtain a CBP One appointment or access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

16.    Laura Doe is a Mexican citizen who fled her home after a criminal organization disappeared her husband and father-in-law. She learned about CBP One while she was still in her home state, but her phone was too old to download the app. With assistance from a relative abroad, Laura bought a new phone, and since June 1, 2023, has tried every day to get a CBP One appointment. At the end of the process when she is about to request an appointment, she almost always gets error messages that require her to close the application and reopen it, which does not resolve the issue. Laura arrived in Tijuana in mid-June 2023. In mid-July 2023, Laura approached the Otay Mesa, California POE. CBP officers turned her back because she did not have a CBP One appointment. To date, Laura has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

17.    Plaintiff Elena Doe is a Mexican citizen and the mother of two young children, including an infant. She fled her home at the end of April 2023 due to the threat of familial and cartel violence and has been in hiding in Tijuana. Elena

traveled to the Ped West entrance at the San Ysidro POE in Tijuana to seek asylum. While she was waiting in line, a Mexican immigration official informed Elena that she could not get through without a CBP One appointment and directed her to a Mexican government building for assistance. Elena registered on the CBP One app, but has not been able to get an appointment for three months. In mid-July, Elena again tried to seek asylum at the San Ysidro POE, this time accompanied by an AOL staff member. At the POE, CBP officers laughed at Elena's attempts to present without a CBP One appointment and refused to allow her to proceed. Elena left because the CBP officers would not allow her to proceed. To date, Elena has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**18.** Plaintiff Alexander Doe is a Russian citizen from Chechnya with a wife and three children. He fled Chechnya because of threats stemming from his political views not aligning with those of the Russian Federation, and is attempting to apply for asylum. After arriving in Tijuana in May 2023, Alexander downloaded and registered on the CBP One app upon the advice of other migrants. In mid-June 2023, after nearly a month of trying to obtain a CBP One appointment, he twice attempted to present at the San Ysidro POE to seek asylum, but was turned back both times by a CBP officer. The first time, Alexander asked the CBP officer for assistance in English because the app was displaying an error message he did not understand; he was told to go back to Mexico and to keep trying to use the app. The second time, Alexander explained to a CBP officer at the limit line between the U.S. and Mexico that he was seeking political asylum and refuge in the United States; the CBP officer told him to "get the fuck out of here" and pushed him backwards onto the cement, causing bruising. Alexander has continued to try to obtain a CBP One appointment

every day from Tijuana. To date, he has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Because Alexander Doe has voluntarily dismissed his claims, *see* ECF No. 35, no response to Paragraph 18 is required. To the extent a response is required, Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**19.**     Luisa Doe is a citizen of Mexico attempting to apply for asylum with her two young children. She arrived in Tijuana, Mexico, in early-June 2023 after fleeing a criminal organization that targeted her based on her cooperation with local police and her family connections. Since arriving in Tijuana, Luisa has been trying daily to get a CBP One appointment for herself and her children, but has instead confronted repeated error messages and glitches. These include instructions to delete and reinstall the app and messages incorrectly stating that she is not in the correct geographic region to request an appointment. At the end of June 2023, Luisa went to the San Ysidro POE to seek asylum. CBP officials blocked her from entering and told her she needed a CBP One appointment. In mid-July 2023, Luisa went back to the San Ysidro POE. Mexican officials stopped her, but she insisted on speaking to a U.S. official. When Luisa informed two CBP officers at the POE that she needed to seek asylum, they responded that the only way to do so was through a CBP One appointment. Despite knowing that Luisa was Mexican and therefore did not need a CBP One appointment, the CBP officers threatened to call Mexican officials to take her away if she did not leave. Luisa continues to attempt to secure a CBP One appointment daily, without success. To date, Luisa has been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**20.** Plaintiff Guadalupe Doe is a citizen of Mexico attempting to apply for asylum after fleeing her hometown on account of extreme domestic violence that threatened her life. Guadalupe traveled to Tijuana with her mother, Plaintiff Somar Doe, and her three children, who are also seeking asylum. They arrived in Tijuana in early-June 2023, and immediately went to the San Ysidro POE to present themselves. However, the CBP officer at the border told them they needed a CBP One appointment or they could wait in a line that had not moved in days. Fearful of waiting on the street with her children, Guadalupe and her family found a shelter to stay in. They registered on the CBP One app and began trying to get appointments. In late-July 2023, Guadalupe and her family attempted to present at the Ped West San Ysidro POE, accompanied by a staff member from AOL. When Guadalupe explained that she and her family were trying to seek asylum but had been unable to get a CBP One appointment, a CBP officer suggested that they apply separately from Plaintiff Somar Doe. When the AOL staff member inquired about placing them on an emergency list given Guadalupe's ex-husband's connections to organized crime, the CBP officer directed them to speak to Mexican immigration officials at the Ped East POE. To date, Guadalupe and her family have been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**21.** Plaintiff Somar Doe is a citizen of Mexico and the mother of Plaintiff Guadalupe Doe. Somar fled her hometown in Mexico with Guadalupe and her three grandchildren after her son-in-law threatened violence against Guadalupe, the children, and Somar. She now hopes to seek asylum in the United States. Upon arriving in Tijuana in June 2023, Somar, Guadalupe, and Somar's grandchildren attempted to seek asylum at the San Ysidro POE. They were turned away, as described in Paragraph 20. In late-July 2023, Somar and her family attempted to

present at the Ped West San Ysidro POE, and they were again turned away, as described in Paragraph 20. The family is currently living at a migrant shelter in Tijuana and has been trying to obtain CBP One appointments for nearly two months. To date, Somar and her family have been unable to obtain a CBP One appointment or otherwise access the U.S. asylum process at a POE.

**Answer:** Defendants deny the allegations in the last sentence of this paragraph, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**B. Defendants**

22.    All Defendants are sued in their official capacities.

**Answer:** Admit.

23.    Defendant Alejandro N. Mayorkas is the Secretary of the U.S. Department of Homeland Security ("DHS"), a cabinet-level department of the federal government. Defendant Mayorkas is responsible for the administration of U.S. immigration laws pursuant to 8 U.S.C. § 1103. He oversees each of the component agencies within DHS, including Customs and Border Protection ("CBP"), and has ultimate authority over all DHS policies, procedures, and practices, including the CBP One Turnback Policy. Defendant Mayorkas is a defendant in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.).

**Answer:** Defendants deny the existence of a "CBP One Turnback Policy" and thus deny that any official at DHS or CBP has authority over a nonexistent policy, but otherwise admit the allegations in this paragraph.

24.    Defendant Troy A. Miller is the Senior Official Performing the Duties of the Commissioner of CBP, the DHS component responsible for implementing the CBP One Turnback Policy. Defendant Miller, who reports to Defendant Mayorkas, is a supervisory official with direct authority over all CBP policies, procedures, and practices, and responsibility for overseeing the implementation of the CBP One

Turnback Policy at POEs. Defendant Miller oversees a staff of more than 60,000 employees, manages a budget of more than $14 billion, and exercises authority over all CBP operations. Defendant Miller's predecessor, Chris Magnus, was a defendant in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.).

**Answer:** Defendants deny the existence of a "CBP One Turnback Policy" and thus deny that any official at DHS or CBP has authority over or is responsible for implementing a nonexistent policy, but otherwise admit the allegations in this paragraph.

25.    Defendant Diane J. Sabatino is the Acting Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including the operations of POEs. Defendant Sabatino, who reports to Defendant Miller, is a supervisory official responsible for implementing the CBP One Turnback Policy at POEs. She exercises authority over 20 major field offices and 328 POEs, oversees a staff of more than 31,000 employees, and manages a budget of more than $6.5 billion. Defendant Sabatino's predecessor, Pete R. Flores, was a defendant in *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.).

**Answer:** Defendants deny the existence of a "CBP One Turnback Policy" and thus deny that any official at DHS or CBP is responsible for implementing a nonexistent policy, but otherwise admit the allegations in this paragraph.

### III. JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1350.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

**27.**     The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants admit that courts have authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, but deny any implication that such relief is appropriate in this case.

**28.**     Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred at or in the vicinity of the San Ysidro POE, the busiest Class A POE on the U.S.-Mexico border. A number of the Individual Plaintiffs attempted to present themselves for inspection and processing at either the San Ysidro POE or the Otay Mesa POE, both of which are located in this district. Witnesses who observed turnbacks pursuant to the CBP One Turnback Policy at the San Ysidro POE or the Otay Mesa POE are likely to be within this judicial district. Moreover, both Plaintiff Al Otro Lado and Plaintiff Haitian Bridge Alliance maintain offices within this judicial district. Defendants' implementation of the CBP One Turnback Policy happens largely on U.S. soil. CBP officers implementing the Policy are standing on U.S. soil when they turn back arriving noncitizens. Even in instances where Mexican immigration officers conduct the actual turnbacks, they—at the behest of their CBP counterparts—direct arriving noncitizens to utilize CBP One, which sends the information it collects to servers in the United States and funnels information to Defendants in the United States.[1] Defendants use information generated by CBP One to make decisions about their use of resources in the United States.

---

[1] See, e.g., U.S. Dep't of Homeland Sec., No. DHS/CBP/PIA-068, *Privacy Impact Statement for CBP One* 4 (Feb. 19, 2021), https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf ("Regardless of the function, CBP One

**Answer:** With respect to the first sentence of paragraph 28, this consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response to the first sentence is required, Defendants admit that venue is proper in the Southern District of California, and admit that the San Ysidro POE is the busiest land POE on the U.S.-Mexico border, but lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this sentence, and therefore deny them. With respect to the second through fourth sentences of paragraph 28, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. With respect to the fifth through eighth sentences of paragraph 28, Defendants admit only that information entered into CBP One is stored in CBP's back-end systems within the United States, and deny the remainder of the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

## IV. LEGAL BACKGROUND

**A. Statutory Protections for Asylum Seekers**

29.    This Court previously addressed the government's statutory obligations with respect to noncitizens arriving at POEs, finding that Congress "intended [8 U.S.C. § 1158(a)(1)] to apply to asylum seekers in the process of arriving" in the United States, even if they have not quite reached the U.S. border. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1202 (S.D. Cal. 2019); *Al Otro Lado, Inc.*, 2021 WL 3931890, at *7-8. A motions panel of the U.S. Court of Appeals for the Ninth Circuit found that this court's "linguistic and contextual analysis" of the

---

does not store any information locally on the device. CBP pushes all information collected through CBP One to back-end systems associated with functions the user is using.").

relevant statutory provisions "has considerable force" and "is likely correct." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020).

**Answer:** This paragraph sets forth statements of law that require no response. To the extent the Court requires a response, Defendants deny that this Court (that is, the Hon. Andrew G. Schopler) previously addressed in a prior case the government's statutory obligations with respect to noncitizens arriving at POEs, and aver that the cited opinions speak for themselves and are the best evidence of their contents, and deny any allegations or characterizations that are inconsistent therewith.

**30.**     The INA provides that: "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or . . . section 1225(b)." 8 U.S.C. § 1158(a)(1).

**Answer:** This paragraph sets forth statements of law that require no response. To the extent the Court requires a response, Defendants admit that Paragraph 30 accurately quotes a portion of the Immigration and Nationality Act, as codified.

**31.**     An implementing regulation more broadly defines "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of means of transport." 8 C.F.R. § 1.2 (2023).

**Answer:** This paragraph sets forth statements of law that require no response. To the extent the Court requires a response, Defendants admit only that paragraph 31 accurately quotes a portion of the Code of Federal Regulations, which speaks for itself, and deny any characterizations that are inconsistent therewith.

**32.**     By using the phrase "arrives in" in 8 U.S.C. § 1158(a)(1), the statute "plainly covers a[] [noncitizen] who may not yet be in the United States, but who is in the process of arriving in the United States through a POE." *Al Otro Lado, Inc,* 394 F. Supp. 3d at 1200; *see also Al Otro Lado, Inc.*, 952 F.3d at 1013. The text of 8 U.S.C. § 1158(a)(1) encompasses "two classes of [noncitizens] who may apply for asylum: (1) a[] [noncitizen] 'who is physically present in the United States' and (2) any [noncitizen] 'who arrives in the United States.'" *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1199. Applying the rule against surplusage, "the Court must presume that these phrases 'mean different things.'" *Id.* (citation omitted). Thus, the statute cannot be read to allow only noncitizens who are physically present in the United States to apply for asylum, and the phrase "arrives in" must connote something different than physical presence in the United States. *See id.* Moreover, Congress' use of verb tense, the statutory context, and relevant legislative history further confirm that § 1158(a)(1) applies to noncitizens in the process of arriving. *See id.* at 1200-01; *Implementation of Title III of the Illegal Immigration Reform & Immigration Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary,* 105th Cong. 17-18 (1997) (letter from Lamar Smith, Chairman, Subcomm. on Immigr. & Claims, to Dir., Pol'y Directives & Instructions Branch, INS).

**Answer:** This paragraph sets forth legal conclusions that require no response. To the extent the Court requires a response, Defendants deny the allegations and specifically deny that § 1158(a)(1) applies to noncitizens who are not on U.S. soil.

**B. Constitutional Protections for Asylum Seekers**

**33.**     The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. In addition, where Congress has granted statutory rights and has directed an agency to establish a procedure for providing such rights, the Constitution requires the government to

establish a fair procedure and to abide by that procedure. In the asylum context, U.S. law mandates that asylum seekers be provided with such process. "In the enforcement of [congressional] policies, the Executive Branch of the Government must respect the procedural safeguards of due process[.]" *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972) (citation omitted).

**Answer:** This paragraph consists of statements and conclusions of law that require no response. To the extent the Court requires a response: Defendants admit that the first sentence of Paragraph 33 accurately quotes the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Defendants deny the allegations of the second and third sentences of Paragraph 33. With respect to the fourth sentence of Paragraph 33, Defendants admit that the sentence accurately quotes a portion of the cited opinion, but deny any implication that it is applicable to Plaintiffs' asserted constitutional claims.

34.    The INA and its implementing regulations provide Individual Plaintiffs with the right to be inspected and processed at a POE and granted access to the asylum process. See, e.g., 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2). These rights form the basis of Individual Plaintiffs' due process claims.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, with respect to the first sentence of Paragraph 34, Defendants deny the allegations and admit only that a noncitizen who is on U.S. soil may seek asylum in the manner prescribed by and under any substantive requirements set forth by statute and regulation. With respect to the second sentence of Paragraph 34, Defendants admit that the Individual Plaintiffs assert a due process claim based on the cited statutory provisions, but otherwise deny the allegations and deny that Individual Plaintiffs can state a claim for a constitutional due process violation.

**C. International Legal Protections for Asylum Seekers**

**35.**    The Office of the United Nations High Commissioner for Refugees ("UNHCR") has described non-refoulement as "the cornerstone of international refugee protection," and notes that it is "of particular relevance to asylum-seekers." U.N. Refugee Agency, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol, ¶¶ 5-6 (Jan. 26, 2007), https://www.unhcr.org/media/advisory-opinion-extraterritorial-application-non-refoulement-obligations-under-1951-0. A primary treaty source for the duty of non-refoulement is the 1951 Convention on the Rights of Refugees. Article 33 of the Convention prohibits a state from returning

> "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

1951 Convention and Protocol relating to the Status of Refugees, 189 U.N.T.S. 137, 176, Art. 33(1), entered into force 22 Apr. 1954 (emphasis added). As UNHCR has explained, the Treaty's emphasis on "any manner" of refoulement reflects a state duty to avoid using direct or indirect ways of subjecting a person to a risk of return to persecution. U.N. Refugee Agency, Advisory Opinion at 7.

**Answer:** This paragraph contains statements and conclusions of law to which no response is required, particularly because the claim to which this assertion relates has been dismissed. Order Granting in Part and Denying in Part Motion to Dismiss (MTD Order), ECF 90, at 21–23. To the extent the Court requires a response, Defendants state that the cited portions of the advisory opinion and the 1951 Convention and Protocol relating to the Status of Refugees speak for themselves and are the best evidence of their contents, and Defendants deny any characterizations in this paragraph that are inconsistent therewith, and specifically deny any implications

that the advisory opinion is binding on the United States and that the Refugee Protocol is self-executing.

**36.** The duty of non-refoulement extends not only to a person's country of origin, "but also to any other place where a person has reason to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 Convention, or from where he or she risks being sent to such a risk." *Id.* at 3 (citing UNHCR, Note on Non-Refoulement ¶ 4 (EC/SCP/2), 1977). Accordingly, a state must not only prevent return to danger, but also take affirmative measures to prevent a risk of harm by "adopt[ing] a course that does not result in [asylum seekers'] removal, directly or indirectly, to a place where their lives or freedom would be in danger." *Id.* ¶ 8. In order to effectuate an asylum seeker's right to non-refoulement, the United States is obligated to implement and follow procedures to ensure that the request for asylum is duly and efficiently considered.

**Answer:** This paragraph contains statements and conclusions of law to which no response is required, particularly because the claim to which this assertion relates has been dismissed. MTD Order, at 21–23. To the extent the Court requires a response, Defendants admit only that the Paragraph contains accurate quotes from the cited advisory opinion, but otherwise deny the allegations and characterizations in this paragraph, and deny any implication that the advisory opinion is binding on the United States.

**37.** The norm of non-refoulement at the border is specific, universal, and obligatory. It is so widely accepted that it has reached the status of jus cogens—a norm not subject to derogation.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required, particularly because the claim to which this assertion relates has been dismissed. MTD Order, at 21–23. To the extent the Court requires a response, Defendants deny the allegations.

**D. The Government's Obligation to Follow Its Own Policies**

**38.**    "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974). This principle is known as the *Accardi* doctrine. *See United States Ex Rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004).

**Answer:** This paragraph contains legal conclusions to which no response is required. To the extent the Court requires a response, Defendants admit only that the first sentence accurately quotes from the cited case, but otherwise state that the cited cases speak for themselves and are the best evidence of their contents, and deny any allegations or characterizations inconsistent therewith.

**39.**    The "procedures" that agencies are required to follow include both formal agency regulations and informal operating procedures and guidance. *Alcaraz*, 384 F.3d at 1162; *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants state that the cited cases speak for themselves and are the best evidence of their contents, and deny any allegations or characterizations inconsistent therewith.

**40.**    The *Accardi* doctrine applies "even where the internal procedures are possibly more rigorous than otherwise would be required." *Alcaraz*, 384 F.3d at 1162 (quoting *Morton*, 415 U.S. at 235).

**Answer:** This paragraph consists of statements of law and legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit only that this paragraph contains an accurate quote from the cited cases, but otherwise state that the cited cases speak for themselves and are the best evidence of their contents, and deny any allegations or characterizations inconsistent therewith.

# V. FACTS

## A. Ports of Entry

41.    The United States has three classes of ports of entry. Class A ports of entry are "designated port[s] of entry for all travelers," including noncitizens seeking asylum in the United States.[2]

**Answer:** Defendants admit the allegations in the first sentence of Paragraph 41, with respect to land and sea ports of entry. With respect to the second sentence of Paragraph 41, Defendants admit that Class A ports of entry are designated ports of entry for all noncitizens (and the term "noncitizen" as used by Defendants is synonymous with the term "alien" set forth in 8 U.S.C. § 1101(a)(3)), but deny the remainder of the allegations and characterizations in this sentence.

42.    Class A ports of entry on the U.S-Mexico border that are capable of processing and inspecting pedestrians include San Ysidro, CA; Otay Mesa, CA; Calexico, CA; Tecate, CA; Andrade, CA; Douglas, AZ; Lukeville, AZ; Naco, AZ; Nogales, AZ; San Luis, AZ; Columbus, NM; Santa Teresa, NM; Roma, TX; Progreso, TX; Laredo, TX; Hidalgo, TX; Eagle Pass, TX; Del Rio, TX; El Paso, TX; and Brownsville, TX. In this Complaint, the terms "port of entry" and "POE" refer to Class A ports of entry on the U.S.-Mexico border.

**Answer:** Admit. Defendants further aver that there are additional Class A ports of entry on the U.S.-Mexico border that are capable of processing pedestrians.

43.    Each port of entry reports to a specific Field Operation Office. The four Field Operations Offices that oversee the operation of POEs on the U.S.-Mexico border are the San Diego, Tucson, El Paso, and Laredo Field Offices. The head of each Field Office is the Director of Field Operations ("DFO"). The four DFOs

---

[2] CBP, Class A, B, or C Port of Entry (May 27, 2022), https://www.cbp.gov/travel/international-visitors/visa-waiver-program/port-classes#:~:text=Class%20A%20means%20that%20the,of%20entry%20for%20all%20travelers; 8 C.F.R. § 100.4 (a).

overseeing the Field Offices on the U.S.-Mexico border report to the Executive Director for Operations at OFO, who reports to Defendant Sabatino.

**Answer:** With respect to the first sentence of this paragraph, Defendants admit that each port of entry falls under a Field Office, but deny the characterization "reports to" and deny that the offices are called "Field Operations Offices." Defendants admit the allegations in the second sentence of this paragraph, but deny that the Field Offices are called "Field Operations Offices." Defendants admit the allegations in the third and fourth sentences of this paragraph.

**44.** A Class A POE has multiple missions, including processing and inspecting commercial freight, vehicle traffic, pedestrians, and noncitizens who express a desire to apply for asylum or a fear of persecution or torture in their country of origin. CBP officers at POEs are also responsible for interdicting illicit cargo, such as narcotics, and for anti-terrorism operations.

**Answer:** Admit.

**45.** Each of these duties is co-equal. As this Court previously found, "[n]one of the enumerated lists of various responsibilities and missions" delegated to DHS by Congress "include any indication that Congress intended to supersede the dut[y]" to inspect and process asylum seekers who arrive at POEs. *Al Otro Lado, Inc.*, 2021 WL 3931890, at *11. Indeed, Congress intended for one of DHS' "primary mission[s]" to be to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland"—including inspecting and processing arriving noncitizens at POEs— "are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b). This case focuses on that primary mission—inspecting and processing asylum seekers.

**Answer:** This paragraph consists of legal conclusions and statements of Plaintiffs' case, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in the first sentence of Paragraph 41.

Defendants admit only that the second and third sentences in this paragraph contain accurate quotes of portions of the referenced case and statute, which speak for themselves and are the best evidence of their contents, and otherwise deny the allegations and characterizations, and specifically deny that "this Court" issued the cited opinion. With respect to the fourth sentence of paragraph 45, Defendants admit only that this case focuses on the inspection and processing of asylum seekers, but deny that that is the primary mission of DHS.

**B. Defendants' Long History of Turning Back Arriving Asylum Seekers**

46.     Multiple witnesses in Al Otro Lado, Inc. v. Mayorkas confirmed that Defendants had a long-standing policy of turning back arriving noncitizens, and a long history of attempting to justify turnbacks at POEs by citing pretextual excuses such as "lack of capacity." For example, although Defendants had told the public that they were turning back arriving noncitizens only when POEs were at capacity, a CBP officer who worked at the Tecate, California POE testified that Defendants' "capacity excuse" was a lie.

**Answer:**  Defendants deny the allegations in the first sentence of paragraph 46; specifically, Defendants deny Plaintiffs' characterization of witness testimony in *AOL I*, deny any implication that the *AOL I* Court made any findings regarding pretext, and specifically deny the existence of a "policy of turning back" noncitizens. With respect to the second sentence of paragraph 46, Defendants admit only that deposition testimony was taken from a CBP Officer that worked at the Tecate POE, and that the quoted language comes from that testimony, but deny the remainder of the allegations in this sentence, including the characterizations of the testimony, which in its entirety speaks for itself and is the best evidence of its contents.

47.     In an October 27, 2020 report DHS's Office of Inspector General ("DHS OIG") concluded that "CBP took several actions to limit the number of undocumented [noncitizens] . . . processed each day at the Southwest Border land ports of entry." U.S. Dep't of Homeland Sec., Office of Inspector Gen., No. OIG-21-

02, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry* 6 (2020). For example, "without prior public notice, seven ports of entry stopped processing virtually all undocumented [noncitizens], including asylum seekers." *Id.* at ii. At two other POEs, DHS OIG investigators observed that "CBP had stopped using blocks of available holding cells, allowing those cells to sit empty while asylum seekers and other undocumented [noncitizens] waited in . . . lines in Mexico." *Id.* at 7.

**Answer:** Defendants admit that this paragraph accurately quotes portions of the referenced DHS OIG report, which speaks for itself and is the best evidence of its contents.

**48.** Indeed, CBP's internal records of capacity at POEs on the Mexican border, known as Queue Management Reports or MCAT Reports, showed that most POEs routinely operated well below 100% capacity. Even in the instances where POEs come close to utilizing 100% of their capacity, each POE has operational contingency plans that it can implement to temporarily increase its capacity, such as utilizing space at nearby U.S. Border Patrol stations and substations, using temporary spaces in tents, and relying on video conference technology to conduct virtual interviews of arriving noncitizens.

**Answer:** Defendants admit only that Queue Management Reports or MCAT Reports showed utilization of less than 100% physical holding capacity and that ports and field offices have contingency plans. Defendants deny the remainder of the allegations in this paragraph, and specifically deny any implication that "capacity" of a port of entry is equal to physical holding capacity.

**49.** Defendants also have a history of refusing to commit the turnback policy to writing. Shortly after the November 2016 presidential election, then-DHS Secretary Jeh Johnson held a meeting of senior officials from OFO and CBP. During this meeting, Kevin McAleenan, who was the Assistant Commissioner of CBP at that time, pushed for OFO to begin turning back arriving noncitizens at all Class A

POEs on the U.S.-Mexico border. Then-Commissioner Johnson agreed to McAleenan's proposal. Then-Executive Assistant Commissioner of OFO, Todd Owen, agreed to implement that proposal, but stated that he did not want to put the policy in writing. Instead, OFO's Executive Director of Operations communicated the Turnback Policy to the four Directors of Field Operations for the four OFO field offices responsible for POEs on the U.S.-Mexico border. The four Directors of Field Operations then communicated the policy to the port directors of the POEs on the U.S.-Mexico border.

**Answer:** Defendants deny the allegations in the first sentence of Paragraph 49, and specifically deny the existence of a "turnback policy." Defendants admit the allegations in the second sentence of paragraph 49. With respect to the third and fourth sentences of Paragraph 49, Defendants deny that Johnson was "Commissioner," deny that McAleenan was "Assistant Commissioner" of CBP, and deny that McAleenan "pushed for OFO to begin turning back arriving noncitizens," but admit that then-Deputy Commissioner McAleenan sought approval to increase efforts to meter arrivals of certain noncitizens in order to bring relief to POEs, and admit the remainder of the allegations in these two sentences. With respect to the fifth, sixth, and seventh sentences in paragraph 49, Defendants admit only that then-Executive Assistant Commissioner Owen expressed that OFO was "on board with metering," that he wanted to communicate about metering orally as opposed to writing, and that guidance about metering was communicated to the port directors, but deny the remainder of the allegations and characterizations in these sentences, including to specifically deny the existence of the "policy" alleged by Plaintiffs. Defendants further aver that Deputy Commissioner McAleenan communicated to EAC Owen that "[t]he implementation is subject to your discretion and [the Directors of Field Operations] (and [Port Director]s) on what will work best operationally and whether it is required on any given day or any specific location."

**50.**    More generally, CBP and OFO frequently communicate directives to port directors, assistant port directors, watch commanders, and CBP line officers using a similar procedure, which is known as a "verbal muster." For example, a CBP officer at the Tecate, California POE testified that he was told to turn back arriving noncitizens via a verbal muster.

**Answer:** With respect to the first sentence of paragraph 50, Defendants admit only that directives are communicated to OFO employees via verbal musters, and otherwise deny the allegations and characterizations in this sentence. With respect to the second sentence of paragraph 50, Defendants admit only that a CBP Officer at Tecate testified about a verbal muster, but deny the remainder of the allegations and specifically deny that any officer was directed to "turn back" arriving noncitizens.

**C. Defendants Have Adopted Guidance Prohibiting Turnbacks**

**51.**    On November 1, 2021, Acting CBP Commissioner Troy Miller issued a memorandum titled Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry (the "Guidance"). The memorandum "provides updated guidance for the management and processing" of undocumented noncitizens who present at POEs along the southern border. Guidance at 1. Miller instructed Defendant OFO to "take appropriate measures, as operationally feasible" to increase processing capacity at POEs along the southern border, including by leveraging technology such as the CBP One mobile application. *Id.* at 2. But the memorandum was clear that "asylum seekers or others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a Southwest Border land POE," and that an individual's failure to use CBP One "should not influence the outcome of any inspection." *Id.* This guidance remains effective and has not been rescinded or superseded by CBP.

**Answer:** Defendants admit the allegations in this paragraph, except for the last sentence. With respect to the last sentence, Defendants admit these allegations

as of the time of filing of the Complaint, but deny that the Guidance has since remained effective and has not been superseded, and aver that on June 4, 2024, Troy Miller, as Senior Official Performing the Duties of the Commissioner of CBP, issued a memorandum providing that the Guidance is superseded during time periods when measures described in the Presidential Proclamation, *Securing the Border*, are in effect, and that those measures have been in effect since June 4, 2024.

**D. Promulgation of the Final Asylum Ban Rule**

52.    On May 11, 2023, the Biden administration promulgated a new Rule, dubiously titled "Circumvention of Lawful Pathways" (the "Rule"), which purports to incentivize the use of new "legal" pathways to seek protection, such as nationality-specific parole programs, to reduce the number of people seeking to cross the southern border.[3] The Rule, while erecting barriers to asylum eligibility, contemplates that all noncitizens will be able to access the process for seeking protection by coming to a POE, whether they have a CBP One appointment or not.[4]

---

[3] Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023). On July 25, 2023, a California district court vacated the Rule on the basis that it is contrary to law, arbitrary and capricious, and procedurally invalid, in violation of the Administrative Procedure Act. See *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. 2023). The order has been stayed for 14 days and thus remains in effect as of the date of this filing.

[4] While individuals subject to the Rule may be ineligible for asylum, they remain eligible for statutory withholding of removal and protection under Article 3 of the Convention Against Torture ("CAT"). 8 C.F.R. § 208.33(b)(2); *see also* 88 Fed. Reg. at 31,318. Under the Rule, anyone barred from establishing eligibility for asylum— e.g., because they presented at a POE without a CBP appointment—should still have the opportunity to show that they face a reasonable possibility of persecution or torture in their designated country or countries of removal, and thus potentially win relief from removal that would enable them to remain in the United States. 88 Fed. Reg. at 31,318. As such, the "asylum process" referenced in this Complaint encompasses the processes for establishing eligibility for asylum, withholding of removal, and CAT protection.

The Rule's preamble further clarifies that CBP is required to inspect and process all asylum seekers who present at POEs.

**Answer:** With respect to the first sentence of paragraph 52, Defendants admit that on May 11, 2023, the Biden administration promulgated a new rule titled "Circumvention of Lawful Pathways" (the "Rule"), but deny the characterizations of The Rule. With respect to footnote 3, Defendants admit the allegations as of the time of the filing of the Complaint, and aver that the Rule remains in effect. With respect to footnote 4, Defendants admit that Plaintiffs define the "asylum process" to include the processes for establishing eligibility for asylum, withholding of removal, and CAT protection; the remainder of the footnote contains a characterization of the Rule, which speaks for itself and is the best evidence of its contents, and Defendants deny any allegations inconsistent therewith. With respect to the remainder of the Paragraph, which consists of Plaintiffs' characterization of the Rule: Defendants admit only that the Rule's preamble states that it is CBP's policy not to turn back noncitizens who seek to present at a port of entry, and that the Rule address asylum eligibility, but otherwise deny the allegations and characterizations in this paragraph.

53.     The Rule makes ineligible for asylum all individuals who transited through a third country en route to the United States (i.e., all non-Mexicans). 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1); *see also* 88 Fed. Reg. 31314 (May 16, 2023). Under the rule, this bar to asylum will not apply if a person seeking asylum in the United States (i) applied for and received a denial of protection in a transit country; (ii) obtained advance permission to travel to the United States through an approved parole program; or (iii) obtained an appointment to present through CBP One. 8 C.F.R. §§ 208.33(a)(2)(ii), 1208.33(a)(2)(ii).[5] Despite the other exceptions, as a

practical matter for most people at the southern border, CBP One is the exclusive means through which they can seek asylum at a POE.

**Answer:** The first and second sentences and footnote 5 of this paragraph consist of Plaintiffs' legal conclusions concerning the Rule, which require no response. To the extent the Court requires a response, Defendants deny the allegations, and aver that the Rule imposes a rebuttable presumption of asylum ineligibility rather than a "bar" to asylum. With respect to the third sentence of paragraph 53, Defendants deny that noncitizens "seek asylum at a POE," deny Plaintiffs' characterization of the Rule, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

54.    The Rule also provides an exception to its bar on asylum if the noncitizen "presented at a port of entry without a pre-scheduled time and place [i.e., without a CBP One appointment], if the [noncitizen] demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

**Answer:** This Paragraph consists of a legal conclusion that requires no response. To the extent the Court requires a response, Defendants deny Plaintiffs' characterization of the Rule.

55.    The Rule provides further that its bar on asylum will not apply if a noncitizen "demonstrate[ing] by a preponderance of the evidence that exceptionally compelling circumstances" exist, such as facing "an acute medical emergency" or "imminent and extreme threat to life or safety," or having been a "victim of a severe form of trafficking." 8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i).

---

[5] In addition, the Rule exempts unaccompanied children. 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i).

**Answer:** This Paragraph consists of a legal conclusion that requires no response. To the extent the Court requires a response, Defendants deny Plaintiffs' characterization of the Rule.

**56.**    Nonetheless, in practice, the CBP Turnback Policy precludes most individuals without CBP One appointments (including many Mexicans, who are not even subject to the Rule) from presenting at POEs or even asserting that they fall into any of the exception categories.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**57.**    To establish an exception to the asylum bar for either the inability to use CBP One or exceptionally compelling circumstances, a noncitizen must have access to the POE. The regulatory language recognizes as much with respect to the inability to use CBP One, as it applies to a noncitizen who "presented at a port of entry without a pre-scheduled time and place."

**Answer:** This Paragraph contains Plaintiffs' characterization of the Rule to which no response is required. To the extent the Court requires a response, Defendants deny the allegations and characterizations in this Paragraph.

**58.**    The preamble to the Rule repeatedly articulates Defendants' official position of allowing individuals who present at a POE without a CBP One appointment to be inspected and processed for the purpose of seeking access to the asylum process.

**Answer:** This paragraph consists of Plaintiffs' characterization of the preamble, to which no response is required. To the extent the Court requires a response, Defendants state that the preamble to the Rule speaks for itself and is the best evidence of its contents, and deny the allegations and characterizations that are inconsistent therewith.

**59.**    For example, the preamble states that "CBP's policy is to inspect and process all arriving noncitizens at POEs, regardless of whether they have used the

CBP One app," that "[i]ndividuals without appointments will not be turned away," and that an advance appointment is "not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed." 88 Fed. Reg. at 31,358 (emphasis added) (citing the Guidance).

**Answer:** Admit.

60. The preamble makes this assertion—that CBP will process all individuals who present at a POE without regard to whether the individual has a CBP One appointment—over and over. See 88 Fed. Reg. at 31,358, 31,365, 31,392, 31,396, 31,399, 31,401 n.240. But as described below, instead of complying with this internal guidance, CBP has instead adopted a policy of turning back asylum seekers who do not have a CBP One appointment, regardless of the reasons for their inability to access the CBP One app.

**Answer:** The first sentence of paragraph 60 consists of Plaintiffs' characterization of the preamble to the Rule, to which no response is required; to the extent the Court requires a response, Defendants deny the characterization. With respect to the second sentence of paragraph 60, Defendants deny the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**E. The CBP One App and Its Limitations**

61. Despite explicitly and officially disavowing turnbacks, upon the termination of Title 42 on May 12, 2023, Defendants continued their practice of turning back arriving noncitizens at POEs—this time under the guise of CBP One. Instead of providing the Individual Plaintiffs and proposed class members access to POEs, Defendants effectively forced them to use the CBP One app. This means that access to the U.S. asylum process at POEs is now entirely dependent on factors that Congress never considered and that appear nowhere in the INA. For example, arriving noncitizens must now have the right type of smartphone, be able to read the correct languages, and have access to the internet in order to seek asylum at a POE.

And even if an asylum seeker is lucky enough to meet all of these arbitrary and unwritten rules for seeking asylum at a POE, they must wait indefinitely, often in unsafe Mexican border towns in the hope that the app will one day allow them to reserve a time to come to a POE. But there is no guarantee that will happen because the app also imposes arbitrary caps on the number of asylum seekers that can present themselves at a POE for inspection and processing. This is not, and never has been, the law. The INA does not permit Defendants to impose de facto language and income tests before a refugee can seek asylum in the United States. But that is exactly what Defendants have done.

**Answer:** Defendants deny the allegations in this paragraph, and specifically deny Plaintiffs' characterization of CBP One's purpose and use, role in the asylum process, deny any practice of "turning back" individuals who approach POEs, deny Plaintiffs' characterizations of "arbitrariness" throughout, and deny the imposition of "language and income tests."

### 1. How CBP One Functions

**62.**    In August 2018, CBP began developing CBP One to have a single portal for a variety of services provided by different CBP mobile apps. When CBP announced the official launch of CBP One in October 2020, the app had limited capabilities that did not include processing of asylum seekers.

**Answer:** Defendants admit that CBP began development of CBP One in 2018 to have a single application for a variety of CBP services, and that CBP One was launched in October of 2020, but deny the remainder of the allegations and characterizations in this paragraph.

**63.**    Nonetheless, CBP began using CBP One to process arriving noncitizens at POEs in spring 2021 during the wind-down of MPP. MPP had already forced tens of thousands of asylum seekers to wait in Mexico, some for years. Since then, while the agency has released various updates to the app, certain aspects have remained static: users must have an up-to-date smartphone, an account with an app

store that carries CBP One, a strong and reliable internet or data connection, access to a stable electricity source, and be able to read and type in one of a limited number of languages to successfully navigate CBP One.

**Answer:** With respect to the first sentence of paragraph 63, Defendants admit only that starting in February of 2021, CBP One offered International Organizations (IOs) the capability to check case status for individuals during the winddown of the Migrant Protection Protocols (MPP) and that in April 2021, CBP developed a capability to permit IOs and certain Non-Government Organizations (NGOs) to assist individuals in submitting advance information and scheduling a time to present at a POE to be considered for an exception to the Title 42 public health Order (Title 42 Order), but deny the remainder of the allegations and characterizations in the first sentence of this paragraph.  With respect to the second sentence of paragraph 63, Defendants admit only that MPP was a program under which certain noncitizens were returned to Mexico pending removal proceedings in the United States pursuant to 8 U.S.C. § 1225(b)(2)(C), but otherwise deny the allegations and characterizations in this sentence. With respect to the third sentence of paragraph 63, Defendants admit only that a powered-on smartphone with an internet or data connection and the latest version of the CBP One app is required to make a CBP One appointment to present at a POE, and that the CBP One app must be downloaded from an app store that carries the CBP One app, but deny the remainder of the allegations and characterizations in this sentence, and specifically deny that the smartphone must be "up to date" (which is vague and undefined), that a smartphone is required to register for CBP One, or that CBP One users must be able to read and type in a limited number of languages.

64. Using CBP One to seek an appointment at a POE involves a multi-step process, the specifics of which have shifted over time but the general features of which have remained constant. An individual must sign in to an authorized mobile app store, such as the Apple App Store or Google Play Store. The individual must

then establish a stable, sustained internet connection through which to download CBP One. After downloading the app from an online mobile application store, accepting the terms and conditions, and installing the app on their smartphone, an individual must create an account at Login.gov—a website that provides account management and user authentication services for participating federal government agencies. To do so, the user must provide personally identifiable information (including an email address and a phone number), create a password, and set up multi-factor authentication. Only then can the individual enter their information into the CBP One app and take the required steps to attempt to schedule an appointment at a POE.

**Answer:** With respect to the first sentence of paragraph 64, Defendants admit that using CBP One to obtain an appointment at a POE is a multi-step process from registration to appointment confirmation, but otherwise deny the allegations and characterizations in this sentence. With respect to the second sentence of paragraph 64, Defendants admit only that access to a mobile app store is required to download CBP One onto a smartphone, but otherwise deny the allegations and characterizations in this sentence. With respect to the third sentence of paragraph 64, Defendants admit only that Wi-Fi or cellular data is required to download CBP One, but otherwise deny the allegations and characterizations in this sentence. With respect to the fourth and fifth sentences of paragraph 64, Defendants admit that individuals are required to create a Login.gov account to register with CBP One, and that such registration requires the submission of personal information, the creation of a password, and the use of multi-factor authentication, but otherwise deny the allegations and characterizations in this sentence. With respect to the sixth sentence of paragraph 64, Defendants admit that personal information is required to register for CBP One and to make a CBP One appointment, but deny the remainder of the allegations and characterizations in this sentence. Defendants further aver that those

who enter the United States at a POE without a CBP one appointment are also required to give personal information during primary or secondary processing.

**65.** Once an individual has successfully logged into the app, they must enter extensive biographic and biometric information—including date and place of birth; country of citizenship and residence; height; weight; hair and eye color; marital status; parentage; travel document number, issue, and expiration date; employment history; any countries traveled through in the previous year with the relevant dates; and destination address and emergency contact in the United States (for each member of their traveling group)—before being prompted to request an appointment. After indicating they are a traveler at a land border seeking an advance appointment, they are able to fill out their profile, including activating geolocation capability to confirm their location and taking a live video selfie to validate that a live person is present at the time of submitting the registration.

**Answer:** With respect to the first sentence of paragraph 65, Defendants admit that biographic and biometric data is required to be entered in order to request a CBP One appointment, but Defendants deny that all pieces of information listed are required, as several pieces of information are optional including height, weight, travel document number, issue and expiration date, and deny that destination address and emergency contact are required for each member of the traveling group. With respect to the second sentence of paragraph 65, Defendants admit that the CBP One app asks travelers to confirm they are seeking an advance appointment at a land border before filling out their profile and activating geolocation, and admit that generally, geolocation is required to confirm their location, but deny that a live video selfie is required at the time of submitting the registration.

**66.** The principal applicant can include family members by adding their personal biographic and biometric information, including a photograph of each person. If an individual erroneously submits their registration with a mistake, there

is no option for correcting it; rather, the CBP guide advises deleting the registration and beginning again.

**Answer:** With respect to the first sentence of paragraph 66, Defendants admit that the principal applicant can include family members in their registration by adding the family members' personal biographic and biometric information, including a photograph. With respect to the second sentence of paragraph 66, Defendants admit that if an individual submits information while registering that they later wish to correct, they must delete their registration and begin the registration again.

**67.** The CBP guide for using the app is 47 pages long.

**Answer:** Admit. Defendants further aver that the user guide for CBP One uses screen shots and visual graphics along with simplified instructions in large font to provide a step-by-step guide for multiple functionalities within the app. Defendants further aver there is a 1-page quick reference guide for CBP One in the following languages: English, Spanish, Haitian Creole, Russian, Portuguese, French, Arabic, Dari, Pashto, Punjabi, Simplified Chinese and traditional Chinese.

**68.** CBP One's facial recognition technology, use of GPS tracking, and data storage methods raise significant privacy and surveillance concerns for asylum seekers. CBP initially sought to address privacy concerns raised by CBP One by insisting that its use was voluntary. A CBP Information Collection Notice issued in September 2021 states that providing advance information to CBP "is not a prerequisite for processing under Title 8."[6] But as discussed above, use of CBP One is no longer voluntary, as it has become the only way for most noncitizens to access the U.S. asylum process.

---

[6] 86 Fed. Reg. 53,667, 53,667 (Sept. 28, 2021).

**Answer:** Defendants deny the allegations in the first and second sentences in paragraph 68. Specifically, Defendants deny the characterization of CBP One's privacy implications and CBP's manner of addressing privacy issues, and aver that in 2021 CBP issued a Privacy Impact Assessment (PIA) to address privacy risks in the deployment and use of CBP One, which stated: "The geolocation information collected from CBP One™ users will not be used to conduct surveillance or track traveler's movement. CBP does not track the location of the traveler's device beyond the time of submission of the data. At the time the user submits his or her exit or entry, the device's GPS is pinged by CBP One™ and the latitude and longitude coordinates are sent to CBP. The GPS ping is only collected at the exact time the user pushes the submit button and is used to confirm the traveler's device is in some cases inside a certain CBP-defined radius or outside the United States. The latitude and longitude information captured is not visible to CBP Officers or Agents." CBP/Privacy Impact Assessment(PIA)-068 CBP One™ Mobile Application, 10, (February 19, 2021), privacy-pia-cbp068-cbpmobileapplication-may2023.pdf (dhs.gov). Further, in July 2024, an update to the 2021 PIA was issued directly addressing data retention and storage. It noted that, "[t]o create a user profile, the CBP One™ application collects and stores the first and last name of the user. Once a user profile is created, this information is stored locally on the user's device (for the mobile application submissions) and in local web storage (for the website application). The local storage enables users to quickly retrieve information submitted through the application for subsequent use. No other biographic information is collected or stored locally on the mobile device or in web storage. No biometric information is collected as part of the user profile or stored locally on the mobile device or in web storage." CBP PIA Update DHS/CBP/PIA-068(a) CBP One™, 2, (July 25, 2024), 24_0725_priv_pia-cbp-068(a)-cbpone-update.pdf (dhs.gov).

With respect to the allegations of the third sentence of this paragraph, Defendants admit only that this sentence accurately quotes a portion of the cited Notice, but deny any implication that the allegation supports the prior sentence. Defendants deny the allegations in the fourth sentence of paragraph 68.

**2. Migrants forced to use CBP One face insurmountable hurdles to getting appointments**

**69.**    DHS has touted CBP One as a way to increase "efficiency" at the border.[7] CBP states that by allowing undocumented noncitizens to submit their biographic and biometric information in advance of their arrival at a POE, the agency can streamline in-person processing. However, by making successful navigation of CBP One a prerequisite to inspection at POEs, Defendants have created new technological hurdles for seeking protection and prevented significant segments of the migrant population from accessing the asylum process.

**Answer:** Defendants admit only that CBP One, including the advance submission of information, has helped streamline the processing of noncitizens at POEs, but deny the remainder of the allegations in this Paragraph.

**70.    Tech Access and Costs.** Requiring use of the app puts poorer migrants at a distinct disadvantage, preventing some asylum seekers from ever being able to access the asylum process at a POE. Similarly, asylum seekers who cannot read or write, or lack technological know-how, have no way around the app's requirements. To complete the registration process, take the necessary photos, and request and schedule an appointment, users must have a functioning, charged, and compatible smartphone; an account with a certified app store, which requires a functioning email address; and an internet or data connection with significant bandwidth. While many

---

[7] Alejandro Mayorkas, Sec'y, U.S. Homeland Sec., Remarks at a Media Availability Outlining Planning and Operations Ahead of the Lifting of the Title 42 Public Health Order (May 10, 2023), https://www.dhs.gov/news/2023/05/10/secretary-mayorkas-remarks-media-availability-outlining-planning-and-operations.

migrants have smartphones, some do not and cannot afford to purchase them or the data plans required to use them. Asylum seekers have reported being robbed of all their belongings, including their mobile phones, either during their journeys or upon arrival at the border.

**Answer:** Defendants deny the allegations in the first and second sentences of paragraph 70. With respect to the third sentence of paragraph 70, Defendants admit only that to use the mobile CBP One app to request a CBP One appointment, the user must have a functioning smartphone with Wi-Fi or cellular data access capable of downloading the CBP One app, as well as a functional email address, but otherwise deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and fifth sentences of this paragraph, and therefore deny them.

**71.** Further, simply having access to any smartphone is not sufficient to successfully operate CBP One. Many smartphones commonly obtained by migrants run on older or nonstandard hardware and operating systems. Individuals must know how to download the application from a certified app store and ensure that the download is successful. CBP One is over 220 MB in size, which is exceptionally large for an application of this kind. For context, the Mobile Passport Control app, another app created by CBP, is only 22 MB in size. As such, downloading CBP One takes significant time, data, and electricity. If a migrant is able to begin downloading CBP One, the download may terminate mid-way if their internet connection is not stable, and the migrant will need to try again.

**Answer:** Defendants deny the allegations in the first sentence of paragraph 71 and aver that for a device to operate CBP One, it must support at least 2GB of RAM and 16GB of storage, and, for iOS operating systems, must be compatible with the iOS operating system version 15.2 or higher, which generally should include the following devices (or newer devices): iPhone 14, iPhone 14 mini, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 13, iPhone 13 mini, iPhone 13 Pro, iPhone 13 Pro Max,

iPhone 12, iPhone 12 mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 8, iPhone 8 Plus, iPhone 7, iPhone 7 Plus, iPhone 6s, iPhone 6s Plus, iPhone SE (1st and 2nd generations), iPod touch (7th generation), iPad, 12.9-inch iPad Pro 4th generation,12.9-inch iPad Pro 3rd generation, iPad Pro 2nd generation (12.9in, 11in), iPad Pro 1st generation (12.9in, 11in, 10.5in, 9.7in),10.2-inch iPad 7th and 8th generations, iPad 6th generation, iPad 5th generation, iPad mini 5, iPad mini 4, iPad Air 4th generation, iPad Air 3rd generation, and iPad Air 2, and for Android Devices (Phones and Tablets), must be compatible with the operating system version 7.0 or higher, *see* https://www.fonearena.com/blog/205746/list-of-smartphones-that-will-receive-android-7-0-nougat-update.html.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph and therefore deny them. Defendants deny the allegations in the third sentence of paragraph 71, as nothing prevents a user from seeking assistance from another person if the user does not currently know how to download a mobile application or how to ensure that the download was successful. Defendants deny the allegations in the fourth and fifth sentences of this paragraph. With respect to the sixth and seventh sentences, Defendants admit only that downloading an app requires an internet or data connection to a powered-on and charged device, but otherwise deny the allegations and characterizations in this paragraph.

**72.** Even if an individual is able to properly download CBP One, using the app requires more data and electricity. Migrants with older or cheaper smartphones and those without access to strong and reliable Wi-Fi or a cell signal have reported a range of technological problems with CBP One that prevent them from successfully obtaining appointments at POEs, including the app crashing, freezing, timing out, and generating error messages. The Wi-Fi connections in shelters and migrant camps—if they exist at all—are often weak and slow, particularly when

44

hundreds of people are attempting to connect. Some migrants have been forced to climb onto the roof of a shelter to try to pick up a good signal, while others have had to travel within dangerous areas of Mexico to find a shelter with a stable internet connection.

**Answer:** With respect to the first sentence of paragraph 72, Defendants admit that use of the app, like use of any mobile phone app, requires access to a data or internet connection and that electricity is needed to charge the battery on a mobile phone. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of this paragraph, and therefore deny them.

73.    Purchasing cellular data or wireless internet access can cost up to $6 a day—a cost that is prohibitive for many displaced migrants in Mexico. For individuals who cannot afford smartphones or access cellular networks, Wi-Fi, or electricity, the consequences are unimaginably high. Some asylum-seeking families have had to make the choice between buying food or buying data for their phones to access CBP One on a daily basis.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny them.

74.    The app's "geofencing" technology requires users to be physically located in central or northern Mexico to request an appointment. However, migrants have reported that the app frequently misidentifies them as being in the incorrect location and prevents them from requesting an appointment even when they are present in border towns.

**Answer:** Defendants admit the allegations in first sentence of paragraph 74 as of the time the complaint was filed. Defendants aver that from January 11, 2023, to August 22, 2024, users were required to be physically located in central or northern Mexico to request an appointment, and beginning on August 23, 2024, non-Mexican users could also be physically located in the Mexican states of Chiapas and Tabasco

to request an appointment, and Mexican nationals can request an appointment from anywhere in Mexico. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph, and therefore deny them.

**75.** Plaintiff Al Otro Lado regularly conducts surveys of asylum seekers at the border to understand the challenges migrants are facing. In January 2023, AOL added questions to ascertain the issues that migrants were having with the CBP One app. According to 937 survey responses as of June 2023, of those who wished to make an appointment with CBP One:

- Almost 30% reported not having access to an internet connection or data plan that would enable them to utilize the CBP One app;

- About 25% reported living in a shelter, many of which are overcrowded and lack a strong Wi-Fi connection. Another 30% reported being homeless or living in an encampment;

- About 6% of survey respondents did not have a smartphone with a camera, even though the CBP One app requires the applicant to take two photographs of themselves; and

- Almost 40% of survey respondents could not register on the CBP One app because of error messages, many of which were in English, a language that they do not read or understand.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny them.

**76.    Language Barriers.** CBP One also presents language access issues for asylum seekers who do not speak, read, or write English, Spanish, or Haitian Creole—the only languages currently supported by the app. It is nearly impossible for asylum seekers who cannot fluently read or write in one of these languages to navigate the app on their own and successfully obtain a CBP One appointment.

46

**Answer:** Defendants admit only that CBP One is available in Spanish, Haitian Creole, and English, and deny the remainder of the allegations in this paragraph.

**77.** Asylum seekers arriving at the southern border speak many languages apart from English, Spanish, and Haitian Creole. AOL's migrant survey demonstrated that individuals were unable to make appointments because they spoke one of 20 languages not supported by the app, including French, Portuguese, Russian, Farsi, Ukrainian, Arabic, Uzbek, Azeri, Belarusian, Turkish, Amharic, Tigrinya, Dari, Tajik, Hindi, and Mandarin, as well as a variety of Indigenous languages, including Garifuna, Mixteco, Triqui, Miskito, Nahautl, Q'eqchi, Tzotzil, and Pech. The CBP One app is not accessible to speakers of any of these languages.

**Answer:** With respect to the first sentence of paragraph 77, Defendants admit that there are individuals who are processed by CBP along the southern border, including individuals with CBP One appointments, who express an intent to seek asylum and who speak languages other than English, Spanish, and Haitian Creole, but otherwise deny the characterizations in this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 77, and therefore deny them. Defendants deny the allegations in the third sentence of this paragraph.

**78.** Even if a person speaks one of the languages included on the CBP One app, certain error messages are only in English. This prevents individuals who do not read or understand English from successfully making a CBP One appointment on their own after receiving an error message. Although CBP provides an email address where people can send questions, most migrants and border organizations report not receiving any response to their inquiries.

**Answer:** With respect to the first sentence of Paragraph 78, Defendants admit that, as of date complaint was filed, certain error messages were only available in English, but deny that the allegations are true at the time of this Answer; Defendants aver that the CBP one app has since been updated and that error messages are

translated. Defendants deny the allegations in the second sentence in this paragraph. With respect to the third sentence of paragraph 78, Defendants admit there exists an email address where people can send questions about CBP One, but Defendants lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this sentence, and therefore deny them.

**79.**    In addition to error messages, Haitian Creole speakers have reported numerous other issues with the Haitian Creole version of CBP One. Haitian Creole speakers can only access the Haitian Creole version of the app after a full user registration process in English or Spanish. The Haitian Creole version of CBP One also includes mistranslations of important words. For example, the word "customs" in "Customs and Border Protection" is mistranslated as the Haitian Creole word for "cultural traditions." Some of the Haitian Creole words in the app have spacing issues, resulting in nonsensical words. These language access issues make successful navigation of CBP One even more challenging for Haitian asylum seekers and often prevent them from obtaining appointments.

**Answer:** With respect to the allegations in the first and third sentences of paragraph 79, Defendants admit only that they have received reports of issues with the Haitian Creole translations in the CBP One app, but lack knowledge or information to form a belief as to the truth of the remainder of the allegations in this sentence, and therefore deny them. With respect to the allegations in the second sentence of paragraph 79, Defendants admit that Login.gov—where individuals create a CBP One registration—is not available in Haitian Creole, but otherwise deny the allegations and characterizations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of this paragraph, and therefore deny them.

**80.    Challenges for Individuals with Disabilities**. CBP One lacks accommodations for individuals with physical disabilities that prevent them from reading or inputting information into the app. The app does not even provide a place

to indicate if an applicant has a disability or other medical condition that should make them a priority for humanitarian reasons. The Sidewalk School, a service provider in Matamoros, has assisted several clients with disabilities that would otherwise have precluded them from using CBP One. These included a man who uses a wheelchair and has a severe medical condition that causes his hands to seize up, along with stage 3 pressure ulcers, which prevented him from holding a phone; a woman with a brain tumor who had difficulty getting CBP One to accept her photograph because of the partial paralysis in her face; and a client with impaired vision who could not see the phone screen.

**Answer:** With respect to the first sentence of paragraph 80, Defendants admit that there are no current accommodations within the CBP One app itself for individuals with physical disabilities, but deny the remainder of the allegations in this Paragraph. With respect to the second sentence of paragraph 80, Defendants admit that the app does not provide a place to indicate if an applicant has a disability or other medical condition, but deny the remainder of the allegations in this Paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of this paragraph, and therefore deny them.

**81.    Discriminatory Facial Recognition**. Problems with CBP One's facial recognition technology have created additional barriers for asylum seekers. Asylum seekers have struggled with CBP One's requirement that they submit a photograph taken with their mobile phone at various stages of the data entry process. The app has prevented many individuals with darker complexions from making appointments because it failed to register their features and rejected their photos.

**Answer:** Defendants deny the first sentence of paragraph 81. With respect to the second and third sentences of this Paragraph, Defendants admit only that CBP One app users are required to submit a photograph at two stages of the process of requesting and obtaining an appointment, but lack knowledge or information

sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**82.** AOL, HBA, and other organizations assisting asylum seekers have previously had to resort to flashing a bright light on individuals with darker complexions when taking CBP One photos, which sometimes helps the app register their facial features. A migrant shelter in Reynosa had to install bright construction lights for Haitian and other asylum seekers to use when taking CBP One photos. Migrants forced to live in encampments or on the street often do not have access to such assistance. In any case, such lights do not always help, so individuals with darker complexions are always disadvantaged by CBP One.

**Answer:** Defendants deny that individuals with darker complexions are disadvantaged by CBP One. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph and therefore deny them.

**83. Exploitation.** While CBP initially advertised CBP One as "providing immediate benefits in reducing exploitation of vulnerable persons seeking to present at POEs," the reality has been the reverse.[8] The Ciudad Juarez Office Chief of the U.N. International Organization for Migration described as a common phenomenon people posing as "lawyers and other professionals offering to help" migrants with CBP One for a fee, even though the app should be accessible for free. Because navigating the app is complicated, asylum seekers are vulnerable to organized criminal groups and smugglers selling them fake appointments, pretending to be service providers, or claiming to have special access to the app. This has led to "countless cases of fraud and extortion related to the use of this app." Reports

---

[8] Press Release, CBP, CBP Releases January 2023 Monthly Operational Update (Feb. 10, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.

indicate that individuals have been charged up to $2,000 for "help" with CBP One. Non-profit organizations such as AOL and HBA have faced security issues due to criminal groups seeking to protect this revenue source brought about by Defendants' illegal implementation of CBP One.

**Answer:** With respect to the first sentence in paragraph 83, Defendants admit that this sentence accurately quotes a portion of the CBP press release, but deny the remainder of the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of this paragraph, and therefore deny them.

84. **Discriminatory Access.** CBP's requirement that asylum seekers utilize the app has led to unequal access to POEs based on an individual's socioeconomic status and ultimately, their nationality and race. People with newer or more advanced smartphones and those staying in hotels with strong internet connections have generally had better luck securing appointments through the app. Data from Tijuana's Migrant Affairs Office demonstrates that as of May 2023, over 40% of CBP One appointments secured by migrants in Tijuana have gone to Russian nationals, despite Russians making up less than 10% of Tijuana's overall migrant population. As the head of the office in Mexico explained, Russian nationals are generally better equipped to access CBP One, as they have the money to stay in hotels with strong Wi-Fi signals and have better smartphones. In contrast, the average Central American migrant stays in a crowded shelter where hundreds of people compete to use the same internet connection, and has a less updated phone.

**Answer:** Defendants deny the allegations in the first sentence of paragraph 84. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of this paragraph and therefore deny the allegations.

85. These challenges to CBP One's accessibility and functionality also put enormous stress on humanitarian providers like Plaintiffs Al Otro Lado and Haitian

Bridge Alliance, which have been forced to divert significant resources to provide technical assistance to migrants trying to navigate the app.

**Answer:** Defendants lack knowledge or information to form a belief as to the truth of the allegations concerning effects on humanitarian providers, and therefore deny them; Defendants deny the remainder of the allegations in this paragraph.

**F. Despite the end of Title 42, the Guidance and the Rule, Defendants are continuing to turn back arriving noncitizens**

### 1. Use of CBP One Post-Title 42

**86.** As of May 12, 2023, CBP One has allowed users a 23-hour period, between 11:00 a.m. and 10:00 a.m. CST the following morning, to request an appointment. Users are notified the next day if they received an appointment and have a further 23-hour period to accept or decline. To accept the appointment, users must upload a live photo to the app.

**Answer:** Defendants admit that Paragraph 86 describes the process for requesting an appointment to present at a land POE via CBP One as of May 12, 2023.

**87.** On June 30, 2023, CBP announced an increase in the number of available appointments to a total of 1,450 appointments per day at eight POEs[9]— still far short of the number of migrants the administration anticipated would be seeking access to asylum after the Title 42 policy ended. CBP also announced that a percentage of daily appointments would be reserved for the earliest-registered CBP One profiles in order to prioritize asylum seekers who had been waiting the longest—sometimes for months—but had been unable to obtain appointments. However, individuals who have to delete their old registrations due to an error, or because they were previously registered with a larger group with whom they are no

---

[9] These POEs are at Brownsville, TX; Paso del Norte in El Paso, TX; Eagle Pass, TX; Hidalgo, TX; Laredo, TX; Calexico, CA; San Ysidro, CA; and Nogales, AZ.

longer traveling, must create a new registration and thus lose the benefit to which they should have been entitled based on their older profile.

**Answer:** With respect to the first sentence of paragraph 87, Defendants admit only that on June 20, 2023, CBP announced an increase in the number of available appointments to 1,450 appointments per day at the eight POEs that were scheduling appointments, and deny the remainder of the allegations and characterizations in this paragraph. With respect to the second sentence of paragraph 87, Defendants admit that in May 2023, CBP announced that it would begin allocating a percentage of appointments towards those with the oldest registration dates. With respect to the third sentence of paragraph 87, Defendants admit only that a user who deletes an old registration and creates a new registration will be allocated an appointment based on their more recent registration date, but deny the remainder of the allegations and characterizations in this sentence.

### 2. Processing of Noncitizens with a CBP One Appointment

**88.** The administration insists that the use of CBP One is critical to a safe, orderly, and humane migration process.[10] But even for those lucky enough to win the CBP One appointment lottery, the realities of the process remain dangerous and uncertain.

**Answer:** With respect to the first sentence of paragraph 88, Defendants admit that the use of CBP One is part of DHS efforts to manage migration in a safe, humane, and orderly way, and admit that the sentence references a portion of the CBP press release, which speaks for itself and is the best evidence of its contents, and deny any allegations inconsistent therewith. Defendants deny the allegations in the second sentence of paragraph 88.

---

[10] Press Release, CBP, CBP Makes Changes to CBP One App (May 5, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app.

**89.**     Migrants who secure a CBP One appointment must still wait in Mexico for the date of their appointment before they can present at their assigned POE. Appointments are generally scheduled 13 days in advance. Border organizations and independent reporting confirm that migrants have experienced violence, kidnapping, extortion, and even been murdered in Mexico while waiting for scheduled appointments.

**Answer:** Defendants deny the allegations in the first sentence of paragraph 89. Defendants admit the allegations in the second sentence of paragraph 89. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of this paragraph, and therefore deny them.

**90.**     Further, Defendants continue to offer appointments for inspections scheduled through CBP One at only eight POEs along the U.S.-Mexico border, despite maintaining many more Class A POEs that have the capacity and mandate to inspect and process arriving noncitizens. Several of the eight POEs are hundreds of miles apart, requiring many asylum seekers who are in different border cities to travel significant distances to reach their appointments. As detailed below, these journeys expose asylum seekers to a wide range of dangers in northern Mexico.

**Answer:** With respect to the first sentence of paragraph 90, Defendants admit only that appointments are offered at eight POEs and that CBP maintains more than 8 Class A POEs, but deny the remainder of the allegations in this paragraph, and deny any implication that the eight POEs offering appointments were the only POEs processing arriving noncitizens without documents sufficient for lawful admission. With respect to the second sentence of paragraph 90, Defendants admit only that some of the eight POEs offering appointments are hundreds of miles apart, but deny the remainder of the allegations in this sentence. Defendants deny the allegations in the third sentence of this paragraph.

**3. Defendants Have a Policy and Widespread Practice of Turning Back Asylum Seekers Who Present at POEs Without CBP One Appointments**

**91.**     Significant evidence confirms Defendants' policy and widespread practice of turning back most asylum seekers without CBP One appointments. Although Defendants' Rule provides for exceptions to the use of CBP One, CBP does not permit most asylum seekers to avail themselves of those exceptions. CBP is almost uniformly requiring asylum seekers to have a CBP One appointment in order to be inspected and processed, regardless of whether they may be eligible for an exception.

**Answer:** Defendants deny the allegations in the first sentence of paragraph 91 and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. With respect to the second sentence of paragraph 91, Defendants deny the allegations, including the characterization of the Rule. With respect to the third sentence of paragraph 91, Defendants deny that, at time of the complaint and during the time periods relevant to the Complaint, CBP was "uniformly requiring asylum seekers to have a CBP One appointment in order to be inspected and processed."

**92.**     Border-wide data shows that, as of May 2023, the eight Class A POEs that are processing asylum seekers are turning back almost all those who do not have a CBP One appointment. At four of these POEs—Matamoros, Reynosa, Nuevo Laredo, and Nogales—there is a tightly controlled process through which local intermediary organizations are able to facilitate the presentation of a limited number of individuals without appointments. The processes for effecting such intervention are opaque, not publicly disclosed, and inaccessible to the vast majority of migrants. The other four POEs are processing almost exclusively asylum seekers with CBP One appointments. And at many Class A POEs, CBP is processing no asylum seekers at all, despite their obligation to do so. Individual migrants, border organizations, and public reporting confirm that turnbacks continued to occur at POEs through June and July 2023 as well.

**Answer:** With respect to the first sentence of paragraph 92, Defendants deny the allegations; specifically, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations that there is "border-wide data," because plaintiffs have not identified which "border-wide data" they are relying on, and therefore deny the allegations; Defendants further deny that the eight Class A POEs that offer appointments are the only POEs that were, during the relevant time period, "processing asylum seekers"; Defendants further deny that those eight POEs were, during the relevant time period, "turning back almost all those who do not have an appointment; and finally, Defendants deny any implication that CBP processes requests for asylum. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the second and third sentences of paragraph 92, and therefore deny them. Defendants deny the allegations in the fourth and fifth sentences of paragraph 92. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the sixth sentence of Paragraph 92, and therefore deny them.

93.    Since the end of Title 42 on May 12, 2023, CBP has been coordinating with Mexican authorities to prevent asylum seekers without CBP One appointments from physically reaching POEs. Mexican officers are generally stationed a few hundred feet from the U.S.-Mexico limit line to identify and turn back individuals without a CBP One appointment.

**Answer:** Defendants deny the allegations in the first sentence of paragraph 93. With respect to the second sentence of paragraph 93, Defendants lack knowledge or information sufficient to form a belief as to where Mexican officers are stationed and whether their purpose is to identify and turn back individuals without a CBP One Appointment, and therefore deny the allegations.

94.    Upon information and belief, CBP communicates directly with Mexican authorities pursuant to this arrangement and, in furtherance of the CBP One Turnback Policy, regularly requests their assistance in clearing lines of waiting

asylum seekers who do not have CBP One appointments from the bridges and entryways leading to POEs.

**Answer:** Defendants admit only that during the course of normal operations CBP communicates with Mexican authorities, but otherwise deny the allegations in paragraph 94 and specifically deny the characterizations that CBP's communications with Mexican authorities are pursuant to a "CBP One Turnback Policy."

95.    The tactics used to implement the CBP One Turnback Policy vary slightly at different POEs, but the result is the same. Noncitizens are turned back by or in coordination with CBP officers and must use CBP One to access the asylum process.

**Answer:** Defendants deny the allegations in paragraph 95 and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

*San Ysidro POE -Tijuana, Mexico/San Diego, CA*

96.    Since the Title 42 policy ended, AOL staff and volunteers have regularly monitored the San Ysidro POE and observed regular turnbacks by CBP of individuals and families without CBP One appointments. AOL staff have observed CBP officers telling asylum seekers they could not be processed without an appointment, and asylum seekers have reported experiencing the same. As described earlier, several Individual Plaintiffs have attempted to present at the San Ysidro POE to seek asylum, only to be turned back when CBP officers determined they did not have CBP One appointments.

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 96 and therefore deny them, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

97.    These turnbacks reflect close coordination between Mexican authorities and CBP, which gives the Mexican National Migration Institute ("INM"),

the Mexican immigration agency, the number of appointments per time slot throughout the day. CBP communicates directly with Mexican immigration and law enforcement officers and regularly requests their assistance in clearing the backlog of people at the San Ysidro POE who do not have CBP One appointments.

**Answer:** Deny.

98.    For example, around May 31, 2023, a line began forming outside the San Ysidro Ped East POE because CBP was not processing asylum seekers without CBP appointments. After about a day, approximately 350 individuals were lined up. Many slept there for days, without food, water, or shelter, other than donations from volunteers and non-profits. A Tijuana police officer directed a port monitor to communicate the message that "the only legal way to enter the U.S. is through the [CBP One] application."

**Answer:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny them.

99.    Since early June 2023, Mexican officials, at the behest of CBP, have prevented asylum seekers without CBP One appointments from even waiting on the Mexican side of the bridge leading to the San Ysidro POE. Those who circumvent Mexican officers and make it to the limit line are generally turned back by CBP officers, who direct them to make CBP One appointments. If any migrant remains at the POE after being turned away, Mexican officers approach them and order them to leave. Those who refuse may be detained.

**Answer:** With respect to the first sentence of paragraph 99, Defendants deny that CBP have requested Mexican officials to prevent asylum seekers without CBP One appointments from waiting on the Mexican side of the walkway bridge leading to the San Ysidro POE; Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations pertaining to Mexican officials' conduct, and therefore deny them. Defendants deny the allegations in the second sentence of Paragraph 99 with respect to the relevant time period, and aver that, prior to the

Presidential Proclamation, Officers were instructed to inform travelers without documents sufficient for admission that they were permitted to wait to be taken into processing, and that such individuals without CBP One appointments were able to wait in line to be processed. With respect to the third sentence of paragraph 99, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them. With respect to the fourth sentence of paragraph 99, it is unclear whether Plaintiffs are referring to actions by U.S. or Mexican officials. To the extent this sentence references the actions of Mexican officials, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations. If the sentence pertains to detentions by U.S. officials, Defendants deny the allegations.

*Paso del Norte POE - Ciudad Juarez, Mexico/El Paso, TX*

**100.**    Since the end of Title 42, Las Americas staff has regularly monitored the Paso Del Norte Bridge that connects Ciudad Juarez, Mexico to El Paso, Texas. Staff members report that CBP officers routinely turn back asylum seekers who cannot access CBP One, even in the case of exigent circumstances.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny them.

**101.**    In mid-May 2023, CBP officers at Paso del Norte POE in El Paso, TX, directly turned back asylum seekers without CBP One appointments, telling them they would not be processed. A reporter witnessed nine instances of CBP officers telling asylum seekers arriving at POEs in El Paso that they "needed" appointments via CBP One in order to present. A CBP officer on the Paso del Norte bridge told a group of asylum seekers without CBP One appointments that asylum without a prearranged appointment "doesn't exist anymore." At the same POE in June 2023, CBP officers did not process anyone without a CBP One appointment for 14 days,

despite the fact that several families with children under three had been waiting over 15 days to enter the port to seek asylum.

**Answer:** With respect to the first through third sentences of paragraph 101, Defendants admit only that on May 11 and May 16, 2024, there was media presence at the Paso del Norte POE, but deny the existence of any media article recounting the information allegedly witnessed by a reporter, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in these sentences and therefore deny them. Defendants Deny the allegations in the fourth sentence of paragraph 101, and aver that in addition to processing individuals with CBP One appointments, the Port of El Paso processed non-CBP One individuals every day in June 2023.

**102.** In July 2023, an attorney with Las Americas Immigrant Advocacy Group in El Paso, Texas accompanied a family of Venezuelan asylum seekers who could not obtain a CBP One appointment to the midpoint of the Paso Del Norte Bridge. The mother was disabled, ill, and pregnant, and the attorney explained that she needed immediate medical attention. A CBP officer refused to let the family pass but directed them to wait while he contacted his supervisor. After the family had endured approximately 45 minutes in extreme heat, the CBP officer relayed that the port was at capacity and that no asylum seekers, including the family, could cross. While the Venezuelan family waited, CBP turned back six additional asylum seekers, all of whom had crossed the midpoint of the bridge into U.S. territory.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore, deny the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**103.** Las Americas staff have also observed that CBP officers regularly dismiss asylum seekers' pleas for consideration when they cannot access CBP One or have missed their appointments due to kidnapping. In June 2023, for example,

Las Americas interviewed a man from Honduras who, shortly after obtaining a CBP One appointment, was kidnapped by gangs in Mexico and held in captivity for 11 days. While in captivity, he was beaten severely, and gang members sent dogs to kill him when he first attempted to escape. He eventually succeeded in escaping, but had to leave behind all his possessions, including his cell phone, without which he could not register for CBP One. When he presented for asylum at the midpoint of the Paso Del Norte Bridge, CBP emphasized that he needed to sign up through the app and denied him any opportunity to explain the exigencies of his situation.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore deny them.

**104.** Later in June 2023, Las Americas interviewed a woman who was kidnapped along with her husband and two minor children. The family was released from captivity on June 17, missing their CBP One appointment on June 14 by three days. The family explained to CBP officers on the Paso Del Norte Bridge that they had missed their appointment because they had been kidnapped and did not feel safe staying in Ciudad Juarez. While one CBP officer told them that they could not be processed without a CBP One appointment, the family overheard another officer say, "Well everyone is saying they're kidnapped these days." After being turned back, the family tried without success to re-register for another appointment every day for three weeks.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore deny the allegations.

**105.** Human Rights First reported that a Honduran teenage minor, adult sibling, and one-year-old child sought protection at the Paso del Norte bridge in Ciudad Juarez in June 2023, but were told by CBP officers that it was at capacity.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 and therefore deny them.

*Matamoros and Reynosa POEs - Matamoros, Mexico/Brownsville, Texas and Reynosa-McAllen/Hidalgo POE*

**106.** Local advocates have indicated that CBP and INM have been coordinating closely on the management and processing of asylum seekers in Matamoros and Reynosa since Title 42 ended. Some advocates have reported hearing INM officers call the local CBP Port Director to ask if particular asylum seekers were allowed to present. Advocates have also reported that Mexican officials have stated that they are "carrying out orders" when preventing asylum seekers from approaching the U.S. POEs and have specifically referenced "CBP orders."

**Answer:** With respect to the first sentence of paragraph 106, Defendants admit only that CBP and INM communicate and coordinate on border management, but lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding what local advocates have indicated and therefore otherwise deny the allegations. With respect to the second and third sentences of paragraph 106, Defendants deny the allegations and specifically deny that CBP gives "orders" to INM.

**107.** On May 12, 2023, an HBA delegation in Matamoros witnessed Mexican officers turning away roughly 100 asylum seekers, including children, and preventing two African asylum seekers from approaching the CBP limit line on the bridge.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 and therefore deny them.

**108.** The following day, an advocate from the Sidewalk School accompanied two families without CBP One appointments to the Gateway International Bridge in Matamoros. Although both families were in desperate need of medical care, INM officers informed them that they could not walk on the bridge or even wait in the plaza at the foot of the bridge.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 and therefore deny them.

**109.** In late May 2023, Mexican officers blocked a pregnant Mexican woman and her husband from approaching the Matamoros POE to seek asylum. The officers instructed the couple to get a CBP One appointment, which they had been attempting to do for two months without success.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 and therefore deny them.

**110.** Human Rights First has reported several turnbacks of asylum seekers by CBP officers at the Matamoros POE. A Nicaraguan woman, who had been waiting months for a CBP One appointment, tried to seek asylum four times, but CBP officers repeatedly told her that the only way to do so was with a CBP One appointment. CBP also reportedly turned away a Mexican Indigenous woman who had been repeatedly raped and impregnated in Matamoros, and whose rapist was looking for her. In addition, CBP reportedly turned away a mother with two minor children who fled after her son was murdered in Honduras. The family tried to seek asylum at the POE in Matamoros, but CBP officers turned them away because they did not have a CBP One appointment.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 and therefore deny them.

**111.** During a fact-finding mission to Reynosa in mid-July 2023, the Women's Refugee Commission interviewed an Armenian man, who had been trying unsuccessfully for over two months to secure a CBP One appointment. CBP officers had turned him back at the McAllen-Hidalgo International Bridge on three different occasions.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 and therefore deny them.

**112.**   The Women's Refugee Commission also spoke to a Mexican woman with four children who fled their home after being pursued by a criminal group that had previously disappeared her husband. After seeing someone from her home state in Reynosa, she feared that the individual would inform the criminal group of her whereabouts and sought to present herself and her children at the Hidalgo POE. Due to their lack of a CBP One appointment, an INM officer turned them away.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112 and therefore deny them.

*Nogales POE – Nogales, Mexico/Nogales, AZ*

**113.**   At the DeConcini POE in Nogales, Arizona, CBP has prevented virtually all those waiting in line at the POE without CBP One appointments from presenting. On most days in July 2023, CBP reportedly inspected and processed only one family from the line. On July 17, people who were next in line to be processed reported that they had been waiting and sleeping there for six nights but still had not been inspected by CBP officers. Also in July, a young Mexican woman with her infant son approached the POE to ask what she could do to seek asylum, and was told by the CBP officer that there was nothing she could do.

**Answer:** With respect to the first sentence of paragraph 113, Defendants deny that, at the time of the filing of this complaint and during relevant time periods, "CBP has prevented virtually all those waiting in line at the POE without CBP One appointments from presenting" at the DeConcini entrance to the POE in Nogales, Arizona, and aver that the port processed noncitizens without appointments. Defendants deny the allegations in the second sentence of paragraph 113, and aver that multiple individuals were usually processed daily from the non-CBP One line in July 2023, at different times of day.  With respect to the third and fourth sentences of paragraph 113, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them.

**114.** A Mexican municipal agency called Bienestar Social (Social Wellbeing) established a QR code system to manage the line of waiting asylum seekers without CBP One appointments. Bienestar Social assigns codes to the first 100 people in line and allows only a small number of those people to remain in line near the DeConcini POE. Local authorities in Nogales have told waiting asylum seekers that they could only seek asylum through the QR code system.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore deny them.

**115.** Bienestar Social has at times restricted access to the POE in Nogales and spread misinformation about U.S. asylum law. Since July 2023, the Kino Border Initiative has received consistent reports from asylum seekers who have tried to add their names to the waitlist, but Bienestar Social has refused to add them. Bienestar Social has also allowed certain asylum seekers to bypass the line altogether and enter the POE, raising concerns about irregularities in the agency's administration of the list.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore deny them.

**G. The CBP One Turnback Policy Places Arriving Asylum Seekers in Grave Danger**

**116.** The unreasonable delays and denials of access to the U.S. asylum process resulting from the CBP One Turnback Policy violate the statutory and due process rights of Individual Plaintiffs and proposed class members, forcing them to live under perilous conditions in Mexico. See *E. Bay Sanctuary*, 2023 WL 4729278, at *15 (noting that asylum seekers waiting in Mexico "are generally at heightened risk of violence by both state and non-state actors").

**Answer:** Defendants deny the allegations in paragraph 116 and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**117.**    Migrants in Mexico face military, law enforcement, and immigration officials who are hostile to their presence in the country.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117, and therefore deny them.

**118.**    The United States has outsourced a substantial portion of immigration enforcement to the Mexican government and encouraged the militarization of Mexico's response to migration flows. Indeed, the Mexican government has deployed 30,000 National Guard soldiers alongside agents from INM, the Mexican immigration agency, to monitor, interdict, and turn back noncitizens seeking to reach the U.S.-Mexico border. INM officials and National Guard soldiers have set up checkpoints on major roads and carry out surprise inspections at hotels and in public parks, effectively criminalizing migrants.

**Answer:** Defendants deny the allegations in the the first sentence of this paragraph. With respect to the second sentence of this paragraph, Defendants admit that 30,000 Mexican National Guard soldiers were deployed, but lack knowledge or information to form a belief as to the truth of the remainder of the allegations in this sentence, and therefore deny them. With respect to the third sentence of this paragraph, Defendants admit that INM officials and Mexican National Guard have set up checkpoints, but lack knowledge or information to form a belief as to the truth of the remainder of the allegations in this sentence, and therefore deny them.

**119.**    When they reach the U.S.-Mexico border after a costly journey that can take months, migrants find few safe shelters, no job prospects, and unreliable access to food, water, and medical treatment. Migrants who appear not to be from Latin America or who do not speak Spanish, such as those from Haiti, Eastern Europe, and Indigenous communities, face even more challenges accessing these basic services, in addition to racial discrimination and abuse from local police and cartels.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny them.

**120.** CBP turns back arriving noncitizens into areas of Mexico that are so dangerous that the U.S. State Department warns U.S. citizens not to travel there. The U.S. State Department warns that "[v]iolent crime—such as homicide, kidnapping, carjacking, and robbery—is widespread and common in Mexico."[11] Arriving migrants experience these dangers with high frequency and must routinely contend with Mexican law enforcement officers who engage in acts of extortion, violence, and arbitrary detention. Further, arriving migrants are in danger of torture and kidnapping by powerful cartels that control illegal border passages.[12] Mexican citizens stuck in the country from which they are trying to flee because of the CBP One Turnback Policy face particular dangers, as they are often forced to disclose their identities to Mexican municipal authorities to be placed on asylum waitlists.

**Answer:** Defendants deny the allegations in the first sentence of Paragraph 120. The second sentence of paragraph 120 quotes a portion of the State Department's 2023 Mexico Travel Advisory, which speaks for itself and is the best evidence of its contents, and Defendants deny any characterizations that are inconsistent therewith. Defendants admit that footnote 12 cites a U.S. Department of State human rights report, which speaks for itself and is the best evidence of its contents, and deny any characterizations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in of the remaining sentences of paragraph 120, and therefore deny the allegations, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

---

[11] U.S. Dep't of State, Bureau of Consular Affairs, Mexico Travel Advisory (Oct. 5, 2022),
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[12] U.S. Dep't of State, Bureau of Democracy, Human Rights, & Labor, 2022 Country Reports on Human Rights Practices: Mexico 2 (Mar. 20, 2023).

**121.**   Defendants' own policies have exacerbated many of the dangers that Individual Plaintiffs and proposed class members face in Mexican border towns. Because Defendants have blocked legal migration pathways by turning back arriving noncitizens at Class A POEs, they have effectively empowered criminal organizations in Mexico to exploit the waiting migrants. The Sinaloa, Juarez, Jalisco, and Northeast cartels operate with impunity in many communities on the U.S.-Mexico border. For instance, in Matamoros, cartel members extract profits "from all the migrants that are going through the area" according to a May 2023 interview with Mark Lippa, the Assistant Special Agent in Charge of Defendant DHS's Homeland Security Investigations' San Ivanio Field Office.

**Answer:** Defendants deny the allegations in the first and second sentences of paragraph 121. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 121, and therefore deny them. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 121, , and therefore deny them.

**122.**   In Nuevo Laredo, near the international bridges leading to the Laredo POE, taxi cabs linger and offer rides to noncitizens who have recently been turned back from the POE. The migrants that accept these rides do not know that the taxi drivers are frequently working for the Northeast Cartel and that they will soon be delivered into the hands of kidnappers. Ransoms demanded by the cartel can be as high as $10,000. Thus, at the Laredo POE, the CBP One Turnback Policy is directly benefiting and enriching a Mexican cartel at the expense of asylum seekers who should have been inspected and processed at the POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the specific allegations in the first through third sentences of paragraph 122 and therefore deny them. Defendants deny the allegations in the

fourth sentence of paragraph 122, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**123.** In the weeks since the implementation of the CBP One Turnback Policy on May 12, many people have suffered horrific harm and threats of violence due to their inability to access a POE. One Honduran woman was raped and threatened with death in late-May 2023 while waiting for a CBP One appointment in the Matamoros encampment. When she attempted to approach the Matamoros POE, she was turned away. Her rapist returned another night in early-June 2023 and attempted to rape her again, but she escaped. She returned to the POE after filing a police report, but was again refused access.

**Answer:** With respect to the first sentence of paragraph 123, Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in the first sentence, and therefore also deny those allegations. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second through fifth sentences of paragraph 123 and therefore deny the allegations.

**124.** In July 2023, 22 non-profits that work along the border reported that kidnappings and extortion of migrants were increasing in the states of Sonora, Chihuahua, and Tamaulipas, all of which border the United States. Kidnappings often occur as migrants attempt to board buses heading towards the border, and result from collaboration between government officials, private bus companies, and organized crime.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124, and therefore deny them.

**125.** Compounding the problem, migrants are often pushed onto the streets because shelters quickly reach maximum capacity. For example, Tijuana has 30 shelters, which house roughly 5,600 people. In March 2023, however, nearly 15,000

migrants arrived in Tijuana, leaving many with inadequate access to housing and other resources when CBP failed to process them. The infrastructure in Tijuana is simply inadequate, and migrants must endure living on the streets.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125, and therefore deny them.

**126.** For those who find space in the shelters, conditions are often cramped and unsanitary, leading many migrants to contract diseases or to experience worsening of existing medical conditions, such as diabetes and hypertension.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126, and therefore deny them.

**127.** In July 2023, HBA's legal director visited encampments of Haitian migrants in Matamoros and Reynosa. In Matamoros, the encampment was at an abandoned gas station, with no toilet facilities, no running water, and no drinking water. In both Reynosa and Matamoros, the encampments included vulnerable populations living in exposed conditions with extremely high temperatures. A Haitian man passed away in an encampment in Reynosa the day before she visited.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127, and therefore deny them.

**128.** As of mid-June 2023, there were over 5,000 people living in the principal migrant camp in Matamoros, primarily people attempting to get CBP One appointments or waiting for their scheduled appointments. The camp lacks sufficient clean water and has poor sanitation, and residents often do not have enough food. Most people sleep in small tents that cannot protect them from extreme weather conditions. Many bathe in the river, where they are at greater risk of being targeted by criminal groups and contracting illnesses. Doctors without Borders, a non-profit operating in the camp, has reported suspected cases of malaria and dengue fever in the camp. Moreover, Mexican cartels are active in the encampments, particularly in the evenings, jeopardizing the security of the residents.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128, and therefore deny them.

**129.** Faced with these conditions, some migrants attempt to enter the United States between POEs without inspection, believing that to be their only way to reach safety. In fiscal year 2022, U.S. authorities recovered the bodies of 890 migrants, a 58% increase over 2021. This does not include the unrecovered bodies of migrants whose corpses have not been found. In Texas, local officials keep a refrigerated truck to hold the bodies of migrants who drown in the currents of the Rio Grande while trying to cross the border into the U.S.

**Answer:** With respect to the first sentence of paragraph 129, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them. With respect to the second sentence of paragraph 129, Defendants deny that "U.S. authorities" is an accurate characterization because the data includes state, local, and tribal authorities, and deny the specific number, but otherwise admit the allegations in this sentence. With respect to the third and fourth sentences of paragraph 129, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

**130.** The CBP One Turnback Policy that Defendants have implemented at POEs, like prior turnback policies, is unconscionable and immoral, particularly given the life-threatening circumstances that prompt most arriving noncitizens to flee their home countries, the arduous journeys that they endure to reach the U.S.-Mexico border, and the dangerous conditions they face in northern Mexico while waiting to access the U.S. asylum process.

**Answer:** Defendants deny the allegations in paragraph 130 and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**H. The CBP One Turnback Policy Has Caused Severe Harm to Each of the Plaintiffs**

**131.**   Harm to Elena Doe. Elena is a survivor of domestic violence, and her reports to the police elicited no response. Elena stayed with her aunt in hiding for a month, fearing that her ex-husband would find and harm her. She had trouble downloading and using the app, and even after receiving assistance, she has not been able to obtain an appointment through CBP One. Elena left her aunt's house and entered a shelter to prevent her ex-husband from finding her. She has had great difficulty finding essentials for her children, including the diapers and milk her infant needs. Elena has suffered psychologically with the fear that her ex-husband will locate her, and U.S. officials laughed at her for not having a CBP One appointment when she attempted to present herself at a port of entry.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131, and therefore deny them.

**132.**   Harm to Alexander Doe. After being kidnapped and threatened in Chechnya by security services, Alexander was forced to seek refuge in the United States. When he attempted to present at the San Ysidro POE, Alexander was pushed by a CBP officer and suffered bruising from the encounter. Because Tijuana police are hostile to Eastern European migrants, Alexander has rarely left his hotel room while trying to get an appointment on CBP One. Alexander fears that his persecutors will discover his identity and location, and harm him or his family.

**Answer:** Because Alexander Doe has voluntarily dismissed his claims, *see* ECF No. 35, no response to Paragraph 132 is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph, and therefore deny them.

**133.**   Harm to Laura Doe. Laura, who is only 23, is attempting to care for her three young children on her own while they wait to seek protection in the United States. Four months ago, her husband was disappeared by a powerful cartel that

controls large swaths of Mexico, and maintains a significant presence in Tijuana. A month before that, the cartel kidnapped her father-in-law. Two of Laura's brothers-in-law were also murdered. After the disappearance of her husband, the cartel threatened to harm Laura and her children if the family continued to ask questions about his whereabouts. They subsequently fled to a shelter in Tijuana. Laura has been trying to get an appointment via CBP One since June 1, 2023, but has encountered numerous obstacles, including a smartphone that did not support CBP One and error messages that do not explain what she did wrong. Because she has been unable to obtain an appointment, CBP officers turned her away from the Otay Mesa POE when she tried to present with her children. Out of fear that the cartel will find them, Laura and her children have only left the shelter on a few occasions, such as when her daughter was ill and required care at the hospital and medicine from a pharmacy.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133, and therefore deny them.

**134.** Harm to Luisa Doe. Luisa has already experienced a brutal attack due to her cooperation with local authorities against narcotraffickers who operated in the market where she worked. This assault added to her fear of remaining in Mexico, where she is also a target because of her ties to her children's father who refused to work for a criminal organization. Luisa witnessed the kidnapping of her partner's uncle and has received threats since then. She has been trying to obtain an appointment for herself and her two children via CBP One since early June 2023, and has grown frustrated. Luisa and her children have tried to present at the San Ysidro POE on two occasions but were turned back and forced to return to the shelter in Tijuana where they have been living. Having received threatening messages stating, "we know where you are," Luisa is too fearful to leave the shelter.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134, and therefore deny them.

**135.**    Harm to Diego Doe. Diego Doe fled his home state in Mexico after working in various positions for the Mexican government, most recently researching organized criminal groups. Through this work, he became a target of corrupt government officials and organized crime. He narrowly escaped a kidnaping in his home state and fled first to Nogales and then Tijuana, Mexico. His wife recently joined him in Tijuana, and he fears for her life and his own. They are currently in hiding. Diego fears that the longer he stays in Mexico, the greater chance his persecutors will find and kill him.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135, and therefore deny them.

**136.**    Harm to Michelle Doe. Michelle Doe fled her abusive ex-partner, a narco-trafficker and member of a Mexican cartel, with her newborn daughter. Michelle and her daughter are currently living in hiding at a shelter in Tijuana. She lives in fear that her ex-partner will locate her and try to kill her, as he threatened to do. She is using a fake name at the shelter and cannot disclose her location to her loved ones for fear that her ex-partner will find out where she is hiding. She fled with nothing and must rely on the shelter to help her with necessities for her newborn. Because her ex-partner broke her phone, Michelle Doe did not have a working phone until Al Otro Lado recently provided her with one, so she was unable to download CBP One until Al Otro Lado intervened.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136, and therefore deny them.

**137.**    Harm to Pablo Doe. After six years of gang-imposed extortion, Pablo Doe fled Honduras in 2023 when armed gang members assaulted him for a missed payment. On his journey to the border, he was assaulted and robbed of his life's savings in Mexico. He is currently hiding in Ciudad Juarez, where he fears widespread cartel violence.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137, and therefore deny them.

**138.**   Harm to Natasha Doe. Natasha Doe fled Haiti after being forced into a car and assaulted by masked men and later received a death threat on her phone. She did not have a phone when she arrived in Matamoros in March 2023 because her phone broke while she was in transit to the U.S.-Mexico border. She has been attempting to get a CBP One appointment since April 2023, when a friend loaned her a phone and helped her register. She regularly does not have enough money to buy food for herself or her child; they often go a day or more without eating. Cars drive dangerously close to their tent. Recently, her daughter slipped and fell, causing alarming swelling in her arm. Natasha Doe worries about the unsafe conditions for her and her child.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138, and therefore deny them.

**139.**   Harm to Guadalupe Doe. Guadalupe fled domestic violence with her children and mother, Plaintiff Somar Doe. She was turned back at the San Ysidro POE when she tried to present herself. Since then, Guadalupe and her family have been living at a migrant shelter in Tijuana. They fear leaving the shelter because of violence in the surrounding areas. They have run out of money. During their time at the shelter, Guadalupe's children have gotten the flu, contracted sore throats, and contracted gastrointestinal illnesses that cause them to vomit at night, likely due to the poor quality of the food they receive at the shelter, which is often well past its expiration date. Guadalupe fears that her husband will find them and harm her, the children, or her mother.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139, and therefore deny them.

**140.**   Harm to Somar Doe. Somar fled her hometown in Mexico along with her daughter, Plaintiff Guadalupe Doe, and her grandchildren due to the violence

and threats of violence her son-in-law inflicted on their family. Somar fears that her son-in-law will find them in Tijuana and will harm or kill them when he does. Somar also fears leaving the migrant shelter where she and her family have been staying. They rarely leave the shelter due to the level of danger and violence in Mexico. Somar briefly worked after arriving in Tijuana, but she quit after a frightening incident because she did not feel safe traveling to and from her job. The family has run out of money.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140, and therefore deny them.

**141.** Injury to Al Otro Lado. AOL has been on the frontlines of the humanitarian crisis at the border for years, and was compelled to expend and divert substantial programmatic, financial, and emotional resources to manage the distinct harms associated with the rollout of the CBP One Turnback Policy. Since January 2023, AOL has hired three additional staff in its Tijuana office and raised funds to provide emergency humanitarian aid to certain migrants who have been turned back under the CBP One Turnback Policy. The funds for these positions would otherwise have been allocated to advancing AOL's mission, including advocating for immigration reform, providing direct services to people seeking asylum in the United States, engaging in litigation to advocate for the rights of asylum seekers at the border and while seeking protection within the United States, and reunifying families separated under the Trump administration.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs, and lack knowledge or information to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny those allegations.

**142.** The CBP One Turnback Policy has required AOL to divert resources to conduct POE monitoring to document how the CBP One Turnback Policy plays out in practice so that they can properly advise clients and engage with policy-makers

and advocates. AOL staff have expended hundreds of hours assisting migrants with the app, as well as accompanying and advocating for those who want to present at a POE without a CBP One appointment.

**Answer:** Defendants deny the allegations in the first sentence of paragraph 142, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 142, and therefore deny them.

**143.** When AOL learned that individuals approaching POEs were being turned away, and that CBP was coordinating with Mexican authorities to ensure that asylum seekers could not wait at POEs to be processed, AOL staff had to update all of their "know your rights" materials in multiple languages and go back to shelters they had previously visited to communicate what they had learned about the CBP One Turnback Policy. AOL also expended resources to produce educational materials regarding CBP One in multiple languages so that asylum seekers who do not speak Spanish, English, or Haitian Creole can understand how the app affects their rights.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. Defendants lack knowledge or information to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny those allegations.

**144.** AOL has spent countless hours in stakeholder engagement meetings—hours that could have been spent assisting desperate migrants—in the hope of convincing DHS to end its CBP One Turnback Policy.

**Answer:** Defendants admit only that AOL has been involved in stakeholder engagement meetings with DHS. Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs, and lack knowledge or information to form

a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny those allegations.

**145.**    The CBP One Turnback Policy frustrates AOL's core mission of assisting migrants in seeking relief in the United States and severely disrupts the work of its Border Rights Project by flagrantly violating the rights of asylum seekers. Although AOL frequently intervenes on behalf of Mexican noncitizens, who are not subject to the Rule, and other noncitizens fleeing imminent harm, who should receive exceptions to CBP One under the Rule, many such individuals are turned back at POEs. The CBP One Turnback Policy has created human desperation of such volume and magnitude that AOL has had to hire additional staff in its Tijuana office and raise funds for emergency humanitarian aid for affected migrants.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs, deny the allegations of the violations of rights of asylum seekers, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 145, and therefore also deny them.

**146.**    In addition, responding to the CBP One Turnback Policy has jeopardized the safety of AOL staff and subjected them to almost unbearable emotional stress. AOL staff work in shelters located in dangerous areas, consistently exposing them to grave harm. One of AOL's staff members was robbed while providing services to asylum seekers. Smugglers and cartels remain active along the border, but AOL has been steadfast in helping individuals to navigate the process of seeking asylum. This presents particularly acute security concerns when AOL assists individuals fleeing organized crime and/or government persecutors who are actively searching for them.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny them.

**147.**   AOL staff and leadership also shoulder a painful emotional burden watching their clients suffer and die for lack of access to POEs. Desperate for AOL's assistance, migrants send disturbing photos of their injuries, illnesses, threats, and tortured or deceased family members to AOL staff through WhatsApp messages. AOL's executive director personally received so many of these photos that she had to change the settings on her phone to not automatically download photos because she could not bear the continued emotional toll of seeing the desperation and harm caused by the CBP One Turnback Policy. Some AOL staff receive dozens or even hundreds of these messages each day. AOL has had to obtain supplementary mental health insurance for their staff because of the traumatic effects of receiving these messages and photos, coupled with their limited capacity to provide assistance despite their monumental efforts. Many of AOL's staff belong to the communities most impacted by CBP's border policies, which makes witnessing Defendants' abuses particularly harrowing.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny them.

**148.**   Injury to Haitian Bridge Alliance. The CBP One Turnback Policy has caused HBA to divert significant resources away from its core programmatic work. HBA's primary mission is to support recently arrived Black immigrants in adjusting to life in the United States. This includes assisting individuals with applications for Temporary Protected Status, providing legal services for individuals in immigration proceedings, and easing adjustments for individuals coming out of immigration detention. A significant portion of HBA's resettlement and legal support is based in California, but it also conducts policy work in Washington D.C., at the United Nations in New York, and in other international fora.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny them.

149. The CBP One Turnback Policy has required HBA to divert time, money, and resources to meet the material needs of migrants at the southwest border. HBA has been forced to prioritize humanitarian services at the border, including finding housing, medical assistance, and other social services; devising new "know your rights" programs for people stranded in Mexico for extended periods; providing assistance to Haitians struggling to use CBP One; and raising funds to provide life-saving services to Haitian and other Black migrants in Tijuana, Matamoros, and Reynosa.

**Answer:** Defendants deny the allegations in Paragraph 149, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

150. The CBP One Turnback Policy has caused significant financial disruption to HBA. California provides vital funds in exchange for HBA's provision of direct representation and legal orientations to asylum seekers in the United States. To continue to receive these funds, HBA must meet certain benchmarks that are becoming increasingly difficult to attain given the significant strain on HBA staff and diversion of resources to the border. Although HBA previously provided monetary support to many of the shelters in Tijuana, they have been forced to divert additional funds for longer-term accommodations due to the longer waiting times resulting from the CBP One Turnback Policy. In June 2023, HBA also diverted funds to secure office space in Reynosa because of the continuing need to support the many Haitians subject to the CBP One Turnback policy.

**Answer:** Defendants deny the allegations in the first sentence of Paragraph 150, and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs. With respect to the remainder of the allegations in paragraph 150,

Defendants again deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs, deny that HBA has been "forced" to take any actions, and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore deny them.

**151.** The implementation of the CBP One Turnback Policy has also put HBA staff at serious risk, endangering the safety of multiple team members. Several staff have been threatened with violence; two were forced to flee because of threats against them. In addition, HBA staff—many of whom are Black migrants themselves—have been traumatized by the effects of the CBP One Turnback Policy. The emotional and mental toll of watching and worrying while community members suffer and sometimes die while waiting to enter the United States is often overwhelming.

**Answer:** Defendants deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs and lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph, and therefore also deny them.

## VI. CLASS ACTION ALLEGATIONS

**152.** Individual Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as:

> All noncitizens who seek or will seek to present themselves at a Class A POE on the U.S.-Mexico border to seek asylum, and were or will be prevented from accessing the U.S. asylum process by or at the direction of Defendants based on the CBP One Turnback Policy.

**Answer:** Defendants admit that the Individual Plaintiffs seek to bring this action on behalf of a class, but deny that Plaintiffs' proposed class definition satisfies the requirements of Federal Rule of Civil Procedure 23 or that class

certification or class-wide relief is otherwise appropriate, and deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**153.**    Fed. R. Civ. P. 23(a)(1) – Numerosity. The class is so numerous that joinder of all class members is impractical. Pursuant to the CBP One Turnback Policy, Defendants have denied or unreasonably delayed thousands of arriving noncitizens from accessing the U.S. asylum process and deprived them of benefits to which they are entitled under Defendants' binding agency guidance. Moreover, class members are geographically dispersed along the U.S.-Mexico border, making joinder of all class members impractical.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations, deny that Plaintiffs' proposed class satisfies Rule 23(a)'s numerosity requirement, and deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**154.**    Fed. R. Civ. P. 23(a)(2) – Commonality. There are questions of law and fact common to the proposed class. The implementation and legality of the CBP One Turnback Policy are systemic questions capable of common proof. There are also other questions of law and fact that are common to the proposed class, including (a) whether Defendants have unlawfully denied noncitizens arriving at Class A POEs on the U.S.-Mexico border access to the U.S. asylum process, (b) whether class members have been adversely affected or aggrieved by the CBP One Turnback Policy, (c) whether Defendants denied class members due process in violation of the Fifth Amendment, (d) whether Defendants have violated the *Accardi* doctrine, and (e) whether the CBP One Turnback Policy violates the United States' non-refoulement obligations. Even if there are "different factual circumstances between each class member's particular experience," that "does not destroy commonality because there is still a common underlying legal question regarding whether each and every class member was illegally denied access to the asylum system because

of the Defendants' overarching policy." *Al Otro Lado, Inc. v. Wolf*, 336 F.R.D. 494, 503 (S.D. Cal. 2020).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations, deny that Plaintiffs' proposed class satisfies Rule 23(a)'s commonality requirement, and deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

155.    Fed. R. Civ. P. 23(a)(3) – Typicality. Individual Plaintiffs' claims are reasonably coextensive with those of the proposed class because the Individual Plaintiffs and all proposed class members were denied access to the U.S. asylum process by or at the direction of Defendants. Even if the CBP One Turnback Policy prompted some members of the proposed class to wait in Mexico instead of attempting to present themselves at a POE, there is "no meaningful difference" between a noncitizen who is denied entry to the United States by a CBP officer enforcing the CBP One Turnback Policy and a noncitizen who decides to wait in a Mexican border town because she knows that she will be turned back at or while in the process of arriving at the POE. *Al Otro Lado, Inc.*, 336 F.R.D. at 505.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations, deny that Plaintiffs' proposed class satisfies Rule 23(a)'s typicality requirement, and deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

156.    Fed. R. Civ. P. 23(a)(4) – Adequacy. Each of the Class Plaintiffs is able to prosecute this litigation vigorously through qualified counsel—almost exactly the same counsel as this Court previously found to be qualified. *Al Otro Lado, Inc.*, 336 F.R.D. at 505. Moreover, none of the Class Plaintiffs have antagonistic or conflicting interests. They all share a common interest in enjoining and vacating the CBP One Turnback Policy and being able to access the U.S. asylum process at a POE along

the U.S.-Mexico border. Moreover, Plaintiffs' counsel will adequately protect the interests of the class because they have demonstrated expertise in litigating similar causes of action and have dedicated significant resources to litigating this matter.

157. Fed. R. Civ. P. 23(b)(2). The proposed class should also be certified because Defendants have acted and refused to act on grounds that apply generally to the class. Namely, Defendants have implemented, enforced, and perpetuated the CBP One Turnback Policy at Class A POEs on the U.S.-Mexico border with respect to all proposed class members. Pursuant to the CBP One Turnback Policy, Defendants have deprived noncitizens who are in the process of arriving at Class A POEs on the U.S.-Mexico border of access to the U.S. asylum process, in violation of the INA, the Administrative Procedure Act, and the Due Process Clause. As in *Al Otro Lado, Inc. v. Wolf*, CBP officers' "refusal to process asylum-seekers . . . is the generally applicable ground for class-wide relief under Rule 23(b)(2)." 336 F.R.D. at 506-07.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations, deny that the Individual Plaintiffs would be adequate representatives of the class Plaintiffs seek to represent, and deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

## VII. CAUSES OF ACTION
## FIRST CLAIM FOR RELIEF
### Violation of the *Accardi* Doctrine

**158.** Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**159.** Under elementary principles of administrative law, as well as fundamental fairness, agencies are required to follow their own policies. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). According to well-established case law, failure to do so constitutes a violation of the *Accardi* doctrine.

**Answer:** This paragraph constitutes Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations, and aver that the case law speaks for itself and is the best evidence of its contents.

**160.** The November 1, 2021 memorandum issued by Acting CBP Commissioner Miller regarding the processing of undocumented noncitizens at land POEs states that "asylum seekers or others seeking humanitarian protection cannot be required to submit advance information [i.e., use the CBP One app] in order to be processed at a Southwest Border land POE." Guidance at 2. This Guidance, which constitutes CBP's binding internal guidance governing the processing of asylum seekers arriving at POEs along the southern border, remains effective and has not been rescinded or superseded by CBP.

**Answer:** Defendants admit that this paragraph quotes a portion of the November 1, 2021 memorandum, which in its entirety, speaks for itself and is the best evidence of its contents, and deny any characterizations inconsistent therewith. With respect to the second sentence of paragraph 160, Defendants admit that these allegations were accurate at the time of the filing of the complaint and during the relevant time period, but deny that the November 1, 2021 memorandum has since remained effective and has not been superseded, and aver that on June 4, 2024, Troy Miller, as Senior Official Performing the Duties of the Commissioner of CBP, issued a memorandum providing that the Guidance is superseded during time periods when measures described in the Presidential Proclamation, *Securing the Border*, are in effect, and that those measures have been in effect since June 4, 2024.

**161.** The recently promulgated "Circumvention of Lawful Pathways" rule similarly sets forth the government's binding guidance that noncitizens presenting at POEs will not be turned away or denied the opportunity to seek protection in the United States. The Rule specifies that noncitizens can "present[] at a port of entry without a pre-scheduled time and place" and will not be turned away, and the Preamble to the rule repeatedly articulates Defendants' position that individuals without appointments will not be turned away.

**Answer:** This paragraph constitutes Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**162.** Defendants have failed to comply with the November 2021 Guidance, as well as the binding agency guidance reflected in the preamble to the Rule and the Rule itself regarding access to POEs. Instead they have adopted and implemented a policy of turning back asylum seekers who do not have CBP One appointments. In so doing, Defendants have denied Individual Plaintiffs access to the asylum process at POEs due to their lack of a CBP One appointment.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**163.** The CBP One Turnback Policy constitutes a final agency action. Furthermore, each instance where Defendants, through their officers, employees, and agents, fail to comply with binding agency guidance regarding access to POEs and thus deny Individual Plaintiffs access to the asylum process, constitutes a final agency action.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**164.** By violating the *Accardi* doctrine, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**165.** In addition, by violating the *Accardi* doctrine, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs to counteract CBP's unlawful CBP One Turnback Policy.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**166.** Plaintiffs have no other remedy in a court to redress the violations alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

## SECOND CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, § 706(2)(A), (C), Agency Action Not in Accordance with Law and in Excess of Statutory Authority

**167.** Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**168.** Under the Administrative Procedure Act, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be

. . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

**Answer:** Defendants admit that this is an accurate statement of law.

**169.** The INA gives any noncitizen "who is physically present in the United States or who arrives in the United States" the right to seek asylum, regardless of such individual's immigration status. 8 U.S.C. § 1158(a)(1).

**Answer:** Paragraph 169 consists of statements of law and Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants that the cited statutory provision speaks for itself and is the best evidence of its contents, and deny the allegations and characterizations that are inconsistent therewith.

**170.** When a noncitizen presents at a POE and indicates an intention to apply for asylum or a fear of persecution, CBP officers must refer the noncitizen for a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. § 235.3(b)(4) or place the noncitizen directly into regular removal proceedings under 8 U.S.C. § 1229(a)(1).

**Answer:** Paragraph 170 consists of statements of law and Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants admit that this is an accurate statement of law with respect to noncitizens who are on U.S. soil, but deny any implication that CBP Officers owe any duties to noncitizens who are not on U.S. soil.

**171.** None of these provisions authorize CBP officers or their agents to turn back asylum seekers arriving at a POE based on lack of a CBP One appointment.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**172.** Individual Plaintiffs presented themselves or attempted to present themselves at POEs, and either asserted an intention to apply for asylum or a fear of

persecution in their countries of origin or would have done so but for Defendants' unlawful conduct. Nevertheless, CBP officers did not refer Individual Plaintiffs for credible fear interviews pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii) or place Individual Plaintiffs directly into regular removal proceedings under 8 U.S.C. § 1229a.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore deny them.

**173.**  Instead, in direct contravention of the INA, Defendants, through the implementation of the CBP One Turnback Policy, have denied Individual Plaintiffs access to the statutorily prescribed asylum process and turned them back to Mexico. In so doing, CBP officers have not acted and continue not to act in accordance with the provisions of the INA and in excess of the authority granted to them by Congress.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**174.**  CBP officers, in coordination with Mexican authorities, implemented the CBP One Turnback Policy at the instigation, under the control or authority, or with the knowledge, consent, direction, and/or acquiescence of Defendants.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**175.**  The CBP One Turnback Policy constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A) and (C).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**176.**  Furthermore, each instance where Defendants, through their officers, employees, and agents, deny Individual Plaintiffs access to the asylum process

constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A) and (C).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**177.** By implementing the CBP One Turnback Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**178.** In addition, by implementing the CBP One Turnback Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**179.** Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

## THIRD CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, § 706(2)(A), Arbitrary & Capricious

**180.** Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**181.** The Administrative Procedure Act provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**Answer:** Defendants admit that this is an accurate statement of law.

**182.** The CBP One Turnback Policy is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**183.** CBP officers, in coordination with Mexican authorities, implemented the CBP One Turnback Policy at the instigation, under the control or authority, or with the knowledge, consent, direction, and/or acquiescence of Defendants.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**184.** The CBP One Turnback Policy constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**185.**   Furthermore, each instance where Defendants, through their officers, employees, and agents, deny Individual Plaintiffs access to the asylum process constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2)(A).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**186.**   By implementing the CBP One Turnback Policy, Defendants have irreparably injured Individual Plaintiffs by depriving them of access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution and/or other serious harm.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**187.**   In addition, by implementing the CBP One Turnback Policy, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**188.**   Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

## FOURTH CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, § 706(1), Agency Action Unlawfully Withheld or Unreasonably Delayed

**189.**   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**190.** The Administrative Procedure Act provides that courts "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

**Answer:** Defendants admit that this is an accurate statement of law.

**191.** In coordination with Mexican authorities, CBP officers, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have engaged in an unlawful and widespread pattern or practice of denying or unreasonably delaying asylum seekers' access to the asylum process by requiring them to obtain a CBP One appointment in order to access the asylum process at a POE.

**Answer:** Defendants deny the allegations in this paragraph.

**192.** In coordination with Mexican authorities, CBP officers, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have adopted and implemented the CBP One Turnback Policy, which restricts or unreasonably delays access to the asylum process at POEs.

**Answer:** Defendants deny the allegations in this paragraph and specifically deny the existence of the "CBP One Turnback Policy" alleged by Plaintiffs.

**193.** Through this conduct, CBP officers have failed, in violation of APA § 706(1), to take actions mandated by the following statutes:

(a)     8 U.S.C. § 1158 (a)(1) ("Any alien who … arrives in the United States … irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b).");

(a)      8 U.S.C. § 1225(a)(1)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.");

(b)      8 U.S.C. § 1225(b)(1)(A)(ii) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer . . . .");

(c)      8 U.S.C. § 1225(b)(2) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."); and

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that they have implemented a "CBP One Turnback Policy" or an unlawful, widespread pattern or practice that violates these statutory provisions.

**194.**    Through this conduct, CBP officers have also failed, in violation of the APA, to take the above-listed mandated actions without unreasonable delay.

**Answer:** This paragraph consists of a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations.

**195.**    Defendants' repeated and pervasive failures to act, and/or to act within a reasonable time, which denied or unreasonably delayed Individual Plaintiffs' access to the statutorily prescribed asylum process, constitute unlawfully withheld and/or unreasonably delayed agency action.

**Answer:** This paragraph consists of a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations.

**196.** As a result of Defendants' acts constituting violations of APA § 706(1), Defendants have irreparably injured Individual Plaintiffs by denying or unreasonably delaying their access to the asylum process and by forcing them to return to and/or wait in Mexico, where they face threats of further persecution or other serious harm.

**Answer:** This paragraph consists of a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations.

**197.** In addition, as a result of the acts constituting violations of APA § 706(1), Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs to counteract Defendants' unlawful practices.

**Answer:** This paragraph consists of a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations.

**198.** Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

## FIFTH CLAIM FOR RELIEF
### Violation of Due Process

**199.** Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**200.** The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V.

**Answer:** Defendants admit this is an accurate statement of law.

**201.** Congress has granted certain statutory rights to asylum seekers, including Individual Plaintiffs and proposed class members, and has directed DHS to establish a procedure for providing such rights. The Due Process Clause thus requires the government to establish a fair procedure and to abide by that procedure.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required: With respect to the first sentence of Paragraph 201, Defendants admit only that Congress has established certain procedures concerning individuals who arrive in the United States who may seek asylum and that DHS and the Department of Justice are charged with administration of those statutory procedures, but otherwise deny the allegations and deny that Congress has granted any noncitizen a right to apply for asylum while that person stands outside the United States. Defendants deny the allegations in the second sentence of Paragraph 201.

**202.** The INA provides Individual Plaintiffs the right to be inspected and processed at a POE and granted access to the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**203.** By implementing the CBP One Turnback Policy, CBP officers have denied or unreasonably delayed Individual Plaintiffs' access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations.

**Answer:** Defendants deny the allegations in this paragraph.

**204.** CBP officers' treatment of Individual Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction, or acquiescence of Defendants.

**Answer:** Defendants deny the allegations in this paragraph.

**205.** By denying or unreasonably delaying Individual Plaintiffs' access to the asylum process, Defendants have violated Individual Plaintiffs' due process rights under the Fifth Amendment to the U.S. Constitution and the Immigration and Nationality Act.

**Answer:** Defendants deny the allegations in this paragraph.

**206.** As a result of the Defendants' violations of the Fifth Amendment to the U.S. Constitution and the Immigration and Nationality Act, Defendants have irreparably injured Individual Plaintiffs by denying or unlawfully withholding their access to the asylum process and by forcing them to return to Mexico or other countries where they face threats of further persecution.

**Answer:** Defendants deny the allegations in this paragraph.

**207.** As a result of Defendants' violations of the Fifth Amendment to the U.S. Constitution and the Immigration and Nationality Act, Defendants have irreparably injured Plaintiffs Al Otro Lado and Haitian Bridge Alliance by frustrating their missions and forcing them to divert substantial resources away from their core programs.

**Answer:** Defendants deny the allegations in this paragraph.

**208.** Plaintiffs have no other adequate remedy in a court to redress the violations alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

## SIXTH CLAIM FOR RELIEF

### Violation of the Non-Refoulement Doctrine Actionable Via the Alien Tort Statute, 28 U.S.C. § 1350

**209.** Individual Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**210.** CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Individual Plaintiffs, and the asylum seekers they represent, in violation of customary international law reflected in treaties that the United States has ratified and implemented: namely, the specific, universal, and obligatory norm of non-refoulement, which has also achieved the status of a jus cogens norm, and which forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture, whether it is her home country or another country. This norm is universally understood to apply at the border.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

**211.** The duty of non-refoulement also requires the adoption of procedures to ensure prompt, efficient, and unbiased access to the asylum process.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

**212.** CBP officials' treatment of Individual Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction, or acquiescence of Defendants.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

**213.** Defendants' conduct is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes declaratory and injunctive relief.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

**214.**   As a result of the acts constituting violations of the jus cogens norm of non-refoulement, Individual Plaintiffs have been damaged by being denied access, or being unreasonably delayed in gaining access, to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

**215.**   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Individual Plaintiffs and further violations of their rights under international law.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

**216.**   Individual Plaintiffs do not have an adequate remedy at law to redress the violations.

**Answer:** This claim for relief has been dismissed, so no response is required. MTD Order at 21–23. To the extent a response is required, Defendants deny the allegations.

## **VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Issue an order certifying the class defined in this Complaint pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), and 23(b)(2);

B. Appoint the undersigned counsel to serve as class counsel pursuant to Fed. R. Civ. P. 23(g);

C. Issue an order and judgment declaring that the CBP One Turnback Policy violates one or more of the following: (1) the *Accardi* doctrine, (2) Section 706(2)(A) of the Administrative Procedure Act, (3) Section 706(2)(C) of the Administrative Procedure Act, (4) Section 706(1) of the Administrative Procedure Act, (5) the Due Process Clause of the Fifth Amendment, and/or (6) the non-refoulment doctrine;

D. Issue an order and judgment permanently enjoining the CBP One Turnback Policy;

E. Issue an order and judgment setting aside the CBP One Turnback Policy;

F. Issue an order and judgment finding that any injunctive relief issued by this Court binds other persons who are in active concert or participation with any of the Defendants pursuant to Fed. R. Civ. P. 65(d)(2)(C);

G. Award Plaintiffs their reasonable attorneys' fees, costs, and other expenses pursuant to 28 U.S.C. § 2412 and any other applicable law; and

H. Grant any and all such other relief as the Court deems just and equitable.

**Answer:** This paragraph consists of Plaintiffs' request for relief, to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that Plaintiffs are entitled to any relief on the claims asserted in the Complaint.

## DEFENDANTS' DEFENSES

1. This Court does not have jurisdiction to review Defendants' actions, certify a class, or grant declaratory or injunctive relief.

2. The Individual Plaintiffs' claims are moot, and this Court does not have jurisdiction over those claims.

3. The Organizational Plaintiffs, Al Otro Lado, Inc., and Haitian Bridge Alliance, lack Article III standing to pursue their claims and their interests are not within the zone of interests sought to be protected by the relevant immigration statutes.

100

4. The Complaint, and each and every one of Plaintiffs' claims, fails to state a claim upon which relief can be granted.

Dated: November 4, 2024                 Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        EREZ REUVENI
                                        Acting Deputy Director

                                        BRIAN C. WARD
                                        Senior Litigation Counsel

                                        *s/ Katherine J. Shinners*
                                        KATHERINE SHINNERS
                                        Senior Litigation Counsel
                                        U.S. Department of Justice
                                        Civil Division
                                        Office of Immigration Litigation
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel: (202) 598-8259 | Fax: (202) 305-7000
                                        Katherine.j.shinners@usdoj.gov

                                        JASON WISECUP
                                        Trial Attorney

                                        *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 4, 2024, I served a copy of this document on the Court and all parties of record by filing it with the Clerk of the Court through the CM/ECF system, which will provide notice and an electronic link to this document to all counsel of record.

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
